1  Mark H. Plager (SBN: 192259)
2  mark@plagerschack.com
   Michael L. Schack (SBN: 128784)
3  michaels@plagerschack.com
4  **PLAGER SCHACK LLP**
   16152 Beach Boulevard, Suite 207
5  Huntington Beach, CA 92647
6  Phone: (714) 698-0601

7  Donald S. Gottesman (SBN: 82208)
8  dgottesman@kgswlaw.com
9  **KULIK GOTTESMAN SIEGEL & WARE LLP**
   15303 Ventura Boulevard, Suite 1400
10 Sherman Oaks, California 91403
11 Phone: (818) 817-3600

12 Counsel for Plaintiffs,
13 BIOLARGO INC., BIOLARGO LIFE TECHNOLOGIES INC.,
   and ONM ENVIRONMENTAL, INC.
14

15            **UNITED STATES DISTRICT COURT**
16                   **OF CALIFORNIA**

17 BIOLARGO INC., a Delaware        ) Case No.
   corporation; BIOLARGO LIFE       )
18 TECHNOLOGIES INC., a California  )
   corporation; and ONM             ) **COMPLAINT FOR PATENT**
19 ENVIRONMENTAL, INC., a           ) **INFRINGEMENT (35 U.S.C. § 271),**
   California corporation,          ) **FALSE ADVERTISING (15 U.S.C. §**
20                                  ) **1125), AND ANCILLARY STATE**
21                                  ) **LAW CLAIMS (BREACH OF**
              Plaintiffs,           ) **CONTRACT, FALSE PROMISE,**
22       vs.                        ) **UNFAIR AND FRAUDULENT**
23                                  ) **BUSINESS PRACTICES, AND**
   POOPH, INC., a Nevada corporation; ) **CONSTRUCTIVE FRAUD)**
24 and IKIGAI MARKETING WORKS,      )
   LLC, a Nevada limited liability  )
25 company                          )
26                                  )
27            Defendants.           )
                                    )
28 _____ )

Plaintiffs BIOLARGO INC., ("BioLargo"), BIOLARGO LIFE TECHNOLOGIES, INC. ("BLT"), and ONM ENVIRONMENTAL, INC. ("ONM") (collectively, "Plaintiffs") allege as follows:

## JURISDICTION AND VENUE

1.    This Court has original subject matter jurisdiction over the patent infringement claims (Counts 1 and II) pursuant to 28 U.S.C. §§ 1331 and 1338(a), the false advertising claim under the Lanham Act (Count III) pursuant to 15 U.S.C. § 1121(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1338(a), and over the ancillary state law claims (Counts IV through X) pursuant to 28 U.S.C. § 1367(a).

2.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

3.    This Court has personal jurisdiction over Defendants because they have a continuous, systematic, and substantial presence in this judicial district and have committed acts of infringement in this district, including but not limited to selling infringing products directly to consumers and/or retailers in this district and into the stream of commerce knowing such products would be sold in California and this district. These acts form a substantial part of the events or omissions giving rise to Plaintiffs' claims.

4.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1400(b). Defendant has committed acts of infringement in this district.

## THE PARTIES

5.    BioLargo is a Delaware corporation.

6.    BLT is a Delaware corporation and one of BioLargo's wholly owned subsidiaries.

7.    ONM is a California corporation and one of BioLargo's wholly owned subsidiaries.

8.    The principal place of business for BioLargo, BLT, and ONM is located at 14921 Chestnut Street, Westminster, California 92683.

9.    Defendant Ikigai Marketing Works, LLC ("Ikigai"), formerly known as Ikigai Holdings LLC, is a Nevada limited liability company. Plaintiffs allege on information and belief that Ikigai's principal place of business is located at One East Liberty Street, Reno, Nevada 89509.

10.    Defendant POOPH, Inc. ("Pooph") is a Nevada Corporation. Plaintiffs allege on information and belief that Pooph's parent company is Ikigai and that Pooph's principal place of business is located at 5852 S. Durango Dr., Suite 105, Las Vegas, Nevada 89113.

11.    Ikigai and Pooph are referred to collectively below as "Ikigai."

## NATURE OF THE CASE

12.    Rising pet ownership in the United States has expanded the market for products that control pet odors. Such products employ various methods to control, or attempt to control, pet odors.

13.    BLT, a BioLargo subsidiary, invented a novel way to eliminate malodors of all kinds, including those caused by industrial processes and household pets.

14.    BLT's key invention is an iodine-based solution known as CupriDyne® that breaks down odorous compounds though the chemical process of oxidation. One molecule of CupriDyne® reacts with and oxidizes an odor-causing molecule on contact, changing its chemical structure into an odorless compound.

15.    Products based on the CupriDyne® technology are safe, non-toxic, and odorless. They eliminate odors, rather than masking them in a fragrance, and work more quickly than enzyme-based odor control products.

16.    Between 2011 and 2016, BLT obtained the following U.S. patents based on its invention: (i) 7,867,510, issued January 11, 2011 (the " **'510 Patent**"); (ii) 7,943,158, issued September 20, 2011 (the " **'158 Patent**"); (iii) 8,574,610,

1  issued November 5, 2013 (the " **610 Patent**"); (iv) 8,642,057, issued February 4,
2  2014 (the " **057 Patent**"); and (v) 9,414,601, issued August 16, 2016 (the " **601**
3  **Patent**"). True and correct copies of these Patents are attached hereto, respectively,
4  as **Exhibits 1 through 5** (collectively, the "Patents").

5       17.    The '057 Patent is due to expire on January 18, 2028.

6       18.    Based on the Patents and Plaintiffs' technical know-how about the uses
7  of and application methods for CupriDyne®, Plaintiffs developed a suite of
8  different products for use by consumers to eliminate household pet odors. They
9  named the products "Stain and Odor Eliminator," "Litter Box Odor Eliminator,"
10  "Outdoor Urine Odor Eliminator," "Litter Box Deodorizer Concentrate," "All
11  Surface Deodorizing Wipes," "Skunk Spray Eliminator," and "Urine Absorbing
12  Concentrate."

13       19.    Ikigai is, or purports to be, in the business of branding and marketing
14  consumer products. In 2021, Ikigai expressed interest in marketing and selling the
15  pet odor-control products Plaintiffs developed. The parties agreed to create a
16  "strategic partnership" to launch the products for sale to consumers.

17       20.    The negotiations resulted in a deal that allowed both sides to benefit
18  financially from a successful retail product launch. BioLargo and BLT granted an
19  exclusive license to Ikigai to market and sell the above-referenced products for uses
20  related solely to the control of household pet odors. In exchange, Ikigai agreed to
21  (i) purchase the products from ONM, (ii) pay royalties to BioLargo based on the
22  revenues generated, and (iii) in the event of a successful product launch, market the
23  product line for sale to a major consumer products company (such as Proctor &
24  Gamble) and, upon a sale, pay BioLargo 20% of the sale price.

25       21.    After test marketing the products, Ikigai branded the product line with
26  the name "Pooph" – an Ikigai-owned trademark – and began selling the products
27  online. The product launch was successful. The Pooph brand is now a highly
28  valuable brand identity for products that eliminate household pet odors.

22.     The substantial value of the Pooph brand is based in large part on the effectiveness of the CupriDyne® technology, Plaintiffs' extensive technical know-how shared with Ikigai, and the marketability and synergy of the suite of products Plaintiffs developed to address household pet odors.

23.     Unfortunately, Ikigai proved to be a dishonest partner with a hidden agenda. Plaintiffs only recently discovered Ikigai's ultimate goal. It was to retain the entire value of the Pooph brand for itself without paying anything to Plaintiffs and without sharing any part of the proceeds from a sale of the Pooph brand of products to a major consumer products company.

24.     Ikigai attempted to accomplish this goal by the following means, among others:

A.     Terminating its business arrangement with Plaintiffs in September 2025 on the *false pretext* that ONM improperly labeled and packaged products;

B.     Concealing its development of a purportedly "new formula" to replace the use of CupriDyne® in Pooph brand products;

C.     Using positive consumer product reviews of products containing CupriDyne® to sell products based on the "new formula";

D.     Failing to pay approximately $1.7 million of royalties due to BioLargo for sales revenue generated in the fourth quarter of 2024 and the first three quarters of 2025;

E.     Failing to pay approximately $2.2 million due to ONM for products manufactured and delivered to Ikigai;

F.     Infringing the Patents by continuing to sell products containing CupriDyne® after Ikigai's license was revoked – a license expressly conditioned on the timely payment of royalties;

G.     Infringing the Patents by marketing products for uses unrelated to household pet odors, thereby exceeding the scope of the license granted; and,

H.     Fraudulently promising to pay past due invoices for royalties and product purchases in order to buy more time for Ikigai to secretly develop its new replacement "formula."

25.     Plaintiffs filed this lawsuit to redress the harm that Ikigai's bad faith conduct has caused.

## FACTUAL BACKGROUND

### *The Strategic Partnership and Agreements*

26.     Plaintiffs were introduced to Ikigai's principals – Jane Pak ("Pak") and Jordan Stanley ("Stanley") – in or about early 2021. Pak and Stanley said they knew how to create and grow mass-market consumer product "winners" and were interested in doing that for products based on Plaintiff's CupriDyne® technology. Plaintiffs' principals – Dennis Calvert ("Calvert") and Joseph Provenzano ("Provenzano") – agreed to discuss the matter further subject to the execution of a nondisclosure agreement.

27.     BioLargo and Ikigai executed a Mutual Nondisclosure Agreement ("NDA") on or about February 8, 2021, a true and correct copy of which is attached hereto as **Exhibit 6**. Pursuant to the NDA, BioLargo agreed to disclose "confidential technical and business information" to assist Ikigai's evaluation of potential "licensing agreements and strategic partnerships" with BioLargo and its subsidiaries.

28.     After the NDA was executed, Calvert and Provenzano disclosed a substantial amount of confidential and proprietary information to Ikigai. The information disclosed related to the CupriDyne® technology, how it works, methods of application, the suite of pet-odor-control products that Plaintiffs developed, technical know-how about product use and performance, ways to demonstrate product benefits to consumers, and marketing claims that Ikigai could make to differentiate CupriDyne®-based products from other pet-odor control products. After the information was disclosed, Pak and Stanley expressed their

interest in partnering with BioLargo and its subsidiaries to market and sell the line of pet-odor control products Plaintiffs had developed based on their patented CupriDyne® technology.

29.    On March 22, 2021, BioLargo and Ikigai signed a Non-Binding Strategic Partnership Term Sheet ("Term Sheet"), a true and correct copy of which is attached hereto as **Exhibit 7**. The Term Sheet states, among other things, that the parties "agree to create a Strategic Partnership with the purpose of identifying and launching distinctive, mass-market consumer product solutions utilizing BioLargo's unique, 'market-ready' technology …."

30.    On or about May 18, 2021, BioLargo and BLT, on the one hand, and Ikigai, on the other, executed two documents in furtherance of their strategic partnership: a Memorandum of Understanding ("MOU") and a License Agreement. A true and correct copy of the MOU is attached hereto as **Exhibit 8**, and a true and correct copy of the License Agreement is attached hereto as **Exhibit 9**.

31.    The MOU recites that the parties had previously executed "a non-binding term sheet for a strategic partnership" and, in connection therewith, had "negotiated and drafted a license agreement … through which Ikigai intends to test market certain claims related to pet products based on BioLargo's proprietary and patented technologies, and which can advance to an exclusive license for certain pet products." The MOU also recites that the parties were negotiating a manufacturing agreement which would, among other things, give BioLargo "the right to manufacture the product[s] at a manufacturer's target margin of 30%," subject to reductions based on sales volume.

32.    The License Agreement granted an initial limited license to Ikigai to test market the products and, upon a "GO Decision" by Ikigai, an exclusive license "to make, use, sell, offer for sale, export, and import Licensed Products anywhere in the [world] … solely within the Field of Use." (License Agreement, sections 2, 3, and 4.) The term "Licensed Products" is defined in the License Agreement to

refer to products (i) based on "at least one claim" of any of the Patents <u>or</u> on "Trade Secrets and Know-How disclosed in accordance with the execution and performance of this Agreement," and (ii) "residing solely within the Field of Use." (*Id.*, section 1d.)

33.     The term "Field of Use," as defined in the First Amendment to License Agreement executed on August 16, 2021, limits the scope of Ikigai's exclusive license to marketing and selling "pet-odor-addressing household products." A true and correct copy of the above-referenced amendment is attached hereto as **Exhibit 10**.

34.     Pursuant to the License Agreement (section 5), Ikigai agreed to pay a royalty to BioLargo equal to six percent of Ikigai's revenue (minus sales discounts, certain taxes, and shipping charges) from the sale of Licensed Products. The royalty was to be paid "simultaneously" with Ikigai's delivery of its quarterly "Royalty Report" to BioLargo. (*Id.*, Section 8b [last sentence].) The grant of the exclusive license to Ikigai was expressly conditioned upon the "performance" of its royalty "payment obligations." (Section 4a.)

35.     Ikigai could only terminate the License Agreement if BioLargo or BLT became insolvent or breached a material term of the Agreement and failed to cure. (Section 12c.) BioLargo and BLT could not terminate the License Agreement "without cause." (Section 12d.)

36.     On or about July 9, 2021, slightly less than two months after executing the MOU and License Agreement, Ikigai entered into a Preferred Master Manufacturing Agreement ("PMMA") with BioLargo's subsidiary ONM. A true and correct copy of the PMMA is attached hereto as **Exhibit 11**.

37.     Pursuant to the PMMA, ONM agreed to manufacture (either by itself or through "co-packers") and sell to Ikigai all of the latter's requirements for Licensed Products. The arrangement was an exclusive one on both sides. Section 1.3 (last sentence) of the PMMA stated that "[s]o long as [ONM] continues to

deliver Product in accordance with this Agreement, *Buyer shall not contract with alternate manufacturers for the production of Products*." (Italics added.) And, for so long as Ikigai had an exclusive license to market and sell Licensed Products, ONM could not manufacture and sell such products to others.

38.    The PMMA had a five-year term, subject to automatic renewals in the absence of a non-renewal notice. (PMMA, section 8.1)

39.    On or about January 9, 2022, Ikigai assigned its rights and obligations under the License Agreement and PMMA to Pooph pursuant to an Assignment of License Agreement. A true and correct copy of the Assignment is attached hereto as **Exhibit 12**. The Assignment, by its express terms, did not relieve Ikigai of any of its obligations under the License Agreement or PMMA.

### *The Retail Product Launch*

40.    After completing its test marketing, Ikigai launched for sale, one by one, the line of pet-odor control products that Plaintiffs developed and disclosed to Ikigai pursuant to the NDA.

41.    To create a brand identity, Ikigai renamed and branded the products with Ikigai's "Pooph" trademark:

      A.    BioLargo's "Stain and Odor Eliminator" became the "Pooph Pet Odor Eliminator";

      B.    BioLargo's "Litter Box Deodorizer Concentrate" became the "Pooph Litterizer";

      C.    BioLargo's "Litter Box Odor Eliminator" became the "Pooph Kitty Spray";

      D.    BioLargo's "All Surface Deodorizing Wipes" became the "Pooph Pure Wipes";

      E.    BioLargo's "Outdoor Urine Odor Eliminator" became the "Pooph Lawn, Garden and Turf"; and,

F.     BioLargo's "Skunk Spray Eliminator" became the "Pooph Skunkless Wonder."

42.    After the PMMA was executed, BioLargo developed two additional pet-odor control products based on the CupriDyne® technology. Ikigai launched and sold them as "Pooph Potty Pads" and "Pooph Laundry."

43.    The above-referenced products based on Plaintiffs' CupriDyne® technology and sold under the Pooph brand are sometimes collectively referred to below as the "CupriDyne® Products."

44.    Ikigai's retail launch of the CupriDyne® Products was successful.

45.    Plaintiffs allege on information and belief that Ikigai's revenue from the sale of the CupriDyne® Products was approximately $45 million in 2023 and almost $52 million in 2024.

46.    Ikigai initially marketed and sold the CupriDyne® Products online via sellers like Amazon and Chewy. It then began selling them to "brick and mortar" stores like Walmart, Target, PetSmart, Ace Hardware, Tractor Supply, Petco, Dollar General, and CVS Pharmacies.

47.    The License Agreement provides that upon a "successful retail launch" of one or more of the CupriDyne® Products, Ikigai intends to market the products for sale "to a major consumer products company, such as Proctor & Gamble." (Section 6.) Upon a sale, Ikigai promised to pay BioLargo 20% of the sale price, called the Acquisition Exit Price ("Exit Price") in the License Agreement. (Section 6a.)

48.    One of the main motivating factors behind BioLargo's decision to partner with Ikigai was the payment of the Exit Price.

### *Ikigai's Bad Faith Conduct*

49.    Plaintiffs allege on information and belief that in or around the first half of 2024, the precise date being unknown to Plaintiffs, Ikigai secretly hatched a plan to (i) find a "new formula" to replace the CupriDyne® formula, (ii) terminate

its strategic partnership with BioLargo and its subsidiaries and cease making sales of CupriDyne® Products, and (iii) retain for itself the entire value of the Pooph brand of products. Ikigai concealed its intentions from Plaintiffs.

50.    In the last quarter of 2024, Ikigai stopped making many of the payments due for CupriDyne® Products that ONM manufactured and delivered to Ikigai. Ikigai then began a series of communications and negotiations with ONM in which Ikigai urged ONM to continue to supply products and extend credit to Ikigai, promising to pay for all product orders. These communications and negotiations continued for months. Trusting that its partner would honor its promises and eventually pay, ONM continued to deliver products and extend credit, unaware that Ikigai's repeated promises to pay were calculated to induce further shipments and credit extensions it could later exploit.

51.    In or around late January 2025, Ikigai failed to make the royalty payment due to BioLargo for the fourth quarter of 2024 in the amount of $764,292.52.

52.    The following month, Ikigai wrongfully accused ONM of mislabeling the Pooph Litterizer by overstating the net weight of the bottle's contents and asserted a bogus claim against ONM for millions of dollars of damages. The mislabeling, however, was not ONM's fault. The mislabeling was due to Ikigai's instructions to ONM's subcontractor/co-packer (Global Supply Company) to change the label and the instructions were given without ONM's knowledge.

53.    In mid-April 2025, Ikigai failed to make the royalty payment due to BioLargo for the first quarter of 2025 in the amount of $613,848.02.

54.    On April 16, 2025, Plaintiff delivered formal notice of Ikigai's breach of the PMMA and the License Agreement, demanding payment of $1,817,668 owed for product purchases and $1,378,240 owed for royalties, providing 30 days to cure these defaults.

55.    At this time, Ikigai's inventory of CupriDyne® products was running low. Ikigai needed to replenish its inventory to stay in business until it could find a new formula to replace CupriDyne®. Ikigai pled with Plaintiffs to accept new purchase orders and continue delivering products, promising to pay for the new orders and cure its unpaid debt to Plaintiffs. Unaware of Ikigai's plan to stop buying Products from ONM once a replacement formula was found, Plaintiffs entered into negotiations with Ikigai to strike a deal that would help their partner stay afloat.

56.    On June 6, 2025, ONM and Ikigai executed a First Amendment to Preferred Master Manufacturing Agreement (the "PMMA Amendment"). The PMMA Amendment addressed the past due amount Ikigai owed to Plaintiffs for unpaid royalties and product purchases totaling $3,763,608.94, as well as payment terms for future purchase orders. A true copy of the PMMA Amendment is attached hereto as **Exhibit 13**. In the PMMA Amendment, Ikigai agreed to pay the $3,763,608.94 owed in 59 weekly installments ending on July 3, 2026. (Exhibit B to the PMMA Amendment.) The PMMA Amendment stated that ONM could withhold "delivery of product" in the event Ikigai failed to "timely pay" any of the weekly installments. (PMMA Amendment, section 7.)

57.    Just five weeks later, on July 11, 2025, Ikigai informed Plaintiffs that it was in dire financial straits and requested, among other things, a deferral of the weekly payments it promised to make in the PMMA Amendment. Plaintiffs responded the next business day with a detailed proposal to help Ikigai by, subject to certain conditions, deferring the weekly payments for 90 days, paying a $200,000 cash marketing rebate to Ikigai at the end of the 90-day forbearance period, and permanently reducing the purchase volumes required for Ikigai to earn pricing discounts. The same day, Ikigai's legal counsel requested Plaintiffs' technical assistance in addressing false advertising allegations in a threatened class action lawsuit against Ikigai. Pooph never responded to Plaintiffs' proposal.

58.     On August 5, 2025, Ikigai delivered its Royalty Report for the second quarter of 2025, showing royalties due to BioLargo in the amount of $463,520.33 – an amount not covered by the PMMA Amendment. Ikigai failed to simultaneously remit payment of the royalties due as required by the License Agreement, and has still not paid this amount or any part of it.

59.     Through August 8, 2025, Ikigai made 11 weekly installment payments required by the PMMA Amendment. Thereafter, without any legitimate excuse, it stopped making the weekly payments. The last payment was made on August 8, 2025. Plaintiffs allege on information and belief that Ikigai, when it signed the PMMA Amendment, never intended to make all of the promised weekly payments and that its false promise was a calculated tactic to buy time to complete development of its replacement formula and secure alternate manufacturing arrangements. Having obtained the continued supply of CupriDyne® Products it needed to maintain sales and revenue during that period, Ikigai then stopped making payments entirely, despite continuing to sell the products delivered to it by Plaintiff.

60.     On September 19, 2025, Ikigai (through counsel) sent a letter to Plaintiffs (i) disclosing, for the first time, that Ikigai had "been working on independently developing a new formula for its products … different than the formula that Pooph has licensed from BioLargo," (ii) stating Ikigai would "no longer be ordering products from ONM" under the PMMA, and (iii) terminating the PMMA "due to ONM's failure to deliver products as required under the Agreement."

61.     The basis stated for terminating the PMMA was pretextual. When Ikigai stopped making the weekly payments, ONM exercised its right under Section 7 of the PMMA Amendment to "withhold … delivery of product," in this case the delivery of product specified in a $44,280 purchase order (PO number 389).

62.     Plaintiffs allege on information and belief that Ikigai terminated the PMMA, not because ONM withheld delivery of products, but because Ikigai finally

had its "new formula." Plaintiffs further allege on information and belief that, though the PMMA expressly prohibits Ikigai from "contract[ing] with alternate manufacturers for the production of Products" for so long as ONM delivered Products in accordance with the PMMA, Ikigai has nonetheless contracted with alternate manufacturers to make pet-odor-addressing household products.

63.    On September 24, 2025, Plaintiffs (through counsel) notified Ikigai that (i) its exclusive license to sell Licensed Products was revoked, effective immediately, for failing to pay the royalties due (the "License Revocation Notice"), (ii) its license could be reinstated by paying the royalties due, and (iii) Plaintiffs were terminating the License Agreement for cause, effective 150 days from the date of the notice, i.e., on February 21, 2026. A true and correct copy of the License Revocation Notice is attached hereto as **Exhibit 14**.

64.    The License Revocation Notice revoked Ikigai's rights and permissions to use the CupriDyne® technology.

65.    As of the date the License Revocation Notice, Ikigai had, and still has, an existing inventory of CupriDyne® Products in its possession or under its control, including products delivered to Amazon for sale on Amazon's website. Despite the revocation of its license, Ikigai still continues to market and sell CupriDyne® Products without Plaintiffs' permission.

66.    On November 3, 2025, Ikigai delivered its Royalty Report for the third quarter of 2025, showing royalties due to BioLargo in the amount of $300,147.68. Ikigai failed to pay this amount or any part of it.

## *False Advertising*

67.    Shortly after Ikigai revealed on September 19, 2025 that it had been "developing a new formula for its products … different than the formula that Pooph has licensed from BioLargo," Plaintiffs learned that Ikigai was selling two Pooph branded products containing the purported "new formula": the Pooph Pet Odor Eliminator ("New Product 1") and the Pooph Kitty Spray ("New Product 2").

68.     Plaintiffs allege on information and belief that New Product 1 and New Product 2 contain no CupriDyne® in them.

69.     Ikigai is marketing and selling New Product 1 via the Amazon website. The marketing information on Amazon's website for New Product 1 as of November 7, 2025 states there are 66,360 customer reviews of New Product 1 with a "4.2 out of 5" score and a "Best Sellers Rank" of "#1 in Dog Deodorizers." These are false statements.

70.     Ikigai is marketing and selling New Product 2 via Walmart's website. The marketing information on Walmart's website for New Product 2 as of November 7, 2025 states there are 3,282 customer ratings for New Product 2 with a "4.3 out of 5" score. These are false statements too.

71.     Plaintiffs allege on information and belief that substantially all of above-referenced consumer reviews and rankings are for products which contain *Plaintiffs' CupriDyne® formula*, not for New Product 1 and New Product 2 which purportedly contain Ikigai's "new formula" without CupriDyne®.

72.     Ikigai also promotes the sale of New Product 1 on its website, Pooph.com, by false statements. Ikigai claims the liquid in New Product 1 is "used by the largest Waste Treatment companies in the country to eliminate odor" and is "odorless." It also claims the "proprietary patented ingredients" in New Product 1 and New Product 2 "have been in use for more than a decade by some of the largest commercial Waste Treatment plants in the U.S. and have been scrutinized for safety and efficacy by local municipalities and their millions of customers for over a decade." Ikigai's claims are true for CupriDyne®-based products but are not true for New Product 1 and/or New Product 2. Plaintiffs allege on information and belief that (i) New Product 1 and New Product 2 have not been used by waste treatment companies to eliminate odor and have not be scrutinized for safety and efficacy by local municipalities and millions of customers for over a decade, and (ii) New Product 1 is not odorless.

### *Marketing Outside the Scope of the License*

73.    The First Amendment to License Agreement states in pertinent part the following:

> **[T]he Field of Use granted under this Agreement … [is] limited to *the following pet-odor-addressing household products*: (i) powdered products marketed to reduce odors caused by household pets, (ii) liquid products marketed to treat stains and odors caused by household pets, and (iii) products composed of porous fabric material and a composition distributed within the porous fabric material to produce molecular iodine (such as wipes).**

[Exhibit 10, section 1, italics in original.]

74.    The Field of Use limitation in the License Agreement prohibits Ikigai from marketing CupriDyne® Products for uses unrelated to the control or elimination of household pet odors. This limitation was important to Plaintiffs because they develop and market CupriDyne®-based products for non-consumer industrial and commercial uses and consumer uses unrelated to pet odors.

75.    Despite this limitation, and without Plaintiffs' permission, Ikigai began marketing CupriDyne® Products for consumer uses unrelated to household pet odors. Ikigai exceeded the Field of Use by, among other things:

A.    Marketing the <u>Pooph Pet Odor Eliminator</u> for sale as a general-purpose spray for auto, home, back packs, sports bags and gear, gym clothes, shoes, diaper pails, trash cans, fabrics, furniture, and floor mats;

B.    Marketing <u>Pooph Laundry</u> for sale as a product which eliminates laundry odors caused by sweat, smoking, cooking, and mildew from workout gear, clothes, sports uniforms, towels, and bedding – and "great for every stinky washable item – clothing, athletic wear, bath and bedding, even totes, back-packs, and more!";

C.    Marketing <u>Pooph Skunkless Wonder</u> as a product which tackles musty or fishy odors in RVs, boats, closets, and basements;

D.    Marketing <u>Pooph Pure Wipes</u> for sale as a wipe for quick odor elimination on the go, including sticky hands, lunch boxes, or smelly lockers;

E.    Marketing <u>Pooph Lawn, Garden and Turf</u> for sale as a product to neutralize organic odors in outdoor spaces (hereinafter collectively referred to as "Non-Pet Products").

76.    Plaintiffs first discovered Ikigai's marketing of CupriDyne® Products outside the permitted Field of Use in or about April 2025.

## COUNT I

**BY BIOLARGO AND BLT AGAINST DEFENDANTS, FOR DIRECT INFRINGEMENT OF THE PATENTS (SALES WTIHOUT A LICENSE)**

77.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 76 of this Complaint as if set forth fully herein.

78.    This is a claim for patent infringement under 35 U.S.C. § 271.

79.    Plaintiffs allege on information and belief that, on and after the date of the License Revocation Notice (September 24, 2025), Ikigai has knowingly and intentionally infringed and continues to infringe the Patents (either literally or under the doctrine of equivalents) by, among other things, using, offering to sell, and/or selling CupriDyne® Products within the United States.

80.    Ikigai's use, offering for sale, and/or sale of the CupriDyne® Products (other than the Pooph Litterizer and Pooph Potty Pads) infringes at least Claim 1 of the **'057 Patent** because such products contain or comprise:

> A liquid antimicrobial solution comprising: at least 80% of total weight of a carrier liquid comprising water, alcohol or a mixture of water and alcohol; at least 0.001% by weight of the solution of $I_2$; and sufficient acid in the solution to provide a pH of less than 6.5, and the solution further comprising [KI] and at least 0.005% by weight of $CuSO_4$, a sulfamic acid compound and a buffering agent. **[Exhibit 4, page 5.]**

81.     Ikigai's use, offering for sale, and/or sale of the Pooph Litterizer and Pooph Potty Pads infringes at least Claim 1 of the **'610 Patent** because such products contain or comprise:

> A flowable particle blend of at least three separate and distinct particles for application to an environment that is a habitat for an animal, the granular composition providing both absorbency and antimicrobial activity comprising: a) a granular water absorbent solid carrier material carrier comprising superabsorbent polymer in the form of particles, granules or flakes; and b) a reactive composition; the reactive composition consisting essentially of at least two separate particles as a first particle comprising CuSO4 reagent and a second particle comprising KI reagent, the first particle and the composition of the second particle reacting with each other in the presence of water to produce molecular iodine, each of the first particles and the second particles being carried by a water absorbent solid carrier material so that application of aqueous liquid equal to 100% by weight of the reactive composition to the composition will cause the reagents of the at least two separate particles to be combined by the aqueous liquid and react with each other; and wherein the two separate particles and the water absorbent carrier are granular, the reactive composition providing a local concentration of at least 10 parts per million iodine in the aqueous liquid applied to the granular composition when the granular composition has 5% by weight of aqueous liquid present in the water absorbent solid carrier material with respect to the total weight of the water absorbent solid carrier material. **[Exhibit 3, page 8.]**

82.     Ikigai's use, offering for sale, and/or sale of the Pooph Potty Pads infringes at least Claim 1 of the **'601 Patent** because such products contain or comprise:

> An article for application to a surface to provide antimicrobial and/or anti-odor activity comprising: a water and/or ethanol absorbent porous fabric material; and a composition distributed within the porous fabric material of at least two particulate solid reagents that react in the presence of water and/or alcohol to produce molecular iodine, the composition capable of providing

a local concentration of at least 5 parts per million iodine in water or ethanol carried by the material when the material has 5% by weight of water and/or alcohol present in the water and/or alcohol with respect to the total weight of the water and/or alcohol absorbent porous fabric material; wherein at least one of the two particulate solid reagents is coated with a water-soluble, water dispersible or water-penetrable solid covering of water-soluble or water-dispersible particles that physically separates the two particulate solid reagents and the solid covering prevents ambient conditions of 50% relative humidity at 25° C. from causing more than 10% of the total reagents exposed to the ambient conditions from reacting in a twenty-four hour period. **[Exhibit 5, page 11.]**

83.    Ikigai's acts of infringement of each of the '057, '610, and '601 Patents (collectively the "Asserted Patents") were undertaken without permission or license from Plaintiffs.

84.    Ikigai's actions constitute willful and intentional infringement of each of the Asserted Patents. Ikigai infringed each of the Asserted Patents with reckless disregard of BioLargo's and BLT's patent rights. Ikigai knew, or it was so obvious that Ikigai should have known, that its actions constituted infringement of each of the Asserted Patents. Ikigai's acts of infringement were not consistent with the standards of commerce for its industry.

85.    As a direct and proximate result of Ikigai's acts of infringement, Ikigai has derived and received gains, profits, and advantages in an amount that are not presently known to Plaintiffs.

86.    Pursuant to 35 U.S.C. § 284, BioLargo and BLT are entitled to damages for Ikigai's infringing acts and treble damages together with interests and costs as fixed by this Court.

87.    Pursuant to 35 U.S.C. § 285, BioLargo and BLT are entitled to reasonable attorneys' fees for the necessity of bringing this claim.

88.    Ikigai's infringing activities have caused and will continue to cause irreparable harm to BioLargo and BLT for which monetary damages alone are an inadequate remedy.

89.    Unless enjoined by this Court, Ikigai will continue to infringe BioLargo's and BLT's patent rights to their great and irreparable injury.

## COUNT II

### BY BIOLARGO AND BLT AGAINST DEFENDANTS, FOR DIRECT INFRINGEMENT OF THE PATENTS (EXCEEDING THE SCOPE OF LICENSE)

90.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 89 of this Complaint as if set forth fully herein.

91.    This is a claim for patent infringement under 35 U.S.C. § 271.

92.    The First Amendment to License Agreement expressly limits the permitted "Field of Use" of the Patents to the manufacture, use, sale, or marketing of the CupriDyne® Products as "pet-odor-addressing household products."

93.    Plaintiffs allege on information and belief that, despite this express limitation on the Field of Use of the Patents, Ikigai has knowingly and intentionally infringed and continues to infringe the Patents (either literally or under the doctrine of equivalents) by, among other things, marketing certain CupriDyne® Products, i.e., the Pooph Pet Odor Eliminator, Pooph Laundry, Pooph Skunkless Wonder, Pooph Pure Wipes, and Pooph Lawn, Garden and Turf (collectively the "Non-Pet Usage Products") for sale outside the Field of Use, as more specifically alleged in paragraphs 73 through 76 of this Complaint.

94.    Ikigai's offering of the Non-Pet Usage Products for sale outside the scope of the license granted to it infringes at least Claim 1 of the '057 Patent because such products contain or comprise:

A liquid antimicrobial solution comprising:  at least 80% of total weight of a carrier liquid comprising water, alcohol or a mixture

of water and alcohol; at least 0.001% by weight of the solution of $I_2$; and sufficient acid in the solution to provide a pH of less than 6.5, and the solution further comprising [KI] and at least 0.005% by weight of $CuSO_4$, a sulfamic acid compound and a buffering agent. **[Exhibit 4, page 5.]**

95.   Ikigai's acts of infringement of the '057 Patent were undertaken without permission or license from Plaintiffs.

96.   Ikigai's actions constitute willful and intentional infringement of the '057 Patent. Ikigai infringed the '057 Patent with reckless disregard of BioLargo's and BLT's patent rights. Ikigai knew, or it was so obvious that Ikigai should have known, that its actions constituted infringement of the '057 Patent. Ikigai's acts of infringement of the '057 Patent were not consistent with the standards of commerce for its industry.

97.   As a direct and proximate result of Ikigai's acts of infringement, Ikigai has derived and received gains, profits, and advantages in an amount that are not presently known to Plaintiffs.

98.   Pursuant to 35 U.S.C. § 284, BioLargo and BLT are entitled to damages for Ikigai's infringing acts and treble damages together with interests and costs as fixed by this Court.

99.   Pursuant to 35 U.S.C. § 285, BioLargo and BLT are entitled to reasonable attorneys' fees for the necessity of bringing this claim.

100.   Ikigai's infringing activities have caused and will continue to cause irreparable harm to BioLargo and BLT for which monetary damages alone are an inadequate remedy.

101.   Unless enjoined by this Court, Defendants will continue to infringe BioLargo's and BLT's patent rights to their great and irreparable injury.

## COUNT III
### BY PLAINTIFFS AGAINST DEFENDANTS,
### FOR FALSE ADVERTISING UNDER THE LANHAM ACT

102.   Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 101 of this Complaint as if set forth fully herein.

103.   This is a claim for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

104.   As alleged more specifically in paragraphs 67 through 72 of this Complaint, Ikigai is marketing and selling New Product 1 via Amazon's website and New Product 2 via Walmart's website as if they are CupriDyne® products. Plaintiffs allege on information and belief that neither product contains CupriDyne®.

105.   The marketing information on these websites contains false and misleading descriptions and representations of fact about New Product 1 and New Product 2, i.e., that these products already have thousands of positive customer reviews and rankings.

106.   The statements are false because substantially all of the customer reviews and rankings relate, not to New Product 1 or New Product 2 which contain Ikigai's "new formula," but to products containing CupriDyne®.

107.   Ikigai's own website (Pooph.com) contains false representations of fact about New Product 1 and New Product 2 as well. Ikigai falsely claims that New Product 1  is "used by the largest Waste Treatment companies in the country to eliminate odor" and is "odorless." It also falsely claims that the "proprietary patented ingredients" in New Product 1 and New Product 2 "have been in use for more than a decade by some of the largest commercial Waste Treatment plants in the U.S. and have been scrutinized for safety and efficacy by local municipalities and their millions of customers for over a decade." These are attributes of CupriDyne® Products, not of New Product 1 and/or New Product 2.

108.   Ikigai is using false and misleading descriptions and representations of fact in commerce to market and sell New Product 1 and New Product 2.

109.   Plaintiffs allege on information and belief that Ikigai contributed to the false advertising on the Amazon and Walmart websites either by knowingly inducing or causing it, or by materially participating in it.

110.   The above-referenced false and misleading descriptions and representations of fact are made in commercial advertising and (i) misrepresent the nature, characteristics, or qualities of New Product 1 and New Product 2, and (ii) are likely to cause confusion or mistake, or to deceive, as to approval of the new products by others.

111.   Ikigai has been and will be unjustly enriched by its false advertising. The unjust enrichment is due to Ikigai seeking to profit from positive customer reviews of products containing Plaintiffs' patented technology which is not contained in New Product 1 or New Product 2.

112.   Plaintiffs are entitled to a remedy of disgorgement of Ikigai's profits from its false advertising pursuant to 15 U.S.C. § 1117(a) and to an injunction prohibiting continuation of the false advertisements.

## COUNT IV

### BY BIOLARGO AND BLT AGAINST DEFENDANTS, FOR BREACH OF THE LICENSE AGREEMENT AND PMMA AMENDMENT (NON-PAYMENT OF ROYALTIES)

113.   Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 112 of this Complaint as if set forth fully herein.

114.   BioLargo and BLT entered into the License Agreement with Ikigai.

115.   ONM entered into the PMMA, as amended by the PMMA Amendment, with Ikigai.

116.   The PMMA Amendment (to the extent it relates to the payment of royalties) was expressly made for the benefit of BioLargo and BLT who, as third party beneficiaries, may enforce it pursuant to California Civil Code section 1559.

117.    Plaintiffs have duly performed all conditions on their part to be performed under the License Agreement and PMMA Amendment, including but not limited to giving notices of breach and an opportunity cure, but excluding the performance of conditions excused by Ikigai's acts or omissions.

118.    Ikigai breached the License Agreement and PMMA Amendment by failing to pay the royalties due to BioLargo and BLT from the sale of CupriDyne® Products for the following periods of time and in the following amounts:

A.    For the fourth quarter of 2024 and the first quarter of 2025 in the aggregate amount of $903,623.75;

B.    For the second quarter of 2025 in the amount of at least $463,520.33;

C.    For the third quarter of 2025 in the amount of at least $300,147.68; and,

D.    For subsequent time periods in an amount currently unknown to Plaintiffs.

119.    As a proximate result of said breaches, BioLargo and BLT have suffered damages in an amount equal to the sum of the (i) unpaid royalties totaling at least $1,667,291.76for the last quarter of 2024 and the first three quarters of 2025, plus (ii) unpaid royalties for subsequent periods of time in an amount to be determined, plus (iii) interest due on said amounts.

## COUNT V

## BY ONM AGAINST DEFENDANTS, FOR BREACH OF THE PMMA (NON-PAYMENT FOR PRODUCT PURCHASES)

120.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 119 of this Complaint as if set forth fully herein.

121.    ONM entered into the PMMA and PMMA Amendment with Ikigai.

122.    ONM has duly performed all conditions on its part to be performed under the PMMA and PMMA Amendment, including but not limited to giving

notices of breach and an opportunity cure, but excluding the performance of conditions excused by Ikigai's acts or omissions.

123.    Ikigai breached the PMMA and PMMA Amendment by failing to pay for its product purchases from ONM in the amount of $2,154,110.07.

124.    As a proximate result of the above-referenced breaches of contract, ONM has suffered damages in the amount of $2,154,110.07, plus interest thereon.

## COUNT VI

## BY BIOLARGO AND BLT AGAINST DEFENDANTS, FOR BREACH OF THE LICENSE AGREEMENT (IMPLIED COVENANT)

125.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 124 of this Complaint as if set forth fully herein.

126.    BioLargo and BLT entered into the License Agreement with Ikigai.

127.    Pursuant to the License Agreement, BioLargo and BLT granted exclusive promotional and licensing rights to Ikigai over the sale of CupriDyne® Products in exchange for, among other things, the payment of royalties and the prospect of payment of the Exit Price.

128.    Pursuant to this exclusive arrangement, Ikigai had an implied obligation to exercise good faith and its reasonable and best efforts to make sales of CupriDyne® Products.

129.    BioLargo and BLT have duly performed all conditions on their part to be performed under the License Agreement, except for the performance of conditions excused by Ikigai's acts or omissions.

130.    Ikigai breached its implied obligation by, as more specifically alleged in paragraphs 12 through 76 of this Complaint, willfully and in bad faith (i) ceasing all efforts to sell CupriDyne® Products, (ii) replacing the CupriDyne® formula in CupriDyne® Products with a "new formula," and (iii) retaining, or attempting to retain, for itself the substantial value of the Pooph brand which, but for the Patents and the technical know-how Plaintiffs imparted to Ikigai, would not exist.

131.     As a proximate result of said breach, BioLargo and BLT have been harmed in that they have, among other things, lost the royalties and the Exit Price they would otherwise have received. The damages suffered as a result of this breach are direct damages, not indirect, special or consequential damages.

132.     The amount of compensatory damages for said harm is unknown at this time.

## COUNT VII

## BY ONM AGAINST DEFENDANTS, FOR BREACH OF THE PMMA (WRONGFUL TERMINATION)

133.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 132 of this Complaint as if set forth fully herein.

134.     ONM entered into the PMMA with Ikigai.

135.     Pursuant to the PMMA, ONM promised to supply exclusively to Ikigai the latter's good faith requirements for CupriDyne® Products, and Ikigai promised to purchase its requirements exclusively from ONM for so long as ONM delivered products in accordance with the PMMA.

136.     This was a lawful agreement for exclusive dealing in the kind of goods concerned (i.e., CupriDyne® Products).

137.     This arrangement imposed an implied obligation on Ikigai to use best efforts to promote the sale of CupriDyne® Products and to purchase from ONM the products needed to fulfil this obligation.

138.   ONM has duly performed all conditions on its part to be performed under the PMMA, except for the performance of conditions excused by Ikigai's acts or omissions.

139.     Ikigai breached the PMMA by terminating it based on the false pretext that ONM failed "to deliver products as required under the Agreement" and by contracting with alternate manufacturers to make pet-odor-addressing household products. Ikigai knew it had granted ONM the right under Section 7 of the PMMA

Amendment to "withhold … delivery of product" if Ikigai failed to timely make the weekly payments required by the PMMA Amendment.

140.    Ikigai also breached its implied obligation by ceasing, without justification, any and all efforts to promote the sale of CupriDyne® Products and to purchase such products from ONM.

141.    As a proximate result of said breaches, ONM has been harmed in that it has, among other things, lost the profit margin specified in the PMMA that it would have earned on product sales to Ikigai. The damages suffered by ONM as a result of this breach are direct damages, not special or consequential damages.

142.    The amount of compensatory damages for said harm is unknown at this time.

143.    In the event ONM's legal remedy is for any reason inadequate, ONM is entitled to a decree of specific performance or an injunction to prevent Ikigai from continuing to violate Section 1.3 (last sentence) of the PMMA by contracting with alternate manufacturers to make pet-odor-addressing household products.

<u>COUNT VIII</u>

**BY PLAINTIFFS AGAINST DEFENDANTS,**

**FOR FALSE PROMISE**

144.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 143 of this Complaint as if set forth fully herein.

145.    Ikigai made a promise to Plaintiffs in the PMMA Amendment that it would pay the past due amount of $3,763,608.94 for royalties and product purchases, plus interest, in accordance with the weekly payment schedule attached to the PMMA Amendment as Exhibit B.

146.    Plaintiffs allege on information and belief that Ikigai did not intend to perform this promise when Ikigai made it.

147.    Ikigai intended that Plaintiffs rely on this promise.

148.   Plaintiffs reasonably relied on this promise by, among other things, filling orders but not receiving payment, and substantially delaying their efforts to find a new distributor for the sale of CupriDyne® Products and to take other actions to protect their legal rights.

149.   Ikigai did not make the promised weekly payments. It made only 11 of the promised 59 payments.

150.   Plaintiffs were harmed by having been tricked into agreeing to the terms of the PMMA Amendment. Such harm included, among other things, filling orders but not receiving payment, and a substantial delay in Plaintiffs' efforts to find a new distributor for the sale of CupriDyne® Products.

151.   Plaintiffs' reliance on Ikigai's false promise was a substantial factor in causing such harm.

152.   The amount of compensatory damages for said harm is unknown at this time.

153.   Ikigai is guilty of "malice" and "fraud" within the meaning of California Civil Code section 3294(c). Accordingly, Plaintiffs are entitled to recover punitive damages in addition to their actual damages.

## COUNT IX

### BY PLAINTIFFS AGAINST DEFENDANTS,
### FOR UNFAIR AND FRAUDULENT BUSINESS
### ACTS OR PRACTICES

154.   Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 153 of this Complaint as if set forth fully herein.

155.   This is a claim for unfair and fraudulent business acts and practices under California's Unfair Competition Law, Business and Professions Code section 17200 *et seq*.

156.   Ikigai engaged in "unfair" business acts and practices within the meaning of the Unfair Competition Law by, as more specifically alleged in

paragraphs 12 through 76 of this Complaint, willfully and in bad faith carrying out its secret plan to **(i)** find a "new formula" to replace Plaintiffs' CupriDyne® formula, **(ii)** cease all efforts to sell CupriDyne® Products, and **(iii)** retain for itself the entire value of the Pooph brand which, but for the Patents and the technical know-how Plaintiffs imparted to Ikigai, would not exist.

157.    Ikigai also engaged in "fraudulent" business practices within the meaning of the Unfair Competition Law by, as more specifically alleged in paragraphs 67 through 72 and 103 through 112 of this Complaint, engaging in false advertising. Plaintiffs allege on information and belief that Ikigai is attempting to deceive the public into believing its "new formula" products have many thousands of positive customer reviews when, in fact, the positive reviews are based on products containing Plaintiffs' patented CupriDyne® formula.

158.    Because of the "strategic partnership" relationship between the parties in this case, Plaintiffs' have a proprietary interest in the substantial value of the Pooph brand they helped to create. Accordingly, to the extent necessary to ensure Ikigai is not unjustly enriched by its unfair and fraudulent business practices, Plaintiffs are entitled to the disgorgement of profits Ikigai obtains from the exploitation of the Pooph brand of products.

159.    Plaintiffs are also entitled to injunctive relief to restrain the continuance of Ikigai's unfair and fraudulent business acts and practices.

## COUNT X

### BY PLAINTIFFS AGAINST DEFENDANTS, FOR CONSTRUCTIVE FRAUD

160.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 159 of this Complaint as if set forth fully herein.

161.    As expressed in the Term Sheet and MOU, the parties understood they were creating a "strategic partnership" to promote the sale of CupriDyne® Products under a marketing brand that Ikigai would create.

162.   Ikigai purported to be acting on behalf of this "strategic partnership" and to be interested in maximizing the value of the products that the parties were, as Plaintiffs believed, jointly engaged in making and selling. As a result thereof, Plaintiffs reposed trust and confidence in Ikigai.

163.   Plaintiffs allege on information and belief that, in or about the first half of 2024 and continuing until September 19, 2025, Ikigai concealed from Plaintiffs its intent to find a "new formula" to replace the CupriDyne® formula in Pooph brand products, terminate all business dealings with Plaintiffs when it found the "new formula," and retain for itself the entire value of the Pooph brand that Plaintiffs helped to create.

164.   Ikigai intended to deceive Plaintiffs, who were misled by Ikigai's concealment of its true intentions.

165.   In reasonable reliance upon their belief that Ikigai was acting in the best interests of their strategic partnership, Plaintiffs declined to insist upon Ikigai's strict compliance with contractual deadlines for paying royalties and for product purchases, entered into the PMMA Amendment, and otherwise did all in their power to help Ikigai increase the value of the Pooph brand of products.

166.   Had Plaintiffs known about Ikigai's true intentions, they would have immediately terminated their strategic partnership with Ikigai and taken no further actions to help Ikigai.

167.   Ikigai's concealment was a substantial factor in causing harm to Plaintiffs and in Ikigai's unjust enrichment from its deceptive conduct.

168.   As a remedy, pursuant to California Civil Code Section 2224, Plaintiffs are entitled to the imposition of a constructive trust on the Pooph brand of products to the extent necessary to avoid Ikigai's unjust enrichment.

169.   Ikigai is guilty of "malice" and "fraud" within the meaning of California Civil Code section 3294(c). Accordingly, Plaintiffs are entitled to recover punitive damages in addition to their actual damages.

1

2    **WHEREFORE**, Plaintiffs pray for judgment in their favor against

3    Defendants for the following relief:

4    A.    On **Counts I and II**, for:

5        (1)    An Order adjudging Defendants to have directly infringed the

6    Patents under 35 U.S.C. § 271;

7        (2)    A preliminary and permanent injunction enjoining Defendants,

8    their officers, directors, agents, servants, employees, and attorneys, and those

9    persons in active concert or participation with Defendants, from making, using,

10   selling, offering to sell, and/or importing the CupriDyne® Products in violation of

11   35 U.S.C. § 271, either directly or indirectly;

12       (3)    A preliminary and permanent injunction enjoining Defendants,

13   their officers, directors, agents, servants, employees, and attorneys, and those

14   persons in active concert or participation with Defendants, from making, using,

15   selling, offering to sell, and/or importing the Non-Pet Usage Products in violation

16   of 35 U.S.C. § 271, either directly or indirectly;

17       (4)    An accounting for all of Defendants' gains, profits, and

18   advantages derived by their infringement of the Patents in violation of 35 U.S.C. §

19   271, and an Order that Defendant pay to Plaintiffs their actual damages in the form

20   of lost profits or, in the alternative, other damages adequate to compensate for the

21   infringement, but in no event less than a reasonable royalty for Defendants' use

22   made of the patented inventions, in accordance with 35 U.S.C. § 284;

23       (5)    An Order for a trebling of damages and/or exemplary damages

24   because of Defendant's willful conduct pursuant to 35 U.S.C. § 284; and,

25       (6)    An Order adjudging that this case is exceptional under 35 U.S.C.

26   § 285 and ordering Defendant to pay to Plaintiffs their reasonable attorney fees

27   incurred in this action.

28   / / /

B.  On **Count III**, for:

(1)    An Order adjudging Defendants to have violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

(2)    A preliminary and permanent injunction enjoining Defendants, their officers, directors, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendants, from (i) using, or allowing to be used, consumer product reviews or rankings based on CupriDyne® Products but not associated with New Product 1 and New Product 2, in connection with marketing or advertising for said new products, (ii) claiming in marketing or advertising for New Product 1 that is "used by the largest Waste Treatment companies in the country to eliminate odor" and/or is "odorless," or similar words to that effect, and (iii) claiming in marketing or advertising for New Product 1 and New Product 2 that the "proprietary patented ingredients" in said products "have been in use for more than a decade by some of the largest commercial Waste Treatment plants in the U.S. and have been scrutinized for safety and efficacy by local municipalities and their millions of customers for over a decade," or similar words to that effect

(3)    An accounting to determine Defendants' profits resulting from their false advertising, and an award for disgorgement of said profits pursuant to 15 U.S.C. § 1117 or, in the alternative, for all damages sustained by Plaintiffs as a result of Defendants' false advertising;

(4)    An Order that such profits and/or damages be trebled and awarded to Plaintiff pursuant to 15 U.S.C. §1117; and,

(5)    An Order adjudging this to be an exceptional case under 15 U.S.C. § 1117 and ordering Defendants to pay to Plaintiffs their reasonable attorney fees incurred in this action.

/ / /

/ / /

C.    On **Count IV**, for:

(1)    An award of compensatory damages for unpaid royalties for the last quarter of 2024 and the first three quarters of 2025 totaling at least $1,667,291.76, plus unpaid royalties for subsequent time periods in an amount according to proof; and,

(2)    An award of reasonable attorneys' fees and costs incurred in this action pursuant to Section 18h of the License Agreement.

D.    On **Count V**, for:

(1)    An award of compensatory damages for amounts due and owing for unpaid product purchases in the amount of at least $2,154,110.07;

(2)    An award of reasonable attorneys' fees and costs incurred in this action pursuant to Section 9.2 of the PMMA.

E.    On **Count VI**, for:

(1)    An award of compensatory damages in an amount according to proof; and,

(2)    An award of reasonable attorneys' fees and costs incurred in this action pursuant to Section 18h of the License Agreement.

F.    On **Count VII**, for:

(1)    An award of compensatory damages in an amount according to proof;

(2)    A decree of specific performance and/or a preliminary and injunction to prevent Ikigai from continuing to violate Section 1.3 (last sentence) of the PMMA by contracting with alternate manufacturers to make pet-odor-addressing household products; and,

(3)    An award of reasonable attorneys' fees and costs incurred in this action pursuant to Section 9.2 of the PMMA.

/ / /

/ / /

G.     On **Count VIII**, for:

(1)     An award of compensatory damages in an amount according to proof; and,

(2)     An award of punitive damages, in addition to actual damages, pursuant to California Civil Code section 3294(c).

H.     On **Count IX**, for:

(1)     An award pursuant to Section 17203 of the California Business and Professions Code for the disgorgement of profits, to the extent necessary to ensure Defendants are not unjustly enriched by their unfair and fraudulent business acts and practices, from the exploitation of the Pooph brand of products; and,

(2)     A preliminary and permanent injunction enjoining Defendants, their officers, directors, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendants, from continuing their unfair and fraudulent business acts and practices.

I.     On **Count X**, for:

(1)     A judicial decree, pursuant to California Civil Code section 2224, that Defendants hold the Pooph brand of products as involuntary and/or constructive trustees for the benefit of Plaintiffs to the extent necessary to avoid Ikigai's unjust enrichment; and,

(2)     Alternatively, an award of compensatory damages in an amount according to proof; and,

(3)     An award of punitive damages, in addition to actual damages, pursuant to California Civil Code section 3294(c).

/ / /

/ / /

/ / /

/ / /

/ / /

J.      On **<u>all Counts</u>**, for:

(1)      An award of pre-judgment and post-judgment interest and costs as fixed by the Court; and,

(2)      Such other and further relief as this Court may deem just and proper.

Dated: November 10, 2025                    Respectfully submitted,


PLAGER SCHACK LLP and
KULIK GOTTESMAN SIEGEL & WARE LLP


By:  _/s/ Mark H. Plager_
     Mark H. Plager, Esq.
     Michael L. Schack, Esq.
     Donald S. Gottesman, Esq.
     Attorneys for Plaintiffs

# DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 10, 2025                Respectfully submitted,


PLAGER SCHACK LLP and
KULIK GOTTESMAN SIEGEL & WARE
LLP

By:   */s/ Mark H. Plager*
        Mark H. Plager, Esq.
        Michael L. Schack, Esq.
        Donald S. Gottesman, Esq.
        Attorneys for Plaintiffs

# EXHIBIT 1

US007867510B2

(12) **United States Patent**
    Code

(10) **Patent No.:**     **US 7,867,510 B2**
(45) **Date of Patent:**          **Jan. 11, 2011**

(54) **MATERIAL HAVING ANTIMICROBIAL ACTIVITY WHEN WET**

(75) Inventor:  **Kenneth R. Code**, Edmonton (CA)

(73) Assignee:  **BioLargo Life Technologies, Inc**, Irvine, CA (US)

( * ) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1160 days.

(21) Appl. No.: **11/516,960**

(22) Filed:  **Sep. 7, 2006**

(65)          **Prior Publication Data**
      US 2008/0063694 A1      Mar. 13, 2008

(51) **Int. Cl.**
      *A61K 9/70*          (2006.01)
(52) **U.S. Cl.** ...................... **424/443**; 424/404; 424/406; 424/409; 424/411; 424/446; 424/447; 424/637; 424/667; 424/670; 523/122
(58) **Field of Classification Search** .......... 424/667–671
      See application file for complete search history.

(56)          **References Cited**
          U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 206,024 | A | 7/1878 | Kendall ...................... 222/432 |
| 2,134,791 | A | 11/1938 | Loweke ................... 188/79.53 |
| 2,817,621 | A * | 12/1957 | Marks et al. ............... 424/421 |
| 3,464,413 | A | 9/1969 | Goldfarb et al. ............ 604/306 |
| 3,489,148 | A | 1/1970 | Duncan et al. ............. 604/382 |
| 3,585,998 | A | 6/1971 | Hayford et al. .............. 165/8 |
| 3,800,792 | A | 4/1974 | McKnight et al. ............ 602/50 |
| 3,896,807 | A | 7/1975 | Buchalter ................. 604/289 |
| 4,375,535 | A | 3/1983 | Kightlinger et al. ......... 527/313 |
| 4,381,784 | A | 5/1983 | Aberson et al. ............. 604/368 |

| | | | |
|---|---|---|---|
| 4,405,323 | A | 9/1983 | Auerbach .................... 604/285 |
| 4,418,686 | A | 12/1983 | Child ......................... 604/285 |
| 4,497,930 | A | 2/1985 | Yamasaki et al. ........... 524/556 |
| 4,675,014 | A | 6/1987 | Sustmann et al. ........... 604/375 |
| 4,722,937 | A | 2/1988 | Jacob et al. ................ 514/474 |
| 4,731,391 | A | 3/1988 | Garvey .................... 521/137 |
| 5,201,326 | A | 4/1993 | Kubicki et al. ............. 128/832 |
| 5,227,161 | A | 7/1993 | Kessler .................... 424/94.4 |

(Continued)

FOREIGN PATENT DOCUMENTS

CA          2278959        *  1/2001

(Continued)

OTHER PUBLICATIONS

P. Kapur and M. Verma, "Determination of Iodate Ion in Presence of Cupric Ion", Industrial and Engineering Chemistry Analytical Ed.; vol. 13, No. 5 (May 1941). p. 338.

*Primary Examiner*—Neil Levy
(74) *Attorney, Agent, or Firm*—Mark A. Litman & Associates, P.A.

(57)          **ABSTRACT**

An article is applied to the body of an animal (including humans) to provide both absorbency and antimicrobial activity. The article may comprise a water absorbent material; and a composition that reacts with water to produce molecular iodine. The composition provides a local concentration (in the water) of at least 10 parts per million iodine in water carried by the material (that is actual water supported by the water absorbent material) when the material has 5% by weight of water present in the water absorbent. The article may be a diaper, sanitary pad, bandage, bandaid or wrap for an animal.

**6 Claims, 1 Drawing Sheet**



**EXHIBIT 1**          **Page 1 of 9**

**US 7,867,510 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,419,902 | A | 5/1995 | Kessler ..................... 424/94.4 |
| 5,612,045 | A | 3/1997 | Syverson ................... 424/402 |
| 5,629,024 | A | 5/1997 | Kessler et al. ............. 424/667 |
| 5,639,481 | A | 6/1997 | Kessler et al. ............. 424/667 |
| 5,643,588 | A | 7/1997 | Roe et al. .................. 424/402 |
| 5,648,075 | A | 7/1997 | Kessler et al. ............. 424/94.4 |
| 5,772,971 | A | 6/1998 | Murphy et al. ............. 422/292 |
| 5,849,291 | A | 12/1998 | Kessler .................... 424/94.4 |
| 5,885,592 | A | 3/1999 | Duan et al. ................ 424/400 |
| 5,962,029 | A | 10/1999 | Duan et al. ................ 424/613 |
| 6,248,335 | B1 | 6/2001 | Duan et al. ................ 424/400 |
| 6,261,577 | B1 | 7/2001 | Kessler .................... 424/401 |
| 6,365,220 | B1 | 4/2002 | Burrell et al. .............. 427/2.1 |
| 6,403,113 | B1 | 6/2002 | Corzani .................... 424/404 |
| 6,403,674 | B1 | 6/2002 | Schubert ................... 522/167 |
| 6,432,426 | B2 | 8/2002 | Kessler .................... 424/401 |
| 6,703,536 | B2 | 3/2004 | Roe et al. .................. 604/360 |
| 7,033,509 | B2 | 4/2006 | Klein et al. ................. 210/753 |
| 2003/0135172 | A1 | 7/2003 | Whitmore et al. |
| 2005/0196593 | A1 | 9/2005 | Campbell et al. |
| 2008/0095812 | A1 | 4/2008 | Code |
| 2008/0145391 | A1* | 6/2008 | Nelson et al. .............. 424/406 |
| 2009/0028915 | A1* | 1/2009 | Code ....................... 424/402 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 98/24486 | * | 6/1998 |
| WO | WO 02/058748 | * | 8/2002 |

### OTHER PUBLICATIONS

PCT International Search Report and The Written Opinion of the Inernatoinal Searching Authority dated Sep. 18, 2009, from related patent application PCT/US2009/04248.

* cited by examiner

EXHIBIT 1                                    Page 2 of 9



Fig. 1

EXHIBIT 1                                                    Page 3 of 9

US 7,867,510 B2

**1**

## MATERIAL HAVING ANTIMICROBIAL ACTIVITY WHEN WET

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present technology relates to the field of antimicrobial protection, particularly antimicrobial activity in close proximity to the bodies of patients, and more particularly in removable materials placed into contact with the bodies of patients.

2. Background of the Art

The growth of many microbes is assisted by or enabled by the presence of water with the microbes. Water and aqueous materials are present in events and activities of most mammalian life forms. Aqueous solutions and dispersion and emulsions are present in blood, exudates, tears, perspiration, menstrual emissions and waste emissions of mammals. These are natural events in life cycles, but may be accompanied by contact with or attack by microbes that can have significant physical effects on the animals (including humans) and their surrounding. At a minimum, growth of some microbes in aqueous materials around the animals can develop odors, disease-carrying media, infections and death or damage to the bodies of the animals.

There are many instances where aqueous materials are retained in contact with animal bodies and in which there is potential for unwanted and even dangerous and significant microbial growth or microbial introduction into the animal body. For example, in the application of materials wound dressing, menstrual products, patches, diapers, pads and the like, moisture from the animal body or ambient conditions or the materials themselves can introduce microbes to the environment and those microbes can proliferate in the vicinity of the materials when moisture is present. The uncontrolled growth of random microbes is seldom beneficial and has been the subject of significant efforts at control.

Many applications exist where it is necessary or at the very least an advantage for agents to be present which demonstrate anti-bacterial, anti-mycotic activity or both, resulting in the control of bacterial and/or fungal growth. For example, an apparatus or article as a whole or in part may have the property of suppressing bacterial and fungal growth. Control of bacterial and/or fungal growth may be through the prevention or inhibition of the growth of such microbes.

The most consistent forms of attempts at microbial control on patients are the direct application of compositions to the surface of patients likely to become infected, such as wounds, vaginal area, areas surrounding diapers and the like. Ointments, creams, tinctures, solutions and other materials have been applied directly to the patients affected areas as a treatment. These treatments generally direly apply or carry active antimicrobial materials to the site, either as a direct application of carried with a device to be secured locally to the patient. Among the type of efforts in this direction have been sources of silver ions surgical and other types of wound dressings. This aspect has been investigated and reported in U.S. Pat. No. 3,800,792. Metallic silver is incorporated into the dressing in one form or another and through dissolution silver ions arc released into the treated area. U.K. Patent Application 2,134,791 discloses that composites containing various metals, such as silver, gold, palladium, platinum and tin are useful in surgical dressings, where the preferred metal is silver. It is postulated that the slow release of silver ions is facilitated by a galvanic interaction with the substrate of the dressing with added metallic or nonmetallic compounds.

**2**

European Patent Application 0206024 discloses use of very smooth coatings of various metal combinations on medical devices, such as catheters to provide some antimicrobial activity when the devices are in contact with body fluids.

U.S. Pat. No. 4,418,686 is directed to an implant active in releasing silver ions to treat a bacterial infection. In U.S. Pat. No. 4,418,686, the implant consists of a plurality of spaced-apart metallic bands on a plastic insert where the surfaces of the bands consist of alternate materials, such as silver and gold. The presence of the silver and gold metals in the presence of body fluids results in a galvanic action which is intended to release or liberate silver ions.

A variety of materials are used every day in treating or preventing infections in humans, animals and the like. For example, catheters, sutures surgical gloves, implants, bandages, diapers, diaper liners, dressings, small adhesive dressings, sanitary napkins and insoles are just a few. Normally, bandages are used as a barrier to airborne pathogenic organisms infecting a cut or wound. However, once infection occurs, the bandage is no longer of any benefit. If the bandage were provided with a broad spectrum antimicrobial agent, on the portion of the bandage which is in contact with the wound and surrounding skin, the bandage becomes an actively rather than a passively antimicrobial surface or microbial barrier. Catheters, implants, bandages, dressings and other materials, such as above, are used extensively every day by millions of people. As a result, any form of antimicrobial material incorporated into these types of devices must be safe for general unsupervised use, should avoid selection of resistant strains, and should be cost effective. Furthermore, the materials may have to retain their flexibility such as with bandages so as to be readily usable. Catheters, implants, bandages, diapers, diaper liners, dressings, and the like can be readily coated with thin films of active elements which, when in contact with body fluids, release substances and ions which stop the growth of or kill various types of microorganisms. As here described, there is no requirement to apply any outside electric current to maintain sustained levels of ion release to treat the infected area.

U.S. Pat. No. 6,365,220 A process for production of an actively antimicrobial surface for a substrate and for use in a biologically dynamic environment, such as for treating and preventing microbial infections, including a film consisting of at least an antimicrobial element and another electrochemically nobler element and which forms multitudinous galvanic cells with electrolyte-containing biological fluids, such as body fluids from wounds, etc., for releasing the antimicrobial element at the surface.

WO92/09289 teaches an improved method for treating diaper rash of neonates, infants, children and incontinent adults which entails applying to the site of diaper rash a composition comprising 15-40% of a copolymer or a derivative thereof, of a lower alkyl vinyl ether and maleic acid dispersed in a semisolid ointment base.

U.S. Pat. No. 4,381,784 discloses an absorbent device designed to absorb blood or blood-like fluids such as a sanitary napkin which is combined with a blood gelling agent which includes, amongst others, maleic anhydride copolymers.

U.S. Pat. No. 6,403,113 describes that certain copolymers can be used to control or prevent the growth of microbic agents such as bacteria and fungus. It has further been found that certain derivatives of these copolymers also have antibacterial and anti-mycotic properties. The finding that the copolymers of the invention and derivatives thereof which are preferably of high molecular weight can be used as antibacterial and/or anti-mycotic agents provides many advan-

**EXHIBIT 1**                                    **Page 4 of 9**

US 7,867,510 B2

3

tages over anti-microbic agents of the prior art, in particular, due to the large molecular weight and polymeric character of the anti-microbic agents of the invention. Furthermore, the copolymers or derivatives per se or blends of said copolymers or derivatives can be formed into articles or incorporated into articles in the form of films, fibers, adhesives etc. The copolymers of the invention have a low toxicity due to their high molecular weight and possess intrinsic anti-bacterial and anti-mycotic activity.

U.S. Pat. No. 6,703,536 describes an absorbent article, at least a portion of which comprises a skin care composition of an enzyme inhibitor and is at least partially transferred from the article to the skin of a wearer of the article as a result of normal contact, wearer motion and/or body heat.

The art has also used lotions in combination with absorbent articles. Examples include: U.S. Pat. No. 3,585,998 to Hayford et al.; U.S. Pat. No. 3,464,413 to Goldfarb et al.; U.S. Pat. No. 3,896,807 to Buchalter; U.S. Pat. No. 3,489,148 to Duncan et al.; and U.S. Pat. No. 5,643,588 to Roe et al.

U.S. Pat. No. 5,643,588 describes diapers having top sheet containing lotion with Lotion compositions can comprise other optional components typically present in emollient, creams, and lotions of this type. These optional components include water, viscosity modifiers, perfumes, disinfectant antibacterial actives, pharmaceutical actives, film formers, deodorants, opacifiers, astringents, solvents and the like. In addition, stabilizers can be added to enhance the shelf life of the lotion composition such as cellulose derivatives, proteins and lecithin. All of these materials are well known in the art as additives for such formulations and can be employed, in appropriate amounts in the lotion compositions of the present invention.

There exists in the female body a complex process which maintains the vagina and physiologically related areas in a healthy state. In a female between the age of menarche and menopause, the normal vagina provides an ecosystem for a variety of microorganisms. Bacteria are the predominant type of microorganism present in the vagina; most women harbor about 10.sup.9 bacteria per gram of vaginal exudate. The bacterial flora of the vagina is comprised of both aerobic and anaerobic bacteria. The more commonly isolated bacteria are *Lactobacillus* species, corynebacteria, *Gardnerella vaginalis, Staphylococcus* species, *Peptococcus* species, aerobic and anaerobic *Streptococcal* species, and *Bacteroides* species. Other microorganisms that have been isolated from the vagina on occasion include yeast (*Candida albicans*), protozoa (*Trichomonas vaginalis*), mycoplasma (*Mycoplasma hominis*), chlamydia (*Chlamydia trachomatis*), and viruses (Herpes simplex). These latter organisms are generally associated with vaginitis or venereal disease, although they may be present in low numbers without causing symptoms. Physiological, social and idiosyncratic factors affect the quantity and species of bacteria present in the vagina. Physiological factors include age, days of the menstrual cycle, and pregnancy. For example, vaginal flora present in the vagina throughout the menstrual cycle can include lactobacilli, corynebacterium, ureaplasma, and mycoplasma. Social and idiosyncratic factors include method of birth control, sexual practices, systemic disease (e.g. diabetes), and medication. Bacterial proteins and metabolic products produced in the vagina can affect other microorganisms and the human host. For example, the vagina between menstrual periods is mildly acidic having a pH ranging from about 3.8 to about 4.5. This pH range is generally considered the most favorable condition for the maintenance of normal flora. At that pH, the vagina normally harbors the numerous species of microorganisms in a balanced ecology, playing a beneficial role in

4

providing protection and resistance to infection and makes the vagina inhospitable to some species of bacteria such as *Staphylococcus aureus* (*S. aureus*). The low pH is a consequence of the growth of lactobacilli and their production of acidic products. Microorganisms in the vagina can also produce antimicrobial compounds such as hydrogen peroxide and bactericides directed at other bacterial species. One example is the lactocins, bacteriocin-like products of lactobacilli directed against other species of lactobacilli. Some microbial products may affect the human host. For example, *S. aureus* can produce and excrete into its environment a variety of exoproteins including enterotoxins, Toxic Shock Syndrome Toxin-1 (TSST-1), and enzymes such as proteases and lipase. There have been numerous attempts to reduce or eliminate pathogenic microorganisms and menstrually occurring TSS by incorporating into a tampon pledget one or more biostatic, biocidal, and/or detoxifying compounds. For example, L-ascorbic acid has been applied to a menstrual tampon to detoxify toxin found in the vagina of the human female during menstruation.

Incorporating glyceryl triacetate into a tampon pledget has been suggested. Others have incorporated monoesters and diesters of polyhydric aliphatic alcohols and a fatty acid containing from 8 to 18 carbon atoms. For example, glycerol monolaurate (GML) has been used to inhibit the production of *S. aureus* enterotoxins and TSST-1. However, as noted above, esterase is abundantly present in the vaginal epithelium and menstrual fluid. This esterase, in combination with esterase and lipase produced by bacteria can enzymatically degrade the esters into non-effective compounds. Until now, persons skilled in the art have not appreciated the affects of lipase and esterase on ester compounds.

U.S. Pat. No. 5,612,045 describes absorbent articles, such as catamenial tampons, for absorbing body fluids are disclosed which include an effective amount of a compound to substantially inhibit the production of exotoxins by Gram positive bacteria.

U.S. Pat. No. 4,405,323 to Auerbach discloses a tampon designed to eliminate the hazards of toxic shock syndrome and dysmenorrhea. The tampon has incorporated therein an antibacterial agent which is said to disperse on contact with body fluids and prevent development of the organisms which produce the toxins which cause toxic shock syndrome. Among the antibacterial materials disclosed for use are povidone-iodine compound, mercury, zinc, penicillin, erythromycin and nitrofurazone. (Povidone iodine is a topical preparation containing povidone and iodine, used for antisepsis of the skin.)

U.S. Pat. No. 5,201,326 describes a rod-shaped medical tampon for releasing an active substance, including (a) a tampon core of compressed fibers selected from the group consisting of cellulose fibers, cotton fibers, and acetate fibers; (b) a tampon cover surrounding said tampon core and being firmly bonded to one another by a glue, the tampon cover comprising a hardened collagen foam or a hardened gelatin foam impregnated with a retardant including a dissolved active substance to be released; and (c) a retrieval string connected to at least one of said tampon core and said tampon cover.

U.S. Pat. No. 4,722,937 method of prophylactics with respect to detoxification of *Staphylococcus aureus* and other toxins by ascorbic acid, salts and esters, topically applied by means of carriers which are otherwise regularly employed in the area where *Staphylococcus aureus* or other bacteria colonize, such as a pharmacological appliance including gauze pads, an absorbant mass or pad associated with menses, douches, and contraceptive compositions.

EXHIBIT 1                                                                 Page 5 of 9

US 7,867,510 B2

| 5 | 6 |

U.S. Pat. No. 4,675,014 describes method for absorbing bodily secretions while hindering the generation of odors and growth of microbes comprising applying a fibrous mass having copper cations bound through selected anions, preferably carboxymethyl, the amount of chemically bound copper being between 0.1 and 3% by weight. The fibrous mass can be in the form of a catamenial device, bandage, diaper, shoe liner, or the like.

### SUMMARY OF THE INVENTION

An article for application, association with or attachment to the body of an animal (including humans) provides both absorbency and antimicrobial activity. The article may be a diaper, gauze, padding, sanitary napkin, wrap, bandage, bandaid or the like and may comprise a water absorbent material; and a composition that reacts with water to produce molecular iodine. The composition provides a local concentration of at least 10 parts per million iodine in water carried by the material when the material has 5% by weight of water present in the water absorbent with respect to the total weight of the water absorbent material.

### BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** shows a view of the inside of an opened diaper product and the distribution of compositions according to the present technology.

### DETAILED DESCRIPTION OF THE INVENTION

One way of providing molecular iodine ($I_2$) on site with a patient, rather than having to find a way of transporting it to a site) is to provide reactants that can readily produce molecular iodine on-site in a controllable reaction. One format of providing the molecular iodine would be through the oxidation-reduction reaction between two salts or compounds to produce the molecular iodine. It is a readily controlled environment where the reaction can be performed in an aqueous environment. One reaction that can effect this would be generically described as:

$$X^+Y^- + Z + I^- \rightarrow X^\circ + Z^+Y^- + I_2$$

In this reaction scheme, X is a metal (preferably a multivalent metal and more particularly a divalent metal), Y is an anion (preferably a multivalent anion and more preferably a divalent anion, and an anion having at least two oxygen atoms), Z is an alkali metal or alkaline cation. Examples of X are copper, iron, manganese, lead, nickel, tin, and the like, Y can be sulfate, sulfite, sulfonate, carbonate, phosphate, phosphate, nitrate, nitrite, borate, and the like, and Z can be sodium, lithium, potassium, ammonium, magnesium, aluminum, and the like. One preferred reaction would be:

$$Cu^{+2}SO_4^{-2} + K^+I^- \rightarrow Cu^\circ + K_2SO_4 + I_2$$

This reaction takes place readily in an aqueous environment and produces molecular iodine at a controlled rate. The reaction may be used by wetting, dispersing or dissolving the molecular iodide and allowing the iodine in the carrying material be released and carried to the site which may be the carrying material itself, such as the fabric, clay, fibers, film etc.) penetrate the area intended to be treated. The iodine may persist for sufficient time to treat the area, particularly within a wetted material on the surface of a patient. The reaction may also be used by dispersing or mixing the two ingredients into the carrying material (e.g., the fabric, fiber, film, sheet, etc.),

either with additional water provided, with water of hydration on the first reactant (e.g., $X^+Y^-.nH_2O$, such as $CuSO_4.5H_2O$) or with ambient water in the carrying material. The two reactants may be physically separated from each other before being combined for application or reaction, as in separate capsules, fibers, layers or the like. The two reactants may be provided as a solid carrier medium that separates the two reactants until they are in contact with water (as in a soluble carrier such as polyvinyl alcohol, gelatin, amylase, sugars and the like, in pellet, fiber, dust, particle or block form). The two reactants may be independently coated with a soluble/dispersible coating and the two ingredients kept in a single water-penetrable layer.

Although the materials of the described technology may be provided in a vast array of materials and compositions applied to the surface of patients, such as bandages, bandaids, diapers, gauze, wraps, sanitary napkins, tampons, plugs, sheet coverings **9** (e.g., on beds) and the like, the discussion will emphasize diapers and incontinence diapers for simplifying the disclosure, without intending to limit the scope of the invention.

The Technology described herein is performed by applying a solid carrier system to a patient, and awaiting the presence of sufficient water on or in the carrier system to activate the ingredients and cause the gaseous iodine to form in sufficient concentration in the solid carrier to attenuate, reduce or eliminate bacterial growth in the solid carrier. A simple format, in considering diaper-like materials for any age animal, would include at least the following formats:

1) particulate and separate reactants may be carried in the same layer of the diaper;

2) particulate and separate reactants may be carried in different layers of the diaper;

3) particulate reactants may be carried in the same pellets in an anhydrous condition in the same layer of a diaper;

4) the particulate reactants may be adhered to the same or separate fibers or films that are associated with on constitute the diaper;

5) the reactants may be carried in fiber materials dispersed throughout or partially constituting the structure of the diaper;

6) capsules or microcapsules of the reactants in water-soluble or water-dispersible shells may be distributed throughout the diaper; and

7) a film or films (water-soluble, water-dispersible or water-leachable) may carry one or more of the reactants, with the other reactant in a location that released or carried first reactant will be placed into contact with the second reactant in the presence of water.

Other formats and process may be used as long as the presence of water on the carrier system enables the generation of gaseous molecular iodine within the carrier in sufficient concentration to act as a microbicide.

The process may use the above reaction to form the molecular iodine represented by

$$XY + ZI \rightarrow X^\circ + ZY + I_2$$

wherein X is a metal, Y is an anion, Z is an alkali metal or alkaline cation, or where X is a multivalent metal, Y is a multivalent anion, and Z is an alkali metal or alkaline cation, and is preferably represented by

$$Cu^{+2}SO_4^{-2} + K^+I^- \rightarrow Cu^\circ + K_2SO_4 + I_2.$$

The process may be performed where the two reactants are carried in a superabsorbent polymer. The solids carriers for

EXHIBIT 1

US 7,867,510 B2

7

the two reactants may also include compositions of the present that comprise superabsorbent or non-superabsorbent polymers, natural products (e.g., papers, cellulosic solids, water-insoluble porous materials which absorb or adsorb the film-forming material within the structure, water-soluble porous materials which absorb or adsorb the film-forming material within the structure, porous containers which merely slowly release a volume of the film-forming material, porous containers which both dissolve and physically release volumes of the film-forming composition through pores, and the like. In general, selection of an effective application rate can depend on habitat depth, surface debris, emergent and surface vegetation, organic matter, microbial and algal concentration, the specific target species, and the developmental stage of the target species. Superabsorbent polymers are described, by way of non-limiting examples in U.S. Pat. Nos. 6,403,674; 4,731,391. Superabsorbent polymers, including starch graft co-polymers, are known in the art. See, for example, those described in U.S. Pat. Nos. 4,375,535 and 4,497,930 (incorporated herein by reference), which have disclosed uses as adhesives, flocculants, sizes, water-retaining materials for agriculture and water-absorbing materials for sanitary materials. However, the spectrum of advantages attendant the use of superabsorbent polymers in solid and flowable terrestrial insecticidal, pesticidal or insecticidal/pesticidal delivery compositions have gone unrecognized.

The superabsorbent polymers of the present invention are synthetic organic polymers which are solid and hydrophilic, absorbing over 100 times their weight in water. These superabsorbent polymers are typically in a powder, granule, extruded, or flake form, adapted to be blended and/or agglomerated into any shape or form.

The superabsorbent polymers may be, for example, acrylamide alkali metal acrylate co-polymers; propenenitrile homo-polymers, hydrolyzed, alkali metal salts; polymers of propenamide and propenoic acid, alkali metal salts; hydrolyzed acrylonitrile co-polymers, and starch graft co-polymers and ter-polymers thereof. All of these are designed to be hydrophilic, absorbing over 100 times their weight in water. The resulting hydrophilic polymers can absorb from over one hundred to greater than about 5000, more typically around 500 to about 1,000, times their own weight in water (measured using distilled water, pH 7.5, 25, 760 mm Hg. absorption within about 30 seconds). However, the absorption or swelling capacity and absorption or swelling time typically varies with each specific superabsorbent polymer.

One class of superabsorbent polymers include combinations of a starch and organic monomers, oligomers, polymers, co-polymers or ter-polymers. They may be manufactured in a variety of ways, for example, the methods described in U.S. Pat. Nos. 4,375,535 and 4,497,930, and can be, for example, the product of grafting corn starch (amylopectin) with acrylonitrile (an acrylic monomer or oligomer). A second class of superabsorbent polymers includes combinations of acrylamide and acrylate polymers, co-polymers and ter-polymers.

The following examples are provided as prophetic descriptions of formats for delivery of technology according to the descriptions of the present invention.

EXAMPLE 1

Fibers would extruded in a non-aqueous solvent of polyvinyl alcohol in two separate batches in combination with particulate reactants. One set of fibers would comprise 40% by weight of Copper Sulfate and the other set of fibers would comprise 40% by weight of Potassium Iodide. The two separate fibers would blended as 5% by total weight of fabric

8

material into the fiber filled used in a diaper. The relatively low concentration (5%) of total added fiber would be expected to minimally change the properties expected from the fiber fill, except for the additional antimicrobial function, Upon accidental release of urine (an aqueous solution) into the diaper, the polyvinyl alcohol would dissolve, the two reactants would dissolve in a single solution, the reactants would react, and the gaseous iodine would be produced.

The technology described herein may be generally described as an article for application to the body of an animal (including humans) to provide both absorbency and antimicrobial activity. The article may comprise a water absorbent material; and a composition that reacts with water to produce molecular iodine. The composition provides a local concentration (in the water) of at least 10 parts per million iodine in water carried by the material (that is actual water supported by the water absorbent material) when the material has 5% by weight of water present in the water absorbent. The 5% is with respect to the total weight of water to the water absorbent material. The article may be a diaper, sanitary pad, bandage, bandaid or wrap for an animal. The water absorbing material preferably comprises water absorbing fibers. The composition that reacts with water to form molecular iodine may comprise at least two salts, one of which at least two salts comprises an iodide salt. The at least two salts may be selected from the groups consisting of a) XY and b) Z I, wherein X is a metal, Y is an anion, and Z is an alkali metal, ammonium or alkaline cation. X is preferably a divalent metal cation. Y is preferably selected from carbonate, sulfate, sulfite, phosphate, phosphate, nitrate and nitrite, and Z is preferably selected from the group consisting of lithium, potassium, calcium, magnesium, sodium and ammonium. The composition that reacts with water to form molecular iodine preferably comprises cupric sulfate and potassium iodide.

The article may have the iodine forming composition appropriately located within the article. For example, where the article is a diaper, it may have more than 70% of total composition in a central 50% of volume of the diaper. There is little need for antimicrobial activity on the portions of the diaper contacting the outer portions of the hips. Similarly, there would be little need for such activity along the waistband of the diaper. It is therefore desirable to concentrate the active materials in the diaper where the water (e.g., urine) is likely to be emitted. The iodine would migrate through the path of the water to all wetted areas.

A method of inhibiting microbial growth in an article provides a composition within the article, the composition comprising at lest two compounds that react in the presence of water to produce molecular iodine, and placing the article against the skin of an animal where an aqueous emission from the animal may occur. The method acts so that upon addition of water in an amount of between 10 and 100% by weight of the composition, a concentration of at least 10 parts per million of iodine is produced in the water in les than 15 minutes.

Another improvement would be to include starch materials into the diaper or the surface of the diaper so that the released iodine would cause the standard reaction for starch testing and a blue coloration would appear on the surface of the diaper to alert caregivers that urination had occurred.

EXAMPLE 2

Two porous films of water-soluble or water-dispersible material such as mannitol are extruded, the porosity provided by mechanical punching of the film of leaching of materials from the film, as well understood in the art. The separate films

EXHIBIT 1                    Page 7 of 9

US 7,867,510 B2

9

would contain 40% by weight of Copper Sulfate and 40% by weight of Potassium Iodide. The films can be used as adjacent or opposite side containers for the fiber fill (preferably with a separate non-dissolvable film).

### EXAMPLE 3

Individual granules of Copper Sulfate and Potassium Iodide are coated with water-soluble/dispersible coatings, preferably in the 2-8 micron thickness range. The uncoated particles would preferably have a diameter of between 5-50 microns so that they could be carried in fiber fill for a diaper without too ready settling out of the fiber fill. The coated particles are mixed into the fiber fill, either alone or with a tacky material (on the fiber or on the particles, such as a partially dried coating on the particles) to avoid separation. The fiber particle blend would constitute the fiber fill in a diaper.

FIG. **1** shows a view of the inside of an opened diaper product **20** and the distribution of compositions according to the present technology. The diaper product **20** is shown with a longitudinal center-line **100** and a horizontal center-line **110** about which are approximately symmetrically disposed wide panels **30**, adhesive tabs **40**, a central absorbent sheet **24**, a stretchable/flexible outer cover layer **32** that may be continuous with the wide panels **30**. A sectioned area **26** exposes longitudinal elastic filaments **54** that form the elasticity of the diaper along with the crinkling pattern **52**. There are significant indentations **50** on the sides of the diaper **120** to allow fitting to legs. The central absorbent sheet **24** is shown with four separate areas **22** within which there could be the heaviest concentrations of the iodine forming material, and two panels **34** that are towards a more rearward placement on a user where lower concentrations of iodine forming material could be located. Areas outside the central absorbing sheet **24** may have little or no iodine forming materials therein. As noted above, the concentration of the iodine forming materials should be centralized where liquids are more likely to be emitted into the absorbent area and be retained in the absorbent area. The upper region of the diaper and pad **36** and the lower region of the diaper and pad **38** could therefore have less total amount and less concentration of the iodine forming materials then the central area **37**. These concentration variations in the vertical direction may also be reflected or substituted with similar regional variations in the horizontal direction of the diaper **20**.

The concentration of the iodine forming material may be selected in the article according the ultimate needs and designs of the manufacturer, and the level of ant-bacterial effect desired. The concentration of the iodine gas in the liquid in the absorbent material is one measure of the desired results, and a further measure of the desired results is referred to in the art as the kill percentage, a measure of the percent of a specific bacteria (e.g., *E. coli*) in a liquid sample that would be killed in 5 minutes by the level of active ingredient present. An example would be that the presence of about 8 parts per million of gaseous iodine dissolved in the aqueous material in the absorbent material would have a kill percentage over 50%. It would be desired, as noted above, to have higher concentrations of gaseous iodine in the liquid so that kill percentages are at least 60%, at least 70%, at least 80% and even at least higher than 90% for targeted bacteria and other microbes. Depending upon the specific bacteria or microbe selected for the measurement, the liquid may have to be provided with at least 10 parts per million (ppm), at least 15 ppm, at least 20 ppm, or at least 25 ppm by controlling the amount of reagents added, the rate of reaction of the reagents,

10

and other controls aimed at keeping the iodine in solution in the liquid, such as providing thickening agents or other materials that would reduce the volatility of the iodine gas from the solution.

All references cited herein are incorporated by reference in their entirety.

What is claimed:

**1.** An article for application to the body of an animal to provide both absorbency and antimicrobial activity comprising:

a water absorbent material comprising a superabsorbent polymer; and

a reactive composition comprising at least two separate particles as a first particle of a first composition of $CuSO_4$ and a second particle of a second composition of KI, the composition of the first particle and the composition of the second particle reacting with each other in the presence of water to produce molecular iodine each of the particles of the first composition being physically separated from all particles of the second composition, each of the particles of the first composition being physically dispersed with all particles of the second composition within the water absorbent material comprising a superabsorbent polymer so that application of water equal to 100% by weight of the reactive composition to the article will cause the at least two separate particles to by carried by the water and react with each other;

the reactive composition providing a local concentration of at least 10 parts per million iodine in water carried by the material when the material has 5% by weight of water present in the water absorbent with respect to the total weight of the water absorbent material.

**2.** The article of claim **1** wherein the separation of the two particles is established by at least one particle being present in the article in a water-soluble or water-dispersible shell distributed throughout the article and the article comprises a super-absorbent polymer.

**3.** The article of claim **1** comprising a diaper, sanitary pad, bandage, band aid or wrap for an animal.

**4.** The article of claim **1** comprising a diaper, and where the water absorbing material comprises water absorbing, super-absorbent polymer fibers.

**5.** An article for application to the body of an animal to provide both absorbency and antimicrobial activity comprising:

a water absorbent material; and

a reactive composition comprising at least two separate particles as a first particle of a first composition and a second particle of a second composition, as a first particle of a first composition of $CuSO_4$ and a second particle of a second composition of KI, the composition of the first particle and the composition of the second particle reacting with each other with water to produce molecular iodine, each of the particles of the first composition being physically separated from all particles of the second composition so that application of water equal to 100% by weight of the reactive composition to the article will cause the at least two separate particles to by carried by the water and react with each other;

the reactive composition providing a local concentration of at least 10 parts per million iodine in water carried by the material when the material has 5% by weight of water present in the water absorbent with respect to the total weight of the water absorbent material, and

wherein, the two separate particles are separated by a film of a water-soluble or water-dispersible polymer that

EXHIBIT 1                                                    Page 8 of 9

US 7,867,510 B2

11

separates the article into two different regions, with the first particle exclusively in one region and the second particle exclusively in the second region.

**6**. The article of claim **5** wherein the separation of the two particles is established by at least one particle being present in

12

the article in a water-soluble or water-dispersible shell distributed throughout the article and the article comprises a super-absorbent polymer.

\* \* \* \* \*

**EXHIBIT 1**                                         **Page 9 of 9**

# EXHIBIT 2

US007943158B2

(12) **United States Patent**
Nelson et al.

(10) Patent No.: **US 7,943,158 B2**
(45) Date of Patent: **May 17, 2011**

(54) **ABSORBENT SYSTEMS PROVIDING ANTIMICROBIAL ACTIVITY**

(75) Inventors: **Anthony R. Nelson**, Woodbury, MN (US); **Susan T. Oeltjen**, Lake Elmo, MN (US); **Christopher J. Rueb**, St. Paul, MN (US); **William A. Hendrickson**, Stillwater, MN (US); **Kenneth R. Code**, Edmonton (CA)

(73) Assignee: **Biolargo Life Technologies, Inc**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 709 days.

(21) Appl. No.: **12/001,073**

(22) Filed: **Dec. 7, 2007**

(65) **Prior Publication Data**

US 2008/0145391 A1     Jun. 19, 2008

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/516,958, filed on Sep. 7, 2006, now abandoned, and a continuation-in-part of application No. 11/516,960, filed on Sep. 7, 2006, now Pat. No. 7,867,510.

(60) Provisional application No. 60/873,763, filed on Dec. 8, 2006.

(51) **Int. Cl.**
*A61K 9/14* (2006.01)
*A61K 9/70* (2006.01)

(52) **U.S. Cl.** ........ 424/404; 424/406; 424/409; 424/443; 424/667; 424/670; 422/37; 523/122

(58) **Field of Classification Search** .................. 422/37; 424/404, 406, 409, 443, 667, 670; 523/122
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,131,645 A | 12/1978 | Keblys et al. | ................ 423/501 |
| 4,375,535 A | 3/1983 | Kightlinger et al. | ........ 527/313 |
| 4,497,930 A | 2/1985 | Yamasaki et al. | ........... 524/556 |
| 4,731,391 A | 3/1988 | Garvey | ....................... 521/137 |
| 4,738,847 A | 4/1988 | Rothe et al. | ................. 424/443 |
| 4,764,418 A | 8/1988 | Kuenn et al. | ................. 442/118 |
| 4,824,689 A | 4/1989 | Kuenn et al. | ................. 427/2.31 |
| 4,828,912 A | 5/1989 | Hossain et al. | ............... 442/123 |
| 4,888,118 A | 12/1989 | Barnes et al. | ............... 210/668 |
| 4,897,304 A | 1/1990 | Hossain et al. | ............... 442/123 |
| 4,990,338 A | 2/1991 | Blank et al. | ................. 525/279 |
| 5,019,495 A | 5/1991 | Shanbrom | ..................... 435/1.1 |
| 5,035,892 A | 7/1991 | Blank et al. | ................. 424/443 |
| 5,061,487 A | 10/1991 | Blank et al. | ................ 424/78.07 |
| 5,128,149 A | 7/1992 | Shanbrom | ..................... 424/529 |
| 5,128,150 A | 7/1992 | Shanbrom | ..................... 424/533 |
| 5,176,836 A | 1/1993 | Sauer et al. | ................. 210/670 |
| 5,186,945 A | 2/1993 | Shanbrom | ..................... 424/529 |
| 5,227,161 A | 7/1993 | Kessler | ..................... 424/94.4 |
| 5,324,438 A | 6/1994 | McPhee et al. | ............... 210/748 |
| 5,336,501 A | 10/1994 | Herkelmann et al. | ........ 423/501 |
| 5,360,605 A | 11/1994 | Shanbrom | ................. 424/78.08 |
| 5,370,869 A | 12/1994 | Shanbrom | ................. 424/78.22 |
| 5,419,902 A | 5/1995 | Kessler | ..................... 424/94.4 |
| 5,464,603 A | 11/1995 | Marchin et al. | ............... 423/501 |
| 5,589,072 A | 12/1996 | Shanbrom | ..................... 210/638 |
| 5,609,864 A | 3/1997 | Shanbrom | ................. 424/78.08 |
| 5,629,024 A | 5/1997 | Kessler et al. | ............... 424/667 |
| 5,635,063 A | 6/1997 | Rajan et al. | ................. 210/266 |
| 5,639,452 A | 6/1997 | Messier | ..................... 424/78.1 |
| 5,639,481 A | 6/1997 | Kessler et al. | ............... 424/667 |
| 5,648,075 A | 7/1997 | Kessler et al. | ............... 424/94.4 |
| 5,720,966 A | 2/1998 | Ostendorf | ..................... 424/402 |
| 5,772,971 A | 6/1998 | Murphy et al. | ............... 422/292 |
| 5,800,372 A | 9/1998 | Bell et al. | ..................... 602/48 |
| 5,830,487 A | 11/1998 | Klofta et al. | ................. 424/402 |
| 5,849,291 A | 12/1998 | Kessler | ..................... 424/94.4 |
| 5,885,592 A | 3/1999 | Duan et al. | ................. 424/400 |
| 5,919,374 A | 7/1999 | Harvey et al. | ............... 210/753 |
| 5,962,029 A | 10/1999 | Duan et al. | ................. 424/613 |
| 5,962,082 A | 10/1999 | Hendrickson et al. | ........ 427/547 |
| 6,004,465 A | 12/1999 | Uhr et al. | ..................... 210/651 |
| 6,037,019 A | 3/2000 | Kooyer et al. | ............... 427/598 |
| 6,071,415 A | 6/2000 | Frommer et al. | ............... 210/669 |
| 6,139,731 A | 10/2000 | Harvey et al. | ............... 210/175 |
| 6,146,725 A * | 11/2000 | Code | ..................... 428/35.2 |
| 6,248,335 B1 | 6/2001 | Duan et al. | ................. 424/400 |
| 6,261,577 B1 | 7/2001 | Kessler | ..................... 424/401 |
| 6,342,653 B1 | 1/2002 | Gancet et al. | ............... 604/359 |
| 6,403,674 B1 | 6/2002 | Schubert | ..................... 522/167 |
| 6,432,426 B2 | 8/2002 | Kessler | ..................... 424/401 |
| 6,863,905 B1 | 3/2005 | Shanbrom | ..................... 424/667 |
| 7,033,509 B2 | 4/2006 | Klein et al. | ................. 210/753 |
| 7,132,379 B2 | 11/2006 | Shanklin | ..................... 442/123 |

FOREIGN PATENT DOCUMENTS

WO     WO 02/058748 A1 *  8/2002

OTHER PUBLICATIONS

P. Kapur and M. Verma, "Determination of Iodate Ion in Presence of Cupric Ion", Industrial and Engineering Chemistry Analytical Ed.; vol. 13, No. 5 (May 1941). p. 338.

* cited by examiner

*Primary Examiner* — Sean E Conley

(74) *Attorney, Agent, or Firm* — Mark A. Litman & Associates, P.A.

(57) **ABSTRACT**

An article and process provides a stable technology that reduces the microbial content by providing molecular iodine to the stabilized reagents when at least two reactants are activated by aqueous and/or alcohol materials.

**21 Claims, No Drawings**

**EXHIBIT 2**                    **Page 1 of 12**

US 7,943,158 B2

**1**

# ABSORBENT SYSTEMS PROVIDING ANTIMICROBIAL ACTIVITY

## RELATED APPLICATIONS DATA

This application claims priority from U.S. Provisional Application Ser. No. 60/873,763, filed Dec. 8, 2006 and U.S. Provisional Patent Application 60/850,976 filed Oct. 11, 2006; and continuation-in-part status under 35 USC 120 from each of U.S. patent application Ser. No. 11/516,958 filed Sep. 7, 2006, now abandoned; and U.S. patent application Ser. No. 11/516,960 filed Sep. 7, 2006, U.S. Pat. No. 7,867,510.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present technology relates to the field of antimicrobial protection, particularly antimicrobial activity in close proximity to environments that need to be protected from or cleansed of microbial or chemical material. These include closed and open environments and absorbent sheet materials that exhibit stability until activated by aqueous environments.

2. Background of the Art

It has become recognized as important to provide antimicrobial activity to surfaces that remain in contact with the bodies of patients.

Antimicrobial articles treated with virucides and germicides are known in the art. U.S. Pat. Nos. 4,828,912 and 4,897,304, both issued to Hossain et al., pertain to the use of a carboxylic acid/surfactant virucidal composition in absorbent products. U.S. Pat. Nos. 4,764,418 and 4,824,689, both issued to Kuenn et al., pertain to the addition of water-soluble humectants to carboxylic acid/surfactant virucides for use in tissue products to reduce irritation potential. U.S. Pat. No. 4,738,847 issued to Rothe et al., pertains to adding a carboxylic acid/surfactant virucide to the center ply of a three ply tissue to prevent transfer of the virucidal composition to the user, and thereby reduce irritation potential.

Irritation caused by virucidal or germicidal treatments to absorbent articles is a persistent problem. There have been attempts to ameliorate this problem by mixing the virucidal or germicidal treatment with lotions or emollients. U.S. Pat. No. 5,720,966 issued to Ostendorf, pertains to a "medicated" lotion absorbent article. The "medication" may be a virucide or disinfectant. U.S. Pat. No. 5,830,487 issued to Klofta et al. pertains to a tissue with a virucidal lotion. The lotion comprises a carboxylic acid/nonionic surfactant virucidal composition. In both the Ostendorf and Klofta, et al. patents, the intent is for the lotion to reside predominantly on the surface of the absorbent article and transfer to the user.

U.S. Pat. No. 7,132,379 describes a non-irritating multiply absorbent article made by treating an inner surface with one or more antimicrobial agents and treating the one or more outer surfaces with one or more siloxane compositions, and methods of making and using the same. The antimicrobial agent will remain confined to the inner portion of the absorbent article, thereby preventing irritation to the user, and the siloxane treated ply(s) will provide a pleasing, soothing, non-irritating tactile quality. In one embodiment, the siloxane composition comprises an amine-modified polysiloxane, in which case the product will also entrap any absorbed fluid, holding it in contact with the antimicrobial agent, and preventing it from wetting through the product and contacting the user.

U.S. Pat. No. 5,800,372 describes a field dressing for control of exsanguination. Such dressing describes the use of

**2**

microfibrillar collagen and a superabsorbent polymer in a hemostatic bandage, which both absorbs blood and induces clotting.

U.S. Pat. No. 7,033,509 (Klein) discloses an iodine fluid purification process using a source of fluid; means for delivery of iodine to the source of fluid for use in the purification process. The process provides a means for recovery of the iodine and/or iodine and/or other iodine species derived from the iodine, from the fluid.

U.S. Pat. No. 5,176,836 discloses a new and improved water purification process or method by introduction of molecular iodine into the water supply to impart a desired iodine residual wherein the water is passed through an iodinated anion exchange bed wherein the concentration of $I_2$ in the flowing water gradually decreases and the ion bed is recharged by treatment with an aqueous iodine solution produced by flowing water through a bed of iodine crystals having connections in parallel with the ion exchange bed and activated periodically e.g. by a timer, by measured flow of water or by residual level to recharge the bed. That system provides for long term microbiological control in water suitable for potable activities. The bed of Iodine crystals is provided with connections for flowing water there through to produce a concentrated (substantially saturated) aqueous iodine solution which is passed through the iodinated resin bed to recharge the bed with bound iodine.

The majority of patents relates to the direct or indirect treatment of water to remove microbes. Such disclosures are shown in U.S. Pat. No. 6,863,905; the use of free elemental iodine to kill or inactivate a large range of microbes (bacteria, virus and other pathogens) particularly in protein-containing solutions such as human blood, human plasma or fractions thereof is described in U.S. Pat. Nos. 5,019,495; 5,128,149; 5,128,150; 5,186,945; 5,360,605; 5,370,869; 5,589,072; and 5,609,864; pentavalent iodine-impregnated resins U.S. Pat. No. 5,635,063; provision of potable water U.S. Pat. Nos. 6,139,731 and 6,071,415; 5,324,438 describes a process for oxidizing a compound comprises contacting the compound with iodide ions and irradiating the iodide ions with UV light of a wavelength sufficient to generate iodine atoms. The compound is then oxidized with the resulting iodine atoms. The iodine atoms are reduced to iodide ions as a result of the oxidation of the compound.

The growth of many microbes is assisted by or enabled by the presence of water with the microbes. Water and aqueous materials are present in events and activities of most mammalian life forms. Aqueous solutions and dispersion and emulsions are present in blood, exudates, tears, perspiration, menstrual emissions and waste emissions of mammals. These are natural events in life cycles, but may be accompanied by contact with or attack by microbes that can have significant physical effects on the animals (including humans) and their surrounding. At a minimum, growth of some microbes in aqueous materials around the animals can develop odors, disease-carrying media, infections and death or damage to the bodies of the animals.

There are many instances where aqueous materials are retained in contact with animal bodies and in which there is potential for unwanted and even dangerous and significant microbial growth or microbial introduction into the animal body. For example, in the application of materials wound dressing, menstrual products, patches, diapers, pads and the like, moisture from the animal body or ambient conditions or the materials themselves can introduce microbes to the environment and those microbes can proliferate in the vicinity of the materials when moisture is present. The uncontrolled

**EXHIBIT 2**                                        **Page 2 of 12**

US 7,943,158 B2

3

growth of random microbes is seldom beneficial and has been the subject of significant efforts at control.

Many applications exist where it is necessary or at the very least an advantage for agents to be present which demonstrate anti-bacterial, anti-mycotic activity or both, resulting in the control of bacterial and/or fungal growth. For example, an apparatus or article as a whole or in part may have the property of suppressing bacterial and fungal growth. Control of bacterial and/or fungal growth may be through the prevention or inhibition of the growth of such microbes.

SUMMARY OF THE INVENTION

There have been many attempts to use absorbent materials (both absorbent fibers and absorbent mass) in the protection of environments, particularly around animal bodies where waste materials carrying potentially biohazardous materials, bacteria, virus, fungus, rickettsiae, parasites and other microbial materials may be released, particularly in aqueous media such as urine, blood, weepage and the like. However, the absorbent materials become breeding grounds for microbial material and rather than protecting such environments. The antimicrobial agent serves to kill or inactivate any microorganisms, such as viruses, bacteria, or fungi that are absorbed into the tissue with body secretions or fluids, thereby inhibiting the spread of disease, such as a viral infection. Direct inclusion of strong antimicrobial materials have proved marginally effect, especially when there is any significant storage time where the microbial material may dissipate in strength, and when the strength of the antimicrobial agent is increased, the potential for irritation increases.

Absorbent systems and absorbent materials are provided to environments and patients to be treated which generate an iodine gas-rich or iodine-dissolved-in-water rich environments that can provide antimicrobial activity or antichemical activity in a controlled environment or location. The iodine environment can be provided in numerous and varied tasks and services by reactive ingredients that generate iodine. At least some of the iodine-generating components must be protected from activation by humidity or ambient moisture.

An article for application, association with or attachment to an environment that is to be treated with an iodine-rich environment upon introduction of aqueous material to the environment including the bodies of animals (including humans) to provide both absorbency and antimicrobial activity. The article and treatments may be any delivery system that can deliver the iodine-rich environment in a stable condition that can be activated as needed at an appropriate target. The delivery may be as protected reaction-ingredients and the like that may be carried in absorbent supports such as fibrous supports, film supports or otherwise deliverable forms such as diaper, gauze, padding, sanitary sheets or the like and may provided with the two reactive ingredients separated by a water-removable barrier that may comprise a water soluble, or water dispersible material; and the two reactive materials that form a composition that reacts with water to produce molecular iodine. The composition is preferably delivered to provide a local concentration of at least 10 parts per million iodine in water carried by the material when the material has 5% by weight of water present in the water absorbent with respect to the total weight of the water absorbent material or concentrations that are sufficiently concentrated in air to address antimicrobial requirements or provide sufficient chemical activity to mediate the concentration of the targeted chemical in the environment.

DETAILED DESCRIPTION OF THE INVENTION

The present technology relates to the provision of articles, such as sheets, films, masses or the like to an environment

4

around a patient (animals including humans) where liquid that might contain biohazardous material, and especially microbial material might be released, needs to be absorbed to prevent environmental contamination, and yet must remain in place for various periods of time (minutes, hours and even days) without allowing microbial growth to be uncontrolled in the device and the environment. The present technology uses iodine generating reactants within an absorbent mass to provide the antimicrobial activity, and stabilizes the reactants so that ambient humidity will not cause the reactants to prematurely release the iodine and thereby reduce the effectiveness of the device when release is needed and avoid unsightly discoloration of the environment because of iodine staining. Articles, methods of stabilization, methods of manufacture and devise are disclosed herein.

One basic technology described herein comprises a process for the stabilization of two reactants that form iodine in the presence of water. The at least two reactants (reagents) are stabilized by providing at least two solid reactants in particulate form that when dissolved or dispersed together in water generate iodine. A coating (layer, film, continuous, discontinuous, multilayered etc.) is provided on at least one of the at least two reactants in particulate form with a layer that is disruptable, dispersible or soluble in an aqueous material or alcohol (e.g., water, aqueous solution, dispersion or suspension, alcohol or alcohol solution, suspension or dispersion) to form at least one coated reactant. The at least one coated reactant is then combined with another of the at least two solid reactants into a single milieu including the coated reactant. The term "milieu" is a generic term encompassing any format, as later exemplified in detail, which can carry, transport or support the at least two reagents with the coated reagent in a deliverable form. The coating may comprise a stand-off coating of stand-off particles having a diameter that is less than 20% of average particle diameters for the at least one of the at least two reactants. Stand-off particles are solid or gel particles that are supported on the surface of the reactant particles to form a physical separation between the coated particle and uncoated particle to prevent intimate contact between adjacent particles, even when contacted by co-confinement in a single container. The stand-off particles, as further described herein, may allow penetration of humidity to the coated reactant, but the physical separation between the reactants established by the stand-off particles prevents the moisture or small amount of water from forming a reactive environment that brings the two reactants together (e.g., a solution or dispersion). The stand-off particles may form a discontinuous coating on surfaces of the at least one reactant particles. The stand-off particles preferably may have a diameter that is less than 20%, less than 10% and less than 5% of average particle diameters for the at least one of the at least two reactants that is coated. The stand-off particles may comprise inorganic oxide particles or organic polymeric particles, by way of non-limiting examples. The coating may alternatively comprise a coating of a water-soluble material, such as a water-soluble polymer. The coating may alternatively comprise a coating of a water-dispersible material. The at least two reactants preferably comprise XY and ZI, wherein X is a metal, Y is an anion, Z is an alkali metal or alkaline cation and I is Iodide, and most preferably comprise $Cu^{+2}SO_4^{-2}$ and $K^+I^-$. The method may be practices wherein iodine is released to an environment by contacting the milieu with sufficient aqueous material to breach the coating and allow the at least two reactants to react to generate iodine in at least the aqueous material. The method may also be practiced wherein the at least one coated particle is retained in the milieu by bonding of the water-soluble coating with solid material in the milieu.

EXHIBIT 2

US 7,943,158 B2

5

The milieu may be preferably selected from the group consisting of a) mixtures of particles, b) mixtures of particles with a carrying medium, c) packets of particles, d) fabric containing particles, e) compacted pellets, and f) combinations of a), b), c), d) and e. Capsules, free-flowing powder mixtures, multicompartmental packets, separate compacted pellets and the like are included within these descriptions. In one preferred embodiment, the milieu comprises fabric in a structured form that retains its shape when contacted with the aqueous material. By structured form is included at least sheets, face masks, fitted covers, shaped garments, preformed size sheets or pads, and the like. The method of release further may use an aqueous material further comprising alcohol, which may accelerate iodine release or concentrate the iodine released. The at least two reagents, including the at least one coated reagent are combined with fabric material prior to establishing a final structured form of the fabric so that the fabric physically retains the at least two reagents in the structured form. For example, the particles may be mixed with fibers and/or filaments before compacting, interleaving, weaving, knitting, bonding, twining and the like. The particles may be provided with additional adhesive or binding agent to secure them within the fabric, or the coating on one or more of the reagent particles may physically secure the particles (by adhesion or bonding) to elements of the fabric.

A water retaining milieu according to one embodiment of the present technology that provides antimicrobial activity may comprise: at least one layer comprising an absorbent mass and at least two reactants that generate gaseous iodine in the presence of water; the at least one layer containing barrier material between the two reactants that is stable for at least 10 hours at 50% relative humidity at 70° C. and is penetrable by direct contact with water comprising at least 25% by weight of the at least two reactants so that the reactants generate iodine gas.

One general description of a process according to the technology disclosed here is a process for reducing the growth rate of microbial content in an article. The method provides an aqueous- or water-absorbent mass in the environment to be protected. The device will release iodine gas after the mass imbibes an aqueous material. The device, usually comprising a sheet, film, fabric or the like, as a bed sheet, diaper, wrap, bandage, gauze, compress, applique', gown or the like is provided into the environment of a live user. The article comprises at least two reactants that form gaseous iodine when immersed in water. The at least two components being with ±75% stoichiometric equivalence and the at least two and preferably two classes of reactants comprising at least 5% of the total solid weight of at least one layer within the absorbent mass in which the reactants are contained and at least 25% of the remainder of the layer comprising an aqueous-absorbing mass. The article is stable in 50% relative humidity at 70° C. for 10 hours without delivering at least 5% of the theoretic iodine available to the environment from the total of the at least two reactants in that 10 hour period, stability being provided by provision of a water disruptable barrier between the two reactants.

The term water-disruptable includes soluble, dispersible, water porosity-inducing or sufficient weakening of the coating that modest shear forces would open up the coating to penetration by direct contact by water. Coating such as water-dispersible or soluble polymers such as, but not limited to acrylates, polyvinyl alcohol, polyvinylpyrrollidone, amylase-derived polymers, silicates, metalsilicates (e.g., sodium-, potassium-, calcium-, magnesium-, aluminum-metsasilicate), gums, resins and the like. The article is preferably provided to the user as a diaper, compress, wrap, bandage,

6

gauze, tourniquet or sheet. The at least two reactants react in the presence of water to generate a concentration of at least 10 parts per million in the water (or aqueous medium) of the molecular iodine. The humidity barrier is best provided as a coating over at least one of the at least two reactants that is dissolved, disrupted or made porous to water in the present of an aqueous material comprising at least 25% by weight of the two reactants. Porosity may be obtained with a water-insoluble film having soluble polymer or salts in the film structure. The preferred medium for the at least two reactants is when they are carried within a superabsorbent mass in the article and wherein molecular iodine gas is generated within the superabsorbent mass and some is dissolved in aqueous material retained by the superabsorbent mass. The preferred process is where the reaction to form the molecular iodine is represented by

$$XY + ZI \rightarrow X^\circ + ZY + I_2$$

wherein X is a metal, Y is an anion, Z is an alkali metal or alkaline cation and more preferably where the reaction to form the molecular iodine is represented by

$$Cu^{+2}SO_4^{-2} + K^+I^- \rightarrow Cu^\circ + K_2SO_4 + I_2.$$

A water (or aqueous material) retaining device described herein may have antimicrobial activity and a structure comprising:

at lest one layer comprising an absorbent mass and at least two reactants that generate gaseous iodine in the presence of water;

the at least one layer containing barrier material between the two reactants that is stable for at least 10 hours at 50% relative humidity at 70° C. and is penetrable by direct contact with water comprising at least 25% by weight of the at least two reactants so that the reactants generate iodine gas. The absorbent mass preferably comprises at least 25% by weight of a superabsorbent polymer wherein the reaction to form the molecular iodine is represented by

$$XY + ZI \rightarrow X^\circ + ZY + I_2$$

and X is a multivalent metal, Y is a multivalent anion, and Z is an alkali metal or alkaline cation; and

XY is present as at least 1% by weight of the absorbent mass and ZI is present as at least 3% by weight of the absorbent mass. At least one of XY and ZI preferably are coated with a humidity stable and water penetrable coating. The superabsorbent polymer preferably comprises an acrylic resin (e.g., an alkali metal or alkaline metal acrylic acid salt polymer) and the concentration of XY is at least 3% by weight of the absorbent mass and the concentration of ZI is at least 7% by weight of the absorbent mass.

One way of providing molecular iodine ($I_2$) on site with a patient, rather than having to find a way of transporting it to a site) is to provide reactants that can readily produce molecular iodine on-site in a controllable reaction. One format of providing the molecular iodine would be through the oxidation-reduction reaction between two salts o4r compounds to produce the molecular iodine. It is a readily controlled environment where the reaction can be performed in an aqueous environment. One reaction that can effect this would be generically described as:

$$X^+Y^- + Z + I \rightarrow X^\circ + Z^\circ + Y^- + I_2$$

In this reaction scheme, X is a metal (preferably a multivalent metal and more particularly a divalent metal), Y is an anion (preferably a multivalent anion and more preferably a divalent anion, and an anion having at least two oxygen atoms), Z is an alkali metal or alkaline cation. Examples of X are cop-

EXHIBIT 2    Page 4 of 12

7

per, iron, manganese, lead, nickel, tin, and the like, Y can be sulfate, sulfite, sulfonate, carbonate, phosphate, phosphate, nitrate, nitrie, borate, and the like, and Z can be sodium, lithium, potassium, ammonium, magnesium, aluminum, and the like. One preferred reaction may be:

$$Cu^{+2}SO_4{}^{-2}+K^+I^-\rightarrow Cu^\circ+K_2SO_4+I_2$$

This reaction takes place readily in an aqueous environment and produces molecular iodine at a controlled rate. The reaction may be used by wetting, dispersing or dissolving the molecular iodide and allowing the iodine in the carrying material be released and carried to the site 9 which may be the carrying material itself, such as the fabric, clay, fibers, film etc.) penetrate the area intended to be treated. The iodine may persist for sufficient time to treat the area, particularly within a wetted material on the surface of a patient. The reaction may also be used by dispersing or mixing the two ingredients into the carrying material (e.g., the fabric, fiber, film, sheet, etc.), either with additional water provided, with water of hydration on the first reactant (e.g., $X^+Y^-.nH_2O$, such as $CuSO_4.5H_2O$) or with ambient water in the carrying material. The two reactants may be physically separated from each other before being combined for application or reaction, as in separate capsules, fibers, layers or the like. The two reactants may be provided as a solid carrier medium that separates the two reactants until they are in contact with water (as in a soluble carrier such as polyvinyl alcohol, gelatin, amylase, sugars and the like, in pellet, fiber, dust, particle or block form). The two reactants may be independently coated with a soluble/dispersible coating and the two ingredients kept in a single water-penetrable layer.

Although the materials of the described technology may be provided in a vast array of materials and compositions applied to the surface of patients, such as bandages, bandaids, diapers, gauze, wraps, sanitary napkins, tampons, plugs, sheet coverings 9 e.g., on beds) and the like, the discussion will emphasize diapers and incontinence diapers for simplifying the disclosure, without intending to limit the scope of the invention.

The composition is preferably delivered to provide a local concentration of at least 10 parts per million iodine in water carried by the material when the material has 5% by weight of water present in the water absorbent with respect to the total weight of the water absorbent material or concentrations that are sufficiently concentrated in air to address antimicrobial requirements or provide sufficient chemical activity to mediate the concentration of the targeted chemical in the environment. In terms of relative compositions in the absorbent material, the material may comprise at least 1% by weight of metal reactant and at least 4% by weight iodine reactant, preferably at least 2% or 3% metal reactant and correspondingly 5% to 7% iodine reactant and most preferably at least 5% (preferably up to 10% metal reactant and 8-18% iodine reactant. The majority of the remaining material may be the absorbent or preferably superabsorbent material or combinations of absorbent and superabsorbent materials, with any desirable adjuvants, such as color indicators that are activated upon release of iodine, anti-inflammatants, skin aids, and the like.

A test may be carried out in accordance with JIS K 7223 "Method for Water Absorption Test of Super Absorbent Polymer" to measure the liquid retention ratio. A nonwoven fabric sample 7 $cm^2$ was dipped in artificial urine (prepared by dissolving 9 g of sodium chloride, 20 g of urea and 1 g of creatine in 1 liter of deionized water) for 2 hours, thereby enabling the sample to retain artificial urea. After a lapse of 2 hours, the sample was allowed to stand while its corner was vertically suspended with a hook for 15 minutes to remove

8

excess artificial urea which could not penetrate into a tea bag. After leaving for 15 minutes, the weight (Wc) was measured. This sample was dried and the dry weight (Wd) was measured. The liquid retention ratio was calculated by before and after weight measurements. Examples of useful superabsorbent polymers may be found, by way of non-limiting examples, in U.S. Pat. Nos. 6,342,653; 5,061,487; 5,035,892; and 4,990,338.

A general description of superabsorbing polymers includes Sodium polyacrylate, crosslinked (monomer residue in the polymer backbone: —CH2-CH(CO2Na)—), which is a crosslinked acrylic acid polymersodium salt, invented by the Dow Chemical Company. Polymers were produced which absorbed up to 10,000 times their weight in distilled water (gel capacity) and are called polyelectrolytes. These polymers are referred to as "Super Absorbents". When dry, the polymer appears as a white powder and when in gel form it is a transparent slush/gel. It is used in diapers, tampons, bed pads, fire control; spray drift control, seed germination, soil conditioning, and hydroponics. It is hard water and salt sensitive in that dissolved minerals greatly reduce the absorption capacity of the gel. Other high-gelling capacity crosslinked salts of polyacrylic acid include potassium, lithium, and ammonium salts. Sodium polyacrylate can absorb more than 300 times its weight of tap water and 800 times its weight in distilled water.

Sodium polyacrylate is a polymer containing many acrylate monomers connected end-to-end in a large chain. Crosslinks between chains "tether" the chains together (FIGURE). The more cross-links the polymer has, the higher the density of the polymer. Superabsorbent polymers are actually partially neutralized polyacrylate. This means that anywhere from 50-70% of the COOH acid groups (FIGURE) have been converted to their corresponding sodium salts.

Water is drawn into the beads—and hence the core of the diaper—by osmotic pressure. As the water is drawn in, the polymer swells and develops the gel-like consistency. The driving force for the osmotic pressure is the higher concentration of sodium ions in the beads than in the outside water. Water is drawn into the polymer in an attempt to balance the number of ions inside and outside the polymer. This is why the polymer can absorb more distilled water than tap water. Tap water already contains some ions and the osmotic pressure is lower between the bead and the outside water. Manufacturers are able treat the outside of the beads to increase the cross-link density of the shell around the bead, forming a bead with a higher crosslink density at the surface than in the interior. This denser shell enables the beads to hold water under a weight-bearing load. The tighter shell prevents leakage.

The term 'superabsorber' encompasses a number of polymers all having the basic ability to absorb massive quantities of water. Four commonly used superabsorbers include sodium polyacrylate, polyacrylamide crystals, polyacrylamide plant spikes, and Gro-Creatures. While each polymer may have a somewhat different mechanism used to achieve the superabsorbing phenomenon and the rates of absorption can differ, they all effectively absorb water. All are essentially hydrophylic non-toxic crosslinked polymers that can absorb several hundred times (e.g., at least 200 times) their weight in water, but do not dissolve because of their three-dimensional polymeric network structure. They are fascinating materials and very versatile because of their unique solubility and transport properties. The liquid-like properties result from the fact that the polymer is composed almost entirely of water. However, the polymer also exhibits solid-like properties due to the network formed by the crosslinking reaction.

EXHIBIT 2

US 7,943,158 B2

**9**

At least one of the two reactants carried in the absorbent mass must be encapsulated, coated or otherwise separated from the other ingredient. The barrier created between the two ingredients must be removable by exposure to an aqueous environment by dissolution, disruption, dispersion or sufficient softening that mild physical shearing would disrupt the barrier, allowing the water to combine the two active ingredients. It is desirable for the barrier to be stable for at least 10 hours at 50% relative humidity at 70° F., and more preferably for 10 hours at 70% relative humidity and 70° F. Barrier materials may be provided by any coating technology such as spray encapsulation of individual ingredient(s), iontopherisis deposition, chemical vapor deposition, sputter coating, particle impact deposition (as described in U.S. Pat. No. 5,962,082, which is also useful for solid to solid deposition), and any other known coating procedures.

The technology described herein is performed by applying a solid carrier system to a patient, and awaiting the presence of sufficient water on or in the carrier system to activate the ingredients and cause the gaseous iodine to form in sufficient concentration in the solid carrier to attenuate, reduce or eliminate bacterial growth in the solid carrier. A simple format, in considering diaper-like materials for any age animal, would include at least the following formats:

1) particulate and separate reactants may be carried in the same layer of the carrier (generally referred to as a diaper, but inclusive of any wrap, sheet, pad, gauze, bandage, compress or the like placed into contact with a patient);

2) particulate and separate reactants may be carried in different layers of the diaper;

3) particulate reactants may be carried in the same pellets in an anhydrous condition in the same layer of a diaper;

4) the particulate reactants may be adhered to the same or separate fibers or films that are associated with on constitute the diaper;

5) the reactants may be carried in fiber materials dispersed throughout or partially constituting the structure of the diaper;

6) capsules or microcapsules of the reactants in water-soluble or water-dispersible shells may be distributed throughout the diaper; and

7) a film or films (water-soluble, water-dispersible or water-leachable) may carry one or more of the reactants, with the other reactant in a location that released or carried first reactant will be placed into contact with the second reactant in the presence of water.

Other formats and process may be used as long as the presence of water on the carrier system enables the generation of gaseous molecular iodine within the carrier in sufficient concentration to act as a microbicide.

The process may use the above reaction to form the molecular iodine represented by

$$XY + ZI \rightarrow X° + ZY + I_2$$

wherein X is a metal, Y is an anion, Z is an alkali metal or alkaline cation, or where X is a multivalent metal, Y is a multivalent anion, and Z is an alkali metal or alkaline cation, and is preferably represented by

$$Cu^{+2}SO_4^{-2} + K^+I^- \rightarrow Cu° + K_2SO_4 + I_2.$$

The process may be performed where the two reactants are carried in a superabsorbent polymer. The solids carriers for the two reactants may also include compositions of the present that comprise superabsorbent or non-superabsorbent polymers, natural products (e.g., papers, cellulosic solids, water-insoluble porous materials which absorb or adsorb the

**10**

film-forming material within the structure, water-soluble porous materials which absorb or adsorb the film-forming material within the structure, porous containers which merely slowly release a volume of the film-forming material, porous containers which both dissolve and physically release volumes of the film-forming composition through pores, and the like. In general, selection of an effective application rate can depend on habitat depth, surface debris, emergent and surface vegetation, organic matter, microbial and algal concentration, the specific target species, and the developmental stage of the target species. Superabsorbent polymers are described, by way of non-limiting examples in U.S. Pat. Nos. 6,403,674; 4,731,391. Superabsorbent polymers, including starch graft co-polymers, are known in the art. See, for example, those described in U.S. Pat. Nos. 4,375,535 and 4,497,930 (incorporated herein by reference), which have disclosed uses as adhesives, flocculants, sizes, water-retaining materials for agriculture and water-absorbing materials for sanitary materials. However, the spectrum of advantages attendant the use of superabsorbent polymers in solid and flowable terrestrial insecticidal, pesticidal or insecticidal/pesticidal delivery compositions have gone unrecognized.

The superabsorbent polymers of the present invention are synthetic organic polymers which are solid and hydrophilic, absorbing over 100 times their weight in water. These superabsorbent polymers are typically in a powder, granule, extruded, or flake form, adapted to be blended and/or agglomerated into any shape or form.

The superabsorbent polymers may be, for example, acrylamide alkali metal acrylate co-polymers; propenenitrile homo-polymers, hydrolyzed, alkali metal salts; polymers of propenamide and propenoic acid, alkali metal salts; hydrolyzed acrylonitrile co-polymers, and starch graft co-polymers and ter-polymers thereof. All of these are designed to be hydrophilic, absorbing over 100 times their weight in water. The resulting hydrophilic polymers can absorb from over one hundred to greater than about 5000, more typically around 500 to about 1,000, times their own weight in water (measured using distilled water, pH 7.5, 25, 760 mm Hg. absorption within about 30 seconds). However, the absorption or swelling capacity and absorption or swelling time typically varies with each specific superabsorbent polymer.

One class of superabsorbent polymers include combinations of a starch and organic monomers, oligomers, polymers, co-polymers or ter-polymers. They may be manufactured in a variety of ways, for example, the methods described in U.S. Pat. Nos. 4,375,535 and 4,497,930, and can be, for example, the product of grafting corn starch (amylopectin) with acrylonitrile (an acrylic monomer or oligomer). A second class of superabsorbent polymers includes combinations of acrylamide and acrylate polymers, co-polymers and ter-polymers.

The following examples are provided as prophetic descriptions of formats for delivery of technology according to the descriptions of the present invention.

Land mass, such as soil and sand, can be contaminated by microbes in a number of manners. The most common manner of soil contamination is from improper handling or disposal of organic wastes and sewage. Excessive rainfall can also stress sewage systems, causing them to overflow and spill raw sewage over the land. Whatever the source of the microbial contamination, the danger to animal life can persist for extended periods of time and can severely affect both the medical and economic health of an area. It is therefore essential that methods and plans be developed that can treat a wide variety of microbial contaminations, and do so in a rapid

EXHIBIT 2                                                                 Page 6 of 12

US 7,943,158 B2

11

manner and at acceptable costs. The problem has been that soil mediation or repair is far more complex and difficult than water purification techniques.

Water can be readily transported through pipes into treatment areas, through filters, or be loaded with chemistry that rapid spreads through the water system to attack microbes. Land mass can not be moved about as readily, and materials added to soil do not disperse as widely as materials added to aqueous systems. Materials added to soil for purposes of microbe reduction or elimination must not persist beyond their useful life and must not contribute a contamination effect themselves.

The technology disclosed herein is based on the discovery that the provision of molecular iodine into microbially contaminated land mass (e.g., soil or sand) can mediate the land mass by killing or at least reducing the concentration of the vast majority of microbes that would ordinarily persist in the land mass.

Land mass (generally soil and/or sand) may become contaminated with any variety of microbes that may be harmful to vegetation or fauna that come into contact with the microbes. The land mass is then treated with molecular iodine in vapor or dissolved liquid form to provide a concentration in water or aqueous mass of at least about 10 parts per million. The molecular iodine (as opposed to iodide anion) is provided as a) a gas, b) liquid or c) provided as two reactants that form molecular iodide (s a gas or into a liquid) in the soil, either by using an aqueous carrier, water of hydration or ambient ground water. The source of molecular iodine may be topically applied, ploughed into the soil, mixed into the soil, injected into the soil, sprayed onto the soil, or otherwise applied where desired. Elemental iodine is a biocidally active form of iodine that has been used as a water disinfectant for almost a century. It is also widely used as a sanitizing compound in the food processing industry. Chlorine solution (especially hypochlorites) have been widely using by growers as a sanitizing wash for many fruits and vegetables. However, the strong oxidizing effect of chlorine in water with a moderate to high organic load results in a number of different complex compounds (trihalomethanes or THM) which can become a significant environmental hazard. There are strong reasons to minimize the excessive use of chlorine in the environment.

One way of providing molecular iodine ($I_2$) on site, rather than having to find a way of transporting it to a site) is to provide reactants that can readily produce molecular iodine on-site in a controllable reaction. One format of providing the molecular iodine would be through the oxidation-reduction reaction between two salts to produce the molecular iodine. It is a readily controlled environment where the reaction can be performed in an aqueous environment. One reaction that can effect this would be generically described as:

$$X^+Y^- + Z + I \rightarrow X^\circ + Z^+Y^- + I_2$$

In this reaction scheme, X is a metal (preferably a multivalent metal and more particularly a divalent metal), Y is an anion (preferably a multivalent anion and more preferably a divalent anion, and an anion having at least two oxygen atoms), Z is an alkali metal or alkaline cation. Examples of X are copper, iron, manganese, lead, nickel, tin, and the like, Y can be sulfate, sulfite, sulfonate, carbonate, phosphate, phosphate, nitrate, nitrite, borate, and the like, and Z can be sodium, lithium, potassium, ammonium, magnesium, aluminum, and the like. One preferred reaction would be:

$$Cu^{+2}SO_4^{-2} + K^+I^- \rightarrow Cu^\circ + K_2SO_4 + I_2$$

12

This reaction takes place readily in an aqueous environment and produces molecular iodine at a controlled rate. The reaction may be used, as intimated above, by either causing the reaction to occur in a container and directing the iodide into the soil (as by gas injection) or by dissolving the molecular iodide and injecting or spraying the dissolved iodide into or onto the soil. The reaction may also be used by dispersing or mixing the two ingredients into the land mass, either with additional water provided, with water of hydration on the first reactant (e.g., $X^+Y^-.nH_2O$, such as $CuSO_4.5H_2O$) or with ambient water in the land mass. The two reactants may be physically separated from each other before being combined for application or reaction, as in separate pouches or containers. The two reactants may be provided in a solid carrier medium that separates the two reactants until they are in contact with water (as in a soluble carrier such as polyvinyl alcohol, gelatin, amylase, sugars and the like, in pellet or block form). The two reactants may be provided as liquids in separate containers to be mixed immediately before application. The two reactants may be independently coated with a soluble/dispersible coating and the two ingredients kept in a single water-tight container.

If provided in solid form (e.g., pellets, grains, tablets, powder, blocks, etc), the solid is preferably mixed into the soil rather than merely spread on top of the soil or sand, so as to prevent winds from blowing the solid away. If the solids are sufficiently large (e.g., at least 1.0 mm, preferably at least 2.0 mm in diameter), they can be more safely sprinkled on the surface of the soil or sand without as much concern of being blown away or unevenly distributed by the wind. The solids may be otherwise ploughed into the soil or sand, raked into the soil or sand, injected into the soil or sand, mixed with solid and sand and deposited onto the soil and sand or otherwise securely applied.

It will be apparent to one skilled in the art that there are various reactant chemicals that can be used. The reaction between anhydrous cupric sulfate and potassium iodine to produce iodine is one which is known in the art. Generally two parts (molecular stoichiometry) potassium iodine is required for every one part of anhydrous cupric sulfate to produce the desired reaction. In order to avoid problems in implementing the invention with the chemicals described above, the following matters should be noted. When using container or mixing prior to application, non-ferrous mixing containers and non-ferrous application instruments (or polymer coated ferrous material) should be used in order to avoid galvanic depositing of copper from solution. Application with absorbent and superabsorbent carriers (acrylic polymers, for example) has been found to require an additional amount of cupric sulfate over and above that used for the reaction. The reason for this is believed to be that the substrate has a tendency to sequester multivalent ions. With mixing in the vicinity of workers, care should be taken to consult safety data sheets relating to iodine gas before experimentation of any magnitude is conducted.

Soil microorganisms tend to congregate at the soil surface in a shallow layer of approximately 10 centimeters in depth. This shallow layer is referenced as either the weathering layer or the plough layer. The large majority of food (leaf fall, plant and animal detritus, etc.) is available at the soil surface. Natural biodegradation end products are fulvic and humic acids which may take up to 25-30 years to biodegrade. Microbial population size bears a direct relationship to the availability of food sources. A distribution of microorganisms may exist in the initial 75 centimeters of a soil profile and may include aerobic bacteria, anaerobic bacteria, actinomycetes, fungi, viruses, rickettsiae and algae. The total aerobic and anaerobic

EXHIBIT 2                                        Page 7 of 12

US 7,943,158 B2

13

bacteria in the upper 8 cm of soil may be 77-80 percent of the total bacteria found in the 75 cm. profile. 95 percent of all bacteria may be found in the upper 25 cm. of the soil profile. Aerobic bacteria may average between 80-90 percent of the total bacteria for the soil horizons investigated. Thus it is desirable that the gas be provided through the major portions of this depth, e.g., at least to 8-25 centimeters.

Iodine is the preferred sanitizing agent in the food industry as it is acknowledged as a more effective user friendly sanitizing agent than chlorine. In addition, depending upon the concentrations, it is safe, can be effectively used at reduced concentrations (up to ten times less) than chlorine yet with a higher microbial kill rate. Iodine (unlike chlorine) does not produce any harmful substances such as carcinogens, and if nearly all by-products are removed, can produce an environmentally safe waste water. Being a solid at room temperatures and supplied, immersed in water, the potentially harmful effects of exposure to a concentrated sanitizing agent such as chlorine are removed, significantly improving environmental work conditions. Furthermore, iodine is less corrosive than chlorine reducing corrosive effects from the use of a biocide.

A number of United States patents disclose the use of iodine in conjunction with processes for purification of water. For example, U.S. Pat. No. 4,888,118 discloses a water purification process in which the water is passed through a mass of nylon 4 complex with iodine. The treated water is subsequently passed through nylon 4 to remove iodine from the water.

One of the difficulties with the known systems is to maintain an optimum amount of active iodine delivered into the target water supply for the specified purpose. To date there has been no effective system which can effectively and economically guarantee the delivery of exactly the right amount of active iodine at higher levels into the water used to wash produce in the case where iodine is used for food sanitization or into water delivered through reticulation systems, not only to prevent waste of iodine and economic loss but also to ensure that there is an acceptable minimum of active iodine.

Iodine recovery processes are known whose objective is to recover iodine to compensate for gradual reduction of I.sub.2 in the flowing water and to provide a desired iodine residual. The process described in U.S. Pat. No. 5,176,836 is distinguished from previous systems by providing a continuous long term microbiological control process in a water supply particularly in space vehicle applications wherein I.sub.2 is released into the water stream flowing through a suitable anion exchange resin.

U.S. Pat. No. 5,919,374 discloses a method and apparatus for producing bacteria free iodine species containing drinking water for farm animals under continuous dynamic water flow to produce a saturated iodine species containing aqueous solution at a pre selected temperature and blending the saturated solution with a second water flow to produce a diluted iodine species bacterium free aqueous solution.

U.S. Pat. Nos. 4,131,645; 5,356,611; 5,464,603; 5,639, 452; 6,139,731; and 6,004,465 disclose prior art processes in which iodine is employed, each of which is incorporated herein by reference. The processes described in those US patents do not teach the use of means to effectively and economically control delivery of iodine in a water stream, nor do they disclose collection and conversion of iodide to iodine species for re use in the process.

Iodinated resin beds are known as a means for recharging a water supply with a minimum amount of active iodine. The recharging is effected by treatment with an aqueous iodine solution produced by flowing water through a bed of iodine crystals. The iodine residual is monitored and the bed

14

recharged where necessary by adjusting the flow rate of water through the bed of iodine crystals. This is an expensive method of monitoring the level of active iodine and the resin rich in bound iodine is very expensive. In addition, the capacity of the resin is limited and reloading techniques in the field would be difficult to maintain in high water flow conditions. Also, this process is best suited to low level (<4 ppm) delivery of active iodine usually in a clean filtered water environment. This is due to the slow dissolving rate of iodine from known iodine beds and the limitation of the release rate and saturation of the anion exchange resins.

An ideal level of active iodine to be maintained in the aqueous content in the soil or sand is in the range of at least or greater then 10 ppm to 25 ppm although some applications may require higher concentrations. When iodine is used in large spill sanitizing applications, it may react with organic matter in which case the active iodine can be reduced to the point where there is little left for microbiological control. If resins (e.g., superabsorbing polymers) are used to deliver active iodine, this could necessitate continual monitoring of iodine concentration. It is expensive to use resin in large areas of soil, so it is likely that this mode of delivery would be used in more localized areas. Saturation of resin with 46% weight Iodine will produce around 4 ppm active iodine release, which is insufficient alone, but with the reactive mixture, higher concentrations of molecular iodine can be provided. A controlled iodine delivery process would be one in which the level of iodine can be maintained at a predetermined optimum level and without constant manual intervention and monitoring.

The process technology of the present disclosure may be practiced in a number of formats, such as a process for reducing the microbial content in land mass by providing molecular iodine in the land mass in a concentration in aqueous material in the land mass of at least 10 parts per million. The aqueous material should have a concentration of at least 10 parts per million is applied to the land mass. Specific formats include two reactants are added to the land mass and the two reactants react in the presence of water to generate a concentration of at least 10 parts per million in the water of the molecular iodine, especially where the two reactants are a) mixed with the land mass and at least some of the water present is ambient water; b) mixed with the land mass and at least some of the water present is water of hydration of one of the two reactants; c) mixed with the land mass and at least some of the water present is applied to the land mass at about the same time as the application of the two reactants; d) mixed with the land mass and at least one of the reactants is coated to prevent premature reaction with water or another reactant. The process is particularly useful on recently contaminated sites, especially where the contaminant microbes reside in the top 25 cm of the soil such as where the land mass is sand at a site where organic waste matter has contaminated the san with microbes.

Among the ways of applying the molecular iodine are at least where molecular iodine gas is injected into the land mass; where the molecular iodine gas is generated in a closed container and injected into the land mass; where the land mass is physically disturbed to assist mixing of molecular iodine into the land mass; where physical disturbance comprises plowing of the land mass; and where solid reactant material to generate the molecular iodine is deposited in the land mass by the physical disturbance. The process may use the above reaction to form the molecular iodine represented by

$$XY + ZI \rightarrow X^\circ + ZY + I_2$$

EXHIBIT 2

US 7,943,158 B2

15

wherein X is a metal, Y is an anion, Z is an alkali metal or alkaline cation, or where X is a multivalent metal, Y is a multivalent anion, and Z is an alkali metal or alkaline cation, and is preferably represented by

$$Cu^{+2}SO_4^{-2} + K^{+}I^{-} \rightarrow Cu^{+} + K_2SO_4 + I_2.$$

The process may be performed where the two reactants are carried in a superabsorbent polymer. The solids carriers for the two reactants may also include compositions of the present that comprise superabsorbent or non-superabsorbent polymers, natural products (e.g., papers, cellulosic solids, water-insoluble porous materials which absorb or adsorb the film-forming material within the structure, water-soluble porous materials which absorb or adsorb the film-forming material within the structure, porous containers which merely slowly release a volume of the film-forming material, porous containers which both dissolve and physically release volumes of the film-forming composition through pores, and the like. In general, selection of an effective application rate can depend on habitat depth, surface debris, emergent and surface vegetation, organic matter, microbial and algal concentration, the specific target species, and the developmental stage of the target species. Superabsorbent polymers are described, by way of non-limiting examples in U.S. Pat. Nos. 6,403,674; 4,731,391. Superabsorbent polymers, including starch graft co-polymers, are known in the art. See, for example, those described in U.S. Pat. Nos. 4,375,535 and 4,497,930 (incorporated herein by reference), which have disclosed uses as adhesives, flocculants, sizes, water-retaining materials for agriculture and water-absorbing materials for sanitary materials. However, the spectrum of advantages attendant the use of superabsorbent polymers in solid and flowable terrestrial insecticidal, pesticidal or insecticidal/pesticidal delivery compositions have gone unrecognized.

The superabsorbent polymers of the present invention are synthetic organic polymers which are solid and hydrophilic, absorbing over 100 times their weight in water. These superabsorbent polymers are typically in a powder, granule, extruded, or flake form, adapted to be blended and/or agglomerated into any shape or form.

The superabsorbent polymers may be, for example, acrylamide alkali metal acrylate co-polymers; propenenitrile homo-polymers, hydrolyzed, alkali metal salts; copolymers of propenamide and propenoic acid, alkali metal salts; hydrolyzed acrylonitrile co-polymers, and starch graft co-polymers and ter-polymers thereof. All of these are designed to be hydrophilic, absorbing over 100 times their weight in water. The resulting hydrophilic polymers can absorb from over one hundred to greater than about 5000, more typically around 500 to about 1,000, times their own weight in water (measured using distilled water, pH 7.5, 25, 760 mm Hg. absorption within about 30 seconds). However, the absorption or swelling capacity and absorption or swelling time typically varies with each specific superabsorbent polymer.

One class of superabsorbent polymers include combinations of a starch and organic monomers, oligomers, polymers, co-polymers or ter-polymers. They may be manufactured in a variety of ways, for example, the methods described in U.S. Pat. Nos. 4,375,535 and 4,497,930, and can be, for example, the product of grafting corn starch (amylopectin) with acrylonitrile (an acrylic monomer or oligomer). A second class of superabsorbent polymers includes combinations of acrylamide and acrylate polymers, co-polymers and ter-polymers.

All references cited herein are incorporated by reference in their entirety.

The concentration of the iodine forming material may be selected in the article according the ultimate needs and

16

designs of the manufacturer, and the level of ant-bacterial effect desired. The concentration of the iodine gas in the liquid in the absorbent material is one measure of the desired results, and a further measure of the desired results is referred to in the art as the kill percentage, a measure of the percent of a specific bacteria (e.g., $E.\ coli$) in a liquid sample that would be killed in 5 minutes by the level of active ingredient present. An example would be that the presence of about 8 parts per million of gaseous iodine dissolved in the aqueous material in the absorbent material would have a kill percentage over 50%. It would be desired, as noted above, to have higher concentrations of gaseous iodine in the liquid so that kill percentages are at least 60%, at least 70%, at least 80% and even at least higher than 90% for targeted bacteria and other microbes. Depending upon the specific bacteria or microbe selected for the measurement, the liquid may have to be provided with at least 10 parts per million (ppm), at least 15 ppm, at least 20 ppm, or at least 25 ppm by controlling the amount of reagents added, the rate of reaction of the reagents, and other controls aimed at keeping the iodine in solution in the liquid, such as providing thickening agents or other materials that would reduce the volatility of the iodine gas from the solution.

EXAMPLES

The two reactants may be provided as a solid carrier medium or separate particulate materials that separate the two reactants until they are in contact with water (as in a soluble carrier such as polyvinyl alcohol, gelatin, amylase, sugars and the like, in pellet, fiber, dust, particle or block form). At least one of the two reactants may be independently coated with a soluble/dispersible coating and the two ingredients kept in a single water-penetrable layer.

Individually coated particles can be provided in water-soluble containers/coverings by using water-soluble or water-dispersible coating materials that are also organic solvent soluble (alcohol soluble) such as PVA, gels, polyvinylpyrrolidone, silica coatings, poly(ether ketones), poly(ester ketones), and the like are applied to the individual particles (one single reagent) or groups of particles (both or all reagents) and prilled, spray dried, or otherwise dried into separate, agglomerated, or packed coated particles. Polyvinyl alcohol may be coated on particles (even water soluble particles as used in the present technology) by use of particle coating technologies such as particle impacting in a fluidized bed or equivalent equipment such as shown in U.S. Pat. No. 6,037,019 (Kooyer).

A simple format, in considering application to agricultural fields for treatment to prevent nematodes or other ground or water-dwelling pests or for any age or stage of pest animal, would include at least the following formats:

1) Separate particulate with separate reactants may be carried in the same container;
2) particulate and separate reactants may be carried in different containers for subsequent separate or joint application;
3) particulate reactants may be carried in the same pellets in an anhydrous condition;
4) the particulate reactants may be adhered to the same or separate carrier materials such as pellets, abrasive particles or capsules;
5) the reactants may be carried in carrier materials dispersed throughout or partially throughout a separate carrier material;

**EXHIBIT 2**                                             **Page 9 of 12**

US 7,943,158 B2

17                                                                                  18

6) capsules or microcapsules of the reactants in water-soluble or water-dispersible shells may be dispersed over the surface; and

7) a film or films (water-soluble, water-dispersible or water-leachable) may carry one or more of the reactants, with the other reactant in a location that released or carried first reactant will be placed into contact with the second reactant in the presence of water.

Other formats and process may be used as long as the presence of water or alcohol on the carrier system enables the generation of gaseous molecular iodine within the carrier in sufficient concentration to act as a sterilizing agent or pesticide.

The following examples are provided as prophetic descriptions of formats for delivery of technology according to the descriptions of the present invention.

Example 1

Prophetic

Fibers would be extruded in a non-aqueous solvent of polyvinyl alcohol in two separate batches in combination with particulate reactants. One set of fibers would comprise 40% by weight of Copper Sulfate and the other set of fibers would comprise 40% by weight of Potassium Iodide. The two separate fibers would blended as 5% by total weight of fabric material into the fiber filled used in a diaper. The relatively low concentration (5%) of total added fiber would be expected to minimally change the properties expected from the fiber fill, except for the additional antimicrobial function, Upon activation by alcohol and/or water into the fibers, the polyvinyl alcohol would dissolve, the two reactants would dissolve in a single solution, the reactants would react, and the gaseous iodine would be produced.

The composition of the present technology provides a local concentration (in the water) of at least 5 ppm and preferably at least 10 parts per million iodine in water carried by the material (that is actual water and/or alcohol supported by the water absorbent material) when the material has 5% by weight of water and/or alcohol present in the water absorbent. The 5% is with respect to the total weight of water to the water absorbent material. The water and/or alcohol absorbing material preferably comprises water absorbing fibers. When providing alcohol, there is usually about 8% water present because of the difficulty in separating water from alcohol, except by expensive processing. The alcohol itself can provide additional anti-microbial activity, so the combination of alcohol and the molecular iodine is particularly effective in the practice of the present technology.

The composition that reacts with water and/or alcohol to form molecular iodine may comprise at least two salts, one of which at least two salts comprises an iodide salt. The at least two salts may be selected from the group consisting of a) XY and b) Z I, wherein X is a metal, Y is an anion, and Z is an alkali metal, ammonium or alkaline cation. X is preferably a divalent metal cation. Y is preferably selected from carbonate, sulfate, sulfite, phosphate, phosphate, nitrate and nitrite, and Z is preferably selected from the group consisting of lithium, potassium, calcium, magnesium, sodium and ammonium. The composition that reacts with water to form molecular iodine preferably comprises cupric sulfate and potassium iodide.

The articles and compositions may have the iodine forming composition appropriately located within the article. For example, where the article is a hand-wipe sheet or diaper, it may have more than 70% of total composition in a central

50% of volume of the diaper. There is little need for antimicrobial activity on the portions of the diaper contacting the outer portions of the hips. Similarly, there would be little need for such activity along the waistband of the diaper. It is therefore desirable to concentrate the active materials in the diaper where the water (e.g., urine) is likely to be emitted. The iodine would migrate through the path of the water to all wetted areas.

A method of inhibiting microbial growth in an article provides a composition within the article, the composition comprising at lest two compounds that react in the presence of water to produce molecular iodine, and placing the article against the skin of an animal where an aqueous emission from the animal may occur. The method acts so that upon addition of water in an amount of between 10 and 100% by weight of the composition, a concentration of at least 10 parts per million of iodine is produced in the water in less than 15 minutes. The activity of the materials may be increased with respect to halogen releasing ability and volume by adding further halogen releasing components, especially iodates, chlorates, bromates, periodates, perchlorates and/or perbromates as a further reagent (e.g., as above 0% to 200% by weight of the further halogen-releasing components to KI. Metal, non-metal, alkaline and alkali halogens compounds may be used.

Another improvement would be to include starch materials into the composition or the surface to be treated so that the released iodine would cause the standard reaction for starch testing and a blue coloration would appear on the surface to alert caregivers that activation had occurred.

Example 2

Prophetic

Two porous films of water-soluble or water-dispersible material such as mannitol are extruded, the porosity provided by mechanical punching of the film of leaching of materials from the film, as well understood in the art. The separate films would contain 40% by weight of Copper Sulfate and 40% by weight of Potassium Iodide. The films can be used as adjacent or opposite side containers for the fiber fill (preferably with a separate non-dissolvable film).

Example 3

Individual granules of Copper Sulfate and Potassium Iodide are coated with water-soluble/dispersible coatings, preferably in the 2-8 micron thickness range. The uncoated particles would preferably have a diameter of between 5-50 microns so that they could be carried in fiber fill for a diaper without too ready settling out of the fiber fill. The coated particles are mixed into the fiber fill, either alone or with a tacky material (on the fiber or on the particles, such as a partially dried coating on the particles) to avoid separation. The fiber particle blend would constitute the fiber fill in a diaper.

FIG. 1 shows a view of the inside of an opened diaper product 20 and the distribution of compositions according to the present technology. The diaper product 20 is shown with a longitudinal center-line 100 and a horizontal center-line 110 about which are approximately symmetrically disposed wide panels 30, adhesive tabs 40, a central absorbent sheet 24, a stretchable/flexible outer cover layer 32 that may be continuous with the wide panels 30. A sectioned area 26 exposes longitudinal elastic filaments 54 that form the elasticity of the diaper along with the crinkling pattern 52. There are significant indentations 50 on the sides of the diaper t20 to allow

EXHIBIT 2                                              Page 10 of 12

US 7,943,158 B2

19

fitting to legs. The central absorbent sheet **24** is shown with four separate areas **22** within which there could be the heaviest concentrations of the iodine forming material, and two panels **34** that are towards a more rearward placement on a user where lower concentrations of iodine forming material could be located. Areas outside the central absorbing sheet **24** may have little or no iodine forming materials therein. As noted above, the concentration of the iodine forming materials should be centralized where liquids are more likely to be emitted into the absorbent area and be retained in the absorbent area. The upper region of the diaper and pad **36** and the lower region of the diaper and pad **38** could therefore have less total amount and less concentration of the iodine forming materials then the central area **37**. These concentration variations in the vertical direction may also be reflected or substituted with similar regional variations in the horizontal direction of the diaper **20**.

The concentration of the iodine forming material may be selected in the article according the ultimate needs and designs of the manufacturer, and the level of anti-bacterial effect desired. The concentration of the iodine gas in the liquid in the absorbent material is one measure of the desired results, and a further measure of the desired results is referred to in the art as the kill percentage, a measure of the percent of a specific bacteria (e.g., *E. coli*) in a liquid sample that would be killed in 5 minutes by the level of active ingredient present. An example would be that the presence of about 8 parts per million of gaseous iodine dissolved in the aqueous material in the absorbent material would have a kill percentage over 50%. It would be desired, as noted above, to have higher concentrations of gaseous iodine in the liquid so that kill percentages are at least 60%, at least 70%, at least 80% and even at least higher than 90% for targeted bacteria and other microbes. Depending upon the specific bacteria or microbe selected for the measurement, the liquid may have to be provided with at least 5 or 10 parts per million (ppm), at least 15 ppm, at least 20 ppm, or at least 25 ppm by controlling the amount of reagents added, the rate of reaction of the reagents, and other controls aimed at keeping the iodine in solution in the liquid, such as providing thickening agents or other materials that would reduce the volatility of the iodine gas from the solution.

Example 3

Prophetic

Particles of KI would be impact coated with smaller particles (¹⁄₁₀ to ¹⁄₅ diameter ratio) of polyvinyl alcohol in accordance with the teachings of the processes and equipment shown in U.S. Pat. No. 6,037,019 (Kooyer). These PVA coated particles could then be mixed with particles of cupric sulfate with no concern for any immediate reaction between the salts, even in the presence of ambient moisture. These particles could be carried to the application site for admixture into water to provide iodine or into other carrier material for application to conduit surfaces. It is important to appreciate that both water-borne iodine, alcohol-borne iodine and vapor-borne iodine can be produced in a single environment to address cracks, nooks and crannies in the surfaces to be treated or in the delivery system where intimate contact with water might be difficult.

The activity of the materials may be increased with respect to halogen releasing ability and volume by adding further halogen releasing components, especially iodates, chlorates, bromates, periodates, perchlorates and/or perbromates as a further reagent (e.g., as above 0% to 200% by weight of the

20

further halogen-releasing components to KI. Metal, non-metal, alkaline and alkali halogens compounds may be used.

There are additional or alternative constructions that may be provided within the practice of the present technology, which should not be considered as limited to any specific examples or materials provided. Materials may be coated or adsorbed and attached by van der walls interactions to provide protection. Multiple coatings of same or different materials may be provided over the reagents or to create a layered reagent product. The protective, humidity resistant coating can be liquid (mineral oil, low MW polymers or plasticizers). Materials may be coated as single particle or as an agglomerate The technology of this invention need not be limited to only I2 delivery, but to any system in a superabsorbent carrier material or absorbent carrier material to deliver other antimicrobial activity or any other function, such as odor delivery, catalyst delivery, reagent delivery, light emission (as by reaction of fluoroluminescent reagents), and the like. There are examples of blending untreated CuSO4 and KI in superabsorbent polymers SAP (i.e., color change as a function of time) provided above. Images may actually be displayed with the color changes, providing an entertaining visual display.

All references cited herein are incorporated by reference in their entirety.

What is claimed:

**1**. A process for the stabilization of two reactants that form iodine in the presence of water comprising:

providing at least two solid reactants in particulate form that when dissolved or dispersed together in water generate iodine;

providing a coating on at least one of the at least two reactants in particulate form with a layer that is disruptable, dispersible or soluble in water to form a coated reactant; and

combining the at least two solid reactants into a single milieu including the coated reactant.

**2**. The method of claim **1** wherein the coating comprises a stand-off coating of stand-off particles having a diameter that is less than 20% of average particle diameters for the at least one of the at least two reactants.

**3**. The method of claim **2** wherein the stand-off particles form a discontinuous coating on surfaces of the at least one reactant particles.

**4**. The method of claim **3** wherein the stand-off particles have a diameter that is less than 10% of average particle diameters for the at least one of the at least two reactants.

**5**. The method of claim **4** wherein the stand-off particles comprise inorganic oxide particles.

**6**. The method of claim **1** wherein the coating comprises a coating of a water-soluble material.

**7**. The method of claim **6** wherein the water-soluble material comprises a water-soluble polymer.

**8**. The method of claim **1** wherein the coating comprising a coating of a water-dispersible material.

**9**. The method of claim **8** wherein the water-soluble material comprises a water-dispersible polymer.

**10**. The method of claim **1** wherein the at least two reactants comprise XY and ZI wherein X is a metal, Y is an anion, Z is an alkali metal or alkaline cation and I is Iodide.

**11**. The method of claim **1** wherein the at least two reactants comprise $Cu^{+2}SO_4^{-2}$ and $K^+I^-$.

**12**. The method of claim **4** wherein the at least two reactants comprise $Cu^{+2}SO_4^{-2}$ and $K^+I^-$.

**13**. The method of claim **5** wherein the at least two reactants comprise $Cu^{+2}SO_4^{-2}$ and $K^+I^-$.

**14**. The method of claim **8** wherein the at least two reactants comprise $Cu^{+2}SO_4^{-2}$ and $K^+I^-$.

EXHIBIT 2                                    Page 11 of 12

US 7,943,158 B2

21

**15**. The method of claim **1** wherein iodine is released to an environment by contacting the milieu with sufficient aqueous material to breach the coating and allow the at least two reactants to react to generate iodine in the aqueous material.

**16**. The method of claim **5** wherein iodine is released to an environment by contacting the milieu with sufficient aqueous material to breach the coating and allow the at least two reactants to react to generate iodine in at least the aqueous material, the at least two reactants comprise $Cu^{+2}SO_4^{-2}$ and $K^{+}I^{-}$ and the milieu comprises the two reactants as particles, stand-off particles and a carrying medium.

**17**. The method of claim **7** wherein the at least one coated particle is retained in the milieu by bonding of the water-soluble coating with solid material in the milieu.

**18**. The method of claim **1** wherein the milieu is selected from the group consisting of a) mixtures of particles, b)

22

mixtures of particles with a carrying medium, c) packets of particles, d) fabric containing particles, e) compacted pellets, and f) combinations of a), b), c), d) and e.

**19**. The method of claim **18** wherein the milieu comprises fabric in a structured form that retains its shape when contacted with the aqueous material.

**20**. The method of claim **15** wherein the at least two reactants comprise $Cu^{+2}SO_4^{-2}$ and $K^{+}I^{-}$ and the milieu comprises the two reactants as particles, stand-off particles and a carrying medium.

**21**. The method of claim **19** wherein the at least two reagents, including the at least one coated reagent are combined with fabric material prior to establishing a final structured form of the fabric so that the fabric physically retains the at least two reagents in the structured form.

\* \* \* \* \*

EXHIBIT 2                    Page 12 of 12

# EXHIBIT 3

US008574610B2

(12) **United States Patent**
Code

(10) Patent No.: **US 8,574,610 B2**
(45) Date of Patent: **\*Nov. 5, 2013**

(54) **MATERIAL HAVING ANTIMICROBIAL ACTIVITY WHEN WET**

(75) Inventor: **Kenneth R. Code**, Edmonton (CA)

(73) Assignee: **Biolargo Life Technologies, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/987,465**

(22) Filed: **Jan. 10, 2011**

(65) **Prior Publication Data**

US 2011/0104303 A1    May 5, 2011

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/516,960, filed on Sep. 7, 2006, now Pat. No. 7,867,510.

(51) **Int. Cl.**
*A01N 25/12* (2006.01)

(52) **U.S. Cl.**
USPC ............. **424/421**; 422/37; 423/197; 423/504; 423/557; 424/405; 424/417; 424/637; 424/667; 424/669; 424/670

(58) **Field of Classification Search**
USPC ................ 424/667–671, 405, 417, 421, 637; 423/197, 504, 557; 422/29, 30, 37
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 206,024 A | | 7/1878 | Kendall |
| 2,134,791 A | | 11/1938 | Loweke |
| 2,973,266 A | * | 2/1961 | Rosenberg .................... 424/489 |
| 3,015,611 A | * | 1/1962 | Smedresman ................ 514/777 |
| 3,464,413 A | | 9/1969 | Goldfarb et al. |
| 3,489,148 A | | 1/1970 | Duncan et al. |
| 3,585,998 A | | 6/1971 | Hayford et al. |
| 3,800,792 A | | 4/1974 | McKnight et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2278959 | * | 1/2001 |
| EP | 0206024 | | 12/1986 |

(Continued)

OTHER PUBLICATIONS

P. Kapur and M. Verma, "Determination of Iodate Ion in Presence of Cupric Ion", Industrial and Engineering Chemistry Analystical Ed.; vol. 13, No. 5 (May 1941). p. 338.

(Continued)

*Primary Examiner* — Neil Levy

(74) *Attorney, Agent, or Firm* — Mark A. Litman & Associates, P.A.

(57)    **ABSTRACT**

An article or material is applied to the environment of the body of an animal (including humans) to provide both absorbency and antimicrobial activity. The article or material may comprise a water absorbent material; and a composition that reacts with water to produce molecular iodine. The composition provides a local concentration (in the water) of at least 10 parts per million iodine in water carried by the material (that is actual water supported by the water absorbent material) when the material has 5% by weight of water present in the water absorbent. The material may be a flowable material, or the article may be diaper, sanitary pad, bandage, adhesive pad or wrap for an animal.

**18 Claims, 1 Drawing Sheet**



**EXHIBIT 3**                    **Page 1 of 9**

## US 8,574,610 B2

Page 2

(56)                **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,896,807 | A | 7/1975 | Buchalter |
| 4,375,535 | A | 3/1983 | Kightlinger et al. |
| 4,381,784 | A | 5/1983 | Aberson et al. |
| 4,405,323 | A | 9/1983 | Auerbach |
| 4,418,686 | A | 12/1983 | Child |
| 4,497,930 | A | 2/1985 | Yamasaki et al. |
| 4,675,014 | A | 6/1987 | Sustmann et al. |
| 4,722,937 | A | 2/1988 | Jacob et al. |
| 4,731,391 | A | 3/1988 | Garvey |
| 4,983,390 | A * | 1/1991 | Levy ............................ 424/404 |
| 5,201,326 | A | 4/1993 | Kubicki et al. |
| 5,612,045 | A | 3/1997 | Syverson |
| 5,643,588 | A | 7/1997 | Roe et al. |
| 6,251,521 | B1 | 6/2001 | Eian |
| 6,365,220 | B1 | 4/2002 | Burrell et al. |
| 6,403,113 | B1 | 6/2002 | Corzani |
| 6,403,674 | B1 | 6/2002 | Schubert |
| 6,703,536 | B2 | 3/2004 | Roe et al. |
| 7,033,509 | B2 | 4/2006 | Klein et al. |
| 7,431,849 | B1 | 10/2008 | Swearingen |
| 7,867,510 | B2 * | 1/2011 | Code ........................... 424/443 |
| 2003/0135172 | A1 | 7/2003 | Whitmore et al. |
| 2004/0267223 | A1 | 12/2004 | Etchells |
| 2005/0196593 | A1 | 9/2005 | Campbell et al. |
| 2008/0095812 | A1 | 4/2008 | Code |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| GB | 2134791 | | 8/1984 |
| WO | WO92/09289 | | 6/1992 |
| WO | WO 98/24486 | * | 6/1998 |

### OTHER PUBLICATIONS

PCT International Search Report and the Written Opinion of the International Searching Authority dated Sep. 18, 2009, from related International patent application PCT/US2009/04248.

* cited by examiner

**EXHIBIT 3**                                            **Page 2 of 9**



**EXHIBIT 3**                                         **Page 3 of 9**

US 8,574,610 B2

**1**

# MATERIAL HAVING ANTIMICROBIAL ACTIVITY WHEN WET

## RELATED APPLICATION DATA

This application is a continuation-in-part of U.S. patent application Ser. No. 11/516,960, filed Sep. 7, 2006, now U.S. Pat. No. 7,867,510.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present technology relates to the field of antimicrobial protection, particularly antimicrobial activity in close proximity to the bodies of patients, and more particularly in removable materials placed into contact with the bodies of patients.

### 2. Background of the Art

The growth of many microbes is assisted by or enabled by the presence of water with the microbes. Water and aqueous materials are present in events and activities of most mammalian life forms. Aqueous solutions and dispersion and emulsions are present in blood, exudates, tears, perspiration, menstrual emissions and waste emissions of mammals. These are natural events in life cycles, but may be accompanied by contact with or attack by microbes that can have significant physical effects on the animals (including humans) and their surrounding. At a minimum, growth of some microbes in aqueous materials around the animals can develop odors, disease-carrying media, infections and death or damage to the bodies of the animals.

There are many instances where aqueous materials are retained in contact with animal bodies and in which there is potential for unwanted and even dangerous and significant microbial growth or microbial introduction into the animal body. For example, in the application of materials wound dressing, menstrual products, patches, diapers, pads and the like, moisture from the animal body or ambient conditions or the materials themselves can introduce microbes to the environment and those microbes can proliferate in the vicinity of the materials when moisture is present. The uncontrolled growth of random microbes is seldom beneficial and has been the subject of significant efforts at control.

Many applications exist where it is necessary or at the very least an advantage for agents to be present which demonstrate anti-bacterial, anti-mycotic activity or both, resulting in the control of bacterial and/or fungal growth. For example, an apparatus or article as a whole or in part may have the property of suppressing bacterial and fungal growth. Control of bacterial and/or fungal growth may be through the prevention or inhibition of the growth of such microbes.

The most consistent forms of attempts at microbial control on patients are the direct application of compositions to the surface of patients likely to become infected, such as wounds, vaginal area, areas surrounding diapers and the like. Ointments, creams, tinctures, solutions and other materials have been applied directly to the patients affected areas as a treatment. These treatments generally direly apply or carry active antimicrobial materials to the site, either as a direct application of carried with a device to be secured locally to the patient. Among the type of efforts in this direction have been sources of silver ions surgical and other types of wound dressings. This aspect has been investigated and reported in U.S. Pat. No. 3,800,792. Metallic silver is incorporated into the dressing in one form or another and through dissolution silver ions arc released into the treated area. U.K. Patent Application 2,134,791 discloses that composites containing

**2**

various metals, such as silver, gold, palladium, platinum and tin are useful in surgical dressings, where the preferred metal is silver. It is postulated that the slow release of silver ions is facilitated by a galvanic interaction with the substrate of the dressing with added metallic or nonmetallic compounds.

European Patent Application 0206024 discloses use of very smooth coatings of various metal combinations on medical devices, such as catheters to provide some antimicrobial activity when the devices are in contact with body fluids.

U.S. Pat. No. 4,418,686 is directed to an implant active in releasing silver ions to treat a bacterial infection. In U.S. Pat. No. 4,418,686, the implant consists of a plurality of spaced-apart metallic bands on a plastic insert where the surfaces of the bands consist of alternate materials, such as silver and gold. The presence of the silver and gold metals in the presence of body fluids results in a galvanic action which is intended to release or liberate silver ions.

A variety of materials are used every day in treating or preventing infections in humans, animals and the like. For example, catheters, sutures surgical gloves, implants, bandages, diapers, diaper liners, dressings, small adhesive dressings, sanitary napkins and insoles are just a few. Normally, bandages are used as a barrier to airborne pathogenic organisms infecting a cut or wound. However, once infection occurs, the bandage is no longer of any benefit. If the bandage were provided with a broad spectrum antimicrobial agent, on the portion of the bandage which is in contact with the wound and surrounding skin, the bandage becomes an actively rather than a passively antimicrobial surface or microbial barrier. Catheters, implants, bandages, dressings and other materials, such as above, are used extensively every day by millions of people. As a result, any form of antimicrobial material incorporated into these types of devices must be safe for general unsupervised use, should avoid selection of resistant strains, and should be cost effective. Furthermore, the materials may have to retain their flexibility such as with bandages so as to be readily usable. Catheters, implants, bandages, diapers, diaper liners, dressings, and the like can be readily coated with thin films of active elements which, when in contact with body fluids, release substances and ions which stop the growth of or kill various types of microorganisms. As here described, there is no requirement to apply any outside electric current to maintain sustained levels of ion release to treat the infected area.

U.S. Pat. No. 6,365,220 A process for production of an actively antimicrobial surface for a substrate and for use in a biologically dynamic environment, such as for treating and preventing microbial infections, including a film consisting of at least an antimicrobial element and another electrochemically nobler element and which forms multitudinous galvanic cells with electrolyte-containing biological fluids, such as body fluids from wounds, etc., for releasing the antimicrobial element at the surface.

WO92/09289 teaches an improved method for treating diaper rash of neonates, infants, children and incontinent adults which entails applying to the site of diaper rash a composition comprising 15-40% of a copolymer or a derivative thereof, of a lower alkyl vinyl ether and maleic acid dispersed in a semisolid ointment base.

U.S. Pat. No. 4,381,784 discloses an absorbent device designed to absorb blood or blood-like fluids such as a sanitary napkin which is combined with a blood gelling agent which includes, amongst others, maleic anhydride copolymers.

U.S. Pat. No. 6,403,113 describes that certain copolymers can be used to control or prevent the growth of microbic agents such as bacteria and fungus. It has further been found

**EXHIBIT 3**                    **Page 4 of 9**

US 8,574,610 B2

3

that certain derivatives of these copolymers also have anti-bacterial and anti-mycotic properties. The finding that the copolymers of the invention and derivatives thereof which are preferably of high molecular weight can be used as anti-bacterial and/or anti-mycotic agents provides many advantages over anti-microbic agents of the prior art, in particular, due to the large molecular weight and polymeric character of the anti-microbic agents of the invention. Furthermore, the copolymers or derivatives per se or blends of said copolymers or derivatives can be formed into articles or incorporated into articles in the form of films, fibers, adhesives etc. The copolymers of the invention have a low toxicity due to their high molecular weight and possess intrinsic anti-bacterial and anti-mycotic activity.

U.S. Pat. No. 6,703,536 describes an absorbent article, at least a portion of which comprises a skin care composition of an enzyme inhibitor and is at least partially transferred from the article to the skin of a wearer of the article as a result of normal contact, wearer motion and/or body heat.

The art has also used lotions in combination with absorbent articles. Examples include: U.S. Pat. No. 3,585,998 to Hayford et al.; U.S. Pat. No. 3,464,413 to Goldfarb et al.; U.S. Pat. No. 3,896,807 to Buchalter; U.S. Pat. No. 3,489,148 to Duncan et al.; and U.S. Pat. No. 5,643,588 to Roe et al.

U.S. Pat. No. 5,643,588 describes diapers having top sheet containing lotion with Lotion compositions can comprise other optional components typically present in emollient, creams, and lotions of this type. These optional components include water, viscosity modifiers, perfumes, disinfectant antibacterial actives, pharmaceutical actives, film formers, deodorants, opacifiers, astringents, solvents and the like. In addition, stabilizers can be added to enhance the shelf life of the lotion composition such as cellulose derivatives, proteins and lecithin. All of these materials are well known in the art as additives for such formulations and can be employed, in appropriate amounts in the lotion compositions of the present invention.

There exists in the female body a complex process which maintains the vagina and physiologically related areas in a healthy state. In a female between the age of menarche and menopause, the normal vagina provides an ecosystem for a variety of microorganisms. Bacteria are the predominant type of microorganism present in the vagina; most women harbor about 10.sup.9 bacteria per gram of vaginal exudate. The bacterial flora of the vagina is comprised of both aerobic and anaerobic bacteria. The more commonly isolated bacteria are *Lactobacillus* species, corynebacteria, *Gardnerella vaginalis, Staphylococcus* species, *Peptococcus* species, aerobic and anaerobic Streptococcal species, and *Bacteroides* species. Other microorganisms that have been isolated from the vagina on occasion include yeast (*Candida albicans*), protozoa (*Trichomonas vaginalis*), *mycoplasma* (*Mycoplasma hominis*), chlamydia (*Chlamydia trachomatis*), and viruses (*Herpes simplex*). These latter organisms are generally associated with vaginitis or venereal disease, although they may be present in low numbers without causing symptoms. Physiological, social and idiosyncratic factors affect the quantity and species of bacteria present in the vagina. Physiological factors include age, days of the menstrual cycle, and pregnancy. For example, vaginal flora present in the vagina throughout the menstrual cycle can include *lactobacilli, corynebacterium, ureaplasma*, and *mycoplasma*. Social and idiosyncratic factors include method of birth control, sexual practices, systemic disease (e.g. diabetes), and medication. Bacterial proteins and metabolic products produced in the vagina can affect other microorganisms and the human host. For example, the vagina between menstrual periods is mildly

4

acidic having a pH ranging from about 3.8 to about 4.5. This pH range is generally considered the most favorable condition for the maintenance of normal flora. At that pH, the vagina normally harbors the numerous species of microorganisms in a balanced ecology, playing a beneficial role in providing protection and resistance to infection and makes the vagina inhospitable to some species of bacteria such as *Staphylococcus aureus* (*S. aureus*). The low pH is a consequence of the growth of *lactobacilli* and their production of acidic products. Microorganisms in the vagina can also produce antimicrobial compounds such as hydrogen peroxide and bactericides directed at other bacterial species. One example is the lactocins, bacteriocin-like products of *lactobacilli* directed against other species of *lactobacilli*. Some microbial products may affect the human host. For example, *S. aureus* can produce and excrete into its environment a variety of exoproteins including enterotoxins, Toxic Shock Syndrome Toxin-1 (TSST-1), and enzymes such as proteases and lipase. There have been numerous attempts to reduce or eliminate pathogenic microorganisms and menstrually occurring TSS by incorporating into a tampon pledget one or more biostatic, biocidal, and/or detoxifying compounds. For example, L-ascorbic acid has been applied to a menstrual tampon to detoxify toxin found in the vagina of the human female during menstruation.

Incorporating glyceryl triacetate into a tampon pledget has been suggested. Others have incorporated monoesters and diesters of polyhydric aliphatic alcohols and a fatty acid containing from 8 to 18 carbon atoms. For example, glycerol monolaurate (GML) has been used to inhibit the production of *S. aureus* enterotoxins and TSST-1. However, as noted above, esterase is abundantly present in the vaginal epithelium and menstrual fluid. This esterase, in combination with esterase and lipase produced by bacteria can enzymatically degrade the esters into non-effective compounds. Until now, persons skilled in the art have not appreciated the affects of lipase and esterase on ester compounds.

U.S. Pat. No. 5,612,045 describes absorbent articles, such as catamenial tampons, for absorbing body fluids are disclosed which include an effective amount of a compound to substantially inhibit the production of exotoxins by Gram positive bacteria.

U.S. Pat. No. 4,405,323 to Auerbach discloses a tampon designed to eliminate the hazards of toxic shock syndrome and dysmenorrhea. The tampon has incorporated therein an antibacterial agent which is said to disperse on contact with body fluids and prevent development of the organisms which produce the toxins which cause toxic shock syndrome. Among the antibacterial materials disclosed for use are povidone-iodine compound, mercury, zinc, penicillin, erythromycin and nitrofurazone. (Povidone iodine is a topical preparation containing povidone and iodine, used for antisepsis of the skin.)

U.S. Pat. No. 5,201,326 describes a rod-shaped medical tampon for releasing an active substance, including (a) a tampon core of compressed fibers selected from the group consisting of cellulose fibers, cotton fibers, and acetate fibers; (b) a tampon cover surrounding said tampon core and being firmly bonded to one another by a glue, the tampon cover comprising a hardened collagen foam or a hardened gelatin foam impregnated with a retardant including a dissolved active substance to be released; and (c) a retrieval string connected to at least one of said tampon core and said tampon cover.

U.S. Pat. No. 4,722,937 method of prophylactics with respect to detoxification of *Staphylococcus aureus* and other toxins by ascorbic acid, salts and esters, topically applied by

EXHIBIT 3                                                                                                    Page 5 of 9

US 8,574,610 B2

5

means of carriers which are otherwise regularly employed in the area where *Staphylococcus aureus* or other bacteria colonize, such as a pharmacological appliance including gauze pads, an absorbant mass or pad associated with menses, douches, and contraceptive compositions.

U.S. Pat. No. 4,675,014 describes method for absorbing bodily secretions while hindering the generation of odors and growth of microbes comprising applying a fibrous mass having copper cations bound through selected anions, preferably carboxymethyl, the amount of chemically bound copper being between 0.1 and 3% by weight. The fibrous mass can be in the form of a catamenial device, bandage, diaper, shoe liner, or the like.

### SUMMARY OF THE INVENTION

An article for application, association with or attachment to the body of an animal (including humans) provides both absorbency and antimicrobial activity. The article may be a diaper, gauze, padding, sanitary napkin, wrap, bandage, bandaid or the like and may comprise a water absorbent material; and a composition that reacts with water to produce molecular iodine. The composition provides a local concentration of at least 10 parts per million iodine in water carried by the material when the material has 5% by weight of water present in the water absorbent with respect to the total weight of the water absorbent material.

### BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** shows a view of the inside of an opened diaper product and the distribution of compositions according to the present technology.

### DETAILED DESCRIPTION OF THE INVENTION

One way of providing molecular iodine ($I_2$) on site with a patient, rather than having to find a way of transporting it to a site) is to provide reactants that can readily produce molecular iodine on-site in a controllable reaction. One format of providing the molecular iodine would be through the oxidation-reduction reaction between two salts o4r compounds to produce the molecular iodine. It is a readily controlled environment where the reaction can be performed in an aqueous environment. One reaction that can effect this would be generically described as:

$$X^+Y^-+Z+I^-{\rightarrow}X^o+Z^+Y^-+I_2$$

In this reaction scheme, X is a metal (preferably a multivalent metal and more particularly a divalent metal), Y is an anion (preferably a multivalent anion and more preferably a divalent anion, and an anion having at least two oxygen atoms), Z is an alkali metal or alkaline cation. Examples of X are copper, iron, manganese, lead, nickel, tin, and the like, Y can be sulfate, sulfite, sulfonate, carbonate, phosphate, phosphate, nitrate, nitrie, borate, and the like, and Z can be sodium, lithium, potassium, ammonium, magnesium, aluminum, and the like. One preferred reaction would be:

$$Cu^{+2}SO_4{}^{-2}+K^+I^-{\rightarrow}Cu^o+K_2SO_4+I_2$$

This takes place readily in an aqueous environment and produces molecular iodine at a controlled rate. The reaction may be used by wetting, dispersing or dissolving the molecular iodide and allowing the iodine in the carrying material be released and (to the site (which may be the carrying material itself, such as the fabric, clay, fibers, film etc.) penetrate the area intended to be treated. The iodine may

6

persist for sufficient time to treat the area, particularly within a wetted material on the surface of a patient. The reaction may also be used by dispersing or mixing the two ingredients into the carrying material (e.g., the fabric, fiber, film, sheet, etc.), either with additional water provided, with water of hydration on the first reactant (e.g., $X^+Y^-{\cdot}nH_2O$, such as $CuSO_4{\cdot}5H_2O$) or with ambient water in the carrying material. The two reactants may be physically separated from each other before being combined for application or reaction, as in separate capsules, fibers, layers or the like. The two reactants may be provided as a solid carrier medium that separates the two reactants until they are in contact with water (as in a soluble carrier such as polyvinyl alcohol, gelatin, amylase, sugars and the like, in pellet, fiber, dust, particle or block form). The two reactants may be independently coated with a soluble/dispersible coating and the two ingredients kept in a single water-penetrable layer.

Although the materials of the described technology may be provided in a vast array of materials and compositions applied to the surface of patients, such as bandages, bandaids, diapers, gauze, wraps, sanitary napkins, tampons, plugs, sheet coverings 9 e.g., on beds) and the like, the discussion will emphasize diapers and incontinence diapers for simplifying the disclosure, without intending to limit the scope of the invention.

The Technology described herein is performed by applying a solid carrier system to a patient, and awaiting the presence of sufficient water on or in the carrier system to activate the ingredients and cause the gaseous iodine to form in sufficient concentration in the solid carrier to attenuate, reduce or eliminate bacterial growth in the solid carrier. A simple format, in considering diaper-like materials for any age animal, would include at least the following formats:

1) particulate and separate reactants may be carried in the same layer of the diaper;

2) particulate and separate reactants may be carried in different layers of the diaper;

3) particulate reactants may be carried in the same pellets in an anhydrous condition in the same layer of a diaper;

4) the particulate reactants may be adhered to the same or separate fibers or films that are associated with on constitute the diaper;

5) the reactants may be carried in fiber materials dispersed throughout or partially constituting the structure of the diaper;

6) capsules or microcapsules of the reactants in water-soluble or water-dispersible shells may be distributed throughout the diaper; and

7) a film or films (water-soluble, water-dispersible or water-leachable) may carry one or more of the reactants, with the other reactant in a location that released or carried first reactant will be placed into contact with the second reactant in the presence of water.

Other formats and process may be used as long as the presence of water on the carrier system enables the generation of gaseous molecular iodine within the carrier in sufficient concentration to act as a microbicide.

The process may use the above reaction to form the molecular iodine represented by

$$XY+ZI{\rightarrow}X^o+ZY+I_2$$

wherein X is a metal, Y is an anion, Z is an alkali metal or alkaline cation, or where X is a multivalent metal, Y is a multivalent anion, and Z is an alkali metal or alkaline cation, and is preferably represented by

$$Cu^{+2}SO_4{}^{-2}+K^+I^-{\rightarrow}Cu^o+K_2SO_4+I_2$$

**EXHIBIT 3**                    **Page 6 of 9**

US 8,574,610 B2

7

The process may be performed where the two reactants are carried in a superabsorbent polymer. The solids carriers for the two reactants may also include compositions of the present that comprise superabsorbent or non-superabsorbent polymers, natural products (e.g., papers, cellulosic solids such as wood particles, fibers or chips, water-insoluble porous materials which absorb or adsorb the film-forming material within the structure such as clays [e.g., bentonite and other known water-absorbing clays], porous ceramic particles, crushed porous stone, crushed concrete or diatomaceous earth, water-soluble porous materials which absorb or adsorb the film-forming material within the structure, porous containers which merely slowly release a volume of the film-forming material, porous containers which both dissolve and physically release volumes of the film-forming composition through pores, and the like, alone or in combination with each other and further ingredients described herein). In general, selection of an effective application rate can depend on habitat depth, surface debris, emergent and surface vegetation, organic matter, microbial and algal concentration, the specific target species, and the developmental stage of the target species. Superabsorbent polymers are described, by way of non-limiting examples in U.S. Pat. Nos. 6,403,674; 4,731,391. Superabsorbent polymers, including starch graft co-polymers, are known in the art. See, for example, those described in U.S. Pat. Nos. 4,375,535 and 4,497,930 (incorporated herein by reference), which have disclosed uses as adhesives, flocculants, sizes, water-retaining materials for agriculture and water-absorbing materials for sanitary materials. However, the spectrum of advantages attendant the use of superabsorbent polymers in solid and flowable terrestrial insecticidal, pesticidal or insecticidal/pesticidal delivery compositions have gone unrecognized. The composition that reacts with water to form molecular iodine may be cupric sulfate and potassium iodide and, independently, the water absorbent solid carrier material may be a material selected from the group consisting of inorganic particles, solid inorganic particles and solid absorbent organic particles and combinations thereof, as described elsewhere herein.

The superabsorbent polymers of the present invention are synthetic organic polymers which are solid and hydrophilic, absorbing over 100 times their weight in water. These superabsorbent polymers are typically in a powder, granule, extruded, or flake form, adapted to be blended and/or agglomerated into any shape or form. The superabsorbent polymers may be, for example, acrylamide alkali metal acrylate copolymers; propenenitrile homo-polymers, hydrolyzed, alkali metal salts; polymers of propenamide and propenoic acid, alkali metal salts; hydrolyzed acrylonitrile co-polymers, and starch graft co-polymers and ter-polymers thereof. All of these are designed to be hydrophilic, absorbing over 100 times their weight in water. The resulting hydrophilic polymers can absorb from over one hundred to greater than about 5000, more typically around 500 to about 1,000, times their own weight in water (measured using distilled water, pH 7.5, 25, 760 mm Hg. absorption within about 30 seconds). However, the absorption or swelling capacity and absorption or swelling time typically varies with each specific superabsorbent polymer.

One class of superabsorbent polymers include combinations of a starch and organic monomers, oligomers, polymers, co-polymers or ter-polymers. They may be manufactured in a variety of ways, for example, the methods described in U.S. Pat. Nos. 4,375,535 and 4,497,930, and can be, for example, the product of grafting corn starch (amylopectin) with acrylonitrile (an acrylic monomer or oligomer). A second class of

8

superabsorbent polymers includes combinations of acrylamide and acrylate polymers, co-polymers and ter-polymers.

The following examples are provided as prophetic descriptions of formats for delivery of technology according to the descriptions of the present invention.

Example 1

Fibers would extruded in a non-aqueous solvent of polyvinyl alcohol in two separate batches in combination with particulate reactants. One set of fibers would comprise 40% by weight of Copper Sulfate and the other set of fibers would comprise 40% by weight of Potassium Iodide. The two separate fibers would blended as 5% by total weight of fabric material into the fiber filled used in a diaper. The relatively low concentration (5%) of total added fiber would be expected to minimally change the properties expected from the fiber fill, except for the additional antimicrobial function, Upon accidental release of urine (an aqueous solution) into the diaper, the polyvinyl alcohol would dissolve, the two reactants would dissolve in a single solution, the reactants would react, and the gaseous iodine would be produced.

The technology described herein may be generally described as an article for application to the body of an animal (including humans) to provide both absorbency and antimicrobial activity. The article may comprise a water absorbent material; and a composition that reacts with water to produce molecular iodine. The composition provides a local concentration (in the water) of at least 10 parts per million iodine in water carried by the material (that is actual water supported by the water absorbent material) when the material has 5% by weight of water present in the water absorbent. The 5% is with respect to the total weight of water to the water absorbent material. The article may be a diaper, sanitary pad, bandage, bandaid or wrap for an animal. The water absorbing material preferably comprises water absorbing fibers. The composition that reacts with water to form molecular iodine may comprise at least two salts, one of which at least two salts comprises an iodide salt. The at least two salts may be selected from the groups consisting of a) XY and b) ZI, wherein X is a metal, Y is an anion, and Z is an alkali metal, ammonium or alkaline cation. X is preferably a divalent metal cation. Y is preferably selected from carbonate, sulfate, sulfite, phosphate, phosphate, nitrate and nitrite, and Z is preferably selected from the group consisting of lithium, potassium, calcium, magnesium, sodium and ammonium. The composition that reacts with water to form molecular iodine preferably comprises cupric sulfate and potassium iodide.

The article may have the iodine forming composition appropriately located within the article. For example, where the article is a diaper, it may have more than 70% of total composition in a central 50% of volume of the diaper. There is little need for antimicrobial activity on the portions of the diaper contacting the outer portions of the hips. Similarly, there would be little need for such activity along the waistband of the diaper. It is therefore desirable to concentrate the active materials in the diaper where the water (e.g., urine) is likely to be emitted. The iodine would migrate through the path of the water to all wetted areas.

A method of inhibiting microbial growth in an article provides a composition within the article, the composition comprising at lest two compounds that react in the presence of water to produce molecular iodine, and placing the article against the skin of an animal where an aqueous emission from the animal may occur. The method acts so that upon addition of water in an amount of between 10 and 100% by weight of

EXHIBIT 3                                    Page 7 of 9

US 8,574,610 B2

9

the composition, a concentration of at least 10 parts per million of iodine is produced in the water in less than 5 minutes.

Another improvement would be to include starch materials into the diaper or the surface of the diaper so that the released iodine would cause the standard reaction for starch testing and a blue coloration would appear on the surface of the diaper to alert caregivers that urination had occurred.

### Example 2

Two porous films of water-soluble or water-dispersible material such as mannitol are extruded, the porosity provided by mechanical punching of the film of leaching of materials from the film, as well understood in the art. The separate films would contain 40% by weight of Copper Sulfate and 40% by weight of Potassium Iodide. The films can be used as adjacent or opposite side containers for the fiber fill (preferably with a separate non-dissolvable film).

### Example 3

Individual granules of Copper Sulfate and Potassium Iodide are coated with water-soluble/dispersible coatings, preferably in the 2-8 micron thickness range. The uncoated particles would preferably have a diameter of between 5-50 microns so that they could be carried in fiber fill for a diaper without too ready settling out of the fiber fill. The coated particles are mixed into the fiber fill, either alone or with a tacky material (on the fiber or on the particles, such as a partially dried coating on the particles) to avoid separation. The fiber particle blend would constitute the fiber fill in a diaper or in the environment of an animal (e.g., its cage or stall).

FIG. **1** shows a view of the inside of an opened diaper product 20 and the distribution of compositions according to the present technology. The diaper product 20 is shown with a longitudinal center-line 100 and a horizontal center-line 110 about which are approximately symmetrically disposed wide panels 30, adhesive tabs 40, a central absorbent sheet 24, a stretchable/flexible outer cover layer 32 that may be continuous with the wide panels 30. A sectioned area 26 exposes longitudinal elastic filaments 54 that form the elasticity of the diaper along with the crinkling pattern 52. There are significant indentations 50 on the sides of the diaper t20 to allow fitting to legs. The central absorbent sheet 24 is shown with four separate areas 22 within which there could be the heaviest concentrations of the iodine forming material, and two panels 34 that are towards a more rearward placement on a user where lower concentrations of iodine forming material could be located. Areas outside the central absorbing sheet 24 may have little or no iodine forming materials therein. As noted above, the concentration of the iodine forming materials should be centralized where liquids are more likely to be emitted into the absorbent area and be retained in the absorbent area. The upper region of the diaper and pad 36 and the lower region of the diaper and pad 38 could therefore have less total amount and less concentration of the iodine forming materials then the central area 37. These concentration variations in the vertical direction may also be reflected or substituted with similar regional variations in the horizontal direction of the diaper 20.

The concentration of the iodine forming material may be selected in the article according the ultimate needs and designs of the manufacturer, and the level of anti-bacterial effect desired. The concentration of the iodine gas in the liquid in the absorbent material is one measure of the desired results, and a further measure of the desired results is referred

10

to in the art as the kill percentage, a measure of the percent of a specific bacteria (e.g., *E. coli*) in a liquid sample that would be killed in 5 minutes by the level of active ingredient present. An example would be that the presence of about 8 parts per million of gaseous iodine dissolved in the aqueous material in the absorbent material would have a kill percentage over 50%. It would be desired, as noted above, to have higher concentrations of gaseous iodine in the liquid so that kill percentages are at least 60%, at least 70%, at least 80% and even at least higher than 90% for targeted bacteria and other microbes. Depending upon the specific bacteria or microbe selected for the measurement, the liquid may have to be provided with at least 10 parts per million (ppm), at least 15 ppm, at least 20 ppm, or at least 25 ppm by controlling the amount of reagents added, the rate of reaction of the reagents, and other controls aimed at keeping the iodine in solution in the liquid, such as providing thickening agents or other materials that would reduce the volatility of the iodine gas from the solution.

All references cited herein are incorporated by reference in their entirety.

What is claimed:

**1**. A flowable particle blend of at least three separate and distinct particles for application to an environment that is a habitat for an animal, the granular composition providing both absorbency and antimicrobial activity comprising:

    a) a granular water absorbent solid carrier material carrier comprising superabsorbent polymer in the form of particles, granules or flakes; and

    b) a reactive composition:

the reactive composition consisting essentially of at least two separate particles as a first particle comprising $CuSO_4$ reagent and a second particle comprising KI reagent, the first particle and the composition of the second particle reacting with each other in the presence of water to produce molecular iodine, each of the first particles and the second particles being carried by a water absorbent solid carrier material so that application of aqueous liquid equal to 100% by weight of the reactive composition to the composition will cause the reagents of the at least two separate particles to be combined by the aqueous liquid and react with each other; and wherein the two separate particles and the water absorbent carrier are granular, the reactive composition providing a local concentration of at least 10 parts per million iodine in the aqueous liquid applied to the granular composition when the granular composition has 5% by weight of aqueous liquid present in the water absorbent solid carrier material with respect to the total weight of the water absorbent solid carrier material.

**2**. The flowable particle blend of claim **1** wherein the water absorbent material carrier comprises i) cellulose solids and ii) superabsorbent polymer.

**3**. The flowable particle blend of claim **2** wherein the superabsorbent polymer comprises superabsorbent fiber.

**4**. The flowable particle blend of claim **2** wherein the superabsorbent polymer comprises superabsorbent particles.

**5**. The flowable particle blend of claim **1** consisting of:

    a) the water absorbent material carrier; and

    b) the reactive composition;

the reactive composition consisting of at least two separate particles as a first particle comprising $CuSO_4$ reagent and a second particle comprising KI reagent, the first particle and the composition of the second particle reacting with each other in the presence of water to produce molecular iodine, each of the first particles and the second particles being carried by a water absorbent solid carrier material so that application of aqueous liquid equal to 100% by weight of the reactive composition to the composition will cause the

EXHIBIT 3      Page 8 of 9

US 8,574,610 B2

11

reagents of the at least two separate particles to be combined by the aqueous liquid and react with each other; and wherein the two separate particles and the water absorbent carrier are granular.

**6.** The flowable particle blend of claim **5** wherein the super-absorbent polymer comprises superabsorbent fiber.

**7.** The flowable particle blend of claim **5** wherein the super-absorbent polymer comprises superabsorbent particles.

**8.** The flowable particulate blend of claim **1** wherein the water-absorbent solid carrier is selected from the group consisting of water-absorbing clays, porous ceramic particles, crushed porous stone, crushed concrete and diatomaceous earth.

**9.** The flowable particulate blend of claim **1** wherein the composition that reacts with water to form molecular iodine comprises cupric sulfate and potassium iodide and the water absorbent solid carrier material comprises a material selected from the group consisting of inorganic particles, solid inorganic particles and solid absorbent organic particles and combinations thereof.

**10.** A flowable particulate composition for application to a stall or cage for an animal, the composition providing both absorbency and antimicrobial activity comprising:

    a) a water absorbent solid carrier material carrier comprising superabsorbent polymer in the form of particles, granules or flakes; and

    b) an at least two particle reactive composition;

the reactive composition comprising at least two separate particles as a first particle comprising $CuSO_4$ reagent and a second particle comprising KI reagent, the first particle and the composition of the second particle reacting with each other in the presence of water to produce molecular iodine, each of the first particles and the second particles being carried by the water absorbent solid carrier material so that application of aqueous liquid equal to 100% by weight of the reactive composition to the reactive composition will cause the reagents of the at least two separate particles to be combined by the aqueous liquid and react with each other; and wherein the two reactive particles provides a local concentration of at least 10 parts per million iodine in the aqueous liquid applied to the flowable particulate composition when the flowable particulate composition has 5% by weight of aqueous liquid present in the water absorbent solid carrier material with respect to the total weight of the water absorbent solid carrier material.

**11.** The flowable particulate blend of claim **10** wherein the water absorbent material carrier comprises i) cellulose solids and ii) superabsorbent polymer.

**12.** The flowable particulate blend of claim **11** wherein the superabsorbent polymer comprises superabsorbent fibers.

**13.** The flowable particulate blend of claim **11** wherein the superabsorbent polymer comprises superabsorbent particles.

12

**14.** The flowable particulate blend of claim **11** wherein the water-absorbent solid carrier is selected from the group consisting of water-absorbing clays, porous ceramic particles, crushed porous stone, crushed concrete and diatomaceous earth.

**15.** The flowable particulate blend of claim **11** wherein the water-absorbent solid carrier is selected from the group consisting of porous containers which slowly release a volume of the film-forming material and porous containers which both dissolve and physically release volumes of the film-forming composition through pores.

**16.** The flowable particulate blend of claim **11** wherein the composition that reacts with water to form molecular iodine comprises cupric sulfate and potassium iodide and the water absorbent solid carrier material comprises a material selected from the group consisting of inorganic particles, solid inorganic particles and solid absorbent organic particles and combinations thereof.

**17.** A flowable multiple particle and separate particle blend for application to an environment that is a habitat for an animal, the flowable multiple particle and separate particle blend providing both absorbency and antimicrobial activity comprising:

    a) a water absorbent solid carrier material carrier comprising superabsorbent polymer; and

    b) a reactive two particle composition;

the reactive composition comprising at least two separate particles as a first particle comprising $CuSO_4$ reagent and a second particle comprising KI reagent, the first particle and the composition of the second particle reacting with each other in the presence of water to produce molecular iodine, each of the first particles and the second particles being carried by a water absorbent solid carrier material so that application of aqueous liquid equal to 100% by weight of the reactive composition to the flowable multiple particle and separate particle blend will cause the reagents of the at least two separate particles to be combined by the aqueous liquid and react with each other; and wherein the two separate particles and the water absorbent carrier are granular, the reactive composition providing a local concentration of at least 10 parts per million iodine in the aqueous liquid applied to the reactive composition when the flowable multiple particle and separate particle blend has 5% by weight of aqueous liquid present in the water absorbent solid carrier material with respect to the total weight of the water absorbent solid carrier material.

**18.** The flowable multiple particle and separate particle blend of claim **17** present within the environment of a cage or stall and the composition is distributed within the cage or stall.

\* \* \* \* \*

# EXHIBIT 4

US008642057B2

(12) **United States Patent**     (10) **Patent No.:**     **US 8,642,057 B2**
Code et al.     (45) **Date of Patent:**     **Feb. 4, 2014**

(54) **ANTIMICROBIAL AND ANTIODOR SOLUTIONS AND DELIVERY SYSTEMS**

(75) Inventors: **Kenneth R. Code**, Edmonton (CA); **Joseph L. Provenzano**, Huntington Beach, CA (US); **Richard D. Bickerstaff**, Phoenix, AZ (US)

(73) Assignee: **Biolargo Life Technologies, Inc.**, La Mirada, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 91 days.

(21) Appl. No.: **13/308,105**

(22) Filed: **Nov. 30, 2011**

(65) **Prior Publication Data**

US 2012/0087965 A1     Apr. 12, 2012

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 12/009,586, filed on Jan. 18, 2008, now Pat. No. 8,226,964.

(60) Provisional application No. 61/490,448, filed on May 26, 2011.

(51) **Int. Cl.**
*A01N 25/02*     (2006.01)

(52) **U.S. Cl.**
USPC ......... **424/405**; 424/76.8; 424/76.9; 424/406; 424/667; 424/668; 424/669; 424/670; 424/671; 424/637; 424/638

(58) **Field of Classification Search**
USPC ......... 424/408, 417–420, 455, 490–495, 637, 424/638, 667–671; 514/608, 962, 963
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,516,941 A | 6/1970 | Matson | |
| 3,860,565 A | 1/1975 | Barber, Jr. | |
| 4,056,610 A | 11/1977 | Barber, Jr. et al. | |
| 4,756,906 A | 7/1988 | Sweeny | |
| 5,433,953 A | 7/1995 | Tsuei et al. | |
| 5,589,194 A | 12/1996 | Tsuei et al. | |
| 5,804,298 A | 9/1998 | Moy | |
| 6,413,548 B1 | 7/2002 | Hamer et al. | |
| 7,867,510 B2 * | 1/2011 | Code | 424/443 |
| 8,257,749 B2 * | 9/2012 | Code | 424/667 |
| 2003/0194447 A1 * | 10/2003 | Scholz et al. | 424/672 |
| 2011/0124504 A1 * | 5/2011 | Oester et al. | 504/206 |

* cited by examiner

*Primary Examiner* — Neil Levy

(74) *Attorney, Agent, or Firm* — Mark A. Litman & Associates, P.A.

(57) **ABSTRACT**

Antimicrobial solutions and delivery systems for them use liquid antimicrobial solutions with:
  at least 80% of total weight of a carrier liquid comprising water, alcohol or a mixture of water and alcohol;
  at least 0.0001% by weight of the solution of $I^2$;
  at least 0.0001% by weight of $CuSO_4$; and
  sufficient acid in the solution top provide a pH of less than 7.0.
A buffering system is also preferable in the solution, and the solution may be provided directly as a liquid, as a spray, as a gel, imbibed and carried in a wipe, encapsulated solution, segregated droplets of solution (in carrying layers of particles, dispersed in a solid of gel carrier) and the like.

**6 Claims, No Drawings**

**EXHIBIT 4**     **Page 1 of 5**

US 8,642,057 B2

**1**

## ANTIMICROBIAL AND ANTIODOR SOLUTIONS AND DELIVERY SYSTEMS

### RELATED APPLICATIONS DATA

This application claims priority as a continuation-in-part application under 35 U.S.C. 120 from U.S. patent application Ser. No. 12/009,586, filed Jan. 18, 2008 and Provisional U.S. Patent Application Ser. No. 61/490,448, filed May 26, 2011.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to the field of antimicrobial solutions, anti-odor solutions and delivery systems for the solutions.

2. Background of the Art

Iodine solutions have been used for over a century as a disinfectant. Further advances in the performance and stability of iodine solutions are desirable.

### SUMMARY OF THE INVENTION

A liquid antimicrobial solution is provided which may contain by way of non-limiting examples:

1. A liquid antimicrobial solution comprising:
at least 80% of total weight of a carrier liquid comprising water, alcohol or a mixture of water and alcohol;
at least 0.001% by weight of the solution of I2; and
sufficient acid in the solution to provide a pH of less than 6.5.

Another description is a solution as:
at least 80% of total weight of a carrier liquid comprising water, alcohol or a mixture of water and alcohol;
at least 0.0005% by weight of the solution of I2 (e.g., at least 10, at least 15 or at least 20 ppm) and/or I$^-$; and
sufficient acid in the solution to provide a pH of less than 6.5.

An alternative solution may contain, by way of non-limiting examples:
0.001% by weight (or at least 10 ppm of the solution) of the solution of a cation (e.g., K$^+$) and a solution of I$_2$ (and some residual I$^-$);
at least 0.001% by weight of CuSO$_4$; and
sufficient acid in the solution to provide a pH of less than 6.5.

These solutions of the present invention may be provided in numerous formats.

### DETAILED DESCRIPTION OF THE INVENTION

One aspect of technology described herein includes a liquid antimicrobial solution with:

A) at least 80% of total weight of a carrier liquid comprising water, alcohol or a mixture of water and alcohol;
at least 0.0005% by weight of the solution of I$_2$; (e.g., 0.0005 to 0.10% by weight, 10-100 ppm, 10-80 ppm, 10-50 ppm, 10-30 ppm iodine), and/or I$^-$ and
sufficient acid (even with buffering) in the solution to provide a pH of less than 7.0, preferably less than 6.5; or

B) at least 80% of total weight of a carrier liquid comprising water and dissolved iodine, alcohol or a mixture of water and alcohol;
at least 0.001% by weight of the solution of (I2 (e.g., 0.0005 to 0.10% by weight, 10-100 ppm, 10-80 ppm, 10-50 ppm, 10-30 ppm iodine), and/or I$^-$;) and cation (e.g., K$^+$) and residual, non-critical, equilibrium I$^-$;

**2**

at least 0.001% by weight of of the solution of CuSO$_4$; and
sufficient acid in the solution top provide a pH of less than 5.0.

The solution may have acid in sufficient amount to provide an initial pH of from 2.0 to 4.8 or 3.5 to 6.0, and then be buffered to moderate the pH to a less acidic (but still acidic) level. The solution has a preferred acid of sulfamic acid and may then be buffered back to a pH of 5.8-7.0, preferably 6.0-6.5.

The solutions of the present technology may be provided, by way of non-limiting examples, wherein the acid is sufficient in an amount to provide a pH of from 5.5 to 6.7, especially where the acid comprises a sulfamic acid compound, such as a sulfamic acid compound having the formula:

NR$_2$SO$_3$H,

wherein R is independently selected from the group consisting of hydrogen and electron-withdrawing groups, or a sulfamic acid compound having the formula:

NR$_2$SO$_3$H,

wherein R is independently selected from the group consisting of hydrogen, halogen, cyano, C1-C6 alkyl, C1 to C6 substituted alkyl, perhalo alkyl, halosubstituted alkyl, and electron-withdrawing groups.

One embodiment may have least one R as hydrogen, or exactly one R as hydrogen. A spherical encapsulation system may be provided as a core of liquid comprising the solution of the present technology having at least 5% by weight water therein, and an encapsulant surrounding the core to form stable encapsulated particles, the encapsulant comprising at least one layer of hydrophobic particles in contact with and surrounding the core, the core and hydrophobic particles providing an encapsulated system that has a volume weighted mean particle diameter of from 0.05 to 25 micrometers, at least 25% of the spherical encapsulated system is spherical and can support its own weight. For example, the encapsulation system may have the core as a droplet of the solution having a diameter of from 0.0001 to 1 mm. The encapsulation system may have the droplet of solution comprises 10-90% average percentage by weight of the encapsulation system.

Another encapsulation system comprising droplet cores of aqueous liquids comprising the solution of the present technology having diameters of from 0.0001 to 0.5 mm aqueous liquid having a surface, said droplets having a stabilizing layer comprising hydrophobic particles with a volume weighted mean particle diameter of from 0.05 to 25 micrometer hydrophobic particles on said surface, said stabilizing layers being generally spherical, with at least 25% by number of all droplets encapsulated by hydrophobic particles in said encapsulated system having less than a 25% deviation in diameter in cross-sections. The layer of hydrophobic particles may be a layer of particles with less than 80% by number of said particles being bonded to any adjacent particle.

One additional subgeneric format includes a microencapsulated particles comprising a frangible shell having a liquid core of the solution of the present technology. The frangible shell may be a polymer and the microencapsulated particles have a number average diameter of 0.001 to 2 mm (or larger, such as up to 5 mm).

Another additional subgeneric format includes an iodine delivery system comprising a hydrocolloid entraining at least 20 by weight of the delivery system of the solution of the present technology.

Still another iodine delivery system includes a clay entraining at least 20 by weight of the delivery system of the solution of the present technology or an iodine delivery system comprising a flexible polymer having droplets of the solution of

EXHIBIT 4

US 8,642,057 B2

3

the technology disclosed herein dispersed therein. This last iodine delivery system may have the droplets with a number average diameter of 0.001 to 2 mm.

The present solution technology may be delivered in a variety of different formats, depending upon the specific use and needs of individual environments and technical applications. The material may be directly applied as a liquid, or brought in a protected mode (e.g., so the liquid solution does not immediately flow (e.g., encapsulated, gelled, imbibed, entrained, etc.). The following descriptions are examples of specific embodiments within the scope of the generic invention.

1. Gel with Iodine and Boron to Control Radiation Leaks

This aspect of the technology prescribes that the chemical basis of nuclear fuel control rods (boron from boric acid, hafnium, cadmium) be suspended in our CupriDyne-SAP™ gel to a desired consistency without breaking the gel, and then disposing on spent fuel rods, fuel rods, and other nuclear plant containment vessels and areas, to absorb neutrons, and cool down the target. This is useful when water cannot be used, but desirable also in that the flocculent of SAP will acquire the fission products as well, and prevent exposure to alpha, beta, and most gamma rays. Just as firefighting using fire retardant chemicals is dropped from the air, likewise a gel will adhere to all surfaces to cool down the spill or problem rods. In essence, it is a gelled version of a control rod which can be pumped by emergency pumpers. Water with boric acid has been tried by the Japanese, but the amount of boric acid is limited to 3-5%, especially in sea water—not enough to cool down the fuel rods, and then the water leaked out from containment in the particular instance, anyway.

Other organic and inorganic polymers and thixotropic agents may be used to increase the viscosity of the solutions or even gel the solutions. Silicas, acrylics, clays, natural resins and oils and waxes, viscofiers and other known additives may be used alone or in combination with stabilizing or emulsifying agents to form solutions, thick solutions, gels of other flowable compositions. Additional polymers and additives such as cellulosic materials (e.g., carboxy alkyl celluloses, such as carboxy methyl cellulose), polyalkylene glycols, phthalates, alcohols, dyes, indicators and the like can be used in the solutions.

2. Stable Iodine Liquid Compositions/Solutions (Ready to Use and Concentrate)

An iodine solution is acidified by the addition of an acid that (alone) produces a pH of less than 6.7 at 1.0 N in deionized water and preferably less than 6.5 under those parameters. Typical acids may be organic acids, inorganic acids, Lewis acids, HCl, HI, HBr (halogenic acids), $HNO_3$, $HClO_4$, $H_2SO_4$, $H_2SO_3$, and especially the family of sulfamic acids.

The iodine environment can be provided in numerous and varied tasks and services and even in combination with other additives such as stable active solutions or film-breaking compositions such as acids (e.g., sulfamic acid, hydrochloric acid, sulfuric acid, enzymes, etc.). At present, the most widely known and accepted acidizing agents include HCl, sulfamic acid, lactic acid, citric acid, and acetic acid, all with varying degrees of reactivity for descaling. The effect of acidizing with iodine gas in solution, however, also attends with additive antimicrobial effects, and when the acidized iodine is combined with sulfamic acid, a powerful and effective method is provided for dissolving and remediating biofilms, and chelating heavy metals which may be solubilized by the process, or otherwise contained in water, especially after physical disruption as described herein.

Sulfamic acid is also a primitive surfactant, and when added to free iodine in water and stabilized by varying added

4

compounds such as silicates (e.g., sodium metasilicate) and phosphates and sulfonates (e.g., sodium xylene sulfonate or phosphate), yields a disinfecting and biofilm removing detergent compound which is active within the technologies described herein for oilfield or watershed applications as a single formulary product. The term a "sulfamic acid compound" or a member of the family of sulfamic acids or class of sulfamic acids is herein defined as any sulfamic acid central moiety with a single substituent on the amide group of the sulfamic acid moiety or sulfamic acid core structure that still allows the sulfamic acid derivative in the family of sulfamic acids to display a pH of less than 6.8 at 0.5N in deionized water, preferably less than 6.5 under those parameters (e.g., 5.5 to 6.7, 5.5 to 6.2, and 4.0-6.7, and 3.0 to 6.7 and even lower levels of acidity up to 6.5, up to 6.6 or up to 6.7 pH). As non-limiting examples of these known sulfamic acid family compounds are sulfamic acid, iodosulfamic acid, chlorosulfamic acid, bromosulfamic acid, fluorosulfamic acid, alkylsulfamic acid (with C1-C8 carbon groups, whether linear, branched or cyclic, such as cycloheylsulfamic acid, and substituted or not, such as trifluromethylsulfamic acid, pentachloroethylsulfamic acid, etc.), cyanosulfamic acid, any electron-withdrawing group on the amide position of the sulfamic acid and even lightly electron-donating groups that do not change the sulfamic acid from an acid to a base at 1.0N in deionized water.

The formula for sulfamic acid is $NH_2SO_3H$ and the corresponding formula for a sulfamic acid compound is represented by:

$NR_2SO_3H$, wherein R is independently selected from the groups described above, such as hydrogen, halogen, cyano, C1-C6 alkyl or substituted alkyl, perhalo alkyl, halosubstituted alkyl, electron-withdrawing groups, mild electron-donating groups and the like. It is preferred that at least one R group is hydrogen.

The inventor has noted that the addition of sulfamic acid (in particular) to all CupriDyne**198** treatment composition formulas can provide ultimate stability or even enhanced activity in its various antimicrobial or surface treatment procedures. The sulfamic acid is both an acidifying agent (and other acids may be used) and a primitive surfactant. CupriDyne™ antimicrobial compositions in water is stabilized (free iodine is continuously available) by lowering pH to 5.5-6.7. Even the CuI resulting component is held in solution. The addition of surfactants, such as sodium metasilicate and sodium tripolyphosphate assists in completing a detergent preparation formula. The solutions may have normal levels of iodine therein (e.g., at least 5 ppm or may be concentrated for dilution with greater than 50 ppm, greater than 100 ppm, greater than 200 ppm, up to solubility limits of iodine in aqueous or alcohol solvents.

The solution is preferred where the acid comprises a sulfamic acid compound having the formula:

$NR_2SO_3H$,

wherein R is independently selected from the group consisting of hydrogen and electron-withdrawing groups. The acid may comprise a sulfamic acid compound having the formula:

$NR_2SO_3H$,

wherein R is independently selected from the group consisting of hydrogen, halogen, cyano, C1-C6 alkyl, C1 to C6 substituted alkyl, perhalo alkyl, halosubstituted alkyl, and electron-withdrawing groups.

EXHIBIT 4                                              Page 3 of 5

US 8,642,057 B2

5

The solution may have at least one R is hydrogen in the sulfamic acid compound or only and exactly one R is hydrogen.

These solutions are antimicrobial, have anti-odor effects, and can bleach or remove some stains.

The solutions have been found to be even further improved by buffering to keep the pH of the solution within an optimum range of between 5.8-7.5, more preferably between 5.8 and 6.5, and still more preferably between 6.0 and 6.4. Preferred buffering agents include inorganic cation buffering agents such as carbonates, bicarbonates, phosphates and other inorganic basic salts. Sodium, calcium, potassium and lithium salts of the buffering agents are preferred, but ammonium salts may also be used. The buffering of the solution surprisingly adds significant value to the solutions including at least one of storage stability, aerial stability, reduced cell toxicity, reduced corrosiveness, reduced corrosive action on dentures and bone and the like.

It has also been found that the order of mixing certain combinations of ingredients simplifies the dissolution of individual ingredients and improves some final solutions properties (such as transparency). For example, it has been found that first dissolving the buffering agent or the acid, and then dissolving the acid or buffering agent, respectively, makes it easier to dissolve the active components and make it easier to provide a transparent active iodine solution. The two iodine-forming reactive ingredients may then be added into the acid-buffer solution. The $CuSO_4$ may be first dissolved into the acid-buffer solution and then the alkali or alkaline iodide is dissolved in the acid-buffer/$CuSO_4$ solution. The iodide may be added as Li, Na, K, Ca, Mg, $NH_4$ iodide or the like. In certain medical and environmental uses, the selection of the particular cation may be more than merely a matter of convenience or choice of equivalents. The particular cation may be desirable as Na in certain medical applications where Li or K is less desirable. The various cations may be selected for design and concentration to maintain an appropriate isotonic balance with patients and their cells and vessels. The concentration of the cations and anions and iodine in solution, the pH and the selection of particular incidental cations and anions are selected to achieve balances of properties in the solutions.

The solutions of the present technology may be added to, combined with and/or modified to replicate other known medical solutions, as with the case of "Normal" saline, where 0.9% w/w NaCl in sterile water is involved, so that it s possible to compute the Na content to include a change from KI to NaI in this technology. This can be used to create a solution with 260 to 310 mOsm/L osmolality, or preferably between 275 and 300 mOsm/L osmolality, and approach balance with the normal Na or cation pressure in tissue. In one preferred embodiment, sodium iodide replaces portions of (5%, 10%, 20%, 30%, 50%, 60%, 75%, 80%, 90%, 95%) or all of the potassium iodide.

On another level, a lactated Ringer's solution is possible. "One litre of lactated Ringer's solution ordinarily contains:

130 mEq (80-200) of sodium ion=130 mmol/L
109 mEq (70-180) of chloride ion=109 mmol/L
28 mEq (15-50) of lactate=28 mmol/L
4 mEq (2-8) of potassium ion=4 mmol/L
3 mEq (1.5-4) of calcium ion=1.5 mmol/L"

An equivalent or partial replacement equivalent or mixture with solutions according to the present technology may also be prepared. The sodium, chloride, potassium, calcium and chloride in the standard lactated Ringer's solution may vary among each other by percentages n the order of (5%, 10%, 20%, 30%, 50%, 60%, 75%, 80%, 90%, and 95%) among each other.

6

These stable solutions are advantageously deliverable in many different forms, besides direct liquid delivery as a wipe, spray or brush application. For example, the solutions may be provided as a spherical encapsulation system comprising a core of liquid comprising the solution of the present technology having at least 5% by weight water therein, and an encapsulant surrounding the core to form stable encapsulated particles, the encapsulant comprising at least one layer of hydrophobic particles in contact with and surrounding the core, the core and hydrophobic particles providing an encapsulated system that has a volume weighted mean particle diameter of from 0.05 to 25 micrometers, at least 25% of the spherical encapsulated system is spherical and can support its own weight. The core may, for example, comprise a droplet of the solution having a diameter of from 0.0001 to 1 mm. The encapsulation system may have the droplet of solution comprises 10-90% average percentage by weight of the encapsulation system. These solutions may be directly applied, sprayed, imbibed in a fabric carrier and applied as a wipe, or gelled and the like.

3. Encapsulated or Microencapsulated Delivery Systems

Another format is as an encapsulation system comprising droplet cores of aqueous liquids comprising the solution of the present technology having diameters of from 0.0001 to 0.5 mm of aqueous liquid having a surface, said droplets having a stabilizing layer comprising hydrophobic particles with a volume weighted mean particle diameter of from 0.05 to 25 micrometer hydrophobic particles on said surface, said stabilizing layers being generally spherical, with at least 25% by number of all droplets encapsulated by hydrophobic particles in said encapsulated system having less than a 25% deviation in diameter in cross-sections. The layer of hydrophobic particles may comprise a layer of particles with less than 80% by number of said particles being bonded to any adjacent particle. This technology is enabled in U.S. Pat. No. 6,413,548. By this technology, generally non-compatible materials may be provided from a single delivery system by a unique encapsulation system. An encapsulation system is advantageously constructed as a core of aqueous liquid having at least 5% by weight water therein, and an encapsulant surrounding the core to form a stable encapsulated particle, the encapsulant comprising at least one layer of hydrophobic particles in contact with and surrounding the core, the core and hydrophobic particles providing an encapsulated system that has an average weight average particle diameter of from 0.05 to 25 micrometers and can support its own weight. The encapsulation system may be provided by a novel method of manufacture comprising providing a mass of hydrophobic particles having average mass diameter size of between 0.05 and 25 micrometers, providing droplets of an aqueous medium to the mass of particles, gently mixing the fine particles of aqueous medium and the hydrophobic particles to form a stable encapsulant system of droplets of the aqueous medium encapsulated by a shell of particles.

Another format of liquid solution delivery is as a microencapsulated particles comprising a frangible shell having a liquid core of the solution of the present technology. The microencapsulated particles may have a frangible shell that comprises a polymer and the microencapsulated particles have a number average diameter of 0.001 to 2 mm. Such technology for forming the shells with liquid fill is enabled as microcapsules produced through interfacial polymerization having shell walls composed of polyamides, polyureas, polyurethanes, and polyesters are known; see U.S. Pat. Nos. 3,516,941, 3,860,565, 4,056,610, and 4,756,906. Alternative enabling methods include U.S. Pat. Nos. 5,433,953, 5,589, 194. and 5,804,298.

**EXHIBIT 4**                    **Page 4 of 5**

US 8,642,057 B2

7

4. Entrained Solution Delivery Systems

Another iodine delivery system may be as a hydrocolloid entraining at least 20 by weight of the delivery system of the solution of the present technology or as an iodine delivery system comprising a clay entraining at least 20 by weight of the delivery system of the solution of the present technology.

5. Aqueous Solution Entrapped in Polymeric Medium

Another alternative liquid delivery system may be as an iodine delivery system comprising a flexible polymer having droplets of the solution of the present technology dispersed therein. This form of liquid delivery system, may for example, use droplets have a number average diameter of 0.001 to 2 mm.

Droplets of aqueous solution may be suspended, dispersed or emulsified within a hardenable (driable or polymerizable) film forming polymeric composition. The hardenable film-forming polymer (which is inclusive of elastomers) is then hardened by dryiving off solvents (drying) or polymerizing the solution or neat (little or no solvent) polymerizable composition to stably entrain the droplets of solution within the hardened film. Rather than droplets, frangible microcapsules or water-beads as disclosed in U.S. Pat. No. 6,413,548 (cite above) may be blended into the hardenable polymer composition, which is then hardened.

The liquids and stabilized (e.g., encapsulated) liquid solutions of the present technology may be used in a wide variety of environments. The liquid solutions may be applied directly to surfaces such as surgical tables, surgical tool trays, surgical tools, surgical tubing; dental tools; equestrian wares such as bits, spurs, metal harness loops, silverware, kitchen sinks and cooking tools; animal sheds, animal coup walls and floors and the like. The encapsulated or stabilized solutions may be added to a wide range of products to add antimrobial or antiodor properties to otherwise conventional products such as papers, napkins, placemats, animal bedding, animal litter, bandages, wraps, sanitary napkins, wound dressings, bed covers, bed pads, transportation wrappings for food (e.g., wrapping paper for fruit, and tray covers for meat) and the like. The solutions and their delivery systems may be included in sealing waxes, seals (e.g., elastomeric tubing and joint seals and washers), animal chew toys (e.g., using the droplet distribution in the elastomer/polymer, or adding a coating layer of polymer with droplets or encapsulated solutions to provide releasable iodine solution from a surface subject to abrasion or pressure).

Frangible encapsulants of the presently described technology, when entrained in insulation media such as styrofoam or fiber batts, add phase change temperature control around the freezing point of the liquid fill. Phase-change insulation

8

media, once frozen and packaged for infectious samples (for example) will delay a package warmup when exposed to ambient temperatures to assist with sample or specimen preservation. In the event that warmup ultimately occurs, the pre-frozen capsules which have expanded at the freezing point of aqueous fill will deploy their contents into the insulation media. The presently described iodine solutions in this format are therefore a broad spectrum oxidative countermeasure against the contents of the samples or specimens which have likely leaked their contents as well.

Similarly, the liquid solutions of the present technology, when frozen, may be provided to contain clathrates of stabilized free iodine which are active oxidizers in solution upon progressive melting. This is a countermeasure against fouling during refrigerated transportation of foods, and at ambient retail outlets with the foods on display.

One skilled in the arts related to this technology, including antiseptic and antimicrobial fields, polymer chemistry, emulsion chemistry and encapsulation technology can provide specific alternatives and equivalents within the scope of the generic disclosure and enablement disclosed herein.

Each reference cited in this disclosure are incorporated by reference in their entirety.

What is claimed:

**1**. A liquid antimicrobial solution comprising: at least 80% of total weight of a carrier liquid comprising water, alcohol or a mixture of water and alcohol; at least 0.001% by weight of the solution of $I_2$; and sufficient acid in the solution to provide a pH of less than 6.5, and the solution further comprising IK and at least 0.005% by weight of $CuSO_4$, a sulfamic acid compound and a buffering agent.

**2**. The solution of claim **1** wherein the acid comprises a sulfamic acid compound having the formula: $NR_2SO_3H$, wherein R is independently selected from the group consisting of hydrogen and electron-withdrawing groups.

**3**. The solution of claim **1** wherein the acid comprises a sulfamic acid compound having the formula: $NR_2SO_3H$, wherein R is independently selected from the group consisting of hydrogen, halogen, cyano, C1-C6 alkyl, C1 to C6 substituted alkyl, perhalo alkyl, halosubstituted alkyl, and electron-withdrawing groups.

**4**. The solution of claim **3** wherein at least one R is hydrogen.

**5**. The solution of claim **1** wherein the buffering agent comprises a carbonate, bicarbonate or phosphate.

**6**. The solution of claim **3** wherein the buffering agent comprises a carbonate, bicarbonate or phosphate.

* * * * *

**EXHIBIT 4**                                    **Page 5 of 5**

# EXHIBIT 5

US009414601B2

(12) **United States Patent**
Code

(10) **Patent No.:**     **US 9,414,601 B2**
(45) **Date of Patent:**     *Aug. 16, 2016**

(54) **MATERIAL HAVING ANTIMICROBIAL ACTIVITY WHEN WET**

(75) Inventor: **Kenneth R. Code**, Edmonton (CA)

(73) Assignee: **BIOLARGO LIFE TECHNOLOGIES, INCORPORATED**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1510 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/220,484**

(22) Filed: **Jul. 24, 2008**

(65) **Prior Publication Data**

US 2009/0028915 A1     Jan. 29, 2009

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/973,933, filed on Oct. 11, 2007, now Pat. No. 8,021,610, which is a continuation-in-part of application No. 11/516,960, filed on Sep. 7, 2006, now Pat. No. 7,867,510, and a continuation-in-part of application No. 11/516,958, filed on Sep. 7, 2006, now abandoned.

(60) Provisional application No. 60/961,903, filed on Jul. 25, 2007, provisional application No. 60/850,976, filed on Oct. 11, 2006.

(51) **Int. Cl.**
*A01N 59/12*     (2006.01)
*A01N 25/08*     (2006.01)
*A01N 25/34*     (2006.01)

(52) **U.S. Cl.**
CPC ............... *A01N 59/12* (2013.01); *A01N 25/08* (2013.01); *A01N 25/34* (2013.01)

(58) **Field of Classification Search**
CPC ....... A01N 59/12; A01N 25/26; A01N 25/00; A01N 25/12; C02F 2303/04
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 206,024 | A | 7/1878 | Kendall | 222/432 |
| 2,134,791 | A | 11/1938 | Loweke | 188/79.53 |
| 3,464,413 | A | 9/1969 | Goldfarb et al. | 604/306 |
| 3,489,148 | A | 1/1970 | Duncan et al. | 604/382 |
| 3,585,998 | A | 6/1971 | Hayford et al. | 165/8 |
| 3,708,263 | A | 1/1973 | Boucher | 422/20 |
| 3,800,792 | A | 4/1974 | McKnight et al. | 602/50 |
| 3,896,807 | A | 7/1975 | Buchalter | 604/289 |
| 4,131,645 | A | 12/1978 | Keblys et al. | 423/501 |
| 4,375,535 | A | 3/1983 | Kightlinger et al. | 527/313 |
| 4,381,784 | A | 5/1983 | Aberson et al. | 604/368 |
| 4,405,323 | A | 9/1983 | Auerbach | 604/285 |
| 4,418,686 | A | 12/1983 | Child | 604/285 |
| 4,497,930 | A | 2/1985 | Yamasaki et al. | 524/556 |
| 4,675,014 | A | 6/1987 | Sustmann et al. | 604/375 |
| 4,715,965 | A | 12/1987 | Sigerson et al. | 210/511 |

| | | | | |
|---|---|---|---|---|
| 4,722,937 | A | 2/1988 | Jacob et al. | 514/474 |
| 4,731,391 | A | 3/1988 | Garvey | 521/137 |
| 4,888,118 | A | 12/1989 | Barnes et al. | 210/668 |
| 5,019,495 | A | 5/1991 | Shanbrom | 435/1.1 |
| 5,128,149 | A | 7/1992 | Shanbrom | 424/529 |
| 5,128,150 | A | 7/1992 | Shanbrom | 424/533 |
| 5,176,836 | A | 1/1993 | Sauer et al. | 210/670 |
| 5,186,945 | A | 2/1993 | Shanbrom | 424/529 |
| 5,201,326 | A | 4/1993 | Kubicki et al. | 128/832 |
| 5,227,161 | A | 7/1993 | Kessler | 424/94.4 |
| 5,265,302 | A | 11/1993 | Sivacoe | 15/104.061 |
| 5,324,438 | A | 6/1994 | McPhee et al. | 210/748 |
| 5,356,611 | A | 10/1994 | Herkelmann et al. | 423/501 |
| 5,360,605 | A | 11/1994 | Shanbrom | 424/78.08 |
| 5,370,869 | A | 12/1994 | Shanbrom | 424/78.22 |
| 5,384,929 | A | 1/1995 | Smith | 15/104.061 |
| 5,419,902 | A | 5/1995 | Kessler | 424/94.4 |
| 5,464,603 | A | 11/1995 | Marchin et al. | 423/501 |
| 5,552,051 | A | 9/1996 | Wang et al. | 210/604 |
| 5,589,072 | A | 12/1996 | Shanbrom | 210/638 |
| 5,609,864 | A | 3/1997 | Shanbrom | 424/78.08 |
| 5,612,045 | A | 3/1997 | Syverson | 424/402 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| DE | DE 2029 598 | 12/1970 | | |
| EP | 439 878 | 8/1991 | | C11D 17/00 |
| EP | 446 761 | 9/1991 | | C11D 3/395 |
| EP | 611 206 | 8/1994 | | C11D 17/00 |
| GB | 2344997 | 6/2000 | | C11D 25/30 |
| WO | WO92/09289 | 6/1992 | | A61K 31/765 |
| WO | WO93/21299 | 10/1993 | | C11D 17/00 |
| WO | WO02/08126 | 1/2002 | | C11D 17/00 |

OTHER PUBLICATIONS

P. Kapur and M. Verma, "Determination of Iodate Ion in Presence of Cupric Ion", Industrial and Engineering Chemistry Analytical Ed.; vol. 13, No. 5 (May 1941). p. 338.
M. Abdalla, et al., *Iodidimetric Determination of Iodate, Bromate, Hypochlorite, Ascorbic Acid and Thiourea Using Flow Injection Amperometry.* Dept of Chem, College of Sri, King Saad Univ, Saudi Arabia Analyst, May 1989, vol. 114, p. 583-586, especially p. 583.
Foret, et al., *The Effect of Free Iodine on the Germicidal Activity of Iodine Teat Dips.* Milkproduction.com, Dec. 12, 2002., Especially Tables 103.
PCT International Search Report and the Written Opinion of the Internatoinal Searching Authority dated Sep. 18, 2009, from related patent application PCT/US2009/04248.

*Primary Examiner* — Kyle Purdy
(74) *Attorney, Agent, or Firm* — Mark A. Litman & Associates, P.A.

(57)     **ABSTRACT**

An article is applied to the surface of an article, animal housing environment or animal (including humans) to provide antimicrobial activity when activated with a liquid comprising alcohol. The article may comprise a water and/or alcohol absorbent material; and a composition that reacts with water and/or alcohol to produce molecular iodine. The composition provides a local concentration (in the water and/or alcohol) of at least 5 or 10 parts per million iodine in water and/or alcohol carried by the material (that is actual water supported by the water absorbent material) when the material has 5% by weight of water present in the water absorbent.

**15 Claims, 1 Drawing Sheet**

**EXHIBIT 5**     **Page 1 of 11**

US 9,414,601 B2

Page 2

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,629,024 | A | 5/1997 | Kessler et al. | 424/667 |
| 5,635,063 | A | 6/1997 | Rajan et al. | 210/266 |
| 5,639,452 | A | 6/1997 | Messier | 424/78.1 |
| 5,639,481 | A | 6/1997 | Kessler et al. | 424/667 |
| 5,643,588 | A | 7/1997 | Roe et al. | 424/402 |
| 5,648,075 | A | 7/1997 | Kessler et al. | 424/94.4 |
| 5,772,971 | A | 6/1998 | Murphy et al. | 422/292 |
| 5,849,291 | A | 12/1998 | Kessler | 424/94.4 |
| 5,885,592 | A | 3/1999 | Duan et al. | 424/400 |
| 5,903,946 | A | 5/1999 | Collins et al. | 15/104.061 |
| 5,919,374 | A | 7/1999 | Harvey et al. | 210/753 |
| 5,924,158 | A | 7/1999 | Watts | 15/104.061 |
| 5,948,385 | A | 9/1999 | Chapman et al. | 424/1.29 |
| 5,962,020 | A | 10/1999 | Duan et al. | 424/613 |
| 6,004,465 | A | 12/1999 | Uhr et al. | 210/651 |
| 6,037,019 | A | 3/2000 | Kooyer et al. | 427/598 |
| 6,067,682 | A | 5/2000 | Rankin | 15/104.061 |
| 6,071,415 | A | 6/2000 | Frommer et al. | 210/669 |
| 6,139,731 | A | 10/2000 | Harvey et al. | 210/175 |
| 6,146,725 | A | 11/2000 | Code | 428/35.2 |
| 6,235,270 | B1 * | 5/2001 | Ishii et al. | 424/59 |
| 6,248,335 | B1 | 6/2001 | Duan et al. | 424/400 |
| 6,261,577 | B1 | 7/2001 | Kessler | 424/401 |
| 6,328,929 | B1 | 12/2001 | Code | 422/29 |
| 6,365,220 | B1 | 4/2002 | Burrell et al. | 427/2.1 |
| 6,403,113 | B1 | 6/2002 | Corzani | 424/404 |
| 6,403,674 | B1 | 6/2002 | Schubert | 522/167 |
| 6,432,426 | B2 | 8/2002 | Kessler | 424/401 |
| 6,703,536 | B2 | 3/2004 | Roe et al. | 604/360 |
| 6,863,905 | B1 | 3/2005 | Shanbrom | 424/667 |
| 7,000,280 | B1 | 2/2006 | Knapp | 15/104.061 |
| 7,033,509 | B2 | 4/2006 | Klein et al. | 210/753 |
| 7,192,911 | B2 | 3/2007 | Sunder et al. | 510/223 |
| 7,431,849 | B1 * | 10/2008 | Swearingen et al. | 210/749 |
| 7,867,510 | B2 * | 1/2011 | Code | A61F 13/8405 |
| | | | | 424/404 |
| 2003/0135172 | A1 | 7/2003 | Whitmore et al. | |
| 2004/0167048 | A1 | 8/2004 | Sunder et al. | 510/220 |
| 2004/0267223 | A1 | 12/2004 | Etchells | 604/385.01 |
| 2005/0196593 | A1 | 9/2005 | Campbell et al. | |
| 2006/0102085 | A1 | 5/2006 | Chen | 119/171 |
| 2006/0112894 | A1 | 6/2006 | Ikegami et al. | 119/171 |
| 2006/0201438 | A1 | 9/2006 | Anttila et al. | 119/171 |
| 2007/0039556 | A1 | 2/2007 | Cook et al. | 119/166 |
| 2007/0277739 | A1 | 12/2007 | Wang et al. | 119/161 |
| 2007/0289543 | A1 | 12/2007 | Petska et al. | 119/173 |
| 2008/0022939 | A1 | 1/2008 | Bracilovic | 119/171 |
| 2008/0058738 | A1 | 3/2008 | Roberts et al. | 604/359 |
| 2008/0058739 | A1 | 3/2008 | Roberts et al. | 604/359 |
| 2008/0095812 | A1 | 4/2008 | Code | |

* cited by examiner

**EXHIBIT 5**                    **Page 2 of 11**



EXHIBIT 5                                                Page 3 of 11

US 9,414,601 B2

1

## MATERIAL HAVING ANTIMICROBIAL ACTIVITY WHEN WET

### RELATED APPLICATIONS DATA

This application claims priority from U.S. Provisional Application Ser. No. 60/961,903, filed Jul. 25, 2007, which in turn claims priority as a Continuation-in-Part application of U.S. Provisional Patent Application Ser. No. 60/850,976, filed Oct. 11, 2006 (now U.S. patent application Ser. No. 11/973,933) which is in turn a continuation-in-part of both of U.S. patent application Ser. No. 11/516,960, filed Sep. 7, 2006 and U.S. patent application Ser. No. 11/516,958, filed Sep. 7, 2006.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present technology relates to the field of antimicrobial protection, particularly antimicrobial activity in close proximity to hard surfaces, enclosed environments, rooms, and the bodies of patients. In particular, the field relates to the use of antimicrobial, antiodor and chemical modification agents that are active in the presence of water and/or lower molecular weight alcohols (e.g., C1-C6 alcohols).

2. Background of the Art

The growth of many microbes is assisted by or enabled by the presence of water with the microbes. Water and aqueous materials are present in events and activities of most mammalian life forms. Aqueous solutions and dispersion and emulsions are present in blood, exudates, tears, perspiration, menstrual emissions and waste emissions of mammals. These are natural events in life cycles, but may be accompanied by contact with or attack by microbes that can have significant physical effects on the animals (including humans) and their surrounding. At a minimum, growth of some microbes in aqueous materials around the animals can develop odors, disease-carrying media, infections and death or damage to the bodies of the animals.

There are many instances where aqueous materials are retained in contact with animal bodies and in which there is potential for unwanted and even dangerous and significant microbial growth or microbial introduction into the animal body. For example, in the application of materials wound dressing, menstrual products, patches, diapers, pads and the like, moisture from the animal body or ambient conditions or the materials themselves can introduce microbes to the environment and those microbes can proliferate in the vicinity of the materials when moisture is present. The uncontrolled growth of random microbes is seldom beneficial and has been the subject of significant efforts at control.

Many applications exist where it is necessary or at the very least an advantage for agents to be present which demonstrate anti-bacterial, anti-mycotic activity or both, resulting in the control of bacterial and/or fungal growth. For example, an apparatus or article as a whole or in part may have the property of suppressing bacterial and fungal growth. Control of bacterial and/or fungal growth may be through the prevention or inhibition of the growth of such microbes.

The most consistent forms of attempts at microbial control on patients are the direct application of compositions to the surfaces or volumes or patients likely to become infected. Sprays, powders, solutions and other materials have been applied directly to the affected areas as a treatment or prophylactic. These treatments generally direly apply or carry active antimicrobial materials to the site, either as a direct application of carried with a device to be secured locally to the surface.

A variety of materials are used every day in treating or preventing infections in humans, animals and the like. For example, catheters, sutures surgical gloves, implants, bandages, diapers, diaper liners, dressings, small adhesive dressings, sanitary napkins and insoles are just a few. Normally, bandages are used as a barrier to airborne pathogenic organisms infecting a cut or wound. However, once infection occurs, the bandage is no longer of any benefit. If the bandage were provided with a broad spectrum antimicrobial agent, on the portion of the bandage which is in contact with the wound and surrounding skin, the bandage becomes an actively rather than a passively antimicrobial surface or microbial barrier. Catheters, implants, bandages, dressings and other materials, such as above, are used extensively every day by millions of people. As a result, any form of antimicrobial material incorporated into these types of devices must be safe for general unsupervised use, should avoid selection of resistant strains, and should be cost effective. Furthermore, the materials may have to retain their flexibility such as with bandages so as to be readily usable. Catheters, implants, bandages, diapers, diaper liners, dressings, and the like can be readily coated with thin films of active elements which, when in contact with body fluids, release substances and ions which stop the growth of or kill various types of microorganisms. As here described, there is no requirement to apply any outside electric current to maintain sustained levels of ion release to treat the infected area.

U.S. Pat. No. 6,365,220 A process for production of an actively antimicrobial surface for a substrate and for use in a biologically dynamic environment, such as for treating and preventing microbial infections, including a film consisting of at least an antimicrobial element and another electrochemically nobler element and which forms multitudinous galvanic cells with electrolyte-containing biological fluids, such as body fluids from wounds, etc., for releasing the antimicrobial element at the surface.

WO92/09289 teaches an improved method for treating diaper rash of neonates, infants, children and incontinent adults which entails applying to the site of diaper rash a composition comprising 15-40% of a copolymer or a derivative thereof, of a lower alkyl vinyl ether and maleic acid dispersed in a semisolid ointment base.

U.S. Pat. No. 4,381,784 discloses an absorbent device designed to absorb blood or blood-like fluids such as a sanitary napkin which is combined with a blood gelling agent which includes, amongst others, maleic anhydride copolymers.

U.S. Pat. No. 6,403,113 describes that certain copolymers can be used to control or prevent the growth of microbic agents such as bacteria and fungus. It has further been found that certain derivatives of these copolymers also have antibacterial and anti-mycotic properties. The finding that the copolymers of the invention and derivatives thereof which are preferably of high molecular weight can be used as antibacterial and/or anti-mycotic agents provides many advantages over anti-microbic agents of the prior art, in particular, due to the large molecular weight and polymeric character of the anti-microbic agents of the invention. Furthermore, the copolymers or derivatives per se or blends of said copolymers or derivatives can be formed into articles or incorporated into articles in the form of films, fibers, adhesives etc. The copolymers of the invention have a low toxicity due to their high molecular weight and possess intrinsic anti-bacterial and anti-mycotic activity.

EXHIBIT 5                                          Page 4 of 11

US 9,414,601 B2

3

U.S. Pat. No. 6,703,536 describes an absorbent article, at least a portion of which comprises a skin care composition of an enzyme inhibitor and is at least partially transferred from the article to the skin of a wearer of the article as a result of normal contact, wearer motion and/or body heat.

The art has also used lotions in combination with absorbent articles. Examples include: U.S. Pat. No. 3,585,998 to Hayford et al.; U.S. Pat. No. 3,464,413 to Goldfarb et al.; U.S. Pat. No. 3,896,807 to Buchalter; U.S. Pat. No. 3,489,148 to Duncan et al.; and U.S. Pat. No. 5,643,588 to Roe et al.

U.S. Pat. No. 5,643,588 describes diapers having a top sheet containing lotion with Lotion compositions can comprise other optional components typically present in emollient, creams, and lotions of this type. These optional components include water, viscosity modifiers, perfumes, disinfectant antibacterial actives, pharmaceutical actives, film formers, deodorants, opacifiers, astringents, solvents and the like. In addition, stabilizers can be added to enhance the shelf life of the lotion composition such as cellulose derivatives, proteins and lecithin. All of these materials are well known in the art as additives for such formulations and can be employed, in appropriate amounts in the lotion compositions of the present invention.

There exists in the female body a complex process which maintains the vagina and physiologically related areas in a healthy state. In a female between the age of menarche and menopause, the normal vagina provides an ecosystem for a variety of microorganisms. Bacteria are the predominant type of microorganism present in the vagina; most women harbor about 10.sup.9 bacteria per gram of vaginal exudate. The bacterial flora of the vagina is comprised of both aerobic and anaerobic bacteria. The more commonly isolated bacteria are *Lactobacillus* species, corynebacteria, *Gardnerella vaginalis, Staphylococcus* species, *Peptococcus* species, aerobic and anaerobic *Streptococcal* species, and *Bacteroides* species. Other microorganisms that have been isolated from the vagina on occasion include yeast (*Candida albicans*), protozoa (*Trichomonas vaginalis*), mycoplasma (*Mycoplasma hominis*), chlamydia (*Chlamydia trachomatis*), and viruses (*Herpes simplex*). These latter organisms are generally associated with vaginitis or venereal disease, although they may be present in low numbers without causing symptoms. Physiological, social and idiosyncratic factors affect the quantity and species of bacteria present in the vagina. Physiological factors include age, days of the menstrual cycle, and pregnancy. For example, vaginal flora present in the vagina throughout the menstrual cycle can include lactobacilli, corynebacterium, ureaplasma, and mycoplasma. Social and idiosyncratic factors include method of birth control, sexual practices, systemic disease (e.g. diabetes), and medication. Bacterial proteins and metabolic products produced in the vagina can affect other microorganisms and the human host. For example, the vagina between menstrual periods is mildly acidic having a pH ranging from about 3.8 to about 4.5. This pH range is generally considered the most favorable condition for the maintenance of normal flora. At that pH, the vagina normally harbors the numerous species of microorganisms in a balanced ecology, playing a beneficial role in providing protection and resistance to infection and makes the vagina inhospitable to some species of bacteria such as *Staphylococcus aureus* (*S. aureus*). The low pH is a consequence of the growth of lactobacilli and their production of acidic products. Microorganisms in the vagina can also produce antimicrobial compounds such as hydrogen peroxide and bactericides directed at other bacterial species. One example is the lactocins, bacteriocin-like products of lacto-bacilli directed against other species of lactobacilli. Some

4

microbial products may affect the human host. For example, *S. aureus* can produce and excrete into its environment a variety of exoproteins including enterotoxins, Toxic Shock Syndrome Toxin-1 (TSST-1), and enzymes such as proteases and lipase. There have been numerous attempts to reduce or eliminate pathogenic microorganisms and menstrually occurring TSS by incorporating into a tampon pledget one or more biostatic, biocidal, and/or detoxifying compounds. For example, L-ascorbic acid has been applied to a menstrual tampon to detoxify toxin found in the vagina of the human female during menstruation.

Incorporating glyceryl triacetate into a tampon pledget has been suggested. Others have incorporated monoesters and diesters of polyhydric aliphatic alcohols and a fatty acid containing from 8 to 18 carbon atoms. For example, glycerol monolaurate (GML) has been used to inhibit the production of *S. aureus* enterotoxins and TSST-1. However, as noted above, esterase is abundantly present in the vaginal epithelium and menstrual fluid. This esterase, in combination with esterase and lipase produced by bacteria can enzymatically degrade the esters into non-effective compounds. Until now, persons skilled in the art have not appreciated the affects of lipase and esterase on ester compounds.

U.S. Pat. No. 5,612,045 describes absorbent articles, such as catamenial tampons, for absorbing body fluids are disclosed which include an effective amount of a compound to substantially inhibit the production of exotoxins by Gram positive bacteria.

U.S. Pat. No. 4,405,323 to Auerbach discloses a tampon designed to eliminate the hazards of toxic shock syndrome and dysmenorrhea. The tampon has incorporated therein an antibacterial agent which is said to disperse on contact with body fluids and prevent development of the organisms which produce the toxins which cause toxic shock syndrome. Among the antibacterial materials disclosed for use are povidone-iodine compound, mercury, zinc, penicillin, erythromycin and nitrofurazone. (Povidone iodine is a topical preparation containing povidone and iodine, used for antisepsis of the skin.)

U.S. Pat. No. 5,201,326 describes a rod-shaped medical tampon for releasing an active substance, including (a) a tampon core of compressed fibers selected from the group consisting of cellulose fibers, cotton fibers, and acetate fibers; (b) a tampon cover surrounding said tampon core and being firmly bonded to one another by a glue, the tampon cover comprising a hardened collagen foam or a hardened gelatin foam impregnated with a retardant including a dissolved active substance to be released; and (c) a retrieval string connected to at least one of said tampon core and said tampon cover.

U.S. Pat. No. 4,722,937 method of prophylactics with respect to detoxification of *Staphylococcus aureus* and other toxins by ascorbic acid, salts and esters, topically applied by means of carriers which are otherwise regularly employed in the area where *Staphylococcus aureus* or other bacteria colonize, such as a pharmacological appliance including gauze pads, an absorbant mass or pad associated with menses, douches, and contraceptive compositions.

U.S. Pat. No. 4,675,014 describes method for absorbing bodily secretions while hindering the generation of odors and growth of microbes comprising applying a fibrous mass having copper cations bound through selected anions, preferably carboxymethyl, the amount of chemically bound copper being between 0.1 and 3% by weight. The fibrous mass can be in the form of a catamenial device, bandage, diaper, shoe liner, or the like.

EXHIBIT 5     Page 5 of 11

US 9,414,601 B2

5

## SUMMARY OF THE INVENTION

A method, composition and article can be used for the application, association with or attachment to a surface, an open environment, a closed environment, an animal housing environment and/or the body of an animal (including humans). The composition may be provided directly, in a bulk composition or in an article that provides both absorbency and antimicrobial activity. The composition may be a dry or liquid composition. The article applied to the surface of an animal may be a diaper, gauze, padding, sanitary napkin, wrap, bandage, bandaid, surface covering (e.g., head rest cover, placemat, etc.) or the like and may comprise a water absorbent material; and a composition that reacts with water to produce molecular iodine. The composition provides a local concentration of at least 5 and preferably 10 parts per million iodine in alcohol and/or water carried to the surface or carried by the material. To fully activate the material there may be as little as 5% by weight solids in the activating water and/or alcohol (C1-C6 aliphatic, branched or cyclic alcohol) present respect to the total weight of the water absorbent material.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** shows a view of the inside of an opened diaper product and the distribution of compositions according to the present technology.

## DETAILED DESCRIPTION OF THE INVENTION

The composition of the present technology is activatable by contact with water, alcohol and/or alcohol/water compositions. The alcohols of primary consideration are the aliphatic and branched lower molecular weight alkanols such as methanol ethanol, propanol, iso-propnaol, butanol, t-butanol, i-butanol, penatnol, hexanol and the like in the one to six carbon atom length alcohols. The compositions have any of an antimicrobial activity, anti-odor activity, and the like and may oxidize harmful and/or toxic chemicals by release of the composition's active ingredients.

One way of providing molecular halide and especially molecular iodine ($I_2$) on site with a patient, rather than having to find a way of transporting it to a site) is to provide reactants that can readily produce molecular halogen and especially molecular iodine on-site in a controllable reaction. One format of providing the molecular iodine would be through the oxidation-reduction reaction between two salts o4r compounds to produce the molecular iodine. It is a readily controlled environment where the reaction can be performed in an aqueous environment. One reaction that can effect this would be generically described as:

$$X^+Y^- + Z + I^- \longrightarrow X^\circ + Z^+Y^- + I_2$$

In this reaction scheme, X is a metal (preferably a multivalent metal and more particularly a divalent metal), Y is an anion (preferably a multivalent anion and more preferably a divalent anion, and an anion having at least two oxygen atoms), Z is an alkali metal or alkaline cation. Examples of X are copper, iron, manganese, lead, nickel, tin, and the like, Y can be sulfate, sulfite, sulfonate, carbonate, phosphate, phosphate, nitrate, nitrie, borate, and the like, and Z can be sodium, lithium, potassium, ammonium, magnesium, aluminum, and the like. One preferred reaction would be:

$$Cu^{+2}SO_4{}^{-2} + K^+I^- \longrightarrow Cu^\circ + K_2SO_4 + I_2$$

This reaction takes place readily in an aqueous environment and produces molecular iodine at a controlled rate. The reac-

6

tion may be used by wetting, dispersing or dissolving the molecular iodide (in water, alcohol or water/alcohol compositions) and allowing the iodine in the carrying material be released and carried to the site (which may be a hard surface, a closed environment such as an oven, dishwasher, clothes washer, sterilization chamber, and the like, the carrying material itself, such as the fabric, clay, fibers, film etc.) penetrate the area intended to be treated. By applying the water or alcohol to a pad with the reagents therein, a hand applied sterilization wipe or wipe carried on a handle 9short length hand or broom length handle) for application of the sterilization material. By using such activatable wipes, the storage stability of the product is assured and the application of the active ingredients can be more easily made in a commonly acceptable format such as hand wipes, wipes on 0.2-1.0 meter handles, 0.8 to 2 meter handles, and even extendible handles for out-of-reach areas (such as 4 meter handles).

The iodine may persist for sufficient time to treat the area, particularly within a wetted material on the surface to be treated or a patient. Sufficient activating liquid (water, alcohol or mixture thereof, with or without additional active agents or ancillary agents) should be used so that at least some liquid is transferred to the surface being wiped. Even though at least a portion of the active iodine may be gaseous, it is desirable that the molecular iodine persist on a surface in many circumstances, which can be accomplished by the use of sufficient carrying liquid to persist for a few seconds or minutes on the surface, holding the molecular iodine in place to treat that surface.

The reaction may also be used by dispersing or mixing the two ingredients with alcohol or alcohol/water (e.g., in a spray container, a bucket, the fabric, fiber, film, sheet, etc.), either with additional water provided, with water of hydration on the first reactant (e.g., $X^+Y^-.nH_2O$, such as $CuSO_4.5H_2O$) or with ambient water in the carrying material. In the latter situation, water and/or alcohol may be carried in the wipe or fabric in frangible encapsulated beads so that pressure on the wipe can break the beads. Release the activating liquid, and the molecular halogen would be released without having to separately provide liquid. The two reactants may be physically separated from each other before being combined for application or reaction, as in separate capsules, coated particles, fibers, layers or the like.

The two reactants may be provided as a solid carrier medium that separates the two reactants until they are in contact with water (as in a soluble carrier such as polyvinyl alcohol, gelatin, amylase, sugars and the like, in pellet, fiber, dust, particle or block form). The two reactants may be independently coated with a soluble/dispersible coating and the two ingredients kept in a single water-penetrable layer.

Although the materials of the described technology may be provided in a vast array of materials and compositions applied to hard surfaces, closed small environments (up to 1.5 m³ in volume), closed medium environments (e.g., 1.5 m³ to 4.0 m³ in volume) to large closed environments (e.g., over 4.0 m³ in volume, such as rooms and offices), onto surfaces to be cleaned, soft surfaces such as apparel, hard surfaces such as countertops, toilets, wash basins, cook-tops, urinals, tools, instruments (including surgical instruments), operating surfaces, the surface (e.g., skin, hair) of patients, such as bandages, bandaids, diapers, gauze, wraps, sanitary napkins, tampons, plugs, sheet coverings 9e.g., on beds) and the like, the discussion will emphasize diapers and incontinence diapers for simplifying the disclosure, without intending to limit the scope of the invention.

The technology described herein is performed by applying the inactive materials and activating them, applying a recently

EXHIBIT 5                                        Page 6 of 11

US 9,414,601 B2

7

activated material, or providing a solid carrier system to the target to be treated, whether an animate or inanimate target, such as the inanimate surfaces to be cleaned, sterilized, receive animal waste (especially urine, although moist feces can activate the materials) or treated, or a patient, and awaiting the presence of sufficient water (in solutions will also work, such as in urine), alcohol or water and alcohol to activate the ingredients and cause the gaseous iodine to form in sufficient concentration in the environment to be treated to attenuate, reduce or eliminate microbial activity such as bacterial growth, viral growth and the like in the treated area, such as the surface of the solid carrier. A simple format, in considering wipe-on applicators, bulk materials to be deposited on a surface (e.g., within an animal stall or cage) and sheet materials would include at least the following formats:

  1) particulate and separate reactants may be carried in the same layer of the sheet or in individual particles in the bulk material;

  2) particulate and separate reactants may be carried in different layers of the sheet or on different pieces of the bulk material (e.g., separate saw dust particles, separate straw pieces, separate absorbent particles, etc.);

  3) particulate reactants may be carried in the same pellets in an anhydrous condition in the same layer of a sheet or on bulk material;

  4) the particulate reactants may be adhered to the same or separate fibers or films that are associated with on constitute the sheet;

  5) the reactants may be carried in fiber materials or particulates dispersed throughout or partially constituting the structure of the sheet or the bulk material;

  6) absorbent particles may be blended with the reactant particles, with binders on one or both types of particles keeping the two types of particles evenly distributed (e.g., protective coatings one or both reagents cant bind the reagent particles to the absorbent particles);

  7) capsules or microcapsules of the reactants in water-soluble or water-dispersible shells may be distributed throughout the sheet or bulk material; and

  8) a film or films (water-soluble, water-dispersible or water-leachable) may carry one or more of the reactants, with the other reactant in a location that released or carried first reactant will be placed into contact with the second reactant in the presence of water and/or lower molecular weight alcohols.

Other formats and process may be used as long as the presence of water, alcohol or mixtures thereof on the applied active ingredients or carrier system enables the generation of gaseous molecular iodine within the carrier in sufficient concentration to act as a microbicide. It is possible to provide a paste material, with water-dispersible or alcohol-dispersible binding material (such as resins, high molecular weight organic liquid carriers (e.g., fatty acids, oliogmers, resins, etc.) that can be applied to a surface, with other additives 9abrasives, fragrances, brightening agents, thickening agents, antioxidants, UV protectors, etc.) to provide compositions with wider ranges of activity.

The process may use the above reaction to form the molecular iodine represented by

$$XY+ZI \rightarrow X° + ZY + I_2$$

wherein X is a metal, Y is an anion, Z is an alkali metal or alkaline cation, or where X is a multivalent metal, Y is a multivalent anion, and Z is an alkali metal or alkaline cation, and is preferably represented by

$$Cu^{+2}SO_4^{-2} + K^+I^- \rightarrow Cu° + K_2SO_4 + I_2.$$

8

The process may be performed where the two reactants are carried as a solid, as coated materials, as blends of materials, in pouches, in capsules, in sheets or fabrics, as a preactivated liquid, or in a superabsorbent polymer. The solids carriers for the two reactants may also include compositions of the present that comprise superabsorbent or non-superabsorbent polymers, natural products (e.g., papers, cellulosic solids, water-insoluble porous materials which absorb or adsorb the film-forming material within the structure, water-soluble porous materials which absorb or adsorb the film-forming material within the structure, porous containers which merely slowly release a volume of the film-forming material, porous containers which both dissolve and physically release volumes of the film-forming composition through pores, and the like. In general, selection of an effective application rate can depend on habitat depth, surface debris, emergent and surface vegetation, organic matter, microbial and algal concentration, the specific target species, and the developmental stage of the target species. Superabsorbent polymers are described, by way of non-limiting examples in U.S. Pat. Nos. 6,403,674; 4,731,391. Superabsorbent polymers, including starch graft co-polymers, are known in the art. See, for example, those described in U.S. Pat. Nos. 4,375,535 and 4,497,930 (incorporated herein by reference), which have disclosed uses as adhesives, flocculants, sizes, water-retaining materials for agriculture and water-absorbing materials for sanitary materials. However, the spectrum of advantages attendant the use of superabsorbent polymers in solid and flowable terrestrial insecticidal, pesticidal or insecticidal/pesticidal delivery compositions have gone unrecognized.

The superabsorbent polymers that may be used in the practice of the present invention are synthetic organic polymers which are solid and hydrophilic, absorbing over 100 times their weight in water. These superabsorbent polymers are typically in a powder, granule, extruded, or flake form, adapted to be blended and/or agglomerated into any shape or form.

The superabsorbent polymers may be, for example, acrylamide alkali metal acrylate co-polymers; propenenitrile homo-polymers, hydrolyzed, alkali metal salts; polymers of propenamide and propenoic acid, alkali metal salts; hydrolyzed acrylonitrile co-polymers, and starch graft co-polymers and ter-polymers thereof. All of these are designed to be hydrophilic, absorbing over 100 times their weight in water. The resulting hydrophilic polymers can absorb from over one hundred to greater than about 5000, more typically around 500 to about 1,000, times their own weight in water (measured using distilled water, pH 7.5, 25, 760 mm Hg. absorption within about 30 seconds). However, the absorption or swelling capacity and absorption or swelling time typically varies with each specific superabsorbent polymer.

One class of superabsorbent polymers include combinations of a starch and organic monomers, oligomers, polymers, co-polymers or ter-polymers. They may be manufactured in a variety of ways, for example, the methods described in U.S. Pat. Nos. 4,375,535 and 4,497,930, and can be, for example, the product of grafting corn starch (amylopectin) with acrylonitrile (an acrylic monomer or oligomer). A second class of superabsorbent polymers includes combinations of acrylamide and acrylate polymers, co-polymers and ter-polymers.

The two reactants may be provided as a solid carrier medium or separate particulate materials that separate the two reactants until they are in contact with water (as in a soluble carrier such as polyvinyl alcohol, gelatin, amylase, sugars and the like, in pellet, fiber, dust, particle or block form). At least one of the two reactants may be independently coated with a soluble/dispersible coating and the two ingredients kept in a

US 9,414,601 B2

9

single water-penetrable layer. It is surprising that water-soluble or water-dispersible coatings or coverings (e.g., the stand-off particles) can be provided to the reagent particles without necessarily dissolving excessive amounts of a reagent. For example, simply by using a viscous water-soluble polymer (such as polyvinyl alcohol) in a rapidly coating/drying environment, any significant amount of dissolved reagent (e.g., KI dissolved in the polymer coating) will remain in the coating and also be active during any reaction. Unless substantial amounts of the dissolved material are on the surface of the coating, premature discoloring or premature reacting are still unlikely to occur, even if they might occur more easily than as compared to a completely encapsulated reactant.

Individually coated particles can be provided in water-soluble containers/coverings by using water-soluble or water-dispersible coating materials that are also organic solvent soluble (alcohol soluble) such as PVA, gels, polyvinylpyrrolidone, silica coatings, poly(ether ketones), poly(ester ketones), and the like are applied to the individual particles (one single reagent) or groups of particles (both or all reagents) and prilled, spray dried, or otherwise dried into separate, agglomerated, or packed coated particles. Polyvinyl alcohol may be coated on particles (even water soluble particles as used in the present technology) by use of particle coating technologies such as particle impacting in a fluidized bed or equivalent equipment such as shown in U.S. Pat. No. 6,037,019 (Kooyer).

A simple format, in considering application to agricultural fields for treatment to prevent nematodes or other ground or water-dwelling pests or for any age or stage of pest animal, would include at least the following formats:

1) Separate particulate with separate reactants may be carried in the same container;

2) particulate and separate reactants may be carried in different containers for subsequent separate or joint application;

3) particulate reactants may be carried in the same pellets in an anhydrous condition;

4) the particulate reactants may be adhered to the same or separate carrier materials such as pellets, abrasive particles, absorbent particles, bulk materials (straw, hay, bark, saw dust, etc.) or capsules;

5) the reactants may be carried in carrier materials dispersed throughout or partially constituting a separate carrier material;

6) capsules or microcapsules of the reactants in water-soluble or water-dispersible shells may be dispersed over the surface; and

7) a film or films (water-soluble, water-dispersible or water-leachable) may carry one or more of the reactants, with the other reactant in a location that released or carried first reactant will be placed into contact with the second reactant in the presence of water.

Other formats and process may be used as long as the presence of water or alcohol on the carrier system enables the generation of gaseous molecular iodine within the carrier in sufficient concentration to act as a sterilizing agent or pesticide.

A method of reducing odor in an animal housing environment (e.g., a stall, cage, litter box, pen and/or corral) is practiced by providing a reactive composition to the floor of the animal housing environment. The reactive composition is that as described generally herein, with at least two compounds that react in the presence of water and/or alcohol to produce molecular iodine. The at least two reagents may comprise at least two particulate reagents wherein at least one of the

10

reagents as a particle coated with a water-soluble, water dispersible or water-penetrable covering that prevents ambient conditions of 50% relative humidity at 25° C. from causing more than 10% of the total of both reagents exposed to the ambient conditions from reacting in a twenty-four hour period while both reagents are present in a mixture. The at least two reagents may be mixed with water absorbent material prior to deposition onto the floor of the animal housing environment and then deposited onto the floor of the animal housing environment or mixed with the water absorbent material after its deposition onto the floor of the animal housing environment.

A water-soluble material actually disperses within the water in molecular size components (polymers are considered water-soluble even though the molecular components may have average molecular weights in the hundreds of thousands, e.g., 200,000 weight average molecular weight). A water dispersible covering may break up into small but microscopically visible (or visible with the naked eye) particles. A water-penetrable covering may be a discontinuous covering, such as a porous film, or massed particles covering the surface and allowing channels for liquid passage therethrough.

In the practice of this technology, these systems may be combined with existing technology such as litter box materials, stall bedding, cage bedding, and other absorbents used to control wastes from animals. Such materials may be natural materials as straw, chaff, bark, hay, sand, gravel, sawdust, cotton, and the like, and artifical materials such as kitty litter, synthetic absorbent particles (clay, bentonite, etc.), synthetic polymer fibers, starch materials, expanded cellulose fibers, expanded starch and the like. Fiber materials my include absorbing fibers and structural (strengthening) fibers such as natural materials, e.g., wool, cotton, hemp, rayon, paper, paper fluff, cellulose (including hardwood fibers, softwood fibers, processed pulp fibers, rice straw fibers, corn stover fibers, gyouli stick fibers, wheat straw fibers, starch fibers including various modified and extracted starch fibers), carbon, avian feathers, activated carbon and synthetic materials, e.g., polyester, nylon, plastics, polymers, copolymers, polypropylene, polyethylene, sodium polyacrylate, polyvinyl acetate. Combination fibers such as SAP (super absorbent polymer)/pulp fiber (about 400 micrometers) or SAP charged non-woven fibers can also be incorporated into the composite particles.

In general illustrative absorbent materials suitable for use as an animal litter that have an inherent ability to clump when wetted include but are not limited to "swelling" clays such as sodium smectite, sodium montmorillonite (aka sodium bentonite or Wyoming bentonite), beidellite, and hectorite.

Absorbent materials having little to no inherent ability to clump generally require the aid of a clumping agent to form a clumping litter material. Illustrative examples include non-swelling or poorly-swelling clays such as calcium smectite, calcium montmorillonite (calcium bentonite or Georgia White Clay), attapulgite (palygorskite), sepiolite, natural zeolite, synthetic zeolite, kaolinite, tobermorite, vermiculite, halloysite, illite, and mica; absorbent rocks such as perlite, volcanic ash, expanded perlite, pumice, diatomite (diatomaceous earth), tuff, opaline silica, slate, marls, and fossilized plant material; natural minerals such as opal (aka amorphous silica), silica, quartz (sand), calcite, dolomite, gypsum, bassenite (plaster of Paris), aragonite, and feldspar; synthetic minerals such as dicalcium silicate and amorphous silicas (e.g., silica gel, precipitated silica, fumed silica, silica aerogel) and aluminas (e.g., amorphous alumina, activated alumina, activated bauxite, gibbsite, bauxite, boehmite, pseudo-boehmite). As used herein the terms "non swelling clays" and

EXHIBIT 5                    Page 8 of 11

US 9,414,601 B2

11

"poorly swelling clays" are synonymous. Other absorbent materials having little to no inherent ability to clump include straw, sawdust, wood chips, wood shavings, ground grain, porous polymeric beads, shredded paper, bark, cloth, ground corn husks, cellulose, water-insoluble inorganic salts, such as calcium sulfate, and sand. Reinforcing fiber attributes include the size, shape and activity of the fibers. Examples of fibers having beneficial shapes include bicomponent sheath core, bicomponent side by side, crimped fibers, bicomponent islands in the sea fibers. Examples of bicomponent fibers include fibers made of both polyethylene and polyester, or polyethylene and polypropylene. Nanofibers (i.e., fibers having at least one dimension in the nanometer size range) include those made through electrospinning techniques and bicomponent spitting techniques. Examples of active fibers include those with antimicrobial efficacy, water absorbing or (mass binding) and absorption rate efficacy, fragrance control release efficacy, and odor absorbing efficacy. These materials will be used alone or in combination with each other. Disclosure of such materials may be found, for example, in US Patent Publications 20080058739; 20080058738; 20080022939; 20070289543; 20070277739; 20060201438; 20060112894; 20060102085; and the like).

Research has shown that most cats prefer fine-grained litters, presumably because they have a softer feel. The new scoopable (clumping) litters usually have finer grains than the typical clay litter and are very popular. But high-quality, dust-free, clay litters are relatively small-grained and may be perfectly acceptable to your cat. Many cats are put off by the odor of scented or deodorant litters. For the same reason, it's not a good idea to place a room deodorizer or air freshener near the litter box. A thin layer of baking soda placed on the bottom of the box will help absorb odors without repelling your cat, and odors shouldn't really be a problem if you keep the litter box clean. An advantage of the present technology is the ability to avoid or eliminate the use of fragrances in or around the box, as the reagents are essentially odorless and the reacted materials have minimal to no odor and the iodine evaporates over brief time periods.

For particulates and fibers, clumping agents may be used. Some preferred clumping agent are methylcellulose (MC), methylhydroxyethylcellulose (MHEC), methylhydroxypropylcellulose (MHPC), guar gum, guar gum derivatives (such as hydroxypropyl guar and hydroxyethyl guar) and combinations thereof. Other water-soluble polymers (WSPs), such as carboxymethylcellulose (CMC), hydroxyethylcellulose (HEC), ethylhydroxyethylcellulose (EHEC), hydroxypropylcellulose (HPC), carrageenan, xanthan gum, alginate, and various combinations thereof can be used as secondary water-retention and clumping agents.

These materials may be used as bulk additives, in structured articles (pellets, bricks, fabrics and the like or in systems such as self-cleaning litter boxes (e.g., US Publication 20070039556). All references cited herein are incorporated by reference in their entirety.

The following examples are provided as prophetic descriptions of formats for delivery of technology according to the descriptions of the present invention.

Example 1

Fibers would extruded in a non-aqueous solvent of polyvinyl alcohol in two separate batches in combination with particulate reactants. One set of fibers would comprise 40% by weight of Copper Sulfate and the other set of fibers would comprise 40% by weight of Potassium Iodide. The two separate fibers would blended as 5% by total weight of fabric

12

material into the fiber filled used in a diaper. The relatively low concentration (5%) of total added fiber would be expected to minimally change the properties expected from the fiber fill, except for the additional antimicrobial function, Upon activation by alcohol and/or water into the fibers, the polyvinyl alcohol would dissolve, the two reactants would dissolve in a single solution, the reactants would react, and the gaseous iodine would be produced.

The composition of the present technology provides a local concentration (in the water) of at least 5 ppm and preferably at least 10 parts per million iodine in water carried by the material (that is actual water and/or alcohol supported by the water absorbent material) when the material has 5% by weight of water and/or alcohol present in the water absorbent. The 5% is with respect to the total weight of water to the water absorbent material. The water and/or alcohol absorbing material preferably comprises water absorbing fibers. When providing alcohol, there is usually about 8% water present because of the difficulty in separating water from alcohol, except by expensive processing. The alcohol itself can provide additional anti-microbial activity, so the combination of alcohol and the molecular iodine is particularly effective in the practice of the present technology.

The composition that reacts with water and/or alcohol to form molecular iodine may comprise at least two salts, one of which at least two salts comprises an iodide salt. The at least two salts may be selected from the groups consisting of a) XY and b) Z I, wherein X is a metal, Y is an anion, and Z is an alkali metal, ammonium or alkaline cation. X is preferably a divalent metal cation. Y is preferably selected from carbonate, sulfate, sulfite, phosphate, phosphate, nitrate and nitrite, and Z is preferably selected from the group consisting of lithium, potassium, calcium, magnesium, sodium and ammonium. The composition that reacts with water to form molecular iodine preferably comprises cupric sulfate and potassium iodide.

The articles and compositions may have the iodine forming composition appropriately located within the article or evenly distributed throughout the applied material. For example, where the article is a hand-wipe sheet or diaper, it may have more than 70% of total composition in a central 50% of volume of the diaper. There is little need for antimicrobial activity on the portions of the diaper contacting the outer portions of the hips. Similarly, there would be little need for such activity along the waistband of the diaper. It is therefore desirable to concentrate the active materials in the diaper where the water (e.g., urine) is likely to be emitted. The iodine would migrate through the path of the water to all wetted areas.

A method of inhibiting microbial growth in an article provides a composition within the article, the composition comprising at lest two compounds that react in the presence of water to produce molecular iodine, and placing the article against the skin of an animal where an aqueous emission from the animal may occur. The method acts so that upon addition of water in an amount of between 10 and 100% by weight of the composition, a concentration of at least 10 parts per million of iodine is produced in the water in less than 15 minutes. The activity of the materials may be increased with respect to halogen releasing ability and volume by adding further halogen releasing components, especially iodates, chlorates, bromates, periodates, perchlorates and/or perbromates as a further reagent (e.g., as above 0% to 200% by weight of the further halogen-releasing components to KI. Metal, non-metal, alkaline and alkali halogens compounds may be used.

Another improvement would be to include starch materials into the composition or the surface to be treated so that the

EXHIBIT 5                    Page 9 of 11

US 9,414,601 B2

13                                                    14

released iodine would cause the standard reaction for starch testing and a blue coloration would appear on the surface to alert caregivers that activation had occurred.

### Example 2

Two porous films of water-soluble or water-dispersible material such as mannitol are extruded, the porosity provided by mechanical punching of the film of leaching of materials from the film, as well understood in the art. The separate films would contain 40% by weight of Copper Sulfate and 40% by weight of Potassium Iodide. The films can be used as adjacent or opposite side containers for the fiber fill (preferably with a separate non-dissolvable film).

### Example 3

Individual granules of Copper Sulfate and Potassium Iodide are coated with water-soluble/dispersible coatings, preferably in the 2-8 micron thickness range. The uncoated particles would preferably have a diameter of between 5-50 microns so that they could be carried in fiber fill for a diaper without too ready settling out of the fiber fill. The coated particles are mixed into the fiber fill, either alone or with a tacky material (on the fiber or on the particles, such as a partially dried coating on the particles) to avoid separation. The fiber particle blend would constitute the fiber fill in a diaper.

FIG. 1 shows a view of the inside of an opened diaper product 20 and the distribution of compositions according to the present technology. The diaper product 20 is shown with a longitudinal center-line 100 and a horizontal center-line 110 about which are approximately symmetrically disposed wide panels 30, adhesive tabs 40, a central absorbent sheet 24, a stretchable/flexible outer cover layer 32 that may be continuous with the wide panels 30. A sectioned area 26 exposes longitudinal elastic filaments 54 that form the elasticity of the diaper along with the crinkling pattern 52. There are significant indentations 50 on the sides of the diaper 120 to allow fitting to legs. The central absorbent sheet 24 is shown with four separate areas 22 within which there could be the heaviest concentrations of the iodine forming material, and two panels 34 that are towards a more rearward placement on a user where lower concentrations of iodine forming material could be located. Areas outside the central absorbing sheet 24 may have little or no iodine forming materials therein. As noted above, the concentration of the iodine forming materials should be centralized where liquids are more likely to be emitted into the absorbent area and be retained in the absorbent area. The upper region of the diaper and pad 36 and the lower region of the diaper and pad 38 could therefore have less total amount and less concentration of the iodine forming materials then the central area 37. These concentration variations in the vertical direction may also be reflected or substituted with similar regional variations in the horizontal direction of the diaper 20.

The concentration of the iodine forming material may be selected in the article according the ultimate needs and designs of the manufacturer, and the level of anti-bacterial effect desired. The concentration of the iodine gas in the liquid in the absorbent material is one measure of the desired results, and a further measure of the desired results is referred to in the art as the kill percentage, a measure of the percent of a specific bacteria (e.g., *E. coli*) in a liquid sample that would be killed in 5 minutes by the level of active ingredient present. An example would be that the presence of about 8 parts per million of gaseous iodine dissolved in the aqueous material in

the absorbent material would have a kill percentage over 50%. It would be desired, as noted above, to have higher concentrations of gaseous iodine in the liquid so that kill percentages are at least 60%, at least 70%, at least 80% and even at least higher than 90% for targeted bacteria and other microbes. Depending upon the specific bacteria or microbe selected for the measurement, the liquid may have to be provided with at least 5 or 10 parts per million (ppm), at least 15 ppm, at least 20 ppm, or at least 25 ppm by controlling the amount of reagents added, the rate of reaction of the reagents, and other controls aimed at keeping the iodine in solution in the liquid, such as providing thickening agents or other materials that would reduce the volatility of the iodine gas from the solution.

### Example 3 (Prophetic)

Particles of KI would be impact coated with smaller particles ($\frac{1}{10}$ to $\frac{1}{8}$diameter ratio) of polyvinyl alcohol in accordance with the teachings of the processes and equipment shown in U.S. Pat. No. 6,037,019 (Kooyer). These PVA coated particles could then be mixed with particles of cupric sulfate with no concern for any immediate reaction between the salts, even in the presence of ambient moisture. These particles could be carried to the application site for admixture into water to provide iodine or into other carrier material for application to conduit surfaces. It is important to appreciate that both water-borne iodine, alcohol-borne iodine and vapor-borne iodine can be produced in a single environment to address cracks, nooks and crannies in the surfaces to be treated or in the delivery system where intimate contact with water might be difficult.

### Example 4 (Prophetic)

Particles of KI and CuSO$_4$ would be prepared by having "stand-off" particles of silica covering the surface of at least one of the particles. The particles could be applied by impact in a fluidized bed, electrostatic coating means, blending and other available methods known for the application of silica coatings to particles. These particles could be dusted or scattered onto stall or cage fill materials (e.g., straw, granules, sand, gravel, litter box fill, etc.) and placed onto the floor of the stall or cage.

The silica either allows free-flowing aqueous materials (e.g., urine, wash water, spilled drinking water, etc.) to pass through channels between individual particles to dissolve one or more of the KI and CUSO$_4$ or equivalent reagents, or actually completely disrupt the stand-off covering, so that the two reagents would then react to produce molecular iodine. Especially where the stall or cage material is absorbent, the liquid and some of the iodine would persist, to fight off odors and microbials. Additionally, the reaction would occur only locally where the liquid contacted the particles.

The coated/protected reagent materials may be added to existing stall materials (e.g., straw, sand, saw dust, clay, dirt, etc.) or may be combined with such materials that are added to the stall or cage prior to application to the floor of the stall.

As the molecular and high concentration of iodine in solutions has been proven to reduce odors and reduce microbial activity, they would be very effective anti-odor and anti-microbial agents in the animal housing field. This would also be effective in horse trailers and other transportation systems for animals, including live stock such as cattle, sheep, pigs, fowl (chicken and turkeys) and the like. One particular benefit in the livestock trade is that the treatment of the surfaces on which the animals walk would likely be able to reduce the

EXHIBIT 5                                              Page 10 of 11

US 9,414,601 B2

**15**

need for direct provision of antibiotics into the livestock, which is a major environment and health concern.

Example 5 (Prophetic)

Protected particles of KI and $CuSO_4$ are blended with conventional retail kitty litter particles. This addition

The activity of the materials may be increased with respect to halogen releasing ability and volume by adding further halogen releasing components, especially iodates, chlorates, bromates, periodates, perchlorates and/or perbromates as a further reagent (e.g., as above 0% to 200% by weight of the further halogen-releasing components to KI. Metal, nonmetal, alkaline and alkali halogens compounds may be used.

All references cited herein are incorporated by reference in their entirety.

What is claimed:

**1.** An article for application to a surface to provide antimicrobial and/or anti-odor activity comprising:

a water and/or ethanol absorbent porous fabric material; and

a composition distributed within the porous fabric material of at least two particulate solid reagents that react in the presence of water and/or alcohol to produce molecular iodine,

the composition capable of providing a local concentration of at least 5 parts per million iodine in water or ethanol carried by the material when the material has 5% by weight of water and/or alcohol present in the water and/or alcohol with respect to the total weight of the water and/or alcohol absorbent porous fabric material;

wherein at least one of the two particulate solid reagents is coated with a water-soluble, water dispersible or water-penetrable solid covering of water-soluble or water-dispersible particles that physically separates the two particulate solid reagents and the solid covering prevents ambient conditions of 50% relative humidity at 25° C. from causing more than 10% of the total reagents exposed to the ambient conditions from reacting in a twenty-four hour period.

**2.** The article of claim **1** comprising a hand-wipe, wiping pad, mop head, diaper, sanitary pad, bandage, wound dressing or wrap.

**3.** The article of claim **1** where the water absorbing material comprises water absorbing fibers.

**4.** The article of claim **1** wherein the composition that reacts with water and/or C1 to C6 alcohol to form molecular iodine comprises at least two salts, one of which at least two salts comprises an iodide salt.

**5.** The article of claim **4** wherein the at least two salts are selected from the groups consisting of a) XY and b) Z I, wherein X is a metal, Y is an anion, and Z is an alkali metal, ammonium or alkaline cation.

**6.** The article of claim **5** wherein X is a divalent metal cation.

**16**

**7.** The article of claim **6** wherein Y is selected from carbonate, sulfate, sulfite, phosphate, phosphate, nitrate and nitrite.

**8.** The article of claim **7** wherein Z is selected from the group consisting of lithium, potassium, calcium, magnesium, sodium and ammonium.

**9.** The article of claim **1** wherein the composition that reacts with water and/or C1 to C6 alcohols to form molecular iodine comprises cupric sulfate and potassium iodide.

**10.** The article of claim **3** wherein the composition that reacts with water to form molecular iodine comprises cupric sulfate and potassium iodide.

**11.** The article of claim **1** wherein the at least two reagents comprise at least two particulate reagents wherein at least one of the reagents is a particle coated with a water-soluble, water-dispersible or water-penetrable solid covering that prevents ambient conditions of 50% relative humidity at 25° C. from causing more than 10% of the total reagents exposed to the ambient conditions from reacting in a twenty-four hour period wherein the solid coating comprises solid particles that form a water-soluble or water-dispersible solid covering as the particle covering.

**12.** The article of claim **1** wherein the composition that reacts with water to form molecular iodine comprises cupric sulfate and potassium iodide and wherein the at least two reagents comprise at least two particulate reagents wherein at least one of the reagents is a particle coated with a water-soluble, water-dispersible or water-penetrable solid covering that prevents ambient conditions of 50% relative humidity at 25° C. from causing more than 10% of the total reagents exposed to the ambient conditions from reacting in a twenty-four hour period.

**13.** The article of claim **3** wherein the composition that reacts with water to form molecular iodine comprises cupric sulfate and potassium iodide and wherein the at least two reagents comprise at least two particulate reagents wherein at least one of the reagents is a particle coated with a water-soluble, water-dispersible or water-penetrable solid particle covering that prevents ambient conditions of 50% relative humidity at 25° C. from causing more than 10% of the total reagents exposed to the ambient conditions from reacting in a twenty-four hour period while both reagents are present in a mixture the porous fabric comprising a polymeric or cellulosic fabric.

**14.** The article of claim **12** wherein absorbent clay particles are present within the porous fabrics and a clumping agent is blended with the composition that reacts with water and the absorbent clay particles, and the clumping agent is a different material from the absorbent clay particles.

**15.** The article of claim **13** wherein absorbent clay particles are present within the porous fabrics and a clumping agent is blended with the composition that reacts with water and the absorbent clay particles, and the clumping agent is a different material from the absorbent clay particles.

* * * * *

**EXHIBIT 5**                    **Page 11 of 11**

# EXHIBIT 6

# MUTUAL NONDISCLOSURE AGREEMENT

This  Mutual Nondisclosure Agreement ("Agreement") dated as of February 8, 2021 is entered in by and between BioLargo, Inc., a Delaware corporation, on behalf of its subsidiaries, including but not limited to, Clyra Medical Technologies Inc., (collectively, "BioLargo") and Ikigai Holdings, LLC, a Nevada LLC (the "Participant"), and sets forth the terms and conditions on which the Parties are willing to disclose certain Confidential Information (as defined in Section 2) about BioLargo, the Participant, and the Parties' technology. BioLargo and the Participant are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

1.    Purpose.  The Participant is interested in evaluating the BioLargo's technology and/or business, in connection with one or more potential transactions, including without limitation direct licensing agreements and strategic partnerships (individually a "Transaction" and collectively the "Transactions"). In connection therewith or otherwise, BioLargo may disclose to the Participant, and the Participant may disclose to BioLargo, certain confidential technical and business information which the disclosing party requires the receiving party to treat as confidential. As used hereinafter, the term "receiving party" shall include the receiving party and any Affiliate (as that term is defined in Section 13) of the receiving party.

2.    "Confidential Information" means any information disclosed to the receiving party by the disclosing party, either directly or indirectly in writing, orally or by inspection of tangible objects, including without limitation  prototypes, designs, ideas, inventions, know-how, production methods and techniques, safety tests and results, trade secrets and any other technical or scientific information; information about the disclosing party's business, prospects, plan of operations, budgets, financial forecasts, non-published results of operations, customer and prospective customer lists, identity of strategic partners and prospects, and any other business or financial information; and any other proprietary information; that may be disclosed by one party to the other, relating to the potential Transactions or otherwise, or which may be used for competitive purposes, including without limitation technology, apparatus, methods, software, hardware, compositions, carriers, systems, and delivery formats relating to chemical compositions, particularly antimicrobial, anti-odor and anti-toxicity systems, and more particularly additives to iodine-generating compositions in the field of antimicrobial, anti-odor and anti-toxicity treatments, and including specifically unpublished patent applications filed by or on behalf of the disclosing party. Confidential Information may also include information disclosed to the disclosing company by third parties. Confidential Information shall not, however, include any information which the receiving party can establish by written documentation (i) was publicly known and made generally available in the public domain prior to the time of disclosure to the receiving party by the disclosing party; (ii) becomes publicly known and made generally available after disclosure to the receiving party by the disclosing party through no action or inaction of the receiving party; (iii) is in the possession of the receiving party, without confidentiality restrictions, at the time of disclosure by the disclosing party as shown by the receiving party's files and records immediately prior to the time of disclosure; or (iv) is developed independently of the Confidential Information, as shown by written records prepared contemporaneously with such independent development.

3.    Non-use and Nondisclosure. The receiving party agrees not to use any Confidential Information for any purpose except to evaluate and engage in discussions concerning one or more potential Transactions. The receiving party agrees not to disclose any Confidential Information to third parties, agents or employees of the receiving party, except only to those third parties, agent or employees ("Additional Recipients")  who are required to have such information in order to evaluate or engage in discussions concerning  a potential or actual Transaction, and, additionally, the following two conditions are satisfied: (a)  each Additional Recipient is identified before any Confidential Information is provided by any person to any such Additional Recipient; and (ii) each Additional Recipient shall sign a copy of this Agreement, agreeing to bound fully by the terms and conditions hereof, and such copy of this Agreement shall be provided to and approved by the disclosing party, before any Confidential Information is provided by any person to any such Additional Recipient. Any

**EXHIBIT 6**

Additional Recipient signing a counterpart of this Agreement shall for all purposes of this Agreement be deemed to be a "Party" as defined hereinabove.

4.    <u>Maintenance of Confidentiality</u>. The receiving party agrees that it shall use best efforts to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information. Without limiting the foregoing, the receiving party shall take at least those measures that the receiving party takes to protect its own confidential information of a similar nature and shall have its agents and employees who have access to Confidential Information sign a non-use and nondisclosure agreement in content substantially similar to the provisions hereof, prior to any disclosure of Confidential Information to such agents or employees. The receiving party shall immediately notify the disclosing party in the event of any unauthorized use or disclosure of any Confidential Information.

5.    <u>Term</u>. This Agreement shall survive until such time as all Confidential Information disclosed hereunder becomes publicly known and made generally available through no action or inaction of the receiving party, unless expressly authorized pursuant to Section 14.

6.    <u>No Obligation</u>.  Nothing herein shall obligate the Parties to proceed with any Transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the potential or any actual Transaction without any liability.

7.    <u>No Warranty</u>. All Confidential Information is provided "as is". The disclosing party makes no warranties, express, implied or otherwise, regarding the accuracy, completeness or performance of any Confidential Information. The disclosing party shall be under no obligation to update any Confidential Information.

8.    <u>No IP Rights Granted</u>.  Nothing in this Agreement is intended to grant any rights to either Party under any patent, copyright or other proprietary rights of the other Party, including without limitation rights to license, nor shall this Agreement grant the receiving party any rights in or to Confidential Information except as expressly set forth herein. The receiving party hereby agrees that any and all intellectual property related to the Confidential Information that is conceived or reduced to practice by either or both receiving party and the disclosing party during the performance of this Agreement shall be and become the exclusive property of the disclosing party and receiving party shall perform all actions necessary to perfect exclusive property rights in the disclosing party, including assigning such rights in their entirety to the disclosing party.

9.    <u>No Reverse Engineering</u>. In the event that the Confidential Information includes tangible products or tangible representations of the disclosing party's technology, the receiving party agrees not to analyze, or have a third party analyze, or reverse engineer any such tangible products or materials.

10.    <u>Return of Materials</u>.  The receiving party will promptly, upon the written request of the disclosing party, return to the disclosing party any and all Confidential Information delivered to the receiving party (without retaining any copy thereof) other than any notes, discs, tapes and other writings and materials prepared by or on behalf of the receiving party based on the Confidential Information, all of which shall be destroyed. The receiving party will then promptly deliver to the disclosing party an affidavit expressly affirming the foregoing.

11.    <u>Regulation FD Compliance</u>.  The Participant covenants and agrees that so long as it is in possession of material non-public Confidential Information, it will not effect transactions in any securities of BioLargo.

12.    <u>Remedies</u>.  The Parties acknowledge that money damages may not be a sufficient remedy for any breach of this Agreement and that the disclosing party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach, including without limitation Sections 3 and

4. Such remedies shall not be deemed to be the exclusive remedy for breach of this Agreement, but shall be in addition to all other remedies that may be available at law or equity. The prevailing party shall be entitled to recover is actual attorney and expert fees in any suit arising out of the rights or obligations set forth in this Agreement, including a suit for equitable relief as set forth in this Section.

13.     "Affiliate" means any corporation, association, other entity or other person that directly or indirectly controls, is controlled by, or is under common control with a Party, either currently or during the term of this Agreement, and shall additionally include any employee, officer, director, attorney, consultant or other agent of the receiving party or Affiliate.

14.     Permitted Disclosures.  Notwithstanding anything contained in this Agreement to the contrary, if the receiving party is required by subpoena, court order, or similar process or applicable governmental regulation to disclose any Confidential Information, the Parties agree that the receiving party will provide the disclosing party with prompt notice of such request or obligation so that the disclosing party may seek an appropriate protective order or procedure if it elects to do so. If the disclosing party does not obtain an appropriate protective order or procedure by the time that such disclosure is reasonably required, the receiving party or such Affiliate shall be permitted to make such disclosure.

15.     Miscellaneous.  This Agreement shall bind and inure to the benefit of the Parties hereto and their successors and assigns. This Agreement may not be assigned. This Agreement shall be governed by the laws of the State of California, without reference to conflict of laws principles. The Parties shall bring any actions or proceedings in connection with this Agreement and the subject matter hereof only in the Federal or state courts in the State of California or commence arbitration proceedings only in the State of California. This Agreement contains the entire understanding between the Parties with respect to the subject matter hereof. Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision hereof. This Agreement may not be amended, nor any obligation waived, except by a writing signed by the Parties hereto.

IN WITNESS WHEREOF, the parties have duly executed this Mutual Nondisclosure Agreement as of the date first set forth above.

**BIOLARGO:**                                      **PARTICIPANT:**
BioLargo, Inc.                                     Ikigai Holdings, LLC

By: _Dennis Calvert_____                  By: _____
    E4D2F44B920E409...                                 8FA2B29452E44DC...
Name: _____                            Name:  Jane Pak
Title: _____                           Title:  CEO

# EXHIBIT 7

CONFIDENTIAL As of 3/22/21

**Non-Binding BioLargo and Ikigai Strategic Partnership Term Sheet**

**Joint Statement of Direction**

Ikigai and BioLargo agree to create a Strategic Partnership with the purpose of identifying and launching distinctive, mass-market consumer product solutions utilizing BioLargo's unique, "market-ready" technology and Ikigai's proprietary method for creating and growing a mass-market consumer product winner.  The following reflects the informal discussions between the Parties, and is not intended to be a definitive or binding agreement. The parties agree to test immediate "market-ready" products and evaluate optimal value positioning, category saturation status, scalability capacity, contracting options and go-to-market strategies.

**Deal Points**

1. Risk Capital Deployment to Facilitate Market Testing: Ikigai commits to invest up to $250K to test for a "market-ready" product with the intention of identifying 1 mass-market consumer product winner that has the potential to reach $100M revenue within 5 years.

2. Manufacturing Excellence & Supply Chain Efficiency: BioLargo and Ikigai agree to enter into a non-exclusive Preferred Master Manufacturing Agreement by March 26, 2021 to ensure product ventures rooted in BioLargo's core IP achieve product excellence and scalability.  Ikigai will work with BioLargo to plan production to scale and ensure supply chain risk mitigation.  BioLargo has the right to manufacture the product at a commercially reasonable manufacturer's margin, or outsource manufacturing at its discretion for submitted purchase orders (with the goal to ensure scalability and guarantee performance). For purchase orders placed to BioLargo, payment terms are 50% deposit due on order placement, if the remaining 50% is paid within ten (10) days of delivery, the entire Purchse Order will be discounted by 2%. All purchase terms will be net 30. Purchase orders must be subject to predictable forecasting. BioLargo will sell product to Ikigai at the manufacturer's cost (which includes the manufacturer's margin), plus a 6% of the customer purchase price margin for BioLargo.

3. Exclusive Rights to License One Consumer Application of BioLargo Patent Portfolio: The parties agree to enter into a license agreement for Product 1 pending a "GO" decision, and exclusive rights to the product for consumer market if a "GO" decision is made.  This license agreement will grant Ikigai temporary exclusivity during the test period.  In order to reach a "GO" decision, BioLargo agrees to grant Ikigai temporary exclusive rights to test Cupridyne based stain and odor concentrates for pet-related product applications in order to identify Product 1 for Phase I Test. After selecting Product 1, the temporary exclusive rights expire.  The parties agree to mutually acceptable testing time frames.  The royalty terms of the Product 1 license agreement would pay BioLargo 20% of the exit price paid with 0% on-going royalty during the term of the agreement. On a "no go" decision, no rights would be transferred. The license agreement would require BioLargo to transfer all ownership rights and intellectual property relating to the particular successful product to the acquiring party (e.g., P&G).

4. Reserved Equity in Ikigai: Ikigai shall allocate up to a 2.2% Class A warrant purchase option that BioLargo may exercise within twelve months after the commercial launch of the first BioLargo-based product.

© Copyright 2021. IKIGAI HOLDINGS, LLC (IKIGAI). All Rights Reserved.

**EXHIBIT 7**                                                                 **Page 1 of 2**

CONFIDENTIAL                                                                As of 3/22/21

5. <u>Regulatory Compliance & Risk Mitigation:</u> BioLargo will continue to mitigate regulatory risk by ensuring consumer products meet all regulatory standards of safety and efficacy.

6. <u>Commitment to Support Ikigai's Fundraising:</u> BioLargo commits to assist in due diligence required by potential investors.

7. <u>Reserved Right to Invest:</u> To the extent available, BioLargo reserves the option to invest via Ikigai's Private Placement Memorandum immediately post Phase I test "GO" scenario.  In addition, BioLargo is willing to support capital investment in product success by facilitating alternative fundraising opportunities such as OTC and other funding vehicles.

Ikigai Holdings, LLC                          BioLargo, Inc

*DocuSigned by:*                              *DocuSigned by:*

*[signature]*                                 *Dennis Calvert*

8FA2B20452E44D6                               E4D2F44B9385400

By:_____Jane Pak_____              By:_____Dennis Calvert_____

Its:_____CEO_____              Its:_____CEO_____

Date:__3/22/2021_____             Date:__3/22/2021_____

© Copyright 2021. IKIGAI HOLDINGS, LLC (IKIGAI). All Rights Reserved.

CONFIDENTIAL
1

**EXHIBIT 7**                                                          **Page 2 of 2**

# EXHIBIT 8

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding (the "**MOU**") is made this 18th day of May, 2021, by and between BioLargo, Inc., a Delaware corporation and its wholly owned subsidiary BioLargo Life Technologies, Inc., a California corporation, having a principal place of business at 14921 Chestnut Street, Westminster, California 92683 (collectively referred to as "**BioLargo**"), and Ikigai Holdings, LLC, a Nevada limited liability company having a principal place of business at One East Liberty Street, Suite 600, Reno, Nevada 89509 ("**Ikigai**"). Each of BioLargo and Ikigai is a "Party", and are collectively referred to herein as the "Parties".

## RECITALS

**WHEREAS**, BioLargo and Ikigai executed a non-binding term sheet for a strategic partnership that would allow Ikigai to identify and launch distinctive mass-market consumer product solutions utilizing BioLargo's CupriDyne formulation and technologies and Ikigai's propriety method for creating and growing a mass-market consumer product winner;

**WHEREAS**, the term sheet contemplates two agreements – a License Agreement and a Manufacturing Agreement;

**WHEREAS**, the parties have negotiated and drafted a License Agreement, and Ikigai is preparing the first draft of the Manufacturing Agreement; and

**WHEREAS**, the parties desire to enter into this binding MOU to document their intention to enter into the License Agreement, and document the essential business terms of the Manufacturing Agreement.

## AGREEMENT

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and for the mutual covenants contained in this MOU, the Parties hereby agree as follows:

1.     License Agreement. The Parties have negotiated and drafted a license agreement, attached hereto as Exhibit A, through which Ikigai intends to test market certain claims related to pet products based on BioLargo's proprietary and patented technologies, and which can advance to an exclusive license for certain pet products.

2.     Preferred Manufacturing Agreement. The Parties are negotiating and drafting a non-exclusive preferred master Manufacturing Agreement (the "**Manufacturing Agreement**") to ensure the products licensed under the License Agreement are manufactured with excellence and scalability. Ikigai has agreed to provide the initial draft of the agreement, which shall include the following terms: (i) Ikigai will work with BioLargo to plan production to scale and ensure supply chain risk mitigation; (ii) BioLargo has the right to manufacture the product at a manufacturer's target margin of 30% at inception, which shall be lowered to a targeted margin of 27.5% upon such time as the volume per month exceeds 1 million units or more, and then to 25% upon such time as the volume per month exceeds 2 million units or more, and/or outsource

<span style="color:red">**EXHIBIT 8**</span>                                         <span style="color:red">**Page 1 of 3**</span>

manufacturing at its discretion for submitted purchase orders (with the goal to ensure scalability and guarantee performance); (iii) BioLargo will agree to disclose to Ikigai the details of its costs to manufacture ordered products; (iv) for purchase orders placed to BioLargo, payment terms are 50% deposit due on order placement, if the remaining 50% is paid within ten (10) days of delivery, the entire Purchase Order will be discounted by 2%; all purchase terms will be net 30. The Parties shall negotiate in good faith the additional commercially reasonable terms of the Manufacturing Agreement.

       3.   <u>Purchase Orders; Forecasting</u>. The Manufacturing Agreement will require Ikigai to place purchase orders for its forecasted 90-day product requirements, and provide that orders must be placed in accordance with BioLargo or co-packer lead times as applicable, and will agree to share product forecasting on an ongoing basis with BioLargo for purposes of planning future production.

       4.   <u>Execution</u>. Upon full execution of this Memorandum of Understanding, BioLargo will execute the license agreement.

       IN WITNESS WHEREOF, the Parties have executed this Memorandum of Understanding as of the dates set forth below.

BIOLARGO
Biolargo, Inc.
BioLargo Life Technologies, Inc.

IKIGAI

Ikigai Holdings, LLC

By: Dennis P. Calvert, President
Date signed: 5/18/2021

By:  Jane Pak, CEO
Date signed: 5/18/2021

**EXHIBIT 8**

**Page 2 of 3**

**Exhibit A**

**Draft License Agreement**

**EXHIBIT 8**

# EXHIBIT 9

# LICENSE AGREEMENT

## [Pet Products]

This License Agreement (the "**Agreement**") is made this 17th day of May, 2021, by and between BioLargo, Inc., a Delaware corporation and its wholly owned subsidiary BioLargo Life Technologies, Inc., a California corporation, having a principal place of business at 14921 Chestnut Street, Westminster, California 92683 (collectively referred to as "**Licensor**"), and Ikigai Holdings, LLC, a Nevada limited liability company having a principal place of business at One East Liberty Street, Suite 600, Reno, Nevada 89509 ("**Licensee**"). Each of Licensor and Licensee is a "Party", and are collectively referred to herein as the "**Parties**".

## RECITALS

**WHEREAS**, Licensor has developed a proprietary and patent-protected formulation called CupriDyne that eliminates odors and can be used as the basis for many products for use in many settings and environments, for consumer, professional, and industrial uses;

**WHEREAS**, Licensor and its affiliates manufacture, market and sell multiple products based on the CupriDyne formulation, including industrial odor control, consumer products, and medical products;

**WHEREAS**, Licensee desires to identify and launch distinctive mass-market consumer product solutions utilizing Licensor's CupriDyne formulation and Licensee's propriety method for creating and growing a mass-market consumer product winner.

**WHEREAS**, the parties desire to set forth their rights and obligations under an arrangement whereby (i) over a set period of time, Licensee tests potential products, claims, and markets to determine one or more products in which it desires to move forward to a next phase of testing, (ii) upon such decision, Licensor temporarily licenses to Licensee exclusive rights to sell a limited amount of the particular product to consumers during which time Licensee would test its viability as a potential mass-market winner (through "Phase I" testing), (iii) upon a "GO" decision to be determined solely by Licensee to proceed forward with expanding marketing and retail launch, Licensor agrees to grant to Licensee an exclusive license for such product, and (iv) in the event of a successful campaign and appropriate retail penetration, Licensee would lead an effort to sell the rights to the product to a consumer products company and Licensor shall permit Licensee to assign its exclusive rights to such third party company.

## Agreement

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and for the mutual covenants contained in this Agreement, the Parties hereby agree as follows:

1.  Definitions.

    a.  "**Licensor**" means BioLargo Life Technologies, Inc., and BioLargo, Inc.

**EXHIBIT 9**                                    **Page 1 of 16**

b.  "**Licensee**" means Ikigai Holdings, LLC.

c.  "**Licensed Patents**" means those patents and patent applications that are listed in <u>Exhibit A</u> and any other potential Licensor's patents and patent applications improving on said listed patents and applications, and their divisions, continuations, continuations in part, patents issuing therefrom and all reissues or renewals of the same which might limit the scope of authorized manufacture use, sale and importing of Licensed Products within the scope of the Field of Use. Licensed Patents shall not include any other intellectual property rights such as, but not limited to, patents and/or patents applications not listed in <u>Exhibit A</u> (except if expressly stated herein), trademarks, copyrights or models.

d.  "**Licensed Products**" means any and all compositions and methods of use of those compositions for use by an end user and falling within the scope of at least one claim of a Licensed Patent and residing solely within the Field of Use.  Licensed Products include for example liquids, powders and other materials containing such liquids and powders.  Licensed Products exclude any associated mechanical devices for applications. Licensed Products shall further include any and all compositions and methods of use of those compositions for use by an end user and falling within the scope of Trade Secrets and Know-How disclosed in accordance with the execution and performance of this Agreement.

e.  "**Field of Use**" means, for purposes of defining the scope of the License under the Licensed Patents, Trade Secrets and Know-How granted in the scope of the present Agreement is limited to the manufacture, use, sale, export or importation of iodine-containing solutions or particles to reduce or eliminate odors in the air or on surfaces. The application may be by brushing, wiping, applying, coating or spraying the iodine-containing solutions or particles into the air or onto surfaces. The Field of Use excludes the use, advertising or marketing of the iodine-containing solutions or particles to the air or surfaces for purposes of antimicrobial or sanitizing uses. Specifically, the Field of Use granted under this Agreement include and are limited to (i) powdered products marketed to reduce odors caused by household pets,  (ii) liquid products marketed to treat stains and odors caused by household pets, and (iii) products composed of porous fabric material and a composition distributed within the porous fabric material to produce molecular iodine (such as wipes).

f.  "**Net Sales Price**" shall mean actual revenues recognized under generally accepted accounting principles actually received from the sale, use or other disposition of the Licensed Products under license less (i) sales discounts, use, excise, added value and withholding taxes, and (ii) shipping charges.

g.  "**Territory**" means world-wide.

h.  "**Trade Secrets**" and "**Know-How**" refers to proprietary knowledge of Licensor related to the Licensed Products and the methods, compositions, and methods of manufacturing compositions described in the Licensed Patents, the Licensed Products, and the Field of Use.

2.    <u>Initial "Rapid Testing"</u>.

a.   During the period beginning on the effective date of this Agreement, and concluding October 1, 2021 (the "**Rapid Testing Period**"), Licensee may test through its proprietary "Rapid Testing Process" potential product uses otherwise known as claims, and potential products in an effort to determine if one or more products based on CupriDyne is appropriate to proceed with further market testing (the "**Phase I Testing**" described below) with the hopes of finding a product within the Licensed Products suitable to launch a full direct-marketing campaign.

b.   During the Rapid Testing Period, Licensor shall cooperate with Licensee as reasonably necessary to provide information as to potential product uses and potential products that may be suitable for initial testing. Licensor shall not be entitled to separate compensation for such cooperation.

c.   On or before the expiration of the Rapid Testing Period, Licensee may advise Licensor in writing of its intention to proceed with Phase I Testing for one (1) or more particular products (such notice, a "**Notice to Proceed**"). Such written notice shall identify with particularity the product name, uses, claims, market and proposed pricing. In the event of Licensor's timely receipt of such notification, the provisions of Section 3 (Phase I Testing) shall apply. If Licensee fails to timely deliver notice to Licensor pursuant to this Section, this Agreement shall terminate at that time without further action by either party, and all rights granted to Licensee pursuant to this Agreement shall terminate.

d.   In the event that Licensee does not notify Licensor of a GO Decision as defined below, Licensee agrees to share with Licensor brief results and information gathered in its prior testing, all of which shall exclude confidential information as defined in the Parties' associated Non-Disclosure Agreement.

3.   <u>Phase I Testing.</u>

a.   Provided that Licensee delivers to Licensor a written Notice to Proceed prior to the expiration of the Rapid Testing Period, Licensee may proceed to test market the product(s) identified in the Notice to Proceed (the "**Phase I Product(s)**") subject to the conditions and limitations of this Section. Licensee intends to develop a brand under which the Phase I Product(s) would be sold (the "**Licensee Brand**").

b.   The "Phase I Testing Period" shall be approximately one hundred and twenty (120) days. The Parties agree to mutually negotiate and agree upon the commencement and termination of the Phase I Testing Period.

c.   Provided that Licensee delivers to Licensor a written Notice to Proceed prior to the expiration of the Rapid Testing Period, Licensor hereby grants to Licensee the world-wide exclusive right to sell the Phase I Product(s) to consumers (the "**Phase I License**") during the Phase I Testing Period. The Phase I License shall terminate upon the expiration of the Phase I Testing Period.

d.   Licensee agrees to order, and Licensor agrees to manufacture, the number of Phase I Product(s) as requested by Licensee, for sale and delivery to Licensee for the purposes of

the Phase I Testing, at Licensor's cost plus a reasonable manufacturer's margin, pursuant to the PMMA (as defined in Section 4(c) below).

       e.    During the Phase I Testing Period, and in consideration of the exclusive rights granted to Licensee during such time, Licensor shall pause all sales of the Phase I Product(s) that may conflict with the information provided in the Notice to Proceed regarding targeted consumers, markets and claims. In addition, Licensor shall ensure that sales by third parties with whom Licensor is under agreement pause for products similar to the Phase I Product(s) and targeted to the same consumers, under any brand. Licensor acknowledges that pausing sales in accordance with this paragraph is critical to allow Licensee to acquire essential data about the Phase I Product(s) and the associated claims.

    f.    On or before the expiration of the Phase I Testing Period, Licensee may advise Licensor in writing of its intention to proceed with an expanded marketing campaign (a "**GO Decision**"), the purpose of which is to build a broader base of consumer awareness, launch the pertinent product in retail stores, and direct customers to retail stores carrying the pertinent product. In such instance, the provisions set forth in Section 4, below, shall apply. If Licensee fails to timely deliver a GO Decision, this Agreement shall terminate at that time without further action by either party, and all rights granted to Licensee pursuant to this Agreement shall terminate.

    g.    In the event that Licensee does not notify Licensor of a GO Decision as defined above, Licensee agrees to share with Licensor brief results and information gathered in its prior testing, all of which shall exclude confidential information as defined in the Parties' associated Non-Disclosure Agreement.

    4.    <u>"GO" Decision on Licensed Product</u>. Provided that Licensee has timely delivered a notice of a GO Decision to Licensor, and unless this Agreement is otherwise terminated, the Parties agree to the following:

       a.    <u>License Grant</u>. Subject to Licensee's performance of the payment obligations and declaration obligations set forth in Section 5, and effective as of the date of delivery of the notice of GO Decision without further action by Licensor or Licensee, Licensor hereby grants to Licensee, an exclusive, royalty-bearing license under the Licensed Patents, Trade Secrets, and Know-How to make, use, sell, offer for sale, export, and import Licensed Products anywhere in the Territory solely within the Field of Use.

         i.    Licensee is not hereby entitled to sublicense or subcontract, in whole or in part, the rights granted to it hereunder, except as otherwise expressly agreed upon under this Agreement.

         ii.    Licensee may subcontract to a third party the manufacturing and assembly, including personalization, of Licensed Products provided that Licensee remains responsible for the performance of the obligations deriving from this Agreement.

iii.    No license right other than those expressly granted under this Article is granted by Licensor to Licensee under this Agreement. Notwithstanding the previous sentence, Licensee shall be granted the right to license any patent covering improvements to the Licensed Patents.

iv.    Licensee shall be able to assign or sell this Agreement only upon approval by Licensor in accordance with Section 6, below, which approval shall not be unreasonably withheld.

b.    Exclusivity. The rights granted to Licensee under Section 4 of this Agreement shall remain exclusive, provided that Licensee continues to generate Two Million Five Hundred Thousand Dollars ($2,500,000.00) in annualized revenues, beginning on the third (3rd) full calendar quarter following the first (1st) delivery of Licensed Product to a retail store, to be determined by multiplying the quarterly revenues (of Licensed Products purchased from Licensee) of the most recent completed quarter by four (4).

c.    Preferred Master Manufacturing Agreement. The parties agree to enter into a non-exclusive Preferred Master Manufacturing Agreement (the "**PMMA**") to ensure the Licensed Product is manufactured with excellence and scalability. Licensee agrees to work with Licensor to plan production to scale and ensure supply chain risk mitigation.

d.    For Licensee's purchase orders placed to Licensor, payment terms are fifty percent (50%) deposit due on order placement. If the remaining fifty percent (50%) is paid within ten (10) days of delivery, the entire purchase order will be discounted by two percent (2%). All purchase terms will be net thirty (30) days of delivery.

5.    Royalty and Payments.

a.    Royalty. Licensee shall pay to Licensor six percent (6%) of the Net Sale Prices of any and all Licensed Products made, used, sold, or imported in the Territory or exported from the Territory (the "**Royalty**"). All payments under this Agreement are exclusive of any value added taxes ("VAT"), withholding and other taxes. In case VAT and/or similar tax applies to any such payment, the required amount of such tax shall be payable by the Licensee in addition to such payment to Licensor.

b.    Payments. All payments under this Agreement shall be made to Licensor by bank transfer to the account listed hereafter, or at such other account as shall be furnished in writing by the duly authorized officer of Licensor.

6.    Sale to Third Party. Upon a successful retail launch determined solely by Licensee of one or more Licensed Products, Licensee intends to market the product(s) under Licensee's Brand for sale to a major consumer products company, such as Proctor & Gamble. In such event Licensor agrees to reasonably cooperate with Licensee in its efforts.

a.    Exit Price. In the event that Licensee sells, transfers, and assigns its rights, title, and obligations under this Agreement to a third-party entity (an "**Acquisition**"), Licensee shall pay to Licensor a one-time payment of twenty percent (20%) of the total amount paid by such third-party to Licensee (the "**Acquisition Exit Price**"). This payment shall be delivered by

Licensee to Licensor within thirty (30) days of Licensee receiving payment from a third-party for an Acquisition. Upon payment of the Acquisition Exit Price, Licensee's obligation to pay the Royalty under Section 5 of this Agreement for the sale of Licensed Product after the payment of the Acquisition Exit Price shall be terminated.

7.    Enforcement/Third Party Infringement. Upon approval by Licensor which shall not be unreasonably withheld, Licensee shall have power to institute and prosecute at its own expense suits for infringement of the Licensed Patents, and, if required by law, Licensor will join as party plaintiff in such suits. All expenses in such suits will be borne entirely by Licensee, and Licensee would be solely entitled to all proceeds of such suit, including but not limited to any settlement or judgment.

8.    Reporting.

a.    Licensee shall keep full and accurate books of account showing the amount of Royalties due pursuant to this Agreement. These books of account shall be kept at Licensee's place of business, and shall be made available to Licensor at reasonable times for inspection by an independent certified public account retained by Licensor and shall be kept and made available to Licensor for the later of (i) the end of the term of this Agreement, including any extensions thereof, or (ii) two (2) years following the end of the calendar year to which they pertain.

b.    Royalty Report. Not later than thirty (30) days after the completion of an Acquisition of Licensee's rights, interest, or obligations under this Agreement to the Licensed Products and Licensed Processes, Licensee shall deliver to Licensor a true and accurate report (a "**Royalty Report**"), giving particulars of the business conducted by Licensee as are relevant to an accounting for Royalties due under this Agreement. The Royalty Report shall include at least the following: (i) the quantity of Licensed Products sold by Licensee; (ii) the revenues arising from sales of Licensed Products; (iii) the calculated Royalty due to Licensor; and (iv) any other revenues received from third parties. Simultaneously with the delivery of each Royalty Report, Licensee shall pay to Licensor the applicable Royalty due, as set forth in Section 5 above.

c.    Audit Rights. Licensor shall be entitled, upon no less than ten (10) days written notice to Licensee and during business hours at Licensee's office or such other place as Licensee shall designate within the state of Nevada, to inspect and examine those books and records of Licensee relating to the determination of Royalties set forth in any Royalty Report. The inspection of Licensee's records shall be performed by a national public accounting firm (a "**Qualified Firm**"). The examination must be conducted within ten (10) days of such books and records being made available to Licensor ("**Examination Period**"). The Qualified Firm shall prepare a report indicating the results of the review (the "**Audit Report**"). If the Audit Report discloses that the amount of Royalties reported to Licensor was incorrect, Licensee shall pay to Licensor the deficiency, unless Licensee disputes the Report within thirty (30) days after the receipt of the Report by Licensee. If Licensee disputes the Report within this thirty (30) day period, Licensee and Licensor shall agree upon another of the national independent accounting firms to review and verify the Royalties, and provide the results thereof to Licensee and Licensor (the "**Reconciliation Audit**") and the determination as set forth in the Reconciliation Audit shall be binding upon Licensee and Licensor. All costs and expenses of the auditor generating the

Audit Report shall be paid by Licensor unless the audit shows that Licensee understated Royalties in the Royalty Report by more than ten percent (10%), in which case Licensee shall pay the cost and expenses of such audit. Notwithstanding the foregoing, in the event the Reconciliation Audit is performed, Licensee and Licensor shall each pay fifty percent (50%) of the cost of the Reconciliation Audit. The exercise by Licensor of its audit rights hereunder shall not relieve Licensee of its obligations to pay prior to the request for and inspection and examination of Licensee's books and records or permit Licensor the right to audit any other sums with the exception of the amounts set forth in this Royalty Report. If Licensor does not elect to exercise its rights to audit during the Audit Period, and/or does not elect to examine the books and records during the Examination Period, then Licensee's Royalty Report shall conclusively be deemed to be correct and Licensor shall be bound by Licensee's determination. Additionally, Licensor agrees and acknowledges that the audit right as set forth herein and the review of books and records shall be confidential and, with the exception of Licensor's auditors, Licensor may not disclose or discuss the audit or the results of the audit to any other parties.

9.     <u>Marking of Patent Rights</u>. All Licensed Products shall bear a trademark designated and owned by Licensee, and appropriate patent marking, such as "Patent Pending" or reference to specific issued U.S. Patents covering the Licensed Products, pursuant to and in conformance with the guidelines issued from time to time by Licensor. Licensee shall consult with and obtain the written approval of Licensor with respect to any such patent marking.

10.     <u>Insurance Requirements</u>. Licensee shall maintain, at Licensee's expense, during the period that any Licensed Product is made, used, sold or otherwise made available to others pursuant to this Agreement, comprehensive liability insurance, including product liability insurance, with a reputable and financially secure insurance carrier(s) to cover the activities of Licensee and its sublicensees, if any, contemplated by this Agreement, for minimum limits of Two Million Dollars ($2,000,000.00) per occurrence. Such insurance shall name Licensor as an additional insured. Licensee shall furnish a Certificate of Insurance, upon request, evidencing coverage of Two Million Dollars ($2,000,000.00) with thirty (30) days of written notice of cancellation or material change to Licensor. Licensee's insurance shall be written to cover claims incurred, discovered, manifested, or made during the term, or after the expiration, of this Agreement. Licensee shall at all times comply, through insurance or self-insurance, with all statutory workers' compensation and employers' liability requirements covering any and all employees with respect to activities performed under this Agreement. All such liability insurance policies shall be written as primary policies not contributing with and not in excess of coverage which Licensor may carry.

11.     <u>Limited Warranty</u>.

a.     In no event shall any amount paid hereunder by Licensee be refundable to it, including in case of cancellation by a court of final jurisdiction or in case of any final invalidation of any Licensed Patent licensed under this Agreement, or in case of termination pursuant to Section 12.

b.     Licensor guarantees only the existence of Licensed Patents. In the event that during the term of this Agreement, the existence of any Licensed Patent is threatened for any reason, Licensor may, in its discretion and at its expense, use reasonable commercial efforts to

preserve such existence and will keep Licensee informed of such actions and procedures when required in writing by Licensee. Licensee will cooperate with Licensor, at Licensor's expense, by providing any information and assistance reasonably requested by Licensor and necessary to initiate and bring the above referred actions and procedures to a satisfactory conclusion.

     c.  Except as set forth in this Section and set forth in the PMMA, Licensor disclaims all warranties, express or implied, including warranty of non-infringement, warranties of merchantability and fitness for a particular purpose, arising out of this Agreement and the rights provided hereunder.

     d.  In no event shall either Party be liable under this Agreement for any indirect, special or consequential damages including, but not limited to, lost profits or demands against the other Party by any person, or other commercial loss.

12.   <u>Events of Default and Termination</u>.

     a.  This Agreement shall terminate automatically in the event that Licensee files a petition, or has a petition filed against it, under any laws relating to insolvency, including, without limitation, any filing under any provision of the U.S. Bankruptcy Code; or enters into any voluntary arrangement for the benefit of its creditors; or appoints, or has appointed on its behalf, a receiver, liquidator or trustee of its property or assets.

     b.  The following shall be considered an "**Event of Default**":

        i.  Licensee's failure to timely pay to Licensor during a particular Reporting Period an amount equal to at least the sum of the Royalty due for such Reporting Period in compliance with Section 5(b);

        ii.  Licensee's failure to timely deliver to Licensor the Report due for a Reporting Period;

        iii.  Licensee's assignment, or attempted assignment, of this Agreement in violation of the terms set forth in Section 18.l below;

        iv.  An uncured "Event of Default" by Licensee under the forthcoming PMMA, as that term is defined in the PMMA;

        v.  Licensor's grant of a license to a third party in the Field of Use during the Term, provided that Licensee has not breached one or more provisions of this Agreement, or otherwise committed an Event of Default; and

        vi.  Licensor's failure to pay any necessary fees for the continuation of the Licensed Patents.

Notwithstanding the above, should an Event of Default occur, Licensor or Licensee, as the case may be, agrees to provide the defaulting party notice of such Event of Default with the opportunity to cure such Event of Default within a period of thirty (30) days.

c.  <u>Termination by Licensee</u>.  Licensee may terminate this Agreement upon thirty (30) days written notice to Licensor for any or all of the following grounds, except for subsection (i) in which case termination shall occur automatically.

i.  Insolvency.  A receiver is appointed for Licensor or its property; or Licensor makes an assignment for the benefit of its creditors; or any proceedings are commenced by, for or against either Party under any bankruptcy, insolvency or debtor's relief law; or either Party is liquidated or dissolved; or

ii.  Breach.  Licensor breaches any material term or condition of this Agreement or forthcoming PMMA, and fails to cure such breach (or commence and diligently pursue cure in the event the breach is of such a nature that it cannot be completely cured within such time) within thirty (30) days after receipt of written notice thereof from Licensee.

d.  <u>Termination by Licensor</u>.  Licensor may not terminate this Agreement without cause, but in the event that it wishes to terminate this Agreement for any reason, Licensor agrees that Licensee will be provided with no less than one hundred fifty (150) days' written notice in order to allow Licensee to reposition its business following the termination of the Agreement.

13.  <u>Obligations and Rights Upon Termination</u>.

a.  Upon termination of this Agreement for any reason, Licensee shall:

i.  promptly return to Licensor all material delivered to Licensee, including but not limited to technical writings, business writings, materials, samples, data, drafts, proposals, sales information, business information, retaining a confidential copy of this Agreement, and cause one or more of its officers to execute a certification, under penalty of perjury, that all such items have been returned;

ii.  immediately stop all business, sales, marketing, publication, public disclosure, and sale of Licensed Product; and

b.  Upon termination of this Agreement, Licensor shall have no obligation to refund any payment or fee made to it or received by it under any provision of this Agreement, regardless of purpose.

c.  Upon termination of this Agreement, Licensor agrees that Licensee shall retain ownership of the Licensee Brand, unless otherwise agreed to in writing.

14.  <u>Representations and Warranties of Licensor</u>.  Licensor represents and warrants to Licensee as follows:

a.  Licensor is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite power and authority to own, lease and operate its property and to carry on its business as now being conducted.

DocuSign Envelope ID: 7B9Z6002-2F95-4314-9D2F-60658E573225

e. Licensor has full power and authority to enter into, execute and deliver this Agreement and perform its obligations hereunder. This Agreement has been duly authorized by all necessary corporate action of Licensor. This Agreement has been duly executed and delivered by Licensor and, assuming this Agreement is duly executed and delivered by Licensee, constitutes a valid and legally binding obligation of Licensor enforceable against Licensor in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws relating to or affecting creditors' rights generally, or the availability of equitable remedies.

f. The execution and delivery by Licensor of this Agreement do not, and compliance by Licensor with the provisions of this Agreement will not, conflict with or result in a breach or default under any of the terms, conditions or provisions of any contract to which Licensor is a party or otherwise bound.

15. <u>Representations and Warranties of Licensee</u>. Licensee represents and warrants to Licensor as follows:

a. Licensee is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite power and authority to own, lease and operate its property and to carry on its business as now being conducted.

b. Licensee has full power and authority to enter into, execute and deliver this Agreement and perform its obligations hereunder. This Agreement has been duly authorized by all necessary corporate action of Licensee. This Agreement has been duly executed and delivered by Licensee and, assuming this Agreement is duly executed and delivered by Licensee, constitutes a valid and legally binding obligation of Licensee enforceable against Licensee in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws relating to or affecting creditors' rights generally, or the availability of equitable remedies.

c. The execution and delivery by Licensee of this Agreement do not, and compliance by Licensee with the provisions of this Agreement will not, conflict with or result in a breach or default under any of the terms, conditions or provisions of any contract to which Licensee is a party or otherwise bound.

16. <u>Confidentiality</u>. From time to time, so long as this Agreement should be in force or effect, Licensee and Licensor shall execute a mutually acceptable non-disclosure agreement in form and substance as each other should from time to time deem necessary or desirable (the "Non-Disclosure Agreement"). Licensee and Licensor shall cause each and every one of their officers, employees, independent contractors, and other individuals or entities having access to the confidential information provided to Licensee and Licensor, to execute mutually acceptable non-disclosure agreements in form and substance as Licensor and Licensee should from time to time deem necessary or desirable.

17. <u>Indemnification</u>.

a. <u>Licensee Indemnification</u>. Licensee shall indemnify, save and hold harmless Licensor and each of its officers, directors, employees, agents and affiliates, and each of their successors and assigns (collectively, the "**Licensor Indemnified Parties**") from and against any and all costs, losses, claims, liabilities, fines, penalties, consequential damages (other than lost profits) whatsoever, including but not limited to death or injury to person or damage to property, and expenses (including interest which may be imposed in connection therewith, court costs and actual attorneys' and expert witness fees and disbursements of counsel) (collectively, "**Damages**") incurred in connection with, arising directly or indirectly out of, resulting from or incident to (i) Licensee's exercise of any of its rights or conduct of any activities granted hereunder, (ii) the commercial sale and/or use of Licensed Product and/or the Licensee Brand; (iii) the performance, non-performance, or harmful effects of the sale, manufacture, or use of the Licensed Products, including without limitation product liability claims; (iv) the content of any advertising of the Licensed Product under the Licensee Brand; (v) any federal or state agency action arising from the promotion or sale of Licensed Product.

b. <u>Licensor Indemnification</u>. Licensor shall defend, indemnify and hold Licensee harmless from and against any damages, claims, lawsuits, causes of action, liabilities, costs, obligations and expenses (including reasonable attorneys' fees and court costs) arising solely out of any claim or allegation (whether or not proven) by any third party that the sale of the Licensed Product infringes upon or violates a valid intellectual property right or represents a misappropriation of a trade secret of a third party.

c. If a claim for Damages (a "**Claim**") is to be made by a Party entitled to indemnification hereunder (an "Indemnified Party") against the indemnifying Party (the "Indemnifying Party"), the Indemnified Party shall give written notice (a "**Claim Notice**") to the Indemnifying Party, which notice shall specify whether the Claim arises as a result of a claim by a person against the Indemnified Party (a "**Third Party Claim**") or whether the Claim does not so arise (a "**Direct Claim**"), and shall also specify (to the extent that the information is available) the factual basis for the Claim and the amount of the Damages, if known. If the Claim is a Third Party Claim, the Indemnified Party shall provide the Claim Notice as soon as practicable after such Party becomes aware of any fact, condition or event which may give rise to Damages for which indemnification may be sought under this Section 17. If any lawsuit or enforcement action is filed against any Indemnified Party, written notice thereof shall be given to the Indemnifying Party as promptly as practicable (and in any event within 15 calendar days after the service of the citation or summons). The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification hereunder, except to the extent that the Indemnifying Party has been damaged by such failure.

d. Such Indemnifying Party shall have the right, at its or his option, to defend at its or his own expense and by its or his own counsel any Third Party Claim, provided that (i) the Indemnifying Party acknowledges in writing (at the time such Indemnifying Party elects to assume such defense) its obligation under this Section to indemnify the Indemnified Party with respect to such Third Party Claim, which acknowledgement may be subject to a reservation of rights against the Indemnified Party, (ii) such counsel is reasonably satisfactory to the Indemnified Party, (iii) the Indemnified Party is kept fully informed of all developments, and is furnished with copies of all documents and papers, related thereto and is given the right to participate in the defense and investigation thereof as provided below, and (iv) such counsel

proceeds with diligence and in good faith with respect thereto. If any Indemnifying Party shall undertake to defend any Third Party Claim, such Indemnifying Party shall notify the Indemnified Party of its or his intention to do so promptly (and in any event no later than twenty (20) days) after receipt of notice of the Third Party Claim, and the Indemnified Party agrees to cooperate in good faith with the Indemnifying Party and its counsel in the defense of such Third Party Claim. Notwithstanding the foregoing, the Indemnified Party shall have the right to participate in the defense and investigation of any Third Party Claim with its own counsel at its or his own expense, except that the Indemnifying Party shall bear the expense of such separate counsel if (A) in the view of counsel to the Indemnified Party reasonably acceptable to the Indemnifying Party, use of counsel of the Indemnifying Party's choice would reasonably be expected to give rise to a conflict of interest, (B) there are or may be legal defenses available to the Indemnified Party that are different from or additional to those available to the Indemnifying Party and which cannot be asserted by the Indemnifying Party on behalf of the Indemnified Party, (C) the Indemnifying Party shall not have employed counsel to represent the Indemnified Party within a reasonable time after notice of the Third Party Claim is given to the Indemnifying Party or notice that the Indemnifying Party intends to assume the defense of the Third Party Claim is given to the Indemnified Party or (D) the Indemnifying Party shall authorize the Indemnified Party to employ separate counsel at the expense of the Indemnifying Party. The Indemnifying Party shall not settle any Third Party Claim without the prior written consent of the Indemnified Party, which shall not be unreasonably withheld or delayed; provided, that, an Indemnified Party shall not be required to consent to any settlement involving the imposition of equitable remedies; and, provided, further, that, in no circumstances shall the Indemnifying Party consent to the entry of a judgment with respect to any Third Party Claim or enter into any settlement which does not include a provision whereby the plaintiff or claimant in such matter releases the Indemnified Party from all liability with respect thereto.

        18.    <u>General Provisions</u>.

        a.    <u>Notices</u>. All Notices, requests and other communications that a Party is required or elects to deliver shall be in writing and shall be delivered personally, or by facsimile, or by a recognized overnight courier service, to the other Party at its address set forth below or to such other address as such Party may designate by notice given pursuant to this Section:

        If to Licensor:    BioLargo, Inc.
                         14921 Chestnut Street
                         Westminster, CA 92683
                         Attn: Dennis P. Calvert

        If to Licensee:    Ikigai Holdings, LLC
                         One East Liberty Street, Suite 600
                         Reno, NV 89509
                         Attn: Jane Pak, CEO

        All such notices, requests and other communications will: (i) if delivered personally to the address as provided in this Section 18(a)18.a, be deemed given upon delivery; and (ii) if delivered by messenger or courier to the address as provided in this Section 18(a), be deemed given on the earlier of the first business day following the date sent by such messenger or courier

upon receipt (in each case regardless of whether such notice, request or other communication is received by any other Person to whom a copy of such notice is to be delivered pursuant to this Section 18(a)18.a. A Party from time to time may change its address, facsimile number or other information for the purpose of notices to that Party by giving notice specifying such change to the other Parties hereto.

        b.  <u>Publicity</u>. Neither Party shall issue any public announcement regarding this Agreement, or which contains the name of the other Party, without giving prior reasonable notice to the other Party, and receiving written approval thereon; provided, however, that (i) Licensor may withhold its approval in its sole and absolute discretion and (ii) written approval from Licensee shall not be required for any disclosures that are required or which counsel advises Licensor are required by applicable law, including without limitation Federal securities laws, in which instance, Licensor shall so notify Licensee as reasonably promptly as commercially possible.

        c.  <u>Entire Agreement</u>. This Agreement contains the sole and entire agreement and understanding of the Parties with respect to the entire subject matter of this Agreement, and any and all prior discussions, negotiations, commitments and understandings, whether oral or otherwise, related to the subject matter of this Agreement are hereby merged herein.

        d.  <u>Waiver and Amendment</u>. No provision of this Agreement may be waived unless in writing signed by all the Parties to this Agreement, and waiver of any one provision of this Agreement shall not be deemed to be a waiver of any other provision. This Agreement may be amended only by a written agreement executed by all the Parties to this Agreement.

        e.  <u>Governing Law</u>. This Agreement has been made and entered into in the State of California and shall be construed in accordance with the laws of the State of California without giving effect to the principles of conflicts of law thereof.

        f.  <u>Severability.</u> Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

        g.  <u>Captions.</u> The various captions of this Agreement are for reference only and shall not be considered or referred to in resolving questions of interpretation of this Agreement.

        h.  <u>Costs and Attorneys' Fees.</u> If any action, suit, arbitration or other proceeding is instituted to remedy, prevent or obtain relief from a default in the performance by any party to this Agreement of its obligations under this Agreement, the prevailing party shall recover all of such party's attorneys' fees incurred in each and every such action, suit, arbitration or other proceeding, including any and all appeals or petitions therefrom. As used in this Section 18.h, attorneys' fees shall be deemed to mean the full and actual costs of any legal services actually performed in connection with the matters involved calculated on the basis of the usual fee charged by the attorney performing such services and shall not be limited to "reasonable attorneys' fees" as defined in any statute or rule of court.

      i.  <u>Rights Cumulative.</u> No right granted to the Parties under this Agreement on default or breach is intended to be in full or complete satisfaction of any damages arising out of such default or breach, and each and every right under this Agreement, or under any other document or instrument delivered hereunder, or allowed by law or equity, shall be cumulative and may be exercised from time to time.

      j.  <u>Judicial Interpretation.</u> Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any person by reason of the rule of construction that a document is to be construed more strictly against the person who itself or through its agent prepared the same, it being agreed that all Parties have participated in the preparation of this Agreement.

      k.  <u>Force Majeure.</u> If any Party to this Agreement is delayed in the performance of any of its obligations under this Agreement or is prevented from performing any such obligations due to causes or events beyond its control, including, without limitation, acts of God, fire, flood, war, terrorism, earthquake, strike or other labor problem, injunction or other legal restraint, present or future law, governmental order, rule or regulation, plague, epidemic, or pandemic, then such delay or nonperformance shall be excused and the time for performance thereof shall be extended to include the period of such delay or nonperformance.

      l.  <u>Assignment and Transfers.</u> Subject to Licensor's written consent which shall not be unreasonably withheld, Licensee may assign or delegate this Agreement or any of its rights, interests, or obligations hereunder to a third party pursuant to an Acquisition as set forth in Section 6. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

      m.  <u>Dispute Resolution</u>.  For any and all disputes arising out of or related to this Agreement, any Party's performance of its obligations herein, the construction and/or interpretation of the terms of this Agreement, or any Party's post-termination obligations arising out of or related to this Agreement, the Parties agree to first attempt to resolve the matter through informal mediation.  In the event the mediation does not resolve the Parties' dispute, the Parties agree to submit their dispute to binding arbitration in Clark County, Nevada. Arbitration under this Agreement shall be conducted by the Judicial Mediation and Arbitration Services ("**JAMS**") in Las Vegas, Nevada, under its Comprehensive Arbitration Rules and Procedures (the "**Rules**"). The aggrieved Party must deliver to the other a written notice of intent to seek arbitration no later than one (1) year after the event that first gives rise to the dispute, otherwise that party's rights shall be irrevocably waived.  The dispute shall be decided by one arbitrator selected by mutual agreement of the Parties, or absent agreement, in accordance with the Rules.  The arbitrator's fee and other expense of the arbitration process shall be shared equally.  The Parties shall bear their own respective costs and attorney's fees during the arbitration and until the Arbitrator awards a prevailing party its fees and costs.  Nothing herein precludes a Party from pursuing equitable relief.

| _____ | _____ |
| Licensor | Licensee |

n. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that all Parties need not sign the same counterpart. Counterparts may be delivered via facsimile, electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

IN WITNESS WHEREOF, the Parties have executed this License Agreement as of the date set forth above.

LICENSOR                                    LICENSEE
Biolargo, Inc.
BioLargo Life Technologies, Inc.           Ikigai Holdings, LLC

_____                  _____
By: Dennis P. Calvert, President           By:  Jane Pak, CEO

## Exhibit A

### Identified Patents

US Registration Number 7,867,510, issued January 11, 2011, titled "Material having antimicrobial activity when wet".

US Registration Number 7,943,158, issued September 20, 2011, titled "Absorbent systems providing antimicrobial activity".

US Registration Number 8,574,610, issued November 5, 2013, titled "Material Having Antimicrobial Activity When Wet".

US Registration Number 8,642,057, issued February 4, 2014, titled "Antimicrobial and Antiodor Solutions and Delivery Systems".

US Registration Number 9,414,601, issued August 16, 2016, titled "Material having antimicrobial activity when wet".

1.      Continuing Patent Applications.  To the extent that there is currently pending at the United States Patent and Trademark Office on the date set forth above any continuing patent application claiming benefit of priority to any of the patents providing Patent Rights under the Agreement, Licensor agrees to keep such continuing patent application or a continuation utility patent application thereof pending during the License Term of the Agreement, for so long as is allowable under U.S. patent law.  For illustration purposes only, and not to limit the scope of this section, currently-pending U.S. Patent Application No. 16/184,048 claims benefit of priority to U.S. Patent No. 8,642,057.  As used herein, "continuing patent application" includes any patent application claiming benefit of priority under 35 U.S.C. § 120 including, but not limited to, continuing, continuation-in-part, and design patent applications.  From time to time, Licensee may request reasonable amendments to the claims of a then-pending continuing patent application, or the filing of another continuing patent application, to present claims for patenting that Licensee may desire.  Licensor agrees to make such reasonable amendments or to file another such continuing application, and the Parties agree to equally share the costs of such amendment or another such continuing application in a manner to be decided by the Parties.  If there is a disagreement between the Parties as to the value of continued prosecution of an application, either Party wishing to continue prosecution (including filing continuation applications and appeals) may do so at their own expense, which will not alter any other provision of this Agreement. Any patent issuing after such reasonable amendment or another such continuing application shall automatically be added to the Patent Rights under the Agreement.

# EXHIBIT 10

DocuSign Envelope ID: 656651A6-A799-448C-BD4B-9E8550A58CC9

# FIRST AMENDMENT TO LICENSE AGREEMENT

This FIRST AMENDMENT TO LICENSE AGREEMENT (this "**Amendment**"), is dated August 16, 2021, and is by and between BioLargo, Inc., a Delaware corporation, and BioLargo Life Technologies, Inc., a California corporation ("**Licensor**"), and Ikigai Holdings, LLC, a Nevada limited liability company ("**Licensee**").

## RECITALS

A.  Licensor and Licensee are parties to that certain License Agreement dated May 17, 2021 ("**License Agreement**"). Unless otherwise defined herein, all capitalized terms used in this Amendment shall have the meanings ascribed to them in the License Agreement.

B.  Licensor and Licensee desire to amend the terms of the License Agreement to expand the Field of Use to include a laundry-additive pet product, pursuant to the terms of this Amendment.

## AMENDMENT

NOW, THEREFORE, in consideration of and incorporating the foregoing recitals and of the promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend the License Agreement as follows:

1.  <u>Amendment to Field of Use</u>. Section 1(e) to the License Agreement is hereby replaced in its entirety with the following language (added language indicated by the use of *red italics*):

> "**Field of Use**" means, for purposes of defining the scope of the License under the Licensed Patents, Trade Secrets and Know-How granted in the scope of the present Agreement is limited to the manufacture, use, sale, export or importation of iodine-containing solutions or particles to reduce or eliminate odors in the air, on surfaces, *or in fabric materials, caused by household pets*. The application may be by brushing, wiping, applying, *pouring*, coating, *imbibing, dissolving* or spraying the iodine-containing solutions or particles into the air, onto surfaces, *or in the laundry*. The Field of Use excludes the use, advertising or marketing of the iodine-containing solutions or particles to the air or surfaces for purposes of antimicrobial or sanitizing uses. Specifically, the Field of Use granted under this Agreement include and are limited to *the following pet-odor-addressing household products:* (i) powdered products marketed to reduce odors caused by household pets, (ii) liquid products marketed to treat stains and odors caused by household pets, and (iii) products composed of porous fabric material and a composition distributed within the porous fabric material to produce molecular iodine (such as wipes).

2.  <u>Miscellaneous</u>.

(a)    <u>Effect of Amendment</u>.  Except to the extent the Agreement is modified by this Amendment, the remaining terms and conditions of the Agreement shall remain unmodified and in full force and effect.  In the event of any conflict between the terms and conditions of the

**EXHIBIT 10**                                                                 **Page 1 of 2**

Agreement and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall prevail and control.

(b)    Entire Agreement.  The Agreement, together with this Amendment, embodies the entire understanding between the parties hereto with respect to its subject matter and can be changed only by an instrument in writing signed by the parties hereto.

(c)    Counterparts.  This Amendment may be executed in one or more counterparts, including the transmission of counterparts by facsimile or electronic mail, each of which shall be deemed an original but all of which, taken together, shall constitute one in the same Amendment. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the California Uniform Electronic Transactions Act, e.g., www.docusign.com, www.echosign.adobe.com, etc.) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment effective as of the date first set forth above.

**LICENSOR**:

BIOLARGO, INC., a Delaware
Corporation
BIOLARGO LIFE TECHNOLOGIES, INC.,
a California corporation

By:  _Dennis Calvert_____
Name:  Dennis Calvert
Title:  President & CEO

Date signed: 8/16/2021

**LICENSEE**:

IKIGAI HOLDINGS, LLC, a
Nevada limited liability company

By:  _____
Name:  Jane Pak
Title:  CEO

Date signed: 8/16/2021

- 2 -

**EXHIBIT 10**                    **Page 2 of 2**

# EXHIBIT 11

# PREFERRED MASTER MANUFACTURING AGREEMENT

This Preferred Master Manufacturing Agreement ("**Agreement**"), dated as of July 9, 2021 (the "**Effective Date**"), is entered into by and between ONM Environmental, Inc., a California corporation, having a principal place of business at 14921 Chestnut Street, Westminster, California 92683("**Seller**"), and Ikigai Holdings, LLC, a Nevada limited liability company having its principal place of business at One East Liberty Street, Suite 600, Reno, NV 89509 ("**Buyer**", and together with Seller, the "**Parties**", and each, a "**Party**").

## RECITALS

**WHEREAS**, Seller manufactures, develops, packages, and sells a proprietary and patent-protected formulation called CupriDyne that eliminates odors and can be used as the basis for many products for use in many settings and environments, for consumer, professional, and industrial uses;

**WHEREAS**, the Parties previously entered into that certain License Agreement executed on May 17, 2021 (the "**License Agreement**"), and that certain  Memorandum of Understanding dated May 18, 2021, which grant Buyer certain rights to pet products based on Seller's CupriDyne formulation;

**WHEREAS**, Buyer wishes to purchase CupriDyne-based products from Seller from time to time for sale to the pet products industry; and

**WHEREAS**, Seller desires to manufacture, develop, package, and sell the Products to Buyer.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing recitals, which are incorporated herein, the mutual covenants, terms and conditions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1.
### PURCHASE AND SALE OF PRODUCTS

**Section 1.1**      **Purchase and Sale**. Subject to the terms and conditions of this Agreement, Buyer shall purchase Products from Seller, and Seller will manufacture, develop, package and sell, as applicable, Products to Buyer, at the Prices set forth in Exhibit A, and in the quantities set forth on the applicable Purchase Order.

**Section 1.2**      **Forecasts**.  Upon execution of this Agreement and after any required Notices, Buyer shall provide to Seller an initial forecast setting forth projected Product volume purchases for the coming six (6) months.  Subsequent to the initial forecast, Buyer shall provide to Seller no later than seven (7) days prior to the end of each calendar half year (June and December) after the Effective Date, a forecast setting forth projected Product volume purchases for the coming six (6) months. Each forecast submitted by Buyer to Seller shall be deemed a good faith projection by Buyer, but shall not limit Buyer's ability to amend and supplement projected Product volumes from time-to-time in response to increased Product demand. Buyer agrees to share its Product forecasting on an ongoing basis with Seller for future planning purposes. Seller shall supply the quantity of Products specified in Buyer's forecasts, subject to the obligations and requirements set forth in this Agreement.

**Section 1.3**      **Subcontracting/Co-Packers.**  The Parties acknowledge that once certain product volumes are reached, Seller intends to subcontract out the manufacturing of the Product to one or more manufacturers (each, a "**Co-Packer**").  Buyer intends for that Seller, as its "preferred master" manufacturer, manage any and all Co-Packers engaged to manufacture Products.

Seller is currently evaluating potential Co-Packers, and at the appropriate time, will advise Buyer of such entities it is considering. Buyer shall have an opportunity to meet in person with representatives of the chosen Co-Packer(s), to evaluate their manufacturing facilities and capabilities, for the purpose of determining whether such Co-Packers are able to handle the products and volumes in Buyer's sole satisfaction, and to ensure a production quality acceptable to Buyer. The parties intend that both parties approve of a Co-Packer prior to formal engagement by Seller of a Co-Packer to manufacture products for delivery to Buyer (or to Buyer's customer), and Buyer,may approve or disapprove of the use of any such Co-Packer in its reasonable discretion. Seller shall contract directly with each Co-Packer; Buyer shall have an opportunity to review and provide input as to the terms of the proposed agreement. Seller shall manage each Co-Packer to ensure the delivery of Products in accordance with the provisions of this Agreement. So long as Seller continues to deliver Product in accordance with this Agreement, Buyer shall not contract with alternate manufacturers for the production of Products.

**Section 1.4**        **Ordering Procedure**.

    A.   <u>Purchase Orders</u>.  From time to time, Buyer may issue one or more Purchase Orders to Seller.  Seller will deliver to Buyer an acknowledgement of its receipt of each Purchase Order issued hereunder (each, an "**Acknowledgement**") within two (2) Business Days following Seller's receipt thereof, either confirming acceptance of the Purchase Order as written, or rejecting the purchase order due to error, requested delivery date, or otherwise.  If Seller fails to issue an Acknowledgement within two (2) Business Days or otherwise commences performance under such Purchase Order, Seller will be deemed to have accepted the Purchase Order.

    B.   <u>Cancellation of Purchase Orders</u>.  Seller may not cancel any previously accepted Purchase Order hereunder.  Buyer may cancel any Purchase Order prior to Seller's delivery of Acknowledgement therefor, provided that Buyer, upon receipt and validation of receipts from Seller, pays for all costs incurred by Seller or its contract manufacturer prior to such cancellation.

# ARTICLE 2.
### SHIPMENT, DELIVERY, ACCEPTANCE, AND INSPECTION

**Section 2.1**        **Shipment and Delivery Requirements**.

    (a) Seller will procure all materials to fabricate, assemble, pack, mark, and ship Products in the quantities, to the Delivery Locations, and by the Delivery Dates specified in the applicable Purchase Order.

    (b) For each shipment of Products, Seller will give Buyer sufficient advanced warning and notice of any hazardous or restricted material that is an ingredient or a part of the shipment, together with such special handling instructions as may be necessary to advise logistics providers, handlers of the Products, and Personnel of how to exercise that measure of care and precaution that will comply with any applicable Laws and prevent bodily injury or property damage in the handling, transportation, processing, use, or disposal of the Products, containers, and packing.

    (c) Within two (2) Business Days after shipment of a Product, Seller will deliver to Buyer a shipment notification containing the date the Products were shipped from Seller's facility, the name and type of transportation carrier, the transportation tracking number, Seller's identification number for the subject Products, the quantity of Products in shipment, the number of cartons or containers in shipment, Seller's name, the bill of lading number, and the country of origin (collectively, the "**Shipment Information**").  Seller will (i) ship all Products using the shipping methods and specifications specified in this Agreement or otherwise provided by Buyer and in a manner required for the protection of Products from damage or destruction by hazards during shipping and delivery and in compliance with Law, and (ii) ensure that all shipments are accompanied by the requisite documentation issued by the proper Governmental Authority, if applicable, including forms, import licenses, quota allocations, and visas and comply with orderly marketing agreements, voluntary restraint agreements, and other such agreements.

**Section 2.2**        **Payment; Transfer of Title and Risk of Loss.**

Buyer will pay all costs of shipping the Products.  If Buyer desires to insure the Products during shipment, Buyer will pay all costs of such insurance.  Title to each Product passes to Buyer upon the earliest of (i) Seller's delivery of the Product to a common carrier, and (ii) payment of the Price for such product by Buyer.  Seller hereby grants to Buyer as security for the delivery of each Product to Buyer hereunder, as and when due, a security interest in and to all of Seller's right, title, and interest in and to the Product effective upon Buyer's payment of the full aggregate purchase Price thereof.

**Section 2.3**        **Packaging and Labeling**. Buyer shall provide artwork for product and packaging labels to Seller for Seller's production of labels for affixation to products and cases. Seller will properly package, label, pack, tag, and ship Products as instructed by Buyer and otherwise in accordance with applicable Law and prudent industry standards.  Additional reasonable and documented costs incurred as a result of modifications to the packaging of the Products requested by Buyer will be reimbursed by Buyer to Seller, provided that Seller delivers to Buyer supporting documentation reasonably acceptable to Buyer of such additional costs.

**Section 2.4**        **Inspection**.  Buyer will have a reasonable period of time, not to exceed five (5) days following delivery of the Products to the Delivery Location ("**Inspection Period**"), to inspect all Products received under this Agreement and to inform Seller of Buyer's rejection of any Nonconforming Products. Buyer may return to Seller any rejected Products that constitute Nonconforming Products or because they exceed the quantity stated in any Purchase Order. If Buyer rejects any Nonconforming Products, Buyer may elect to (a) require Seller, at Seller's sole cost, to repair or replace the rejected Products, (b) repair the Nonconforming Products itself or have a third party repair the Nonconforming Products (and require Seller to reimburse Buyer's reasonable and documented costs and expense in connection therewith), (c) receive a refund from Seller for the price Buyer paid for such Nonconforming Products; in each case such option will be Buyer's sole remedy with respect to the Nonconforming Products other than Seller's duty to indemnify Buyer as set forth in Section 10.1, or (d) retain the rejected Products; in each case without limiting the exercise by Buyer of any other rights available to Buyer under this Agreement or pursuant to applicable Law.  All returns of Nonconforming Products to Seller are at Seller's sole risk and expense.  Buyer's acceptance of any Products will not be deemed a waiver or limitation of Seller's obligations pursuant to this Agreement (or any breach thereof), including those obligations with respect to Seller's Product Warranty and Seller's duty to indemnify Buyer.  Seller will maintain a retained sample of each batch and lot of Product for a period of two (2) years from the production date or one year from the date of expiration, whichever is longer.

**ARTICLE 3.**
**PRICE AND PAYMENT**

**Section 3.1**        **Price**.  Buyer will purchase the Products from Seller at the Prices set forth in <u>Exhibit A</u> (the "**Price(s)**").  All Prices are in US dollars. All Products shall be delivered to Buyer free and clear of all liens and encumbrances. The Parties agree that with respect to the Price, Seller shall have the right to manufacture the Product at an initial target margin of thirty percent (30%) (the "**Target Margin**"), with the Target Margin being reduced to twenty-seven and one-half percent (27.5%) the month following Buyer purchasing at least one million (1,000,000) Products units in a calendar month and with the Target Margin being reduced further to twenty-five percent (25%) the month following Buyer purchases from Seller at least two million (2,000,000) Product units in a calendar month. Upon written request from Buyer, Seller shall provide Buyer with all supporting documentation required by Buyer to establish the current Target Margin. For purposes of this Section, references to "units"  shall mean the total units purchased by Buyer for a given month and not merely the number of SKUs purchased by Buyer.

**Section 3.2**        **Invoices**.  Seller will issue periodic invoices to Buyer for all Products (regardless of whether a subcontractor is used) ordered by Buyer, which invoices will include the amount payable by Buyer for the Products purchased based upon the Prices of the Products.  Each invoice for Products must set forth in reasonable detail the amounts payable by Buyer under this Agreement and contain the following information, as applicable: (a) the Purchase Order number, (b) the line-item number, if applicable; (c) Seller's name; and (d) a copy of the applicable Shipment Information.  Buyer may withhold and set-off payment due to any invoices or related documents that Buyer disputes in good faith or that are incorrectly submitted to Buyer.  Any payment by Buyer of an invoice is not an acceptance of any nonconforming element or terms on such invoice or the related Products.

**Section 3.3**        **Payment**.  Buyer shall submit to Seller a deposit in an amount equal to fifty percent (50%) of all amounts submitted per Purchase Order at the time the Purchase Order is delivered to Seller. Unless otherwise set forth in any Purchase Order and except for any amounts disputed by Buyer in good faith, Seller's accurate and correctly submitted invoices will be payable within thirty (30) days following the later of (a) Buyer's receipt of Seller's invoice or (b) Buyer's receipt of the applicable Products.  If Buyer pays the full outstanding amount under any Purchase Order within ten (10) business days the delivery of the Product, the entire amount owed under any Purchase Order shall be decreased by two percent (2%). If Buyer disputes the amount of an invoice, the Parties will promptly use commercially reasonable efforts to resolve the dispute as to the remainder.  If a dispute occurs concerning an invoice, the deadline for payment of an invoice will be determined using the date of delivery of the correct invoice and not the date of delivery of the incorrect invoice.  If Buyer has a reasonable basis for doing so, Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may reasonably direct, of the absence of any Encumbrances on the Products.  Buyer will make all payments in US dollars.

### ARTICLE 4.
### CERTAIN OBLIGATIONS OF SELLER

**Section 4.1**        **Quality.**

Seller will meet or exceed Buyer's quality standards for the Products as outlined in an Acceptable Quality Levels Agreement in <u>Exhibit A-2</u>, which the Parties will execute simultaneously with the full execution of this Agreement, and which Buyer may reasonably modify from time to time.  If Buyer makes any modifications to the Acceptable Quality Levels Agreement in <u>Exhibit A-2</u>, Seller shall have fifteen (15) business days to review such modifications and to determine whether Seller is capable of meeting the modified quality standards for the Products.  If Seller determines that Seller is not capable of meeting the modified quality standards for the Products, Seller may terminate this Agreement by giving written Notice of ninety (90) days of such termination to Buyer.  At Buyer's request, and at Buyer's expense, Seller will furnish to Buyer test samples of Products as reasonably required by Buyer to determine if their packaging is in accordance with the Specifications in <u>Exhibit A</u> and Buyer's quality standards set forth in the Quality Agreement.  Seller will perform quality inspections of Products before delivery and will certify inspection results in the manner requested by Buyer and in accordance with the terms of the Quality Agreement.

Seller will provide reasonable support as requested by Buyer to address and correct quality concerns.  In addition to its other rights and remedies, Buyer may hold Seller responsible for costs associated with quality-issue investigation and containment to the extent caused by Seller's acts or omissions, but only after Buyer has given Notice to Seller of Buyer's quality concerns and Seller's subsequent failure to cure such quality concerns within thirty (30) days of receiving such Notice.

**Section 4.2**        **Duty to Advise**.  Seller will promptly provide Notice to Buyer after becoming aware of any of the following events or occurrences or any facts or circumstances reasonably likely to give rise to any of the following events or occurrences and Seller's proposed actions for addressing such events or circumstances: (a) any failure by Seller to perform any of its obligations under this Agreement; (b) any delay in delivery of Products; (c) any defects or quality problems relating to Products; (d) any change in Control of Seller;  (e) any deficiency in the Specifications, samples, prototypes, or test results relating to this Agreement; (f) any change in Seller's authorized representatives or decrease in insurance coverage, or (g) loss of any relevant certifications.

**Section 4.3**        **Certain Changes**.  Buyer may direct Seller to make changes with respect to the Products, which may include changes in the design, drawings, specifications, inspection, testing, quality control, methods of packing and shipping, or the date or place of delivery (a "**Buyer Required Change**").  Seller will promptly make any Buyer Required Change (i) that does not affect Seller's costs or production timing, or (ii) that has resulted in a Price increase mutually agreed to by the Parties. If Seller reasonably believes a Buyer Required Change will affect Seller's costs or production timing, within fifteen (15) Business Days after Buyer's notice to Seller of the Buyer Required Change, Seller will deliver to Buyer a Notice of a claim for adjustment of the Price with all sufficient information and documentation regarding Seller's costs and production timing resulting from such changes to allow Buyer to perform an audit and verify such claim.  Buyer may audit any such claim.  No Buyer Required Change will affect the Price or time of delivery of the Products unless (A) Buyer verifies that, in order to implement such Buyer Required Change, Seller's actual out-of-pocket costs increased or that implementing such changes reasonably and appropriately caused a delay in the Delivery Date of any affected Products, and (B) the Parties mutually agree on an increase to the Prices hereunder in a per-unit amount solely to the extent necessary to compensate Seller for such commercially reasonable cost increases.  In no event will any such increase allow for any additional margin.  If Buyer's audit

and verification results indicate that Seller's costs have actually decreased as a result of the Buyer Requested Change, the Prices hereunder will decrease on a per-unit basis to reflect the amount of any such cost savings.

**Section 4.4**          **Records**. Seller will keep, maintain, and protect (or use reasonable efforts to ensure its contract manufacturer keeps, maintains, and protects) all reasonable records it possesses that relate to the Products (including with respect to the Specifications, certificates or analysis, test results, batch production records, quality agreement testing and sanitation records, employee training materials, Product complaints and returned Products, batch or lot control numbers for traceability, reserve samples, and documentation, as applicable) and retain such reasonable records until the date that is two (2) years after the last of the applicable batch of Products is delivered to Buyer.

**Section 4.5**          **Ingredients and Materials Disclosure**. Upon Buyer's request, Seller will promptly provide to Buyer its Safety Data Sheet(s) for each product sold to Buyer.

## ARTICLE 5.
### INTELLECTUAL PROPERTY

**Section 5.1**             **Ownership**. Each of the Parties acknowledges and agrees that:

(a)       each Party retains exclusive ownership of its Intellectual Property Rights;

(b)       Buyer does not transfer to Seller any of its Intellectual Property Rights, and Seller will not use any of Buyer's Intellectual Property Rights other than to produce and supply Products to Buyer hereunder;

(c)       Seller does not transfer to Buyer any of Seller's Intellectual Property Rights;

**Section 5.2**          **Prohibited Acts**. Each of the Parties will not (a) take any action that interferes with the other Party's Intellectual Property Rights, including such other Party's ownership or exercise thereof; (b) challenge any right, title or interest of the other Party in such other Party's Intellectual Property Rights; (c) make any claim or take any action adverse to such other Party's ownership of its Intellectual Property Rights; (d) register (or apply for registrations of), anywhere in the world where the other Party has ongoing business, the other Party's Trademarks or any other Trademark that is similar to such other Party's Trademarks or that incorporates the same in whole or in confusingly similar part; (e) use any mark, anywhere, that is confusingly similar to the other Party's Trademarks; (f) misappropriate any of the other Party's Trademarks for use as a domain name without such other Party's prior consent; or (g) alter, obscure or remove any of the other Party's Trademarks or trademark or copyright notices or any other proprietary rights notices placed on the products purchased under this Agreement (including Products), marketing materials or other materials.

## ARTICLE 6.
### TANGIBLE PROPERTY

**Section 6.1**          **Buyer-Supplied Material**.

Buyer will provide or otherwise make available to Seller certain materials/supplies, information and other documentation identified in Exhibit C at the time(s) and location(s) specified therein.  All property, including raw materials, supplies, materials, designs, drawings, artwork, copy layout, electronic data, and other items furnished by Buyer, either directly or indirectly, to Seller or to any supplier of Seller in connection with or related to this Agreement (collectively, "**Buyer-Supplied Material**"), including the Buyer-Supplied Material described in Exhibit C, is and will at all times remain the property of Buyer and be held by Seller on a bailment-at-will basis.  Risk of loss of, and damage to, the Buyer-Supplied Material will transfer from Buyer to Seller upon delivery to Seller's facility.  If any Buyer-Supplied Material is not delivered or otherwise made available to Seller by the time(s) required in Exhibit C, Seller will estimate the impact of the delay on the Agreement and/or cost of performance, if any, and the Buyer will make an equitable adjustment to the Price, Payment and Delivery Schedule.

When Buyer-Supplied Material is delivered to Seller's facility, Seller will verify its quantity and perform the necessary inspection(s) to ascertain its then-current condition.  Seller will promptly notify the Buyer of any damage or shortages with respect to the Buyer-Supplied Material received.  If the Buyer-Supplied Material received by Seller is not in a

DocuSign Envelope ID: 9A9ZE554-D3DE-4EF5-A5CF-D99BC1DBCC13

condition suitable for use, Seller will in its notification to the Buyer include details of the facts, hold the Buyer-Supplied Material, and act as directed by the Buyer. When directed by the Buyer to take any action with respect to the damaged or non-usable Buyer-Supplied Material, Seller will be entitled to and the Buyer will make an equitable adjustment to the Price, Payment and Delivery Schedule.

Seller will establish and maintain a program for the accountability, use, maintenance, protection and preservation of the Buyer-Supplied Material in accordance with its standard practices. Any special maintenance routines required for any Buyer-Supplied Material except those specifically outlined in this Agreement are not included in the Price and will be estimated separately by Seller. Seller will (a) store the Buyer-Supplied Material in such a manner as may be required for the protection of the Buyer-Supplied Material from damage or destruction and in compliance with applicable Law, and (b) deliver to Buyer, each month, commencing on the first Business Day of the month after Seller's first receipt of Buyer-Supplied Material hereunder, a correct and complete monthly inventory count of the Buyer-Supplied Material located at Seller's facility. Seller will not use any Buyer-Supplied Material for any purpose other than the performance of Seller's obligations under this Agreement. Except in the performance of Seller's obligations under this Agreement, Seller will not commingle any Buyer-Supplied Material with the property of Seller or with that of a Person other than Buyer or Seller and will not move any Buyer-Supplied Material from Seller's premises without the prior approval by Buyer. Buyer may, at any time, for any reason and without payment of any kind, retake possession of any Buyer-Supplied Material. Upon Buyer's request, Buyer-Supplied Material will be immediately released to Buyer or delivered to Buyer by Seller, at Buyer's expense. Seller's continued holding of Buyer-Supplied Material after demand has been made by Buyer for delivery will substantially impair the value thereof, and, accordingly, Buyer will be entitled to a court order of possession without any need of proving damages or a bond. To the fullest extent permitted by Law, Seller will not allow any Encumbrance to be imposed on or attach to any Buyer-Supplied Material through Seller or as a result of Seller's action or inaction, and Seller hereby waives any Encumbrance that it may have or acquire in the Buyer-Supplied Material.

Buyer has inspected the Buyer-Supplied Material and is satisfied that the Buyer-Supplied Material is suitable and fit for its intended purposes (including consumer use), of which Buyer is aware; and SELLER HAS NOT MADE AND DOES NOT MAKE ANY REPRESENTATION OR WARRANTY WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF THE BUYER-SUPPLIED MATERIAL OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Notwithstanding the foregoing, if the bailment relationship described in this Section 8.1 is deemed to be a secured financing transaction, Seller grants to Buyer a continuing security interest in any rights or interests it may have in the Buyer-Supplied Material.

Seller will bear all risk of loss of and damage to Buyer-Supplied Material after receipt by Seller. Seller will, at its own expense, for the benefit of Buyer, insure all Buyer-Supplied Material with full and extended coverage for all losses, for its full replacement value, in accordance with the terms of Article 13. As and when it is commercially reasonable to do so, Seller will, at its sole cost and expense, maintain, repair, refurbish, and replace Buyer-Supplied Material. All replacements of Buyer-Supplied Material will also be Buyer's property.

Seller will maintain a written inventory of all Buyer-Supplied Material that sets forth a description and the location of all Buyer-Supplied Material and provide a copy of this inventory to Buyer upon request. Seller will mark all Buyer-Supplied Material conspicuously to identify it as the property of Buyer, and indicate Buyer's name and address. Seller will immediately sign any documents reasonably requested by Buyer to evidence all of Buyer's rights to and interests in Buyer-Supplied Material.

Seller will be responsible for any loss or destruction of, or damage to, Buyer-Supplied Material from the time of its delivery to Seller until its return to Buyer to the extent such loss or damage is directly attributable to the negligence or willful misconduct of Seller.

Upon becoming aware of loss or destruction of or damage to any Buyer-Supplied Material, Seller will so promptly notify Buyer as such, including a statement of:

(a)     the lost, destroyed or damaged Buyer-Supplied Material;

(b)     the time and origin of the loss, destruction or damage; and,

**EXHIBIT 11**                    **Page 6 of 26**

(c)    the insurance policy or policies, if any, covering the lost, destroyed or damaged Buyer-Supplied Material.

After such time as Buyer notifies Seller of the timeframe in which the Buyer-Supplied Material will be repaired or replaced, Seller will estimate and promptly notify Buyer of the effect of the lost, destroyed or damaged Buyer-Supplied Material on the performance and obligations of Seller under this Agreement.

Seller will do nothing to prejudice Buyer's right to recover against any third party for any loss or destruction of, or damage to, Buyer-Supplied Material.  Upon the request of Buyer, and at Buyer's expense, Seller will furnish to Buyer all reasonable assistance and cooperation in obtaining recovery.

If Seller transfers the Buyer-Supplied Material to the possession and control of a contract manufacturer, the transfer will not affect the liability of Seller as set forth in this Article 6.

Except as specifically set forth herein, Seller will not be responsible for repair, replacement, delay or any other cost or liability related to the Buyer-Supplied Material.  To the extent the loss or destruction of the Buyer-Supplied Material for which Seller is not solely responsible under this Article 6 causes a delay in Seller performance, such delay will be an excusable delay which will entitle Seller to an equitable adjustment in both Price and Delivery Schedule.

**Section 6.2**    **Seller's Property**. Unless otherwise agreed to by Buyer, Seller, at its sole expense, will furnish, keep in good condition, and replace when necessary all facilities and equipment and other items necessary or helpful for the packaging of the Products other than the Buyer-Supplied Material ("**Seller's Property**").  Seller will insure Seller's Property with full and extended coverage for all losses, for its full replacement value, in accordance with the terms of Article 13.

## ARTICLE 7.
### REPRESENTATIONS AND WARRANTIES; PRODUCT WARRANTY

**Section 7.1**    **Mutual Representations and Warranties**.  Each Party represents and warrants to the other Party that:

(a)    it is a legitimate business entity duly organized, validly existing and in good standing under the laws of the state or province in which it is organized or incorporated;

(b)    it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required, except where the failure to be so qualified, in the aggregate, could not reasonably be expected to adversely affect its ability to perform its obligations under this Agreement;

(c)    it has the full right, power, and corporate authority to enter into this Agreement and to perform its obligations hereunder;

(d)    the execution of this Agreement by its representative whose signature is set forth at the end of this Agreement, and its delivery of this Agreement, have been duly authorized by all necessary corporate action;

(e)    its execution, delivery, and performance of this Agreement will not violate, conflict with, require consent under or result in any breach or default under (i) any of its organizational documents, (ii) any applicable Law or (iii) with or without notice or lapse of time or both, the provisions of any agreement to which it is bound;

(f)    this Agreement has been executed and delivered by it and (assuming due authorization, execution and delivery by the other Party) constitutes the legal, valid and binding obligation, enforceable against it in accordance with its terms;

(g)    it is in compliance with all applicable Laws and contracts relating to this Agreement;

(h)    it has obtained all Permits required by applicable Laws to conduct its business generally and to exercise its rights and perform its obligations under this Agreement;

DocuSign Envelope ID: 9A9ZE551-D8DE-4EF5-A5CF-D99BC1DBCC13

(i)    it is not insolvent and is paying all of its debts as they become due; and in the case of Seller only, Seller represents that: (i) all financial information that it has provided to Buyer is true and accurate and fairly represents Seller's financial condition; (ii) all of Seller's manufacturing or warehousing facilities used by Seller to fulfill its obligations under this Agreement have a current and appropriate registration required for domestic or foreign facilities; and (iii) none of Seller's Intellectual Property used in the Products infringes or violates any Intellectual Property Right of any Person.

**Section 7.2**        **Seller Representations and Warranties**. In addition to the representations and warranties provided in Section 7.1, Seller represents and warrants to Buyer that Seller shall order and maintain an inventory of raw materials and packaging materials sufficient to meet all forecasts submitted by Buyer.

**Section 7.3**        **Product Warranty**.  Seller warrants to Buyer for the period starting at the time of delivery of the Products and continuing for one (1) year thereafter (the "**Product Warranty**"):

The packaging for the Products will:

(a)    conform to the Specifications;

(b)    conform to samples of packaging for the Products previously approved by Buyer;

(c)    be assembled and packaged in accordance with the agreements between the parties.

## ARTICLE 8.
### TERM; TERMINATION

**Section 8.1**        **Term**. The term of this Agreement commences on the Effective Date and remains in full force and effect for all Products for a period of five (5) years.  At the expiration of the initial term of five (5) years, the term shall be automatically extended for one additional two-year term unless notice of non-renewal is provided in writing at least 180 days before the date of expiration.  Either Party may terminate this Agreement and/or a Statement of Work by (a) both Parties executing a document terminating this Agreement and/or a Statement of Work, (b) a Party giving notice to the other if there are no Purchase Orders for Products that have not been fully satisfied or terminated as provided herein, or (c) as otherwise provided herein (the "**Term**"). A Party may terminate a particular Purchase Order as provided herein or therein.

**Section 8.2**        **Buyer's Right to Terminate for Cause**. Buyer may terminate this Agreement, by providing Notice to Seller if:

(a)    Seller is in breach of, or threatens to breach, any representation, warranty or covenant of Seller under this Agreement (except for any of the foregoing covered by another subsection of this Section 8.2) and either the breach cannot be cured or, if the breach can be cured, it is not cured by Seller within thirty (30) days following Seller's receipt of Notice of such breach;

(b)    Seller fails to, or threatens not to, timely deliver Products conforming to the requirements of, and otherwise in accordance with, the terms and conditions of this Agreement except to the extent Seller is paying liquidated damages thereof as required by Section 8.5; or

(c)    Seller (i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due, (ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency Law, (iii) makes or seeks to make a general assignment for the benefit of its creditors, or (iv) applies for or has appointed a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

Any termination under this Section 8.2 will be effective on Seller's receipt of Buyer's Notice of termination or such later date (if any) set forth in such termination Notice. Upon the occurrence of any of the events described under this Section 8.2, Buyer may, in addition to any of its other rights under applicable Law or in equity, immediately suspend its

EXHIBIT 11                                    Page 8 of 26

performance under all or any part of this Agreement, without any liability of Buyer to Seller (including any liability for a Cancellation Charges Claim, but excluding its liability for payment of any outstanding invoices prior to the termination), and at its election, recover all damages, costs (including attorneys' and other professionals' fees and costs), expenses and losses incurred by Buyer as a result of any event described under this Section 8.2.

**Section 8.3         Seller's Right to Terminate for Cause**. Seller may terminate this Agreement, by providing Notice to Buyer if:

(a)         Buyer is in breach of any representation, warranty or covenant of Buyer under this Agreement, and either the breach cannot be cured or, if the breach can be cured, it is not cured by Buyer within a commercially reasonable period of time (in no case exceeding thirty (30) days) after Buyer's receipt of Notice of such breach; or

(b)         Buyer (i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due, (ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency Law, (iii) makes or seeks to make a general assignment for the benefit of its creditors, or (iv) applies for or has appointed a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

Any termination under this Section 8.3 will be effective on Buyer's receipt of Seller's Notice of termination or such later date (if any) set forth in such termination Notice, but Buyer shall not be relieved of its liability for payment of any outstanding invoices or other liability incurred prior to the termination.

**Section 8.4         Effect of Expiration or Termination**.

(a)         _Seller's Obligations_.  Immediately upon termination of this Agreement, Seller will, unless otherwise directed by Buyer, immediately terminate all performance under this Agreement and under any outstanding Purchase Orders; provided, however, that Buyer will pay for all costs incurred by Seller and/or Seller's contract manufacturer up until such termination if the termination is not caused by Seller's action or inaction.

(b)         _Mutual Obligations_.  Upon the termination of this Agreement, each Party will: (i) return to the other Party (or destroy, if directed to do so by the other Party) all documents and tangible materials (and any copies) containing, reflecting, incorporating, or based on the other Party's Proprietary and/or Confidential Information; (ii) permanently erase all of the other Party's Confidential Information from its computer systems, except for copies that are maintained as archive copies on its disaster recovery or information technology backup systems, which copies will be destroyed upon the normal expiration of its backup files; and (iii) upon the other Party's written request, certify to such other Party that it has complied with the requirements of this Section 8.4(b).

(c)         _Effect on Previous Obligations_.  Expiration or termination of the Term will not affect any rights or obligations of the Parties that: (i) come into effect upon or after termination or expiration of this Agreement; or (ii) otherwise survive the expiration or earlier termination of this Agreement pursuant to Section 15.4 or were incurred by the Parties prior to such expiration or earlier termination.

(d)         _No Liability of Non-Breaching Party_.  Without prejudice to any obligations of the Parties that by their nature survive termination of this Agreement, the Party terminating this Agreement in accordance with this Article 8 will not be liable to the other Party for any damage of any kind (whether direct or indirect) incurred by the other Party by reason of the termination of this Agreement. Termination of this Agreement in accordance with this Article 8 will not constitute a waiver of any of either Party's rights, remedies or defenses under this Agreement, at law, in equity or otherwise.

**Section 8.5      Liquidated Damages**. Damages to Buyer caused by Seller's failure to comply with the Delivery Dates are difficult to ascertain. Accordingly, the liquidated damages set forth in Exhibit D (a) represent a fair, reasonable, and proportionate approximation of Buyer's damages caused thereby and do not constitute a penalty, and (b) shall be the sole damages available to Buyer for Seller's failure to comply with the Delivery Dates, but the liquidated damages shall not preclude

- 9 -

**EXHIBIT 11**                              **Page 9 of 26**

Buyer's exercise of (i) other non-monetary remedies that may be available for such default, including termination of a Purchase Order of this Agreement if Seller suspends payment of liquidated damages or a cap on liquidated damages has been met, equitable relief, or a request for adequate assurance, or (ii) any remedies (monetary or otherwise) available for other defaults that occur currently with, before, or after such default.

# ARTICLE 9.
## INDEMNIFICATION

**Section 9.1**            **Seller Indemnification**.  Seller will indemnify, defend and hold harmless the Buyer Parties (each, a "**Buyer Indemnified Party**") against any and all losses, damages, liabilities, deficiencies, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement and the cost of pursuing any insurance providers (collectively, "**Losses**"), incurred by any Buyer Indemnified Party , including as a result of a third-party Claim against a Buyer Indemnified Party, to the extent the Losses arise out of (a) a negligent or wrongful act, error, or omission of, or a breach of the representations, warranties, or covenants of this Agreement by, Seller or its Representatives; (b) any bodily injury, death, or damage to property directly or indirectly caused by Seller or its Representatives; (c) manufacturing, supplying, or handling of the Goods prior to delivery thereof; or (d) any allegation that any of the following violates applicable Laws or infringes, misappropriates, or otherwise violates any Intellectual Property Right or other right of any Person: (i) Seller's Intellectual Property or any Foreground Intellectual Property Rights developed by Seller alone or as requested by Buyer in connection with this Agreement, (ii) the use of Seller's Intellectual Property or any Foreground Intellectual Property Rights developed by Seller alone or as requested by Buyer in connection with this Agreement in the design, manufacturing, production, or supply of the Goods (or otherwise embodied in the Goods), or (iii) the Goods or the use thereof for the particular purpose intended by Buyer, its customers, and end users.

**Section 9.2**            **Buyer Indemnification**.  Buyer will indemnify, defend and hold harmless the Seller Parties (each, a "**Seller Indemnified Party**") against any and all Losses incurred by any Seller Indemnified Party, including as a result of a third-party Claim against a Seller Indemnified Party, to the extent the Losses arise out of (a) a negligent or wrongful act, error, or omission of, or a breach of the representations, warranties, or covenants of this Agreement by, Buyer or its Representatives; (b) any bodily injury, death, or damage to property directly or indirectly caused by Buyer or its Representatives, (c) any alleged violation of Law related to the marketing or sale of the Products.

**Section 9.3**            **Exceptions and Limitations on Indemnification**. Notwithstanding anything to the contrary in this Agreement, Seller is not obligated to indemnify or defend any Buyer Indemnified Party against any Claim or corresponding Losses to the extent such Claims result directly from the Buyer Indemnified Party's or its Personnel's gross negligence, willful misconduct, or a breach of the representations, warranties, or covenants of this Agreement by, the Buyer Indemnified Party or its Representatives.

**Section 9.4**            **Exceptions and Limitations on Indemnification**. Notwithstanding anything to the contrary in this Agreement, Buyer is not obligated to indemnify or defend any Seller Indemnified Party against any Claim or corresponding Losses to the extent such Claims result directly from the Seller Indemnified Party's or its Personnel's gross negligence, willful misconduct, or a breach of the representations, warranties, or covenants of this Agreement by, the Seller Indemnified Party or its Representatives.

**Section 9.5**            **Procedure**.  If a third party Claim is made against a Buyer Indemnified Party or a Seller Indemnified Party that could reasonably be expected to result in a Loss that is subject to the indemnification obligations of Section 9.1 or 9.2, or if the Buyer Indemnified Party or Seller Indemnified Party discovers any inquiry or investigation that it believes may involve or expect to lead to a third party Claim that could reasonably be expected to result in such a Loss, the respective Buyer Indemnified Party will promptly notify the other party, and the parties will cooperate to defend or settle such third party Claim.

**Section 9.6**            **Effect of Insurance**.  The obligations of this Section will apply regardless of the amount of insurance coverage held by Seller, including any such coverage under any workers' compensation act, disability act, or other employee benefit act, or any other applicable Law that would limit the amount or type of damages, compensation or benefits payable by or for Seller, and will be both independent of and not limited by or to any insurance carried or provided by Seller pursuant to this Agreement or otherwise.

## ARTICLE 10.
## NO LIABILITY FOR CONSEQUENTIAL OR INDIRECT DAMAGES

NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, EXCEPT TO THE EXTENT LIABILITY ARISES FROM A PARTY'S (a) BREACH OF ITS CONFIDENTIALITY OBLIGATIONS HEREUNDER, (b) GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (c) IN THE CASE OF SELLER AS THE LIABLE PARTY, (i) INTELLECTUAL PROPERTY INFRINGEMENT BY THE PACKAGING FOR PRODUCTS OR (ii) INDEMNIFICATION OBLIGATIONS HEREUNDER IN CONNECTION WITH A THIRD-PARTY CLAIM.

## ARTICLE 11.
### CONFIDENTIALITY

**Section 11.1        Scope of Confidential Information**. From time to time during the Term, either Party (as the "**Disclosing Party**") may disclose or make available to the other Party (as the "**Receiving Party**") information about its business affairs, goods and services (including any Forecasts), confidential information and materials comprising or relating to Intellectual Property Rights, trade secrets, third-party confidential information, and other sensitive or proprietary information. Such information, as well as the terms of this Agreement, whether orally or in written, electronic or other form or media, and whether or not marked, designated, or otherwise identified as "confidential" constitute "Confidential Information" hereunder. Confidential Information does not include information that at the time of disclosure and as established by documentary evidence:

> (a)        is or becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of this Article 11 by the Receiving Party or any of its Representatives;

> (b)        is or becomes available to the Receiving Party on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information;

> (c)        was known by or in the possession of the Receiving Party or its Representatives prior to being disclosed by or on behalf of the Disclosing Party; or

> (d)        was or is independently developed by the Receiving Party without reference to or use of, in whole or in part, any of the Disclosing Party's Confidential Information.

**Section 11.2        Protection of Confidential Information**. The Receiving Party will (a) protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care; (b) not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under this Agreement without the Disclosing Party's prior approval; and (c) not disclose any such Confidential Information to any Person, except to the Receiving Party's Representatives who need to know the Confidential Information to assist the Receiving Party, or act on its behalf, to exercise its rights or perform its obligations under this Agreement, provided that such Representatives agree to not disclose the Confidential Information to any third party without the Disclosing Party's prior consent. The Receiving Party will be responsible for any breach of this Article 11 caused by any of its Representatives.

**Section 11.3        Disclosure Compelled by Law**. If the Receiving Party is compelled to produce Confidential Information of the Disclosing Party by Law or by a subpoena or other legal process, the Receiving Party will give the Disclosing Party prompt notice of such subpoena or legal process and will reasonably cooperate with the Disclosing Party in seeking a protective order or other appropriate protection to safeguard the Disclosing Party's Confidential Information. If a protective order or other appropriate protection is not obtained, or if the Disclosing Party waives its right to seek a protective order or other appropriate protection, the Receiving Party will (a) furnish only that minimum portion of the Confidential Information that, upon the advice of legal counsel, it is legally required to disclose, and (b) exercise reasonable efforts to ensure that confidential treatment is afforded to such Confidential Information.

## ARTICLE 12.
### INSPECTION AND AUDIT RIGHTS

**Section 12.1        Audits**. Seller hereby grants to Buyer, and its authorized Representatives, access to Seller's premises and all pertinent documents and other information, whether stored in tangible or intangible form, including any books, records and accounts, in any way related to Seller's performance under this Agreement (including Sellers' processes and procedures), Products, Buyer-Supplied Material or any payment or other transaction occurring in connection with this Agreement, for the purpose of auditing Seller's compliance with the terms of this Agreement, including Seller's charges for Products, or inspecting or conducting an inventory of finished Products, work-in-process or raw-material inventory or Buyer-Supplied Material. Buyer will provide Seller with reasonable advance notice (at least one (1) Business Day) prior to conducting such audit or inspection, and Seller will cooperate fully with Buyer in connection with any such audit or inspection. Buyer will use reasonable efforts to conduct such audit or inspection during Seller's regular business hours and in a manner that does not unreasonably interfere with Seller's day-to-day operations, and Seller shall select one of its agents to accompany Buyer or its Authorized Representative while they are on the premises. Seller will maintain, during the Term and for a period of seven years after the Term, complete and accurate books and records and any other financial information in accordance with GAAP. Seller will segregate its records and otherwise cooperate with Buyer so as to facilitate any audit by Buyer. Seller will reimburse Buyer for all amounts associated with errors discovered during an audit. In addition, Seller will reimburse Buyer for the amount of Buyer's reasonable costs and expenses incurred in conducting the audit if the results of such audit indicate that Buyer has paid more than five percent (5%) of the total amount actually payable by Buyer for the period examined, and Buyer will reimburse Seller for the amount of Seller's reasonable costs and expenses incurred in connection with the audit if the results of such audit do not indicate that Buyer has paid more than five percent (5%) of the total amount actually payable by Buyer for the period examined. If requested by Buyer, Seller will use reasonable efforts to permit Buyer and its Representatives to obtain from subcontractors or other suppliers to Seller the information and permission to conduct the reviews specified with respect to Seller in this Article 12.

**Section 12.2        Buyer Right of Inspection and Tests.** Buyer and its Representatives may inspect and test the Products and any quality assurance or other records related to the Products during their design, manufacture, processing, construction, preparation, delivery, and completion, at reasonable times upon reasonable advance notice (at least one (1) Business Day) and in a manner that does not unreasonably interfere with Seller's operations. While on the premises of Seller or Seller's Personnel, Buyer will, and will cause Buyer's Representatives to, comply with all site-specific rules and regulations, and Seller shall select one of its agents to accompany Buyer or its Authorized Representative while they are on the premises. Seller will give Buyer reasonable notice of readiness for inspection of each Product before such Product is boxed or crated for shipment. At Buyer's request, Seller will supply test reports and material certificates. Unless otherwise stated in writing by Buyer, Buyer's performance of (or failure to perform) any inspection or test will not be deemed (a) an assumption of risk, liability, or control over Seller or Seller's Personnel, (b) an acceptance or approval of the Products, or (c) a waiver of (1) Seller's obligation to perform its obligations in accordance with the covenants and warranties of this Agreement or (2) Buyer's right to make a claim for Losses hereunder.

**Section 12.3        Regulatory Inspections and Action**. If either Party is notified or otherwise becomes aware that it is to be the subject of an audit, site visit, or inspection (each, an "**Inspection Event**") by, or otherwise receives any correspondence or inquiry from (including, without limitation, any seizure of Products or recall request), the EPA or any other Governmental Authority, in each case, in connection with the Products, such Party will, to the extent permitted by applicable Law: (a) immediately, and no later than the next Business Day after such Party becomes aware of such Inspection Event, notify the other Party thereof, investigate the inquiry or complaint, and if applicable, advise the other Party of the results of its investigation and/or the occurrence of and circumstances of the Inspection Event; (b) if applicable and at its discretion, allow the other Party or its representative to assist in the preparation for such Inspection Event, subject to the confidentiality obligations set forth in this Agreement; (c) if applicable, notify the other Party of the results of the Inspection Event; (d) at its discretion, incorporate in good faith any recommendations provided by the other Party with respect thereto prior to submitting such correspondence or response to the applicable Governmental Authority; and (e) obtain the other Party's prior consent before referring to such Party in any regulatory correspondence unless such reference is necessary or advisable under applicable Law. In the event of any action described in this Section, the Parties will cooperate in determining, and will mutually agree upon, the response, if any, to be made to such action and each Party agrees to cooperate with the other in responding to any communication or inquiry and attempting to resolve any such action.

**EXHIBIT 11**                                                                            **Page 12 of 26**

# ARTICLE 13.
## INSURANCE

**Section 13.1    Seller Insurance**. During the Term and for the period of time thereafter that Seller is in possession of any Buyer-Supplied Material, Seller will, and will cause its subcontractors and contractors to, at its own expense, maintain and carry in full force and effect the following insurance policies with financially sound and reputable insurers: Commercial General Liability (including product and completed operations, personal and advertising injury, contractual liability coverage) with a minimum of $2,000,000 general aggregate limit; $2,000,000 Products and Completed Operations Aggregate limit; and $1,000,000 each occurrence. Upon Buyer's reasonable request, Seller will provide Buyer with a certificate of insurance evidencing the insurance coverage specified in this Section. The certificate of insurance will name Buyer as an additional insured and loss payee. Seller will provide Buyer with ten (10) Business Days' advance notice in the event of a cancellation or material change in such insurance policy. Seller waives and Seller will cause its insurers to waive, any right of subrogation or other recovery against Buyer, its Affiliates, and their insurers.

**Section 13.2    Buyer Insurance.** During the Term and for the period of time thereafter that Seller is in possession of any Buyer-Supplied Material, Seller will, and will cause its subcontractors and contractors to, at its own expense, maintain and carry in full force and effect the following insurance policies with financially sound and reputable insurers: $2,000,000 Products and Completed Operations Aggregate limit; and $1,000,000 each occurrence. Upon Seller's reasonable request, Buyer will provide Seller with a certificate of insurance evidencing the insurance coverage specified in this Section. The certificate of insurance will name Seller as an additional insured and. Buyer will provide Seller with ten (10) Business Days' advance notice in the event of a cancellation or material change in such insurance policy. Buyer waives and Buyer will cause its insurers to waive, any right of subrogation or other recovery against Seller, its Affiliates, and their insurers.

# ARTICLE 14.
## DEFINITIONS

"**Acceptance**" means verification by Buyer of completion, compliance and certification by Seller of completion of specifically defined specifications or performance criteria.

"**Acknowledgment**" has the meaning set forth in Section 1.4.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Assignment**" has the meaning set forth in Section 15.13.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located are authorized or required by Federal Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble to this Agreement.

"**Buyer Indemnified Parties**" has the meaning set forth in Section 9.1.

"**Buyer Parties**" means Buyer, its Affiliates, and its and their respective officers, directors, shareholders, members, managers, partners, and employees, and the successors and assigns of all of the foregoing.

"**Buyer's Intellectual Property**" means all Intellectual Property Rights owned by or licensed to Buyer (excluding Seller's Intellectual Property).

"**Claim**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or other, whether at law, in equity or otherwise.

"**Confidential Information**" has the meaning set forth in Section 11.1.

"**Control**" (and correlated terms, including "**Controls,**" "**Controlled by,**" and "**under common Control with**") means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies, or activities of such Person, whether through the ownership or voting securities, its capacity as a sole or managing member, its capacity as a general partner, by contract, or otherwise.

"**Co-Packer**" hs the meaning set forth in Section 1.3.

"**Delivery Date**" means the delivery date for Products ordered hereunder that is set forth in the applicable Purchase Order.

"**Delivery Location**" means the street address for delivery of the Products specified in the applicable Purchase Order.

"**Disclosing Party**" has the meaning set forth in Section 11.1.

"**Effective Date**" has the meaning set forth in the preamble to this Agreement.

"**Encumbrance**" means any charge, claim, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, right of first refusal, deed of trust, or restriction of any kind, whether or not filed, recorded or otherwise perfected, or any interest of a vendor or lessor under any conditional sale agreement, capital lease, or other title retention agreement.

"**Force Majeure**" has the meaning set forth in Section 15.20.

"**Forecast**" means, with respect to any period, a good faith projection or estimate of Buyer's requirements for Products during each month during the period identified in the forecast, which approximates, based on information reasonably available at the time to Buyer, the quantity of Products that Buyer may order for each such month.

"**GAAP**" means US generally accepted accounting principles in effect from time to time.

"**Goods**" means the physical Products identified in this Agreement on <u>Exhibit A</u>, which may be changed, from time to time by the mutual written agreement of the Parties.

"**Governmental Authority**" means any federal, state, local, or foreign government (including any country in which the Products or any material or ingredients incorporated into the Products is mined, produced, manufactured, assembled, or packaged) or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court, or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award, or determination entered by or with any Governmental Authority.

"**Inspection Event**" has the meaning set forth in Section 12.3.

"**Intellectual Property Rights**" means all current and future intellectual property rights, industrial rights, and other proprietary rights, including: (a) Patents; (b) Trademarks; (c) works of authorship, expressions, designs, and design registrations, whether or not copyrightable, including copyrights and copyrightable works, software, and firmware, files, records, schematics, data, data files, and databases and other specifications and documentation; (d) Trade Secrets; and (e) all other intellectual property rights, and all rights, interests, and protections that are associated with, equivalent or similar to, or required for the exercise of, any of the foregoing, however arising, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, such rights or forms of protection pursuant to the Laws of any jurisdiction throughout any part of the world.

**EXHIBIT 11**    **Page 14 of 26**

DocuSign Envelope ID: 9A9ZE554-D3DE-4EF5-A5CF-D99BC1DBCC13

"**Law**" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Governmental Order or other requirement or rule of law of any Governmental Authority, including the Foreign Corrupt Practices Act, the Federal Trade Commission Trade Practice Rules, the Fair Packaging and Labeling Act, Fair Labor Standards Act, the Federal Food, Drug, and Cosmetics Act, the Dietary Supplement Health and Education Act, the Federal Insecticide, Fungicide, and Rodenticide Act, regulations related to the foregoing, and similar laws.

"**License Agreement**" has the meaning set forth in the Recitals.

"**Losses**" has the meaning set forth in Section 9.1.

"**Nonconforming Products**" means any packaging for the Products received by Buyer from Seller that: (a) do not conform to the description listed in the applicable Purchase Order or the Specifications; or (b) on visual inspection, Buyer determines are otherwise defective; or (c) exceed the quantity of Products ordered by Buyer pursuant to the Purchase Order. Where the context requires, Nonconforming Products are deemed to be Products for purposes of this Agreement.

"**Notice**" has the meaning set forth in Section 15.5.

"**Party**" has the meaning set forth in the preamble to this Agreement.

"**Patents**" means all patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions, and extensions thereof), patent applications, and other patent rights, and any other Governmental Authority-issued indicia of invention ownership (including inventor's certificates, petty patents, and patent utility models).

"**Permits**" means permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances, and similar rights obtained or required to be obtained, from any Governmental Authority.

"**Person**" means an individual or entity.

"**Personnel**" of a Party means any agents, employees, contractors, or subcontractors engaged or appointed by such Party.

"**Price**" has the meaning set forth in Section 3.1.

"**Product**" or "**Products**" means the products identified on <u>Exhibit A</u> and described in the Specifications.

"**Product Warranty**" has the meaning set forth in Section 7.2.

"**Purchase Order**" means Buyer's purchase order in a form substantially similar to the form attached hereto as <u>Exhibit B</u> issued to Seller hereunder, which may, among other things, specify items such as: (a) a description of the Products to be purchased, (b) the quantity of each of the Products ordered, (c) the Delivery Date, (d) the unit Price for each of the Products to be purchased, (e) the billing address, and (f) the Delivery Location; in each case, including all terms and conditions attached to, or incorporated into, such purchase order.

"**Receiving Party**" has the meaning set forth in Section 11.1.

"**Representatives**" means a Party's Affiliates and each of their respective Personnel, officers, directors, members, managers, partners, shareholders, attorneys, third-party advisors, successors and permitted assigns.

"**Seller**" has the meaning set forth in the preamble to this Agreement.

"**Seller Parties**" means Seller, its Affiliates, and its and their officers, directors, shareholders, members, managers, partners, and employees, and the successors and assigns of all of the foregoing.

"**Seller Indemnified Parties**" has the meaning set forth in Section 9.2.

"**Seller's Intellectual Property**" means all Intellectual Property Rights owned by or licensed to Seller (excluding Buyer's Intellectual Property), used in the design, production, and manufacturing of the Products.

"**Shipment Information**" has the meaning set forth in Section 2.1(c).

"**Specifications**" means the specifications for the Products attached hereto as Exhibit A.

"**Term**" has the meaning set forth in Section 8.1.

 "**Trademarks**" means all rights in and to US and foreign trademarks, service marks, trade dress, trade names, brand names, logos, symbols, trade dress, corporate names, and domain names and other similar designations of source, sponsorship, association, or origin, together with the goodwill symbolized by any of the foregoing, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, such rights and all similar or equivalent rights or forms of protection in any part of the world.

"**Trade Secrets**" means all inventions, discoveries, trade secrets, business, and technical information and know-how, databases, data collections, patent disclosures, and other confidential and proprietary information and all rights therein.

"**UCC**" means the Uniform Commercial Code, as adopted in the State of California.

## ARTICLE 15.
### MISCELLANEOUS

**Section 15.1**        **Further Assurances**. Upon a Party's reasonable request, the other Party will, at its sole cost and expense, execute and deliver all such further documents and instruments, and take all such further acts, necessary to give full effect to this Agreement.

**Section 15.2**        **Relationship of the Parties**. The relationship between Seller and Buyer is solely that of vendor and vendee and they are independent contracting parties. Nothing in this Agreement creates any agency, joint venture, partnership or other form of joint enterprise, employment or fiduciary relationship between the Parties. Neither Party has any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement or undertaking with any third party.

**Section 15.3**        **Entire Agreement; Order of Precedence**.  This Agreement with accompanying License Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof and supersedes and replaces all previous negotiations, understandings and writings relating to the subject matter hereof.  If there is any inconsistency among the terms in the body of this Agreement, any Purchase Order, or the Pricing outlined in Exhibit A, then the terms will control in accordance with the following order of priority: first, the terms in Exhibit A and Article 3 with respect to the Prices only; second, the terms in the body of this Agreement; and third, the terms in the applicable Purchase Order.  Without limitation of anything contained in this Section 15.3, any additional or different terms contained in any Acknowledgement or any of Seller's invoices or in any other documents, certificates, or communications provided by either Party are deemed rejected by the Parties and will not modify this Agreement or be binding on the Parties unless such terms have been fully approved in a signed writing by authorized representatives of both Parties.

**Section 15.4**        **Survival**. The terms and conditions of Section 2.4, Section 3.3, Section 4.5, Section 5.1, Section 7.3, Section 7.4, Section 8.4, Section 8.5, Article 9, Article 10, Article 11, Article 13, Article 14, and Article 15 will survive the expiration or termination of this Agreement. The other terms and conditions of this Agreement will survive the expiration or termination of this Agreement to the full extent necessary for their enforcement and for the protection of the party in whose favor they operate.

**Section 15.5**        **Notices**. All notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "**Notice**") will be sufficient in all respects if given in writing and delivered to the other Party at its address set forth below (or to such other address that the receiving Party may designate from time to time in accordance with

this section) in person, by email, by overnight courier, or by certified mail, postage prepaid, return receipt requested. Notice will be deemed given, delivered, and received on the earlier of the date of delivery, in the case of personal delivery or email, or on the delivery or refusal date, as specified on the return receipt in the case of certified mail or on the tracking report in the case of overnight courier.

|  |  |
|---|---|
| Notice to Seller: | Notice to Buyer: |
| ONM Environmental, Inc. | Ikigai Holdings, LLC |
| 14921 Chestnut Street | One East Liberty Street, Suite 600 |
| Westminster, CA 92683 | Reno, NV 89509 |
| United States | United States |
| E-Mail: Joseph.Provenzano@biolargo.com | E-Mail: jpak@ikigaiholdingsllc.com |
| Attention: President, Joseph Provenzano | Attention: CEO, Jane Pak |
| Copy to: dennis.calvert@biolargo.com |  |
| Copy to: john.browning@biolargo.com |  |

**Section 15.6        Interpretation**.  Unless a clear contrary intention appears, (a) the words "**include,**" "**includes,**" or "**including**" mean including without limiting the generality of the description preceding such term; (b) the word "**or**" is not exclusive; (c) the phrase "**this Agreement**" and the words "**herein,**" "**hereof,**" "**hereby,**" "**hereto,**" "**hereunder**" and derivatives or similar words refer to this entire Agreement as a whole and the applicable Purchase Order, as the same may be amended from time to time, which is incorporated herein; (d) references to any Purchase Order refer to such Purchase Order; (e) the singular includes the plural and vice versa; (f) references to Sections and Exhibits mean the Sections of, and Exhibits attached to, this Agreement; (h) references to an agreement, instrument, Law, or other document means such agreement, instrument, Law, or other document as amended, supplemented, replaced, and modified from time to time; and (i) all references to money will be in US dollars.

**Section 15.7        Headings**. The headings in this Agreement are for reference only and do not affect the interpretation of this Agreement.

**Section 15.8        Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability does not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal, or unenforceable, the Parties will negotiate in good faith to modify this Agreement to affect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 15.9     Amendment and Modification**. No amendment to this Agreement is effective unless it is in writing and signed by an authorized representative of each Party.

**Section 15.10     Waiver**.  No waiver under this Agreement is effective unless it is in writing and signed by an authorized representative of the Party waiving its right. Any waiver authorized on one occasion is effective only in that instance and only for the purpose stated and does not operate as a waiver on any future occasion. None of the following constitutes a waiver or estoppel of any right, remedy, power, privilege, or condition arising from this Agreement: (a) any failure or delay in exercising any right, remedy, power or privilege or in enforcing any condition under this Agreement; or (b) any act, omission or course of dealing between the Parties.

**Section 15.11     Cumulative Remedies**. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties or otherwise.

**Section 15.12     Equitable Remedies**. Each Party acknowledges and agrees that (a) a breach or threatened breach by such Party of any of its obligations under Article 5, Article 11, or Section 15.2 could give rise to irreparable harm to the other Party for which monetary damages may not be an adequate remedy and (b) in the event of a breach or a threatened breach by such Party of any such obligations, the other Party will, in addition to any and all other rights and remedies that may be available

to such Party at law, at equity, or otherwise in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction, without any requirement to post a bond or other security, and without any requirement to prove actual damages or that monetary damages will not afford an adequate remedy. Each Party agrees that such Party will not oppose or otherwise challenge the appropriateness of equitable relief or the entry by a court of competent jurisdiction of an order granting equitable relief, in either case, consistent with the terms of this Section 15.12.

**Section 15.13    Assignment**. Neither this Agreement, nor the rights and obligations hereunder, may be assigned, delegated, transferred, or subcontracted (each, an "**Assignment**") by either Party without the prior consent of the other Party. No Assignment by either Party will relieve that Party of any of its obligations under this Agreement, and any purported Assignment by either Party in violation of this Section is null and void.

**Section 15.14    Successors and Assigns**. This Agreement is binding on and inures to the benefit of the Parties and their respective permitted successors and permitted assigns.

**Section 15.15    No Third-Party Beneficiaries**. This Agreement benefits solely the Parties and their respective permitted successors and permitted assigns and nothing in this Agreement, express or implied, confers on any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 15.16    Governing Law**. This Agreement, including all exhibits, schedules, attachments and appendices attached hereto and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the Laws of the State of California, United States of America, without regard to the conflict of Laws provisions thereof. The Parties agree that the United Nations Convention on Contracts for the International Sale of Products does not apply to this Agreement. THE PARTIES HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT.

**Section 15.17    Counterparts**. This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original and all of which, taken together, will constitute one agreement. A signature page in "**PDF**" format or an electronic signature to this Agreement will be deemed an original and binding upon the Party against which enforcement is sought. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com, www.echosign.adobe.com, etc.) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**Section 15.18    Force Majeure**. To the extent a Party is rendered wholly or partly unable to perform, or is delayed in the performance of, its obligations under this Agreement (other than Buyer's obligation to pay the invoices pursuant to the terms of Section 3.3) due to an event that (a) is beyond its reasonable control (b) is not the result of negligence, willful misconduct, breach of contract, or intentional act or omission of the affected Party, and (c) could not reasonably be anticipated as of the date of the applicable Purchase Order, including acts of God (including fire, flood, earthquake, storm, lightning strike, tornado, volcanic eruption, hurricane, global pandemic, or other natural disaster), nationwide strikes, lockouts, war, riots, acts of public enemy or terrorist, acts of government, government shutdown despite the Party's diligent efforts (a "**Force Majeure**"), such failure to perform or delay in performance will not constitute a default under this Agreement, so long as the affected Party (i) notifies the other Party as soon as practicable following the commencement of the Force Majeure, (ii) takes reasonable steps to avoid or remove the Force Majeure, and (iii) resumes performance when and to the extent the Force Majeure is removed. Unless a Force Majeure substantially frustrates the performance of a Party's obligations under this Agreement, the Force Majeure will not operate to excuse, but only delay performance, and the obligations of such Party will be extended in an amount of time equal to the time of such delay.  If a Force Majeure occurs on the part of Seller causing a delay in Seller's delivery of any Products of more than thirty (30) days beyond the Delivery Date for such Products, Buyer may invoke a termination as to Products so affected without cost to Buyer (including any penalty or Cancellation Charges Claim).

**Section 15.19    Changes.**  Buyer may from time-to-time direct changes for: (i) technical requirements; (ii) shipment or packing methods; (iii) place of delivery, inspection or acceptance; (iv) reasonable adjustments in quantities, delivery schedules or both; (v) amount of Buyer-Supplied Material; (vi) time of performance; and (vii) place of performance. If any such change causes an increase in the price or a decrease in the time required for its performance, Seller will promptly notify Buyer thereof and assert its claim for equitable adjustment within three (3) days after the change is ordered, and an equitable adjustment shall be made.  However, nothing in this provision shall excuse Seller from proceeding immediately with the directed

change(s).  Changes shall not be binding upon Buyer except when specifically confirmed in a written subcontract or change order.  Only the Buyer authorized agent has authority to direct such changes.

The Parties hereto have executed and delivered this Preferred Master Manufacturing Agreement as of the Effective Date.

IKIGAI HOLDINGS, LLC

By _____

Name: Jane Pak

Title:  CEO


ONM ENVIRONMENTAL, INC

By _____

Name: Joseph L. Provenzano

Title: President

Exhibit A
to
PREFERRED MASTER MANUFACTURING AGREEMENT
by and between
Ikigai Holdings, LLC
and ONM Environmental, Inc.
Dated as of   July 9, 2021

**Products and Specifications**

Specifications for each Product will include all of the specifications provided in the following documents. Each document may be amended from time to time by Buyer providing an updated version of each document to Seller from time to time in its normal course of business, including through mail or email:

1. Label specifications as shown on each label proof provided by Buyer to Seller
2. Finished Products, Specifications & Prices (Exhibit A-1)
3. Defect Classification – Acceptable Quality Levels document.  Sample form provided in Exhibit A-2

**EXHIBIT 11**                                                          **Page 20 of 26**

Exhibit A-1
Finished Products, Specifications & Prices

Terms not defined below shall have the meaning set forth in the Agreement.


Products:


To be determined by amendment

**EXHIBIT 11**                                          **Page 21 of 26**

DocuSign Envelope ID: 9A97E551-D9DE-4EF5-A5CF-D99BC1D9CC13

Exhibit A-2
Defect Classification - Acceptable Quality Levels

The defects listed in this document are those identified to be most plausible.  These defects may apply to the individual unit, any outer packaging, and/or the shipping case.  The identified defects have been combined into critical, major A, major B, and minor categories which include the associated maximum allowable failure rate.

To be discussed and determined with each Co-Packer.

**EXHIBIT 11**                                        **Page 22 of 26**

Exhibit B
To
PREFERRED MASTER MANUFACTURING AGREEMENT
by and between
Ikigai Holdings, LLC
and ONM Environmental, Inc.
Dated as of ___July 9, 2021___

**Form of Purchase Order**

See attached.

**EXHIBIT 11**                                    **Page 23 of 26**

PURCHASE ORDER

| | |
|---|---|
| **Purchase Order No.** | |
| **Issue Date** | |
| **Branch Plant** | |

| BILLING INFORMATION | |
|---|---|
| **Buyer**:<br>Ikigai Holdings, LLC<br>One East Liberty Street, Suite 600<br>Reno, NV 89509<br><br>**Phone**:<br>**Purchasing Agent**: Jane Pak<br>**Email**: jpak@ikigaiholdingsllc.com<br>_____ | **Seller:**<br>ONM Environmental, Inc.<br>14921 Chestnut St.<br>Westminster, CA 92683<br><br>Representative: Joseph Provenzano<br>Email: joseph.provenzano@biolargo.com<br><br>_____ |

TERMS AND CONDITIONS

This purchase order is governed by that certain Preferred Master Manufacturing Agreement, between the above referenced Buyer and Seller, dated as of _____, 20___.

| PRODUCTS; QUANTITY; PRICES | | | | | |
|---|---|---|---|---|---|
| **ITEM #** | **DESCRIPTION OF PRODUCTS** | **REQUESTED DELIVERY DATE** | **UNIT PRICE (USD)** | **QUANTITY (UNITS)** | **TOTAL VALUE** |
| | | __/__/__ | $ | | $ |
| | | __/__/__ | $ | | $ |
| | | __/__/__ | $ | | $ |
| | | __/__/__ | $ | | $ |
| | | __/__/__ | $ | | $ |
| | | | | **SUBTOTAL (USD):** | $ |
| | | | **FREIGHT (USD)** (if delivery is F.O.B. Destination): | | $ |
| | | | | **TAX (USD):** | $ |
| | | | | **TOTAL (USD):** | $ |

| SHIPPING TERMS; DELIVERY LOCATION |
|---|
| **Delivery Location:** |
| **Carrier:** |
| **Special Instructions:**<br>*[Buyer to add specifications not included in Exhibit A and packing and marking requirements.]* |

| ADDITIONAL TERMS AND CONDITIONS |
|---|
| |

**BUYER:**
**IKIGAI HOLDINGS, LLC**

By: _____
Name: _____
Title: _____

**EXHIBIT 11**                    **Page 24 of 26**

Exhibit C
to
PREFERRED MASTER MANUFACTURING AGREEMENT
by and between
Ikigai Holdings, LLC
and ONM Environmental, Inc.
Dated as of ___July 9, 2021___

**Buyer-Supplied Material**

NONE

**EXHIBIT 11**                    **Page 25 of 26**

Exhibit D
to
PREFERRED MASTER MANUFACTURING AGREEMENT
by and between
Ikigai Holdings, LLC
and ONM Environmental, Inc.
Dated as of ___July 9, 2021_____

**Liquidated Damages**

In accordance with Section 8.5, Seller shall pay to Buyer, as liquidated damages (and not as a penalty), whichever of the following is applicable, and if more than one of the following is applicable whichever is the higher amount of liquidated damages:

> One-half of one percent (0.5%) of the total price of such Goods set forth in the applicable Purchase Order for the first week (of such delay/failure) or part thereof, and one percent (1%) of the total price of such Goods for each subsequent week (of such delay/failure) or part thereof, and so forth up to a maximum of ten percent (10%) of the total purchase price of such Goods as set forth in the Purchase Order;

Such liquidated damages shall be immediately payable by Seller upon Buyer's demand.  Buyer may, at its option, deduct such liquidated damages from payments due by Buyer to Seller.

Buyer's rights and remedies under this Exhibit D are in addition to all of its other rights and remedies available under this Agreement and/or under a Purchase Order issued pursuant to this Agreement and/or at law or in equity.

**EXHIBIT 11**                                                      **Page 26 of 26**

# EXHIBIT 12

## ASSIGNMENT OF LICENSE AGREEMENT

This ASSIGNMENT OF LICENSE AGREEMENT (this "Assignment Agreement") is made as of January 9, 2022, by and between POOPH, Inc., a Nevada corporation, having a principal place of business at 2232 S Nellis Blvd, Suite G3-225, Las Vegas, Nevada 89104 ("Assignee"), and Ikigai Marketing Works, LLC, formerly Ikigai Holdings LLC, a Nevada limited liability company having a principal place of business at 89509 316 California Street, Suite 317, Reno, Nevada 89509 ("Assignor").

W I T N E S S E T H

WHEREAS, Assignor is a party to the following agreements with BioLargo, Inc., a Delaware corporation and its wholly owned subsidiary BioLargo Life Technologies, Inc., a California corporation, having a principal place of business at 14921 Chestnut Street, Westminster, California 92683 ("Licensor"): (i) that certain License Agreement (the "License Agreement"), dated May 17, 2021, as amended on August 16, 2021; and (ii) that certain Preferred Master Manufacturing Agreement ("PMMA") dated July 9, 2021 ; and

WHEREAS, Assignor desires to assign to Assignee, and Assignee desires to accept from Assignor, all of Assignor's position, rights and obligations under the License Agreement and PMMA, as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee, intending to be legally bound hereby, do hereby agree as follows:

1. Assignment and Assumption - License Agreement. Effective as of the Effective Date, Assignor assigns, conveys and transfers to Assignee, and Assignee accepts, all of Assignor's rights, title and interests in, to and under the License Agreement. Effective as of the Effective Date, Assignee assumes and agrees to keep, perform, and be bound by all of the terms, covenants, conditions and obligations first arising on or after the Effective Date contained in the License Agreement as the "Licensee" thereunder. This assignment does not relieve Assignor of any obligation under the License Agreement.

2. Assignment and Assumption - PMMA. Effective as of the Effective Date, Assignor assigns, conveys and transfers to Assignee, and Assignee accepts, all of Assignor's rights, title

**EXHIBIT 12**                                        **Page 1 of 3**

and interests in, to and under the PMMA. Effective as of the Effective Date, Assignee assumes and agrees to keep, perform, and be bound by all of the terms, covenants, conditions and obligations first arising on or after the Effective Date contained in the PMMA as the "Buyer" thereunder. This assignment does not relieve Assignor of any obligation under the PMMA.

3.    <u>Interpretation; Successors</u>. Nothing contained in this Assignment Agreement shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions set forth in either the License Agreement or the PMMA, nor shall this Assignment Agreement reduce, expand or enlarge any remedies under either the License Agreement or the PMMA.  This Assignment Agreement is intended only to effect the assignment by Assignor of such agreements and shall be governed entirely in accordance with the terms and conditions of the such agreements. This Assignment Agreement shall be binding upon and inure solely to the benefit of Assignor, Assignee and their respective successors and assigns in accordance with the terms of the License Agreement.

4.    <u>Governing Law; Amendment</u>. Construction and interpretation of this Assignment Agreement shall be governed by the Laws of the State of Nevada, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Assignment Agreement to the substantive Law of another jurisdiction. This Assignment Agreement may not be waived or amended except by an instrument in writing signed on behalf of each of the parties hereto.

5.    <u>Counterparts</u>. This Assignment Agreement may be executed in one or more counterparts (including by facsimile or electronic transmission in .pdf, .tiff or any similar format), all of which shall be considered one and the same Assignment Agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.

*[Signature Page Follows]*

**EXHIBIT 12**                                                                                    **Page 2 of 3**

IN WITNESS WHEREOF, the undersigned have caused this Assignment Agreement to be executed as of the date first written above.

**ASSIGNEE:**

POOPH, INC

By: _____

Name: Jane Pak

Title: CEO

By: _____

Name: Fairy Dong

Title: Treasurer

**ASSIGNOR:**

IKIGAI MARKETING WORKS, LLC

By: _____

Name: Jane Pak

Title: Co-Founder and CEO

*BIOLARGO, INC., AND BIOLARGO LIFE TECHNOLOGIES, INC., HEREBY APPROVE AND CONSENT TO THE FOREGOING ASSIGNMENTS.*

**LICENSOR:**

BIOLARGO, INC

By: _____

Name: Dennis P. Calvert

Title: President

**EXHIBIT 12**                    **Page 3 of 3**

# EXHIBIT 13

**FIRST AMENDMENT**
**TO**
**PREFERRED MASTER MANUFACTURING AGREEMENT**

This FIRST AMENDMENT TO PREFERRED MASTER MANUFACTURING AGREEMENT (this "**Amendment**") is made as of June 6, 2025 ("**Amendment Date**") by and between ONM Environmental, Inc., a California corporation ("**Seller**"), and Ikigai Holdings, LLC, a Nevada limited liability company and Pooph Inc., a Nevada corporation (collectively, "**Buyer**"). (Seller and Buyer, collectively, the "**Parties**".)

**RECITALS**

A.  WHEREAS, Buyer and Seller are parties to that certain Preferred Master Manufacturing Agreement dated July 9, 2021 ("**PMMA**"), pursuant to which Seller is selling to Buyer certain pet-odor control products which Buyer markets and sells under the brand name Pooph. Unless otherwise defined herein, all capitalized terms used in this Amendment shall have the meanings ascribed to them in the PMMA.

B.  WHEREAS, Buyer and an affiliate of Seller, BioLargo, Inc., entered into that certain License Agreement dated May 17, 2021, as amended ("**License Agreement**"), pursuant to which Buyer was granted a royalty-bearing license to sell "licensed products" in the "territory" within the "field of use" of household pet stain and odors.

C.  WHEREAS, the Parties have agreed to amend certain provisions of the PMMA and have agreed to evidence such agreement in this Amendment.

NOW, THEREFORE, in consideration of the above Recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**AGREEMENT**

1.      Incorporation of Recitals/Capitalized Terms. Except as modified herein, all of the other terms, covenants and conditions of the PMMA are hereby ratified and affirmed and the same shall remain in full force and effect. From and as of the Amendment Date, all references to the word "Agreement" in the PMMA shall mean the PMMA as amended by this Amendment.  Unless specifically defined herein, the capitalized terms used in this Amendment have the meanings defined in the PMMA.

2.      Purchase Order 385. Buyer submitted to Seller Purchase Order 385 ("**PO 385**") in the amount of $525,850, and delivered a deposit of $262,500 to Buyer on April 28, 2025, leaving a remaining balance due of $263,500. Buyer agrees to pay the remaining $263,500 due on Purchase Order 385 within 30 days of Seller's delivery of the subject product (such 30-day period beginning upon delivery of all product subject to the purchase order) ("**Final Payment Due Date**"). Unpaid amounts as of the Final Payment Due Date shall accrue interest at the rate of 1.5% per month.

3.      Payment of Past Due Amounts. As of the Amendment Date, Buyer owes to Seller $2,385,468.40, which excludes any alleged credits or deductions owed to Buyer by Seller for claims related to the Litterizer products, on invoices related to product purchases as set forth on Schedule A attached hereto, not including PO 385. Additionally, Buyer owes to Seller (and Seller affiliate BioLargo Inc.) royalties under the License Agreement in the aggregate amount of $1,378,140.54 as follows: (i) $764,292.52 for fourth quarter of calendar year 2024, and (ii) $613,848.02 for first quarter of calendar year 2025. In the aggregate, not including PO 385 and net of payments previously made, Buyer owes to Seller:

EXHIBIT 13                                                                    Page 1 of 6

| Description | Amount |
|---|---|
| Product invoices | $     2,385,468.40 |
| Royalties | $     1,378,140.54 |
| **Total** | **$     3,763,608.94** |

Buyer shall make weekly payments to Seller in the amounts set forth on <u>Schedule B</u> attached hereto, no later than Friday of each week, beginning May 30, 2025, and continuing thereafter, said payments to be made via ACH (routing number 121000358) or wire transfer (routing number 026009593) and delivered to Seller's deposit account (Bank of America account number 325105755511) no later than the due date as set forth in Schedule B. Unpaid amounts shall bear interest at an annual percentage rate of ten percent (10%) beginning May 23, 2025. Late payments shall incur interest at an annual percentage rate of fifteen percent (15%). Nothing contained herein shall prohibit Buyer from paying off the Past Due Amounts at any time.

4.      <u>Future Purchase Orders</u>. With respect to Purchase Orders submitted by Buyer to Seller after the Amendment Date, Buyer shall deliver to Seller concurrently with the Purchase Order a cash deposit equal to fifty percent (50%) of the Purchase Order ("**Cash Deposit**"). Seller shall have until 5:00 p.m. Pacific Time on the second business day following delivery of the Purchase Order to accept or reject the Purchase Order in accordance with Section 1.4.A of the PMMA, and will confirm expected product delivery dates per SKU as soon thereafter as possible. If the Cash Deposit is not timely delivered, Seller may pause and any expected delivery dates may be adjusted. Thereafter, Seller shall use its best efforts to expeditiously effectuate delivery, in whole or in part, of the product subject to the Purchase Order by the confirmed expected delivery date. Buyer  shall pay to Seller the remaining amounts owed on Purchase Order in accordance with Section 5 below based on ROG (receipt of goods), in whole or in part, by Buyer's representative (e.g., currently Global Supply Logistics, or as designated in the Purchase Order), in such form as specified in the Purchase Order. Any amounts not timely paid in accordance with the foregoing shall bear interest at an annual percentage rate of fifteen percent (15%).

5.      <u>Purchase Order Invoicing</u>. On Friday of each week, Seller may submit invoices to Buyer based on delivery of products ordered not yet invoiced (e.g., for deliveries that had occurred during the week). Amounts invoiced shall credit a pro-rata amount of the Cash Deposit received with respect to the Purchase Order applicable to the delivered products (e.g., an invoice for $20,000 in products shall reflect a $10,000 credit for the 50% Cash Deposit). Buyer shall pay the invoices in four (4) equal weekly installments beginning the Friday of the week following email delivery of the invoices.

6.      <u>Modification of Section 3.3, Payment</u>. The third sentence in Section 3.3 of the PMMA, which reads "If Buyer pays the full outstanding amount under any Purchase Order within ten (10) business days the delivery of the Product, the entire amount owed under any Purchase Order shall be decreased by two percent (2%)", is hereby amended to state the following:

"If Buyer pays the full outstanding amount under any Purchase Order within ten (10) business days the delivery of the Product, the entire amount owed under any Purchase Order shall be decreased by three point five percent (3.5%)."

7.      <u>Default</u>. Buyer's failure to timely pay any amount due as set forth in this Amendment shall be an Event of Default. Upon the occurrence of an Event of Default, Seller may withhold, without cure, delivery of product.

8.      <u>Purchase Orders for Puppy Pads</u>. Buyer previously placed purchase order 352 (in the amount of $36,099 for POPP-30) and purchase order 378 (in the amount of $156,800 for POPP-50), and has previously paid $12,033 as against PO 352. The contract manufacturer to whom Seller placed an

- 2 -

EXHIBIT 13                                    Page 2 of 6

order to manufacture the products advised Seller on May 16, 2025 that it was filing for bankruptcy protection. Seller is currently sourcing a new manufacturer and shall submit a proposed new manufacturer for Buyers' approval, which may be withheld in Buyer's sole discretion.

9.     <u>Issues Not Addressed in this Amendment</u>. Buyer and Seller reserve all rights, claims and defenses related to all claims asserted by each party related to the License Agreement and the PMMA. Nothing set forth in this Amendment shall constitute a waiver of any such right, claim or defense, all of which remain expressly reserved.

10.     <u>Miscellaneous</u>.

(a)     <u>Effect of Amendment</u>.  Except to the extent the PMMA is modified by this Amendment, the remaining terms and conditions of the PMMA shall remain unmodified and in full force and effect.  In the event of any conflict between the terms and conditions of the PMMA and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall prevail and control.

(b)     <u>Entire Agreement</u>.  The PMMA, together with this Amendment, embodies the entire understanding between the parties hereto with respect to its subject matter and can be changed only by an instrument in writing signed by the parties hereto.

(c)     <u>Counterparts</u>.  This Amendment may be executed in one or more counterparts, including the transmission of counterparts by facsimile or electronic mail, each of which shall be deemed an original but all of which, taken together, shall constitute one in the same Amendment. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the California Uniform Electronic Transactions Act, e.g., www.docusign.com, www.echosign.adobe.com, etc.) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

IN WITNESS WHEREOF, the parties hereto have executed this FIRST AMENDMENT TO PREFERRED MASTER MANUFACTURING AGREEMENT effective as of the date first set forth above.

**SELLER:**                                                          **BUYER:**

ONM Environmental, Inc.                              IKIGAI HOLDINGS, LLC, a
                                                                         Nevada limited liability company

By:  *Joe Provenzano*                                   By: _____
Name: Joe Provenzano                                  Name:  Jane Pak
Title:    CEO                                                        Title:  CEO

                                                                         POOPH, INC., a
                                                                         Nevada corporation

                                                                         By: _____
                                                                         Name:  Jane Pak
                                                                         Title:  CEO

EXHIBIT 13                                                        Page 3 of 6

# SCHEDULE A

| PO# | Invoice # | Product | Invoiced Amount | | Payments | | Amount due | |
|------|-----------|---------|----------------:|---|---------:|---|----------:|---|
| 347 | 8404 | 20/32 oz | $ | 484,700.00 | $ | (371,175.02) | $ | 113,524.98 |
| 354 | 8448 | 20/24 oz | $ | 301,200.00 | $ | (75,300.00) | $ | 225,900.00 |
| 356 | 8477 | Princo 50 | $ | 84,244.46 | $ | (58,799.97) | $ | 25,444.49 |
| 357 | 8509 | 20 24 32 | $ | 289,250.00 | $ | - | $ | 289,250.00 |
| 358 | 8499 | 20 oz | $ | 82,950.00 | $ | - | $ | 82,950.00 |
| 359 | 8501 | 20 oz | $ | 104,000.00 | $ | - | $ | 104,000.00 |
| 360 | 8523 | Wipes | $ | 56,112.77 | $ | - | $ | 56,112.77 |
| 365 | 8531 | Princo 50 | $ | 168,250.72 | $ | - | $ | 168,250.72 |
| 366 | 8532A | asst | $ | 566,650.00 | $ | - | $ | 566,650.00 |
| 366 | 8532B | 12/20 oz | $ | 203,850.00 | $ | - | $ | 203,850.00 |
| 366 | 8532C | 16 oz | $ | 64,000.00 | $ | - | $ | 64,000.00 |
| 377 | 8578A | ASST | $ | 418,650.21 | $ | - | $ | 418,650.21 |
| 377 | 8578B | 32 oz | $ | 60,150.00 | $ | - | $ | 60,150.00 |
|  | 8565 | Wipes | $ | 6,735.23 | $ | - | $ | 6,735.23 |
| **Total** | | | $ | **2,890,743.39** | $ | **(505,274.99)** | $ | **2,385,468.40** |

EXHIBIT 13                                                    Page 4 of 6

# SCHEDULE B

Payment Schedule

| Date | Amount Due | Accrued Interest | Total | Payment | New amount due |
|------|-----------|------------------|-------|---------|----------------|
| 5/23/2025 | $ 3,763,608.94 | $ - | $3,763,608.94 | $ - | $ 3,763,608.94 |
| 5/30/2025 | $ 3,763,608.94 | $ 7,217.88 | $3,770,826.82 | $ (55,000.00) | $ 3,715,826.82 |
| 6/6/2025 | $ 3,715,826.82 | $ 7,126.24 | $3,722,953.06 | $ (55,000.00) | $ 3,667,953.06 |
| 6/13/2025 | $ 3,667,953.06 | $ 7,034.43 | $3,674,987.49 | $ (55,000.00) | $ 3,619,987.49 |
| 6/20/2025 | $ 3,619,987.49 | $ 6,942.44 | $3,626,929.94 | $ (55,000.00) | $ 3,571,929.94 |
| 6/27/2025 | $ 3,571,929.94 | $ 6,850.28 | $3,578,780.21 | $ (55,000.00) | $ 3,523,780.21 |
| 7/4/2025 | $ 3,523,780.21 | $ 6,757.93 | $3,530,538.15 | $ (55,000.00) | $ 3,475,538.15 |
| 7/11/2025 | $ 3,475,538.15 | $ 6,665.42 | $3,482,203.56 | $ (55,000.00) | $ 3,427,203.56 |
| 7/18/2025 | $ 3,427,203.56 | $ 6,572.72 | $3,433,776.28 | $ (55,000.00) | $ 3,378,776.28 |
| 7/25/2025 | $ 3,378,776.28 | $ 6,479.84 | $3,385,256.13 | $ (55,000.00) | $ 3,330,256.13 |
| 8/1/2025 | $ 3,330,256.13 | $ 6,386.79 | $3,336,642.92 | $ (55,000.00) | $ 3,281,642.92 |
| 8/8/2025 | $ 3,281,642.92 | $ 6,293.56 | $3,287,936.48 | $ (55,000.00) | $ 3,232,936.48 |
| 8/15/2025 | $ 3,232,936.48 | $ 6,200.15 | $3,239,136.63 | $ (55,000.00) | $ 3,184,136.63 |
| 8/22/2025 | $ 3,184,136.63 | $ 6,106.56 | $3,190,243.20 | $ (55,000.00) | $ 3,135,243.20 |
| 8/29/2025 | $ 3,135,243.20 | $ 6,012.80 | $3,141,255.99 | $ (55,000.00) | $ 3,086,255.99 |
| 9/5/2025 | $ 3,086,255.99 | $ 5,918.85 | $3,092,174.84 | $ (55,000.00) | $ 3,037,174.84 |
| 9/12/2025 | $ 3,037,174.84 | $ 5,824.72 | $3,042,999.56 | $ (55,000.00) | $ 2,987,999.56 |
| 9/19/2025 | $ 2,987,999.56 | $ 5,730.41 | $2,993,729.97 | $ (55,000.00) | $ 2,938,729.97 |
| 9/26/2025 | $ 2,938,729.97 | $ 5,635.92 | $2,944,365.89 | $ (55,000.00) | $ 2,889,365.89 |
| 10/3/2025 | $ 2,889,365.89 | $ 5,541.25 | $2,894,907.14 | $ (65,000.00) | $ 2,829,907.14 |
| 10/10/2025 | $ 2,829,907.14 | $ 5,427.22 | $2,835,334.36 | $ (65,000.00) | $ 2,770,334.36 |
| 10/17/2025 | $ 2,770,334.36 | $ 5,312.97 | $2,775,647.33 | $ (65,000.00) | $ 2,710,647.33 |
| 10/24/2025 | $ 2,710,647.33 | $ 5,198.50 | $2,715,845.83 | $ (65,000.00) | $ 2,650,845.83 |
| 10/31/2025 | $ 2,650,845.83 | $ 5,083.81 | $2,655,929.64 | $ (65,000.00) | $ 2,590,929.64 |
| 11/7/2025 | $ 2,590,929.64 | $ 4,968.91 | $2,595,898.55 | $ (65,000.00) | $ 2,530,898.55 |
| 11/14/2025 | $ 2,530,898.55 | $ 4,853.78 | $2,535,752.33 | $ (65,000.00) | $ 2,470,752.33 |
| 11/21/2025 | $ 2,470,752.33 | $ 4,738.43 | $2,475,490.76 | $ (65,000.00) | $ 2,410,490.76 |
| 11/28/2025 | $ 2,410,490.76 | $ 4,622.86 | $2,415,113.62 | $ (65,000.00) | $ 2,350,113.62 |
| 12/5/2025 | $ 2,350,113.62 | $ 4,507.07 | $2,354,620.68 | $ (65,000.00) | $ 2,289,620.68 |
| 12/12/2025 | $ 2,289,620.68 | $ 4,391.05 | $2,294,011.74 | $ (65,000.00) | $ 2,229,011.74 |
| 12/19/2025 | $ 2,229,011.74 | $ 4,274.82 | $2,233,286.55 | $ (65,000.00) | $ 2,168,286.55 |
| 12/26/2025 | $ 2,168,286.55 | $ 4,158.36 | $2,172,444.91 | $ (65,000.00) | $ 2,107,444.91 |
| 1/2/2026 | $ 2,107,444.91 | $ 4,041.68 | $2,111,486.59 | $ (75,000.00) | $ 2,036,486.59 |
| 1/9/2026 | $ 2,036,486.59 | $ 3,905.59 | $2,040,392.18 | $ (75,000.00) | $ 1,965,392.18 |
| 1/16/2026 | $ 1,965,392.18 | $ 3,769.25 | $1,969,161.42 | $ (75,000.00) | $ 1,894,161.42 |
| 1/23/2026 | $ 1,894,161.42 | $ 3,632.64 | $1,897,794.06 | $ (75,000.00) | $ 1,822,794.06 |
| 1/30/2026 | $ 1,822,794.06 | $ 3,495.77 | $1,826,289.83 | $ (75,000.00) | $ 1,751,289.83 |
| 2/6/2026 | $ 1,751,289.83 | $ 3,358.64 | $1,754,648.47 | $ (75,000.00) | $ 1,679,648.47 |
| 2/13/2026 | $ 1,679,648.47 | $ 3,221.24 | $1,682,869.71 | $ (75,000.00) | $ 1,607,869.71 |
| 2/20/2026 | $ 1,607,869.71 | $ 3,083.59 | $1,610,953.30 | $ (75,000.00) | $ 1,535,953.30 |
| 2/27/2026 | $ 1,535,953.30 | $ 2,945.66 | $1,538,898.96 | $ (75,000.00) | $ 1,463,898.96 |
| 3/6/2026 | $ 1,463,898.96 | $ 2,807.48 | $1,466,706.44 | $ (75,000.00) | $ 1,391,706.44 |
| 3/13/2026 | $ 1,391,706.44 | $ 2,669.03 | $1,394,375.46 | $ (75,000.00) | $ 1,319,375.46 |
| 3/20/2026 | $ 1,319,375.46 | $ 2,530.31 | $1,321,905.77 | $ (75,000.00) | $ 1,246,905.77 |
| 3/27/2026 | $ 1,246,905.77 | $ 2,391.33 | $1,249,297.10 | $ (75,000.00) | $ 1,174,297.10 |
| 4/3/2026 | $ 1,174,297.10 | $ 2,252.08 | $1,176,549.18 | $ (85,000.00) | $ 1,091,549.18 |
| 4/10/2026 | $ 1,091,549.18 | $ 2,093.38 | $1,093,642.56 | $ (85,000.00) | $ 1,008,642.56 |
| 4/17/2026 | $ 1,008,642.56 | $ 1,934.38 | $1,010,576.94 | $ (85,000.00) | $ 925,576.94 |
| 4/24/2026 | $ 925,576.94 | $ 1,775.08 | $ 927,352.02 | $ (85,000.00) | $ 842,352.02 |
| 5/1/2026 | $ 842,352.02 | $ 1,615.47 | $ 843,967.49 | $ (85,000.00) | $ 758,967.49 |

EXHIBIT A

| 5/8/2026 | $ | 758,967.49 | $ | 1,455.55 | $ | 760,423.04 | $ | (85,000.00) | $ | 675,423.04 |
| 5/15/2026 | $ | 675,423.04 | $ | 1,295.33 | $ | 676,718.38 | $ | (85,000.00) | $ | 591,718.38 |
| 5/22/2026 | $ | 591,718.38 | $ | 1,134.80 | $ | 592,853.18 | $ | (85,000.00) | $ | 507,853.18 |
| 5/29/2026 | $ | 507,853.18 | $ | 973.96 | $ | 508,827.14 | $ | (85,000.00) | $ | 423,827.14 |
| 6/5/2026 | $ | 423,827.14 | $ | 812.82 | $ | 424,639.96 | $ | (85,000.00) | $ | 339,639.96 |
| 6/12/2026 | $ | 339,639.96 | $ | 651.36 | $ | 340,291.33 | $ | (85,000.00) | $ | 255,291.33 |
| 6/19/2026 | $ | 255,291.33 | $ | 489.60 | $ | 255,780.93 | $ | (85,000.00) | $ | 170,780.93 |
| 6/26/2026 | $ | 170,780.93 | $ | 327.53 | $ | 171,108.45 | $ | (85,000.00) | $ | 86,108.45 |
| 7/3/2026 | $ | 86,108.45 | $ | 165.14 | $ | 86,273.59 | $ | (86,273.59) | $ | 0.00 |

**EXHIBIT 13**                    **Page 6 of 6**

# EXHIBIT 14

# KULIK GOTTESMAN SIEGEL & WARE LLP

Glen L. Kulik
Donald S. Gottesman
Leonard Siegel
Thomas M. Ware II
Mitchell S. Brachman
David A. Bernardoni
Matthew Mejia
Gerard R. Kilroy
Justin A. Nash
Kasun Wijeyewickrema
Elmira Tofanyan
Christina Darbinyan
Christiana Kim
Jessica Frey

Attorneys at Law
Comerica Bank Building
15303 Ventura Boulevard
Suite 1400
Sherman Oaks, California 91403
www.kgswlaw.com

Telephone  (310) 557-9200
                   (818) 817-3600
Facsimile   (310) 557-0224

Sender's e-mail address:
dgottesman@kgswlaw.com

File No.: 6893-0001

September 24, 2025

**BY EMAIL AND OVERNIGHT MAIL**

Brett Schuman, Esq.
Goodwin Procter LLP
525 Market Street
Floor 32
San Francisco, California 94105

Re:    Revocation of Grant of License and Notice of Termination of License Agreement

Dear Mr. Schuman:

My firm has been retained as litigation counsel by BioLargo, Inc., BioLargo Life Technologies, Inc. (collectively "BioLargo"), and ONM Environmental, Inc. ("ONM"). I understand you represent POOPH, Inc. and Ikigai Marketing Works LLC, formerly Ikigai Holdings LLC (collectively "Pooph"). For the reasons stated below, I am writing to inform you that **(1)** pursuant to Section 4.a of the License Agreement, which conditions the license grant upon compliance by Pooph with its royalty payment obligations, the license grant is revoked, and **(2)** without conceding that 150 days' notice of termination is required under the circumstances of this case, BioLargo hereby provides Pooph with notice of termination of the License Agreement pursuant to Section 12.d thereof, effective 150 days from the date of this letter.

*Revocation of the Grant of License.* Pursuant to Section 4.a of the License Agreement, BioLargo's grant of the license to Pooph to use BioLargo's patents and proprietary information is "[s]ubject to Licensee's performance of [its royalty] payment obligations …." The term "subject to" imposes a contract condition, i.e., Pooph's rights under the license grant are expressly conditioned upon Pooph's timely payment of the royalties due.

Pooph has failed to timely pay the royalties due to BioLargo and, despite notice, refused to cure these failures. It failed to make the royalty payment due for the second quarter of 2025 in the amount of $463,520.33 "[s]imultaneously with the delivery of" the royalty report as required by Section 8.b (last sentence) of the License Agreement. And it failed to timely make the weekly royalty payments due under the Amendment to the Preferred Master Manufacturing Agreement ("PMMA Amendment") for the fourth quarter of 2024 and first quarter of 2025 – leaving an unpaid balance due in the amount of $903,623.75. The total amount of past due and unpaid royalties as of the date of this letter, excluding interest, is **$1,367,144.08**.

**EXHIBIT 14**                    **Page 1 of 3**

KULIK GOTTESMAN SIEGEL & WARE LLP

Brett Schuman, Esq.
Goodwin Procter LLP
September 24, 2025
Page 2

Accordingly, pursuant to express language of Section 4.a, the grant of license is now formally revoked, effective immediately. Although it is not obligated to do so, BioLargo will allow Pooph to reinstate the grant of license through the date of termination of the License Agreement (150 days from now) by paying the royalties due in the amount of $1,367,144.08, plus interest at the rate of 10% per year on the unpaid amounts. The reinstatement would be effective on the date of payment. If the license is reinstated in this manner, it will be revoked again if Pooph fails to pay royalties for the third quarter of 2025 on the date they become due and payable.

Please be advised that unless and until the grant of license is reinstated pursuant to the terms stated above, Pooph is not allowed to market or sell products that incorporate, use, or are based on, in whole or in part, BioLargo's patents and proprietary information, including but not limited to know-how, disclosed to Pooph. This requires, among other things, that absent reinstatement of the grant of license, Pooph must immediately stop marketing and selling any such products in its possession, custody or control (or sold through market portals or platforms such as Amazon). BioLargo will seek court intervention to enjoin Pooph's refusal to comply with this demand.

*Termination of the License Agreement.* Section 12.d prohibits BioLargo from terminating the License Agreement "without cause." However, BioLargo has cause to terminate the License Agreement based on Pooph's repeated breaches of the License Agreement that were either uncured after notice was given or uncurable.

In this regard, Pooph has failed to pay the royalties due for the last quarter of 2024 and the first two quarters of this year. It has breached the License Agreement by marketing Licensed Products outside the Field of Use, i.e., to treat *non-pet* odors. And it has breached Section 9 of the License Agreement by failing to include "appropriate patent marking" on the Licensed Products.

The License Agreement also specifies in Section 12.b(iv) that Pooph's breaches of the PMMA constitute breaches of the License Agreement too. Accordingly, Pooph's failure to make the weekly payments due for "product invoices" under the PMMA Amendment, to pay for the amount due under the invoice for Purchase Order 391, and its intentional mislabeling of the Litterizer product, furnishes cause to terminate the License Agreement. The past due amount for the product invoices, excluding interest, is **$2,154,110.07**. Pooph also breached the PMMA by terminating it on September 19, 2025 based on ONM's purported "failure to deliver products as required under the [PMMA]." However, the PMMA Amendment expressly authorized ONM to "withhold … delivery of product" if Pooph failed "to timely pay any amount due" under the Amendment's weekly payment schedule. Since Pooph stopped making the required weekly payments on August 15, 2025, ONM was not thereafter required to deliver products. Pooph's wrongful termination of the PMMA constitutes additional cause to terminate the License

EXHIBIT 14

KULIK GOTTESMAN SIEGEL & WARE LLP

Brett Schuman, Esq.
Goodwin Procter LLP
September 24, 2025
Page 3


Agreement.

       The description above of BioLargo's "cause" to terminate the License Agreement is not meant to be a complete or exhaustive description of all of Pooph's breaches of contract and other wrongdoing, nor limit BioLargo's rights to assert further causes of action. But it suffices to demonstrate that BioLargo has legally sufficient "cause" to justify terminating the License Agreement.

       BioLargo contends that the requirement in Section 12.d of the Licensing Agreement for giving 150 days' written notice of termination applies only to terminations "without cause" – not to terminations, as here, based on Pooph's willful and uncured breaches of the Agreement. However, out of an abundance of caution, and without conceding the applicability of the 150-day notice provision to the facts of this case, BioLargo provides this notification of termination of the License Agreement, effective 150 days from the date of this letter.

       BioLargo and ONM expressly reserve all rights and, except as specified above, waive none.



Very truly yours,

*[signature]*

Donald S. Gottesman


cc: John Browning, by email only

**EXHIBIT 14**                                                     **Page 3 of 3**